# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARTIN HOWARD, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ARCONIC INC. and KLAUS KLEINFELD,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Martin Howard ("Plaintiff") alleges the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Arconic, Inc., formally known as Alcoa, Inc., ("Arconic"[1] or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, media reports about the Company, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of Arconic common or preferred stock between November 4, 2013 and June 26, 2017, inclusive (the "Class Period") seeking to pursue remedies under the Securities Exchange Act of 1934 ("1934 Act").

2.      Throughout the Class Period, without alerting investors, Arconic knowingly marketed and sold its Reynobond panels with a combustible, Polyethylene ("PE") core for inappropriate uses, such as for use on residential high-rise towers.

3.      On June 14, 2017, fire consumed a 24-story housing block, the Grenfell Tower, in London, United Kingdom, killing at least 79 and injuring 70 people. Investigators believe that the speed with which the Grenfell Tower fire spread resulted from Arconic's Reynobond siding that clad the building's exterior. Because of Arconic's siding, the flames spread from the outside of the building, engulfing the building in a cylinder of fire.

4.      Arconic's aluminum Reynobond panels consist of two sheets of thin aluminum, each permanently bonded to an extruded thermoplastic core. These panels are combined with insulation to form cladding used to cover residential and office towers and other commercial

---

[1] "Arconic" refers collectively to both Arconic, Inc. and Alcoa, Inc.

structures. Throughout the Class Period, Arconic boasted that "***Reynobond is a fully tested product, with building-code approvals throughout the world***."[2] With respect to Arconic's PE version of the Reynobond panels, the United States and most European countries prohibit their installation in high-rise structures because of their combustibility.

5.      Despite Defendants (defined below) knowing of the combustibility of the Reynobond PE panels, and the prohibitions in place in the U.S. and Europe, Arconic has nonetheless sold millions of dollars of the combustible panels for use in projects that it knew were not appropriate for the installation of Reynobond PE. Arconic's U.K. sales were $711 million during 2016, $698 million during 2015, $464 million during 2014, $475 million during 2013 and $438 million during 2012. During that same five year period, Arconic's total sales of "Architectual aluminum systems" worldwide, which include Reynobond panels, amounted to $1.01 billion during 2016, $951 million during 2015, $1 billion during 2014, $702 million during 2013  and $692 million. Thus, the Company sold a material amount of Reynobond PE in the U.K.

6.      Throughout the Class Period, Arconic's sales of Reynobond panels exposed the Company to the risk of massive civil, regulatory and criminal liability. With these sales practices concealed from the investment community, the price of Arconic common and preferred stock traded at artificially inflated prices throughout the Class Period.

7.      On Saturday, June 24, 2017, just after the Grenfell Tower fire, reports surfaced, indicating that Arconic knew it supplied flammable panels to the Grenfell Tower project. *Reuters* reported, "***Arconic knowingly supplied flammable panels for use in tower – emails***," describing that Arconic employees prompted the owners to use Reynobond PE panels despite the warnings in its own sales brochures that such use was inappropriate and a fire hazard. Internal emails showed

---

[2] All emphasis is added unless otherwise noted.

Arconic employees questioning the use of the cheaper but more dangerous product on the Grenfell Tower project.

8.      Also on June 24th, *The New York Times* reported that "Arconic has marketed the flammable facades in Britain for years, even as it has adjusted its pitch elsewhere. In other European countries, Arconic's sales materials explicitly instructed that 'as soon as the building is higher than the firefighters' ladders, it has to be conceived with an incombustible material.'" The *Times* report further emphasized the extent to which Arconic had improperly marketed the more flammable version of Reynobond panels, specifically in the U.K.

9.      In response to these news reports, when trading resumed on Monday June 26th, the price of Arconic common and preferred stock declined materially with the common stock trading down as low as $22.65 in intraday trading, an 11% decline from its close of $25.54 per share on the evening of Friday, June 23rd, on unusually high volume of more than 20.2 million shares trading, or more than seven times the average daily volume over the preceding ten trading days.

10.     On Monday June 26th, Arconic, conceding its sales and marketing misconduct, stated that it was discontinuing the sale of its Reynobond PE core panels ***worldwide*** for use in "any high-rise applications." That day the *Times* reported that "[t]he Metropolitan Police ha[d] also said they [would] consider manslaughter among other charges," because "in Britain, corporations can be charged with manslaughter." More, the *Times* further report further emphasized that Arconic had been on notice of the fire-risk of these panels when used improperly for years, stating, in pertinent part, that "Cladding has been blamed for numerous fires over the years, including several in Dubai, in the United Arab Emirates."

11.     On this news, the price of Arconic common and preferred stock fell further, with the common stock trading down as low as $21.76 per share in intraday trading on June 27th, and closing down more than $2 per share, a more than 9% decline from its close of $24.01 per share on June 26th, again falling on unusually high volume of more than 21 million shares trading, more than seven times the average daily volume over the preceding ten trading days.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act [15 U.S.C. §§78j(b) and 78t(a)] and SEC Rule 10b-5 [17 C.F.R. §240.10b-5]. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

13.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) the Company is incorporated in Pennsylvania and a significant portion of Defendants' actions, and subsequent damages, took place within this judicial district. Arconic's corporate center is located in this District at 201 Isabella Street, Pittsburgh, Pennsylvania 15212-5858. The Arconic Technology Center for research and development is located within this District at 100 Technical Drive, New Kensington, Pennsylvania 15069-0001. Arconic's auditor is located within this District in the Pittsburgh, Pennsylvania office of PricewaterhouseCoopers, LLP.

14.     In connection with the acts and conduct alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate wire and telephone communications.

## PARTIES

15.     Plaintiff purchased Arconic common stock, as set forth in the accompanying certification incorporated by reference herein, and has been damaged thereby.  Certification of

Plaintifff's purchase of Arconic common stock is attached hereto as Exhibit A.

16.     Defendant Arconic is a global provider of lightweight multi-material solutions, focused on the aerospace market in addition to serving the automotive, industrial gas turbine ("IGT"), commercial transportation, and building and construction markets. The Company also provides titanium, aluminum, nickel-based super alloy, and specialty alloy solutions. Arconic is incorporated in Pennsylvania. Arconic's corporate center is located at 201 Isabella Street, Pittsburgh, Pennsylvania 15212-5858. The Arconic Technology Center for research and development is located at 100 Technical Drive, New Kensington, Pennsylvania 15069-0001. Arconic's locates its headquarters at 390 Park Avenue, New York, NY. Arconic common and preferred stock traded in efficient markets on the New York Stock Exchange ("NYSE") throughout the Class Period under the ticker symbols "ARNC" and "ARNC-PB." Prior to the Company's spin-off on November 1, 2016, the ticker symbol on NYSE of Alcoa was "AA."[3]

17.     Defendant Klaus Kleinfeld ("Kleinfeld") was, until forced to resign in April 2017, the Chairman of Arconic's Board of Directors and its Chief Executive Office ("CEO").

18.     Defendant Kleinfeld is sometimes referred to herein as the "Individual Defendant." Arconic and the Individual Defendant are sometimes referred to herein collectively as "Defendants."

19.     Defendants are liable for making false statements and failing to disclose adverse facts known to them about Arconic. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Arconic common and preferred stock was a success, as it: (i) deceived the investing public regarding Arconic's business and financial prospects; (ii) artificially inflated the price of Arconic securities; (iii) permitted Arconic to sell

---

[3] Since November 1, 2016, the "AA" ticker symbol on NYSE is used by the spun-off entity, Alcoa Corporation.

$2.5 billion in securities at artificially-inflated prices; and (iv) caused plaintiff and other members of the Class to purchase Arconic common and preferred stock at inflated prices.

## BACKGROUND

20.     Founded in 1886, the Company's predecessor, Alcoa, Inc., was the world's fifth largest producer of aluminum. On November 1, 2016, Arconic spun-off its alumina and primary metals segments, the rolling mill at the Warrick, Indiana, operations and a 25.1% stake in the Ma'aden Rolling Company in Saudi Arabia into a new separately-held company, Alcoa Corporation. The predecessor company changed its name to Arconic. All references in this Complaint to Arconic include its predecessor company.

21.     Post spin-off, Arconic has continued to engage in lightweight metals engineering and manufacturing. Arconic's multi-material products, which include aluminum, titanium, and nickel, are used worldwide in aerospace, automotive, commercial transportation, packaging, building and construction, oil and gas, defense, consumer electronics, and industrial applications. Arconic operates in 19 countries. Arconic's operations now consist of three worldwide reportable segments: Global Rolled Products, Engineered Products and Solutions, and Transportation and Construction Solutions.

22.     Reynobond Aluminum Composite Material ("ACM") is a wall cladding product Arconic sells consisting of two sheets of thin aluminum, each permanently bonded to an extruded thermoplastic core. The ACM panels are combined with insulation to form cladding used to cover residential and office towers and other buildings. Reynobond is sold with either a Polyethylene ("PE") core, which is combustible, or a more expensive Fire Resistant ("FR") core. The Polyethylene core product, Reynobond PE, the cheaper of the two products, was the one Arconic's sales personnel pushed particularly when engaged in competitive bidding in order to win projects.

23.     Indeed, despite the known flammability of the Reynobond PE panels, resulting in prohibitions against installing them on high-rises in the U.S. and Europe, during the Class Period, Arconic knowingly sold millions of dollars of the flammable panels for use in projects Arconic knew were not appropriate and which presented known fire risks.

24.     On June 14, 2017, a fire engulfed Grenfell Tower, a 24-story, 220-foot (67 meter) high tower block of public housing flats in North Kensington, west London. The Grenfell Tower fire resulted in at least 79 fatalities and over 70 injuries. The tower contained 127 flats, with 227 bedrooms, at the time of the fire. The fire started in a fourth-floor flat. The speed at which the fire spread is believed to have been increased by the building's exterior cladding. Flames consumed the tower quickly. People trapped on the higher floors screamed for their lives through broken windows. Flames in an ordinary fire burst out of windows, moving from the inside out. Grenfell Tower burned in reverse, moving inward from the building's exterior. The flames quickly tore upward in streaks through the facade, filling apartments with toxic black smoke. Torrents of orange and red branched out of the first streaks and shot upward. The flames encased the building in a cylinder of fire. More than 200 firefighters battled the blaze. They brought 40 fire engines and other vehicles.

25.     The Grenfell Tower was managed on behalf of the borough council by Kensington and Chelsea Tenant Management Organisation ("KCTMO"), the largest tenant management organisation ("TMO") in England, which is responsible for the management of nearly 10,000 properties in the borough. The KCTMO has a board comprising of eight residents (tenants or leaseholders), four council-appointed members, and three independent members.

26.     Grenfell Tower underwent a major renovation, which was completed in 2016. Plans for the renovation were publicized in 2012. The £8.7 million renovation was overseen by

Studio E Architects, Rydon Ltd. of Forest Row, East Sussex, in conjunction with Artelia for contract administration and Max Fordham as specialist mechanical and electrical consultants. As part of the project, in 2015–2016, the concrete structure received new windows and new aluminum composite rainscreen cladding supplied by Arconic, in part to improve the appearance of the building. Two types were used: Arconic's Reynobond and Reynolux aluminum sheets. Beneath these, and fixed to the outside of the walls of the flats, was Celotex RS5000 PIR thermal insulation. Arconic sold its ACM panels to Worcester-based Omnis Exteriors, which acted as the "fabricator," cutting the panels into shape and supplying them to the contractors working on Grenfell. The cladding installation work was carried out by Harley Facades of Crowborough, East Sussex, at a cost of £2.6 million.

27.     The original contractor, Leadbitter, had been dropped by KCTMO because their price of £11.278 million was £1.6 million higher than the proposed budget for the refurbishment. The contract was put out to competitive bidding. Rydon's bid was £2.5 million less than Leadbitter's. Rydon's bid called for the installation of Reynobond PE rather than Reynobond FR, despite that Grenfell Tower is 67 meters tall and despite that Arconic's own marketing literature states it should not be used on buildings higher than 10 meters, due to its lack of fire retardant.

### PRE-CLASS STATEMENTS THAT REMAINED ALIVE AND UNCORRECTED DURING THE CLASS PERIOD

28.     On February 15, 2013, Arconic filed its Form 10-K for the fiscal year ended December 31, 2012 with the SEC ("2012 10-K"), which was signed and certified pursuant to the Sarbanes Oxley Act of 2002 by Defendant Kleinfeld. Concerning sales in Arconic's "Engineered Products and Solutions" segment, which then included sales of "integrated aluminum structural systems," the 2012 10-K stated that "[t]hird-party sales for this segment climbed 17% in 2011 compared with 2010, largely attributable to higher volumes across all businesses . . . ." The 2012

10-K also stated in pertinent part that Arconic had experienced "lower volumes from the building and construction end market" during 2012 and warned that "[i]n 2013, . . . [the] building and construction end markets [were] expected to weaken."

29.     The Company's 2012 Annual Report sent to investors in early 2013 included a Chairman's Letter signed by Defendant Kleinfeld that further lauded the financial performance in Arconic's Engineered Products and Solutions segment, stating, in pertinent part, as follows:

> After using the downturn to reposition its portfolio, reduce costs and prepare for profitable growth, ***this segment continues to win new business and improve adjusted EBITDA margins year-over-year***. Our downstream businesses increased ATOI by 14% in 2012 and achieved a full-year record high 19.2% adjusted EBITDA margin, which is more than double the margins of 10 years ago.  With organic revenue growth of $180 million in 2012, we made progress toward our three- year $1.6 billion revenue growth target for our five industry- leading downstream business units. By the end of 2013, we expect $1.0 billion in targeted growth from regions, new customers, share gains, ***new products and innovation***. ***The remaining organic growth will depend on end-market growth.***

30.     Prioritizing the Company's "Values," the Chairman's Letter then detailed "five enduring values that" comprised Arconic's "True North," including the following two described, in pertinent part, as follows:

- **Integrity** is the fundamental principle that guides everything we do. During 2012, we hired an expert on corporate governance, Audrey Strauss, as our Chief Legal and Compliance Officer. ***Audrey's mission is to ensure that every Alcoan understands and lives by both the spirit and the laws that form our concept of integrity at Alcoa.***

- ***Environment, Health and Safety*** is a combined value for which Alcoa is widely known and respected. Building on ***our reputation for being best-in-class for safety***, during 2012 we launched a global wellness program to improve the health and longevity of every Alcoan.

31.     The Chairman's Letter concluded emphasizing Arconic's "Bright Future," highlighting in pertinent part that it was "a great company, ***built on strong values*** and run by excellent people," and that it was "this bright future for Alcoa and for our miracle metal that should

*give our shareholders confidence that their investment in Alcoa will grow for many years to come*" and that "it is the steady progress in the face of the economic volatility of the past year that should *give our shareholders confidence that Alcoa has the structure, strategy and leadership to ensure that, in good times and bad, their investment will prosper*."

32.    The statements referenced above in ¶¶34-37 were materially false and misleading because they failed to disclose the following adverse facts which were known to defendants or recklessly disregarded by them:

(a)    that Arconic was knowingly selling Reynobond PE for use in construction projects where the product was to be used in a manner that the Company knew was unsafe and presented a fire hazard;

(b)    that Arconic's marketing and sales of highly-flammable Reynobond PE sales for use in high-rise tower projects across the U.K. and other countries directly conflicted with the purported strong culture of safety, ethics and legal compliance that the Company claimed to have and exposed Arconic to hundreds of millions of dollars in potential civil and criminal liability and reputational harm;

(c)    that Arconic's own oft repeated claims that Reynobond PE was "a fully tested product, with building-code approvals throughout the world," coupled with its strong assurances of effective global safety and integrity practices, concealed from investors the immense risk Arconic had assumed through its sales and marketing practices; and

(d)    as a result, Defendants' statements about Arconic's business, operations and financial prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

33.    The statements referenced above in ¶¶34-37 remained alive and uncorrected

during the Class Period.

**MATERIALLY FALSE AND MISLEADING STATEMENTS
MADE DURING THE CLASS PERIOD**

34.     The Class Period starts on November 4, 2013. Arconic common stock traded as high as $22.42 per share that day in intraday trading.

35.     On February 13, 2014, Arconic filed its Form 10-K for the fiscal year ended December 31, 2013 with the SEC ("2013 10-K"), which was signed and certified pursuant to the Sarbanes Oxley Act of 2002 by Defendant Kleinfeld. Concerning sales in Arconic's "Engineered Products and Solutions" segment, which included sale of "integrated aluminum structural systems," the 2013 10-K stated that "[t]hird-party sales for the Engineered Products and Solutions segment improved 4% in 2013 compared with 2012 . . . ."  The 2013 10-K also stated, in pertinent part, that "[i]n 2014, . . . the building and construction end market is expected to improve as the gradual recovery in North America continues and the decline in Europe slows down."

36.     The Company's 2013 Annual Report sent to investors in early 2014 included a Chairman's Letter signed by Defendant Kleinfeld that emphasized Reynobond panels' contribution to "the bright future for Alcoa's $1.5 billion commercial construction businesses," stating, in pertinent part, as follows:

> The beautiful cauldron holding the Olympic flame above the Sochi Winter Games was touted by the Russian hosts as a symbol of an environmentally-friendly Olympics. Built with panels made from Alcoa's architectural aluminum, it is also a symbol of Alcoa innovation and ***the bright future for Alcoa's $1.5 billion commercial construction businesses***. The Alcoa Reynobond® panels in the cauldron were coated with an innovative technology called EcoClean™ that is self-cleaning and removes pollutants from the air. In addition to aesthetic and emissions benefits, Alcoa's new aluminum architectural systems provide buildings with stronger impact protection and more than 50% better thermal performance than traditional methods. ***As governments and customers seek to reduce the high energy consumption and resultant emissions of buildings, Alcoa's "green building" innovations enabled Alcoa to grow our business during the construction drought of the past five years and position us for dramatic growth***

12

*when the commercial real estate market rebounds*.

37.     The Chairman's Letter concluded lauding the Company's purported strong commitment to safety values on a global level, stating, in pertinent part, as follows:

> We continued to reaffirm Alcoa's Values during 2013. *We launched a global Integrity Champion Network of high potential managers to further embed a values-based culture of integrity and compliance at all levels of the Company*. Our *employees' strong commitment to* our Environment, *Health and Safety Value* resulted in Alcoa's first fatality free year in *the 70 years since the Company began monitoring safety on a global basis*.

38.     The 2013 Annual Report specifically emphasized the Company's purported strong safety values, stating, in pertinent part, as follows:

> *Alcoa is a values-based company.* Our Values—*Integrity, Respect,* Innovation, *Excellence and Environment*, *Health and Safety*—guide our work and help us accomplish our goals the right way.  *They also align us with our stakeholders, from employees, customers and suppliers to investors and the communities in* which we operate.
>
> *To strengthen our Environment, Health and Safety Value, Alcoa introduced the "Stop for Safety" Program, which encourages and recognizes employees for stopping work when they see a potentially unsafe situation on the job.* In our Global *Voices Survey of employees, the question, "If I see a situation that is unsafe, I can stop work," received the highest overall rating in the survey. By reinforcing the message that nothing is more valuable than human life, Alcoa has progressively improved its safety performance over the years*.

39.     On February 19, 2015, Arconic filed its Form 10-K for the fiscal year ended December 31, 2014 with the SEC ("2014 10-K"), which was signed and certified pursuant to the Sarbanes Oxley Act of 2002 by Defendant Kleinfeld. Concerning sales in Arconic's "Engineered Products and Solutions" segment, which included sale of "integrated aluminum structural systems," the 2014 10-K stated that "[t]hird-party sales for the Engineered Products and Solutions segment increased 5% in 2014 compared with 2013, primarily due to higher volumes . . . ." The 2014 10-K also stated, in pertinent part, that "[i]n 2015, . . . the building and construction end market is expected to improve through growth in North America for the non- residential sector but

will be somewhat offset by overall weakness in Europe."

40.    The Company's 2014 Annual Report sent to investors in early 2015 included a Chairman's Letter signed by Defendant Kleinfeld that emphasized that Arconic's "***businesses benefit*** from a set of Alcoa Values ***that have endured the test of time—Integrity; Respect; Environment, Health and Safety***; ***Innovation; and Excellence***." Further expounding on the Company's purported "Values," the 2014 Annual Report emphasized the Company's strong commitments to safety, ethics and compliance in all of its product offerings, stating, in pertinent part, as follows:

> ***Our Alcoa Values – Integrity, Respect, Innovation, Excellence and Environment, Health and Safety*** – bring out the best in our employees and our Company. As Alcoa transforms, our Values serve as a bright beacon, continuing to guide how we work with our stakeholders and communities.
>
> **Safety**
>
> Our world-class safety culture values human life above all else, seeks to manage risk accordingly . . . .
>
> **Ethics and Compliance**
>
> In 2014, Alcoa's Ethics and Compliance Program expanded its reach through increased communications and the impact of its global Integrity Champion Network. High potential employees appointed to the Network work within their businesses and resource units to raise awareness, promote a "Speak-Up" culture, and provide advice on ethics and compliance matters. In 2014, Alcoa released a new Code of Conduct, providing a roadmap for "Advancing with Integrity."
>
> Every employee worldwide received the Code, reinforcing Alcoa's Values and the shared responsibility for conducting business in accordance with Alcoa's highest ethical standards and the law. At the same time, Alcoa's 24/7 hotline was rebranded as the "Integrity Line." The Program's monthly "Leading with Integrity" messages to leadership include real life ethics and compliance scenarios for discussion with employees. The Ethics and Compliance Program continues to focus on anti-corruption, trade compliance and ***adherence with all relevant U.S. and national laws and regulations***.

41.    The 2014 Annual Report also specifically highlighted the successes of the Engineered Products and Solutions segment, stating, in pertinent part, as follows:

**ENGINEERED PRODUCTS AND SOLUTIONS**

2014 was the best year ever for our innovative, multi-material Engineered Products and Solutions (EPS) segment. It generated $6.0 billion in third-party revenues and $767 million in after-tax operating income (ATOI) with an adjusted EBITDA margin of 21.9%. By engineering proprietary *products that are highly valuable to customers across its* aerospace, commercial transportation, *building and construction*, industrial gas turbine, and oil and gas *end markets*, EPS drove strong share gains across all of its businesses. *The segment signed a number of valuable contracts throughout the year*, including a $1.1 billion 10-year supply agreement with Pratt & Whitney for jet engine components.

42.     On February 19, 2016, Arconic filed its Form 10-K for the fiscal year ended December 31, 2015 with the SEC ("2015 10-K"), which was signed and certified pursuant to the Sarbanes Oxley Act of 2002 by Defendant Kleinfeld. Concerning sales in Arconic's "Engineered Products and Solutions" segment, which included sale of "integrated aluminum structural systems," the 2015 10-K stated that "[t]hird-party sales for the Engineered Products and Solutions segment improved 27% in 2015 compared with 2014, . . ." The 2015 10-K also stated, in pertinent part, that "[i]n 2016, . . . net productivity improvements [were] anticipated while pricing pressure across all markets [was] expected. . . ."

43.     The Company's 2015 Annual Report sent to investors in early 2016 included a Chairman's Letter signed by Defendant Kleinfeld that emphasized that in Arconic's "building and construction business, [its] innovative architectural systems [were] helping builders meet E.U. and U.S. commitments for zero energy buildings and [were] driving [its] business' expansion into China and the Middle East." Elsewhere the 2015 Annual Report highlighted the financial results achieved in the "Construction Solutions" segment that sold the Reynobold panels, stating that it had a reported an after-tax operating income ("ATOI") "of $166 million in 2015" and "delivered a solid 2015 adjusted EBITDA margin of 14.4 percent."[4]  The 2015 Annual Report

---

[4] EBITDA means earnings before interests, taxes, depreciation and amortization.

also contained a glossy workup highlighting the Company's architectural product offerings which emphasized its "broad portfolio offering of products and systems that [could] ***serve the needs of all types of projects – from the smallest to the truly monumental***," and stated that the Company was also "***positioned to benefit from urbanization that [would] require more multi-family buildings*** . . . .





44.     As in past years, the 2015 Annual Report also emphasized the Company's purported strong values, stating they "center on *Integrity, Respect, Innovation, Excellence and Environment, Health and Safety*," and that the Company "*live[d] [its] Values every day, everywhere for the benefit of [its] customers, investors, employees, communities and partners*." The Chairman's Letter went on to emphasize in pertinent part that "[w]hile applying disruptive technologies and strategies and working toward the separation, *[the Company] ha[d] been careful to retain the core Values that ha[d] been [its] bedrock for 127 years*." Specifically addressing "Safety," the 2015 Annual Report once again stated that Arconic's "world-class safety culture value[d] human life above all else" and that "all" of the Company's "locations ha[d] implemented Human Performance, an approach that focuses on anticipating and recognizing the potential for error and taking action to prevent errors from occurring." As to safety, the 2015 Annual Report went so far as to state that the death of "four Alcoans and one contractor . . . from workplace injuries at Alcoa sites during the year" had led Arconic to "intensify [its] fatality prevention efforts," such that the Company could now "*operate fatality free*." The 2015 Annual Report further emphasized that the Company's "Ethics and Compliance Program continue[d] to focus on anti-corruption, trade compliance and *adherence with all relevant U.S. and international laws and regulations*." It further stated that Arconic had "welcomed new members to [its] Integrity Champion Network, which [was] comprised of high- potential employees appointed by their organizations to raise ethics and compliance awareness, *promote a speak-up culture* and provide advice on ethics and compliance matters," emphasizing that all "employees received *Code of Conduct* training, *reinforcing [its] Values and [its] commitment to advancing with integrity*."

45.     On February 28, 2017, Arconic filed its Form 10-K for the fiscal year ended December 31, 2016 with the SEC ("2016 10-K"), which was signed and certified pursuant to the

Sarbanes Oxley Act of 2002 by Defendant Kleinfeld. Concerning sales in Arconic's "Engineered Products and Solutions" segment, which included sale of "integrated aluminum structural systems," the 2016 10-K stated that "[t]hird-party sales for the Engineered Products and Solutions segment improved 7% in 2016 compared with 2015 . . . ." The 2016 10-K also stated, in pertinent part, that "[i]n 2017, . . . net productivity improvements [were] anticipated while pricing pressure across all markets [was] likely to continue. . . ." The cover of the 2016 Annual Report emphasized that: "Working in close partnership with our customers, we solve complex engineering challenges to transform the way we fly, drive, build and power," and that "[t]hrough the ingenuity of our people and cutting-edge, advanced manufacturing techniques, ***we deliver these products at a quality and efficiency that ensure customer success and shareholder value***."

46.     Arconic's 2016 Annual Highlights Report sent to investors in early 2017 lauded the financial performance in its new Transportation and Construction Solutions segment, stating that it had "recorded revenue of $1.8 billion in 2016, down four percent year over year, ATOI of $176 million, up six percent year over year, adjusted EBITDA of $291 million, up seven percent year over year, and an adjusted EBITDA margin of 16.1 percent." It further highlighted that Arconic was deriving 10% of its sales from the building and construction industries, and a full 6% of its revenues from the U.K., the only other country than the U.S. whose sales were so significant to Arconic that they were individually broken-out:



47.    In a section entitled "Living Our Values," the 2016 Annual Highlights Report emphasized that Arconic "excel[s] as high-performance teams – safely, with respect and integrity." The section emphasized that "*[n]othing matters more than human life*," and that this had "long been a guiding principle at Arconic, and safety [was] one of [its] most cherished values." Describing the Company's "Ethics and Compliance," the 2016 Annual Report emphasized a "global culture of integrity, compliance, prevention and risk identification and mitigation," and a "*speak-up culture*," stating, in pertinent part, as follows:

> *Arconic promotes a "speak-up culture," in which employees are encouraged to ask questions and raise concerns.* Our Ethics and Compliance Program drives a *global culture of integrity, compliance, prevention and risk identification and mitigation*, with a strong focus on anti-corruption and trade compliance.
>
> In 2016, Arconic launched its new Code of Conduct to guide employees on how to "lead with integrity" every day, everywhere.
>
> \*         \*         \*
>
> Arconic's Integrity Champions partner with their business and resource units to integrate ethics and compliance into their organizations and serve as trusted advisors to their colleagues. In 2016, the Champions were involved in *"Project Integrity," with the goal of conducting live trainings on issues most relevant to employees operating in diverse, global locations*.

48.     Based on Defendants' materially false and misleading statements, the price of Arconic common and preferred stock traded at artificially inflated prices throughout the Class Period, with the common stock reaching a Class Period high of nearly $40 per share by November 21, 2014.

49.     The statements referenced above in ¶¶41-53 were materially false and misleading because they failed to disclose the following adverse facts which were known to defendants or recklessly disregarded by them:

(a)     that Arconic was knowingly selling Reynobond PE for use in construction projects where the product was to be used in a manner that the Company knew was unsafe and presented a fire hazard;

(b)     that Arconic's marketing and sales of highly-flammable Reynobond PE sales for use in high-rise tower projects across the U.K. and other countries directly conflicted with the purported strong culture of safety, ethics and legal compliance that the Company claimed to have and exposed Arconic to hundreds of millions of dollars in potential civil and criminal liability and reputational harm;

(c)     that Arconic's own oft repeated claims that Reynobond PE was "a fully tested product, with building-code approvals throughout the world," coupled with its strong assurances of effective global safety and integrity practices, concealed from investors the immense risk Arconic had assumed through its sales and marketing practices; and

(d)     as a result, Defendants' statements about Arconic's business, operations and financial prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

50.     On Saturday, June 24, 2017, *Reuters* published a report entitled "Arconic

knowingly supplied flammable panels for use in tower – emails." In its report, *Reuters* disclosed that Arconic employees knew Reynobond PE panels were being used on the more than 60 meter building, despite the warnings in its own sales brochures, with Arconic's own personnel questioning the use of the cheaper but more dangerous product on the Grenfell Tower refurbishment project, stating, in pertinent part, as follows:

> Six emails sent by and to an Arconic Inc. [] sales manager raise questions about why the company supplied combustible cladding to a distributor for use at Grenfell Tower, despite publicly warning such panels were a fire risk for tall buildings.
>
> The emails, dating from 2014 and seen by Reuters, were between Deborah  French, Arconic's UK sales manager, and executives at the contractors involved  in the bidding process for the refurbishment contract at Grenfell Tower in London, where 79 people died in a blaze last week.
>
> When asked about the emails, Arconic said in a statement that it had known the panels would be used at Grenfell Tower but that it was not its role to decide what was or was not compliant with local building regulations.
>
> The company manufactures three main types of Reynobond panel – one with a polyethylene (PE) core, one with a fire retardant core and another with a non-combustible core, according to its website.
>
> Diagrams in a 2016 Arconic brochure for its Reynobond panels describe how PE core panels are suitable up to 10 meters in height.  Panels with a fire resistant core – the FR model – can be used up to 30 meters, while above that height, panels with the non-combustible core – the A2 model – should be used, the brochure says.
>
> Grenfell Tower is more than 60 meters tall.
>
> The brochure also issued a blunt warning that cladding can be a fire risk.
>
> "When conceiving a building, it is crucial to choose the adapted products in order to avoid the fire to spread to the whole building. Especially when it comes to facades and roofs, the fire can spread extremely rapidly," the brochure said.
>
> "As soon as the building is higher than the fire fighters' ladders, it has to be conceived with an incombustible material." ***Nonetheless, between May and July 2014, French, who was based at Arconic's factory in Merxheim, France, responded to requests from the companies involved in refurbishing Grenfell Tower on the availability of samples of five different types of Reynobond aluminium-covered panels, all of which were only available in the combustible***

*PE and FR versions, according to Arconic brochures*.

*In the end, Arconic said on Friday, the company provided PE panels*.

51.     The *Reuters* report provided additional detail confirming that Arconic had to have known of the building's height, and thus the risk, and was directly involved in the sale of the product for use in the project, stating, in pertinent part, as follows:

> Arconic, which was known as Alcoa Inc until 2016, declined to say if it knew how tall the tower was and the emails seen by *Reuters* do not specifically refer to its height. *They do, however, refer to "Grenfell Tower" and mention other high rise projects where paneling has been used when discussing the appearance that was being sought for Grenfell Tower*.
>
> *Arconic also knew the quantity of panels being supplied and thus the total exterior coverage.  A source at one of the companies involved in the process said Arconic had "full involvement" throughout the contract bidding process*.
>
> *                *                *
>
> *In the emails, French and representatives of Harley, Omnis and Rydon also discuss the choice of panel models and colours and how they were inching towards securing the contract with the local authority, the Royal Borough of Kensington and Chelsea (RBKC)*.

52.     Also on June 24th, *The New York Times* published a report entitled "Why Grenfell Tower Burned: Regulators Put Cost Before Safety." In that report, *The Times* blamed the KCTMO for selecting the cheaper, combustible product – and specifically blamed Arconic's UK sales tactics for selling it to them – stating, in pertinent part, as follows:

> Promising to cut "red tape," business-friendly politicians evidently judged that cost concerns outweighed the risks of allowing flammable materials to be used in facades. Builders in Britain were allowed to wrap residential apartment towers – perhaps several hundred of them – from top to bottom in highly flammable materials, a practice forbidden in the United States and many European countries. And companies did not hesitate to supply the British market.
>
> *                *                *
>
> *Arconic has marketed the flammable facades in Britain for years, even as it has adjusted its pitch elsewhere*. In other European countries, Arconic's sales materials

22

explicitly instructed that "as soon as the building is higher than the firefighters' ladders, it has to be conceived with an incombustible material." ***An Arconic website for British customers said only that such use "depends on local building codes*."

        *       *       *

[B]y 1998, regulators in the United States – where deaths from fires are historically more common than in Britain or Western Europe – began requiring real-world simulations to test any materials to be used in buildings taller than a firefighter's two-story ladder. "The U.S. codes say you have to test your assembly exactly the way you install it in a building," said Robert Solomon, an engineer at the National Fire Protection Association, which is funded in part by insurance companies and drafts model codes followed in the United States and around the world.

***No aluminum cladding made with pure polyethylene – the type used at Grenfell Tower – has ever passed the test, experts in the United States say. The aluminum sandwiching always failed in the heat of a fire, exposing the flammable filling. And the air gap between the cladding and the insulation could act as a chimney, intensifying the fire and sucking flames up the side of a building. Attempts to install nonflammable barriers at vertical and horizontal intervals were ineffective in practice*.**

***As a result, American building codes have effectively banned flammable cladding in high-rises for nearly two decades*.**

        *       *       *

***In 2014, the Fire Protection Research Foundation, an organization in the United States, counted 20 major high-rise fires involving cladding*.** In at least a half-dozen – in France, Dubai, South Korea, the United States and elsewhere – the same type of panels installed at Grenfell Tower caught fire. A 2014 fire in Melbourne, Australia, resulted in multiple investigations into the dangers of combustible cladding. Another fire broke out in Dubai, around a 60-story skyscraper, on New Year's Eve of 2015, and yet another, around a 70-story skyscraper there, this April.

53.    *The Times* report further emphasized the extent to which Arconic had been improperly marketing its more flammable panels in the U.K, stating, in pertinent part, as follows:

In a brochure aimed at customers in other European countries, the company cautions that the polyethylene Reynobond should not be used in buildings taller than 10 meters, or about 33 feet, consistent with regulations in the United States and elsewhere. "Fire is a key issue when it comes to buildings," the brochure explains. "Especially when it comes to facades and roofs, the fire can spread extremely rapidly."

A diagram shows flames leaping up the side of a building. "As soon as the building is higher than the firefighters' ladders, it has to be conceived with an incombustible material," a caption says.

***But the marketing materials on Arconic's British website are opaque on the issue***.

"***Q: When do I need Fire Retardant (FR) versus Polyethylene (PR) Reynobond? The answer to this, in part, depends on local building codes. Please contact your Area Sales Manager for more information," reads a question-and-answer section***.

54.     On this news, the price of Arconic common and preferred stock declined precipitously when trading resumed on Monday June 26th, with the common stock trading down as low as $22.65 in intraday trading, down 11% from its close of $25.54 per share on the evening of Friday, June 23rd, on unusually high volume of more than 20.2 million shares, or more than seven times the average daily volume over the preceding ten trading days.

55.     While the June 24th *Reuters* report had quoted Arconic, responding to questions about the 2014 emails, responding "in a statement that it had known the panels would be used at Grenfell Tower but that it was not its role to decide what was or was not compliant with local building regulations," later in the day in the U.S. on Monday June 26th, Arconic issued a public statement essentially conceding its prior misconduct.  In that announcement, Arconic stated that it was discontinuing the sale of its Reynobond PE core panels worldwide for use in "any high- rise applications regardless of local codes and regulations." Arconic cited the purported inconsistency of building codes across the world and issues that had arisen in the wake of the Grenfell Tower tragedy regarding code compliance of cladding systems in the context of buildings' overall designs. Arconic's statement also confirmed that its aluminum product, Reynobond PE, was part of the cladding system on the outside of Grenfell Tower.  As reported  by *The Guardian* that day, "[t]he company emailed clients on Monday to tell them it would no longer sell Reynobond PE to buyers planning to use it on tower blocks."

56.     *The Guardian* also reported on Monday June 26th that the U.K. Department for Communities and Local Government had put in place a "combustibility testing programme" for aluminum composite materials and that in early testing, 60 samples from buildings in 25 areas were classed as combustible, with approximately 540 then-still yet to be tested. Over the prior weekend, following the fire, hundreds of Londoners in public housing structures clad with ACM panels had been forced to evacuate due to safety concerns. *The New York Times* later reported that "***[i]nvestigators ha[d] found 75 buildings across Britain that ha[d] similar cladding, and hundreds of apartments were evacuated on Friday [June 23rd] amid fears they faced simila*r** fire risks."

57.     That same day, on June 26, 2017, *Bloomberg* reported that U.K. investigators were targeting Arconic in their investigations as potentially liable, and that the investment community was taking note, stating, in pertinent part, as follows:

> The use of combustible cladding has become a focal point for investigators. As the U.K. looks to hold someone responsible, Arconic could be subject to significant liabilities, Seaport Global analyst Josh Sullivan said in an interview.

> "The political sentiment on the ground in the U.K. is very aggressive right now," he said. "Whether or not they are ultimately culpable, they are going to be a part of the inquiry process."

> While it's too early to determine the possible financial impact, the situation could make it more difficult for Arconic to find a permanent CEO, Cowen & Co. analyst Gautam Khanna said in a note. David Hess has been serving on an interim basis since April, when Klaus Kleinfeld left the company.

58.     As reported by *The New York Times* on June 26th, Arconic's Reynobond PE panels "had been assailed for their fire risks and faced tighter restrictions in the United States," the country of the Company's origin, lamenting that "[s]uch regulatory gaps expose how multinational corporations can take advantage of the vulnerabilities in government oversight." *The Times* also reported that "[t]he Metropolitan Police have also said they will consider manslaughter among

other charges," and that "in Britain, corporations can be charged with manslaughter." *The Times*

report further emphasized that Arconic had been on notice of the fire- risk of these panels when

used improperly for years, stating, in pertinent part, as follows:

> Even if the fire was started by the refrigerator, many fire safety experts point to the
> cladding, which was installed during a refurbishment finished last year, as a crucial
> factor in the rapid spread of the fire. ***Cladding has been blamed for numerous fires
> over the years, including several in Dubai, in the United Arab Emirates***.

59.     On this news, the price of Arconic common and preferred stock plunged further,

with the common stock trading down as low as $21.76 in intraday trading on June 27th, and closing

down more than $2 per share, a more than 9% decline from its close of $24.01 per share on June

26th, again trading on unusually high volume of more than 21 million shares, again more than

seven times the average daily volume over the preceding ten trading days.

## ADDITIONAL SCIENTER ALLEGATIONS

60.     As alleged herein, Arconic and the Individual Defendant acted with scienter in

that they knew that the public documents and statements issued or disseminated in the name of the

Company were materially false and misleading; knew that such statements or documents would

be issued or disseminated to the investing public; and knowingly and substantially participated or

acquiesced in the issuance or dissemination of such statements or documents as primary violations

of the federal securities laws. As set forth elsewhere herein in detail, these Defendants, by virtue

of their receipt of information reflecting the true facts regarding Arconic, their control over, and/or

receipt and/or modification of Arconic's allegedly materially misleading statements and/or their

associations with the Company which made them privy to confidential proprietary information

concerning Arconic, participated in the fraudulent scheme alleged herein.

61.     Arconic was also motivated to conceal the true extent of its potential civil,

regulatory and criminal liability related to its sales and marketing practices from investors in order

to permit it to raise **$2.5 billion** in capital during the Class Period. This required not only keeping the price of its common and preferred stock artificially inflated, but required that Arconic improve its corporate credit ratings, which had been slashed in 2013, as described in the Company's 2013 10-K:

> ***Alcoa's cost of borrowing and ability to access the capital markets are affected not only by market conditions but also by the short- and long-term debt ratings assigned to Alcoa's debt by the major credit rating agencies.***
>
> On April 11, 2013, Fitch Ratings (Fitch) affirmed the following ratings for Alcoa: long-term debt at BBB- and short-term debt at F3. Additionally, Fitch changed the current outlook from stable to negative.
>
> On April 26, 2013, Standard and Poor's Ratings Services (S&P) affirmed the following ratings for Alcoa: long-term debt at BBB- and short-term debt at A-3. Additionally, S&P changed the current outlook from stable to negative.
>
> On May 29, 2013, Moody's Investors Service (Moody's) downgraded the following ratings for Alcoa: long-term debt from Baa3 to Ba1 and short-term debt from Prime-3 to Speculative Grade Liquidity Rating-1. Additionally, Moody's changed the current outlook from rating under review to stable.

62.   Then, as disclosed in the Company's 2015 10-K:

> On July 11, 2014, Alcoa filed a new shelf registration statement, which was amended on July 25, 2014 and became effective on July 30, 2014, for up to $5,000 of securities on an unallocated basis for future issuance. As of December 31, 2015, $2,500 in securities were issued under the new shelf registration statement.
>
> ***In September 2014, Alcoa completed two public securities offerings under its shelf registration statement for (i) $1,250 of 25 million depositary shares***, each representing a 1/10th interest in a share of Alcoa's 5.375% Class B Mandatory Convertible Preferred Stock, Series 1, par value $1 per share, liquidation preference $500 per share, and (ii) ***$1,250 of 5.125% Notes due 2024***.
>
> ***Alcoa's cost of borrowing and ability to access the capital markets are affected not only by market conditions but also by the short- and long-term debt ratings assigned to Alcoa's debt by the major credit rating agencies***.
>
> On March 9, 2015, Standard and Poor's Ratings Services (S&P) affirmed the following ratings for Alcoa: long-term debt at BBB- and short-term debt at A-3. Additionally, S&P changed the current outlook from negative to stable. On

September 28, 2015 S&P issued a statement that these ratings and outlook for Alcoa were not affected by Alcoa's plan to separate into two publicly-traded companies.

On April 16, 2015 Fitch affirmed the following ratings for Alcoa: long-term debt at BB+ and short-term debt at B. Additionally, Fitch changed the current outlook from stable to positive. On September 30, 2015, Fitch placed these ratings on "ratings watch positive" based on Alcoa's plan to separate into two publicly- traded companies.

On April 30, 2015, Moody's Investor Service (Moody's) affirmed the following ratings for Alcoa; long-term debt at Ba1 and short-term debt at Speculative Grade Liquidity Rating-1. Additionally, Moody's changed the current outlook from stable to positive. On September 28, 2015, Moody's affirmed these ratings and changed the current outlook from positive to developing based on Alcoa's plan to separate into two publicly-traded companies. On January 21, 2016, Moody's placed Alcoa's long-term debt rating under review and changed the current outlook from developing to rating under review, while leaving Alcoa's short-term debt rating unchanged.

63. And further from Arconic's 2016 10-K

*Arconic's cost of borrowing and ability to access the capital markets are affected not only by market conditions but also by the short- and long-term debt ratings assigned to Arconic's debt by the major credit rating agencies.*

On March 31, 2016, Moody's Investor Service (Moody's) affirmed the following ratings for Arconic: long-term debt at Ba1 and short-term debt at Speculative Grade Liquidity Rating-1. Additionally, Moody's changed the current outlook from rating under review to negative. On June 30, 2016, Moody's maintained the current outlook as negative based on the filing of a Form 10 registration statement related to the planned separation of Arconic. On September 22, 2016, Moody's placed the long-term debt rating Ba1 as under review for possible downgrade. On November 1, 2016, Moody's downgraded Arconic's long-term debt to Ba2 and short-term debt to Speculative Grade Liquidity-2 based upon the completion of the Separation Transaction. Additionally, Moody's changed the current outlook to stable.

On April 21, 2016, Fitch affirmed the following ratings for Arconic: long-term debt at BB+ and short-term debt at B. Additionally, Fitch changed the current outlook from positive to evolving. On July 7, 2016, Fitch changed the current outlook from evolving to stable based on the filing of a Form 10 registration statement related to the planned separation of Arconic.

On April 29, 2016, Standard and Poor's Ratings Service (S&P) affirmed the following ratings for Arconic: long-term debt at BBB- and short-term debt at A-3. Additionally, S&P maintained the current outlook as stable. On September 19, 2016, S&P affirmed its ratings for Arconic: long-term debt at BBB- and short- term

debt at A-3.  Additionally, S&P maintained the current outlook as stable.

## LOSS CAUSATION/ECONOMIC LOSS

64.      During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Arconic securities and operated as a fraud or deceit on Class Period purchasers of Arconic securities by misrepresenting the Company's business and prospects. Later, when the defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Arconic securities fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of Arconic securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## NO SAFE HARBOR

65.      Defendants are liable for any false or misleading forward-looking statements ("FLS") pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Arconic who knew that the FLS was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## CLASS ACTION ALLEGATIONS

66.      Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who  purchased

or acquired Arconic common and preferred stock during the Class Period, and who were damaged

thereby (the "Class"). Excluded from the Class are Defendants and their families, the officers and

directors of the Company, at all relevant times, members of their immediate families and their

legal representatives, heirs, successors or assigns and any entity in which Defendants have or had

a controlling interest.

67.     The members of the Class are so numerous that joinder of all members is

impracticable. Arconic securities were actively traded. While the exact number of Class members

is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery,

Plaintiff believes that there are hundreds of members in the proposed Class. Record owners and

other members of the Class may be identified from records maintained by Arconic or its transfer

agent and may be notified of the pendency of this action by mail, using the form of notice similar

to that customarily used in securities class actions.

68.     Plaintiff's claims are typical of the claims of the members of the Class as all

members of the Class are similarly affected by Defendants' wrongful conduct in violation of

federal law that is complained of herein.

69.     Plaintiff will fairly and adequately protect the interests of the members of the Class

and has retained counsel competent and experienced in class and securities litigation.

70.     Common questions of law and fact exist as to all members of the Class and

predominate over any questions solely affecting individual members of the Class. Among the

questions of law and fact common to the Class are:

(a)     whether the 1934 Act was violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the

Class Period misrepresented material facts about the business, operations and management of Arconic; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

71.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5 Against All Defendants

72.    Plaintiff incorporates ¶¶1-77 by reference.

73.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

74.    The defendants named in this Count violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    employed devices, schemes and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)      engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Arconic common and preferred stock during the Class Period.

75.      Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Arconic common and preferred stock. Plaintiff and the Class would not have purchased Arconic common and preferred stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by these defendants' misleading statements.

## COUNT II

### Violations of §20(a) of the 1934 Act Against Defendant Kleinfeld

76.      Plaintiff incorporates ¶¶1-81 by reference.

77.      Defendant Kleinfeld acted as a controlling person of Arconic within the meaning of §20(a) of the 1934 Act. By reason of his positions with the Company, and his ownership of Arconic stock, Defendant Kleinfeld had the power and authority to cause Arconic to engage in the wrongful conduct complained of herein. Defendant Kleinfeld controlled Arconic and all of its employees. By reason of such conduct, Defendant Kleinfeld is liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class

members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

     C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

     D.     Such equitable/injunctive or other relief as may be deemed appropriate by the Court.

## DEMAND FOR TRIAL BY JURY

    Plaintiff hereby demands a trial by jury.

Dated:  August 11, 2017

**CARLSON LYNCH SWEET**
**KILPELA & CARPENTER LLP**
*/s/ Edwin J. Kilpela, Jr.*
Edwin J. Kilpela, Jr.
1133 Penn Avenue
5th Floor
Pittsburgh, PA 15222
Tel: (412) 322-9243
Fax: (412) 231-0246
ekilpela@carlsonlynch.com

**THE ROSEN LAW FIRM, P.A.**
Jacob A. Goldberg, Esq. (PA ID: 66399)
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Tel:  (215) 600-2817
Fax: (212) 202-3827
jgoldberg@rosenlegal.com

**THE ROSEN LAW FIRM, P.A.**
Laurence Rosen, Esq.
Phillip Kim, Esq.
275 Madison Avenue, 34th Floor
New York, New York 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
lrosen@rosenlegal.com
pkim@rosenlegal.com

*Attorneys for Plaintiff*