UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARTIN HOWARD, Individually and on Behalf of All Others Similarly Situated, | Civ. Action No. 2:17-cv-01057-MRH **(Consolidated)** |
| Plaintiff, | **AMENDED CLASS ACTION COMPLAINT** |
| vs. | JURY TRIAL DEMANDED |
| ARCONIC INC., KLAUS KLEINFELD, WILLIAM F. OPLINGER, ROBERT S. COLLINS, ARTHUR D. COLLINS, JR., KATHRYN S. FULLER, JUDITH M. GUERON, MICHAEL G. MORRIS, E. STANLEY O'NEAL, JAMES W. OWENS, PATRICIA F. RUSSO, SIR MARTIN SORRELL, RATAN N. TATA, ERNESTO ZEDILLO, MORGAN STANLEY & CO. LLC, CREDIT SUISSE SECURITIES (USA) LLC, CITIGROUP GLOBAL MARKETS INC., GOLDMAN SACHS & CO., J.P. MORGAN SECURITIES LLC, BNP PARIBAS SECURITIES CORP., MITSUBISHI UFJ SECURITIES (USA), INC., RBC CAPITAL MARKETS, LLC, and RBS SECURITIES INC. | |
| Defendants. | |

TABLE OF CONTENTS

NATURE OF THE ACTION ......................................................................................1

JURISDICTION AND VENUE ................................................................................4

PARTIES ..................................................................................................................5

PLAINTIFFS' CLASS ACTION ALLEGATIONS ..................................................8

OVERVIEW OF THE COMPANY .........................................................................10

THE GRENFELL TOWER BURNS TO THE GROUND KILLING AT LEAST 71
    PEOPLE............................................................................................................11

NEWS ARTICLES REVEAL DEFENDANTS' MISCONDUCT .............................18

SECURITIES ACT ALLEGATIONS .......................................................................23

THE PREFERRED IPO.............................................................................................23

    The Registration Statement Contained Inaccurate Statements of Material Fact and
        Omitted Material Information Required to Be Disclosed Therein ........................24

COUNT I ...................................................................................................................28

    (For Violation Of §11 Of The Securities Act Against All Defendants by Plaintiff
        Sullivan)..............................................................................................................28

COUNT II ..................................................................................................................30

    (For Violation of §15 of the Securities Act Against the Company and the Individual
        Defendants by Plaintiff Sullivan)........................................................................30

EXCHANGE ACT ALLEGATIONS.........................................................................30

    During the Class Period, Arconic Knowingly or Recklessly Supplied Flammable PE
        Panels for High-Rise Buildings, But Hid This Critical Fact From Investors ........30

A RECENT INVESTIGATION BY THE BBC CONFIRMS ARCONIC'S SCIENTER...........38

ADDITIONAL ALLEGATIONS OF SCIENTER RELEVANT TO THE EXCHANGE
    ACT VIOLATIONS .........................................................................................47

MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE
    CLASS PERIOD RELEVANT TO THE EXCHANGE ACT VIOLATIONS .................53

    False and Misleading Statements Made in 2013................................................................53

i

REASONS WHY THE STATEMENTS MADE IN 2013 WERE FALSE AND
MISLEADING...................................................................................55

False and Misleading Statements Made in 2014.................................55

REASONS WHY THE STATEMENTS MADE IN 2014 WERE FALSE AND
MISLEADING...................................................................................63

False and Misleading Statements Made in 2015.................................65

REASONS WHY THE STATEMENTS MADE IN 2015 WERE FALSE AND
MISLEADING...................................................................................72

False and Misleading Statements Made in 2016.................................74

REASONS WHY THE STATEMENTS MADE IN 2016 WERE FALSE AND
MISLEADING...................................................................................84

False and Misleading Statements Made in 2017.................................86

REASONS WHY THE STATEMENTS MADE IN 2017 WERE FALSE AND
MISLEADING...................................................................................90

THE TRUTH EMERGES.........................................................................92

PRESUMPTION OF RELIANCE...........................................................102

COUNT III..............................................................................................103

(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated
Thereunder Against Defendants Arconic and Kleinfeld by Plaintiff Ironworkers,
and by Plaintiff Sullivan With Respect to the Defined "Preferred Shares" Only)103

COUNT IV...............................................................................................106

(Violations of Section 20(a) of the Exchange Act Against Defendant Kleinfeld by
Plaintiff Ironworkers, and by Plaintiff Sullivan With Respect to the Defined
"Preferred Shares" Only)....................................................................106

PRAYER FOR RELIEF ..........................................................................107

DEMAND FOR TRIAL BY JURY ..........................................................108

Lead Plaintiffs Iron Workers Local 580 – Joint Funds and Ironworkers Locals 40, 361 & 417 – Union Security Funds ("Ironworkers") and Janet L. Sullivan ("Sullivan" and together with Ironworkers, "Lead Plaintiffs" or "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against Defendants (defined below), allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of Defendants' public documents, conference calls and statements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Arconic Inc. ("Arconic" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired: (i) Arconic securities between November 4, 2013 and June 23, 2017, both dates inclusive (the "Class Period"), seeking to recover damages caused by the Arconic Defendants' (defined below) violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder; and (ii) Arconic Depositary Shares, each representing a 1/10th interest in a share of 5.375% Class B Mandatory Convertible Preferred Stock, Series 1, par value $1 per share, liquidation preference $500 per share (the "Preferred Shares") pursuant to and/or traceable to the Registration Statement and Prospectus issued in connection with Arconic's September 18, 2014 initial public preferred stock offering (the "Preferred IPO"), seeking to pursue remedies under Sections 11 and 15 the Securities Act of 1933 (the "Securities Act")

1

against the Company and certain of its top officials, and the Underwriter Defendants (defined below).  Arconic is a global provider of lightweight multi-material solutions, focused on the aerospace market, as well as the automotive, industrial gas turbine, commercial transportation, and building and construction markets.  The Company also provides titanium, aluminum, nickel-based super alloy, and specialty alloy solutions.

2.      Arconic's common and preferred stock trade on the New York Stock Exchange ("NYSE"), with common stock trading under the ticker symbol "ARNC" and preferred stock trading under the ticker symbol "ARNC-PB."

3.      Lead Plaintiff Sullivan alleges claims under the Securities Act for the filing of a Registration Statement and incorporated prospectus supplements in connection with the Preferred IPO that contained inaccurate statements of material fact and omitted material information that was required to be disclosed.  Specifically, Defendants made inaccurate statements of material fact and/or failed to disclose material information regarding the Company's compliance with applicable laws and safety standards, and the potential civil, regulatory and criminal risks that the Company faced.

4.      Separately, Plaintiffs allege claims under the Exchange Act for fraud against the Arconic Defendants for making materially false and misleading statements regarding the Company's business, operations and compliance policies.  Specifically, the Arconic Defendants made false and/or misleading statements and/or failed to disclose that: (i) Arconic knowingly or recklessly supplied its highly flammable Reynobond polyethylene (PE) cladding panels for use in high-rise buildings; (ii) the foregoing conduct significantly increased the risk of property damage, injury and/or death in buildings constructed with Arconic's Reynobond PE panels; and (iii) as a result of the foregoing, Arconic's public statements were materially false and misleading at all relevant times.

2

5.      On June 14, 2017, a fire broke out at the 24-story Grenfell Tower apartment block in London.  The fire burned for roughly 60 hours, destroying the building and causing at least 71 deaths and over 70 injuries.

6.      On June 24, 2017, *The New York Times* published an article entitled "Why Grenfell Tower Burned: Regulators Put Cost Before Safety," describing the causes of the Grenfell Tower fire and attributing the rapid spread of the fire to the highly flammable Reynobond PE cladding panels manufactured by Arconic.  The article stated, in relevant part:

> The facade, installed last year at Grenfell Tower, in panels known as cladding and sold as Reynobond PE, consisted of two sheets of aluminum that sandwich a combustible core of polyethylene. It was produced by the American manufacturing giant Alcoa, which was renamed Arconic after a reorganization last year.
>
> Arconic has marketed the flammable facades in Britain for years, even as it has adjusted its pitch elsewhere. In other European countries, Arconic's sales materials explicitly instructed that "as soon as the building is higher than the firefighters' ladders, it has to be conceived with an incombustible material." An Arconic website for British customers said only that such use "depends on local building codes."
>
> *             *             *
>
> Fire safety experts said the blaze at Grenfell Tower was a catastrophe that could have been avoided, if warnings had been heeded.
>
> *             *             *
>
> For more than a week after the fire, Arconic declined repeated requests for comment. Then, on Thursday, the company confirmed that its flammable polyethylene panels had been used on the building.

7.      On that same day, *Reuters* published an article entitled "Arconic knowingly supplied flammable panels for use in tower: emails," revealing that Arconic sales managers were aware that flammable panels would be distributed for use at Grenfell Tower.

8.      On June 26, 2017, Arconic issued a press release announcing it would discontinue global sales of Reynobond PE for use in high-rise buildings after the material was suspected to have contributed to the spread of the deadly fire at the Grenfell Tower apartment complex in London.

3

9.      A recent investigation conducted by the British Broadcasting Corporation shows that Arconic knew—but did not disclose to investors—that, at least as early as 2014, the Reynobond PE products it supplied to high-rise buildings posed a high risk of fire and had in fact failed to meet critical fire safety tests.

10.      On these and other related disclosures, Arconic's common share price fell $3.70 per share, or 14.49%, to close at $21.84 per share, and Arconic's preferred stock fell $5.56 per share or 13.9% per share on June 27, 2017.

11.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5) and pursuant to §§11 and 15 of the Securities Act.

13.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and §27 of the Exchange Act, and §22 of the Securities Act.

14.      Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa), §22 of the Securities Act and 28 U.S.C. §1391(b) and (c).  Arconic maintains its U.S. corporate center within this Judicial District.

15.      In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

16.     Lead Plaintiff Ironworkers, as set forth in its previously filed Certification, purchased Arconic securities at artificially inflated prices during the Class Period, and was damaged thereby.

17.     Lead Plaintiff Sullivan, as set forth in her previously filed Certification, purchased Preferred Shares of Arconic during the Class Period, including traceable to the Preferred IPO, and was damaged thereby.

18.     Defendant Arconic is incorporated in Pennsylvania.

19.     Before November 1, 2016, when the Company spun-off its mining and manufacture of raw aluminum operations to the new "Alcoa Corporation" (the "Spin-Off"), Arconic was known as Alcoa Inc.  In connection with the Spin-Off, the Company also changed its name to Arconic. Defendant Arconic's corporate center is located at 201 Isabella Street, Pittsburgh, Pennsylvania, and the Arconic Technology Center for research and development is located at 100 Technical Drive, New Kensington, Pennsylvania.  Arconic remains engaged in the engineering and manufacturing of aluminum and other lightweight metals into products used worldwide in the aerospace, automotive, commercial transportation, packaging, building and construction, oil and gas, defense, consumer electronics, and industrial industries.  Following the Preferred IPO, and until the time of the Spin-Off, Arconic Preferred Shares traded on the NYSE under the ticker symbol "AA-PRB" and have traded on the NYSE under the ticker symbol "ARNC-PB" since the time of the Spin-Off.

20.     Defendant Klaus Kleinfeld ("Kleinfeld") served as the Company's Chief Executive Officer ("CEO") from May 8, 2008 until he was asked to resign on April 17, 2017, after displaying flagrant behavior toward one of the Company's largest shareholders.  Kleinfeld was elected to Alcoa's Board of Directors in November 2003 and became Chairman on April 23, 2010.  He was President and Chief Operating Officer of Alcoa from October 1, 2007 to May 8, 2008.  This was not the first time Kleinfeld was asked to resign from his position as a Chief Executive Officer.

According to media outlets, in 2007, Kleinfeld resigned from his positions as President and CEO of Siemens AG after a scandal surfaced uncovering evidence of bribery and kickbacks in more than a dozen countries where Siemens AG operated and bid for contracts.

21.     Defendant William F. Oplinger ("Oplinger") was, at the time of the Preferred IPO, the Executive Vice President and Chief Financial Officer of Arconic.  He has worked at Alcoa since the Spin-Off.

22.     Defendant Robert S. Collins ("Collins") was, at the time of the Preferred IPO, the Vice President and Controller of Arconic.  He has worked at Alcoa since the Spin-Off.

23.      Defendants Kleinfeld, Oplinger and Collins are referred to herein as the "Officer Defendants" and Defendants Arconic and Kleinfeld are collectively referred to herein as the "Arconic Defendants."

24.     Defendants Arthur D. Collins, Jr. ("A. Collins"), Kathryn S. Fuller, Judith M. Gueron, Michael G. Morris, E. Stanley O'Neal ("O'Neal"), James W. Owens, Patricia F. Russo ("Russo"), Sir Martin Sorrell, Ratan N. Tata and Ernesto Zedillo were, at the time of the Preferred IPO, directors of Arconic.  Defendants A. Collins, O'Neal and Russo remain directors of Arconic.

25.     The defendants named in ¶¶ 20-24 are referred to herein as the "Individual Defendants."  The Individual Defendants each signed the Registration Statement.

26.     Defendants Morgan Stanley & Co. LLC, Credit Suisse Securities (USA) LLC, Citigroup Global Markets Inc., Goldman, Sachs & Co., J.P. Morgan Securities LLC, BNP Paribas Securities Corp., Mitsubishi UFJ Securities (USA), Inc., RBC Capital Markets, LLC and RBS Securities Inc., (the "Underwriter Defendants") are investment banking firms that acted as underwriters of Arconic's Preferred IPO, helping to draft and disseminate the offering documents. Underwriter Defendants Morgan Stanley & Co. LLC and Credit Suisse Securities (USA) LLC were

both joint book-running managers for the Preferred IPO and representatives of the Underwriter Defendants in the Preferred IPO, and Underwriter Defendants Citigroup Global Markets Inc., Goldman, Sachs & Co., and J.P. Morgan Securities LLC were book-running managers for the Preferred IPO.  Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements and omissions in the Registration Statement.

27.     The Underwriter Defendants are investment banking houses that specialize, *inter alia*, in underwriting public offerings of securities; they served as the underwriters of the Preferred IPO and collectively shared $37.5 million in fees.  The Underwriter Defendants determined that in return for their share of the Preferred IPO proceeds, they were willing to merchandize Arconic preferred stock in the Preferred IPO.

28.     The Underwriter Defendants also demanded and obtained an agreement from Arconic that Arconic would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws.  They also made certain that Arconic had purchased millions of dollars in directors' and officers' liability insurance.

29.     Representatives of the Underwriter Defendants also assisted Arconic and the Individual Defendants in planning the Preferred IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of Arconic, an undertaking known as a "due diligence" investigation.  The due diligence investigation was required of the Underwriter Defendants in order to engage in the Preferred IPO.  During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Arconic's operations and financial prospects.

30.     In addition to availing themselves of virtually unbridled access to internal corporate documents, agents of the Underwriter Defendants met with Arconic's lawyers, management and top

executives and engaged in "drafting sessions" between at least July 2014 and September 2014. During these sessions, understandings were reached as to: (i) the strategy to best accomplish the Preferred IPO; (ii) the terms of the Preferred IPO, including the price at which Arconic Preferred Shares would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about Arconic would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Arconic management and top executives, the Underwriter Defendants would or should have learned of Arconic's existing problems as detailed herein.

31.    The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with offers and sales thereof, including to Plaintiff Sullivan and the Class.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

32.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of Classes, consisting of all those who purchased or otherwise acquired Arconic securities during the Class Period (the "Exchange Act Class,") or traceable to the Preferred IPO (the "Securities Act Class" and together with the Exchange Act Class, the "Classes") and were damaged thereby. Excluded from the Classes are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

33.    The members of the Classes are so numerous that joinder of all members is impracticable. Throughout the Class Period, Arconic securities were actively traded on the NYSE.

While the exact number of members of the Classes is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Classes.  Record owners and other members of the Classes may be identified from records maintained by Arconic or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

34.    Plaintiffs' claims are typical of the claims of the members of the Classes as all members of the Classes are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

35.    Plaintiffs will fairly and adequately protect the interests of the members of the Classes and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Classes.

36.    Common questions of law and fact exist as to all members of the Classes and predominate over any questions solely affecting individual members of the Classes.  Among the questions of law and fact common to the Classes are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Arconic;

- whether the Registration Statement issued in connection with the Preferred IPO negligently omitted and/or misrepresented material facts about and the Company's business, operations and management;

- with regard to claims under the Exchange Act only, whether the Arconic Defendants acted knowingly or recklessly in issuing false and misleading statements; and

- whether the members of the Classes have sustained damages and, if so, what is the proper measure of damages.

37.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Classes may be relatively small, the expense and burden of individual litigation make it impossible for members of the Classes to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## OVERVIEW OF THE COMPANY

38.     Founded in 1888, the Company's predecessor, Alcoa, Inc., was the world's fifth largest producer of aluminum.  On November 1, 2016, Alcoa spun-off its Alumina and Primary Metals segments, the rolling mill at the Warrick, Indiana, operations and a 25.1% stake in the Ma'aden Rolling Company in Saudi Arabia into a new separately-held company, Alcoa Corporation. The predecessor company changed its name to Arconic.  All references in this Complaint to Arconic include its predecessor company.

39.     Before the Spin-Off, the Company's operations consisted of four worldwide reportable segments: (i) Alumina, (ii) Primary Metals, (iii) Global Rolled Products, and (iv) Engineered Products and Solutions (which included aluminum).  Post Spin-Off, Arconic has continued to engage in lightweight metals engineering and manufacturing.  Arconic's multi-material products, which include aluminum, titanium, and nickel, are used worldwide in aerospace, automotive, commercial transportation, packaging, building and construction, oil and gas, defense, consumer electronics, and industrial applications.  Arconic's operations now consist of three worldwide reportable segments: (i) Global Rolled Products, (ii) Engineered Products and Solutions, and (iii) Transportation and Construction Solutions.

40.     Reynobond Aluminum Composite Material ("ACM") is a wall cladding product sold by Arconic that consists of two sheets of thin aluminum, each permanently bonded to an extruded thermoplastic core.  The ACM panels are combined with insulation to form cladding used to cover residential and office towers and other buildings.  Reynobond is sold with either a Polyethylene ("PE") core, which is combustible, or a more expensive Fire Resistant ("FR") core.  The Polyethylene core product, Reynobond PE, the cheaper of the two products, was the one Arconic's sales personnel pushed to customers, particularly when engaged in competitive bidding, in order to win projects.

41.     At all relevant times, Arconic was a leading producer of aluminum products.  The Company represented that aluminum and alumina constituted approximately 80% of Alcoa's revenues.  In November 2016, Arconic's upstream business segments separated to become a stand-alone company, and in 2016, Arconic operated in 19 countries.  Based upon the country where the point of sale occurred, the U.S. and Europe generated 51% and 26%, respectively, of Arconic's sales in 2013; 51% and 27%, respectively, of Arconic's sales in 2014; 51% and 26%, respectively, of Arconic's sales in 2015; and 63% and 26%, respectively, of Arconic's sales in 2016.

42.     In filings with the SEC, Arconic acknowledged that it was subject to highly competitive conditions in all aspects of its aluminum businesses, with competition from both U.S. and non-U.S. companies in all major markets.  Arconic's brand names faced brand recognition, with brand loyalty also playing an important competitive role.

**THE GRENFELL TOWER BURNS TO THE GROUND KILLING AT LEAST 71 PEOPLE**

43.     On June 14, 2017, a fire engulfed Grenfell Tower, a 24-story, 220-foot (67 meter) high tower block of public housing flats in North Kensington, west London, in the United Kingdom.

11

44.     The Grenfell Tower contained flammable cladding supplied by Arconic.   That cladding fueled the inferno that eradicated the Grenfell Tower.   Approximately 3,125 square meters of PE panels were used to coat the tower.



**SPREADING OF FIRE**

Flammable cladding and insulation enabled the fire to spread rapidly on the exterior of the building.

45.     The Grenfell Tower fire is the deadliest in the U.K. for more than a century.   The inferno resulted in at least 71 fatalities and over 70 injuries.   The tower contained 127 flats, with 227 bedrooms, at the time of the fire.   The fire started in a fourth-floor flat.   The speed at which the fire spread accelerated as a result of the building's exterior cladding.   Flames consumed the tower quickly.   People trapped on the higher floors screamed for their lives through broken windows. Flames in an ordinary fire burst out of windows, moving from the inside out.   Grenfell Tower burned in reverse, moving inward from the building's exterior.   The flames quickly tore upward in streaks through the facade, filling apartments with toxic black smoke.   Torrents of orange and red branched

out of the first streaks and shot upward.  The flames encased the building in a cylinder of fire.  More than 200 firefighters battled the blaze.  They brought 40 fire engines and other vehicles.



46.    The Grenfell Tower was managed on behalf of the borough council by Kensington and Chelsea Tenant Management Organisation ("KCTMO"), the largest tenant management organization ("TMO") in England, which is responsible for the management of nearly 10,000 properties in the borough.  The KCTMO has a board comprising of eight residents (tenants or leaseholders), four council-appointed members, and three independent members.

47.    Grenfell Tower had undergone a major renovation, which was completed in 2016.  Plans for the renovation were publicized in 2012.  The £8.7 million renovation was overseen by Studio E Architects, Rydon Ltd. of Forest Row, East Sussex, in conjunction with Artelia for contract administration and Max Fordham as specialist mechanical and electrical consultants.  As part of the project, in 2015–2016, the concrete structure received new windows and new aluminum composite rainscreen cladding supplied by Arconic, in part to improve the appearance of the building.  Two types were used: Arconic's Reynobond and Reynolux aluminum sheets. Beneath these and fixed to the outside of the walls of the flats was Celotex RS5000 PIR thermal insulation.  Arconic sold its

13

ACM panels to Worcester-based Omnis Exteriors, which acted as the "fabricator," cutting the panels into shape and supplying them to the contractors working on the Grenfell Tower. The cladding installation work was carried out by Harley Facades of Crowborough, East Sussex, at a cost of £2.6 million.

48.     The original contractor, Leadbitter, had been dropped by KCTMO because its price of £11.278 million was £1.6 million higher than the proposed budget for the refurbishment. The contract was put out to competitive bidding. Rydon's bid was £2.5 million less than Leadbitter's. Rydon's bid called for the installation of Reynobond PE rather than Reynobond FR, despite that Grenfell Tower is 67 meters tall and despite the fact that Arconic's own marketing literature states it should not be used on buildings higher than 10 meters, due to its lack of fire retardant.

49.     Initial building plans for Grenfell Tower approved by residents in 2012 specified zinc cladding. Documents from June and July of 2014 show that KCTMO pressured the project manager for the refurbishing of Grenfell Tower to cut costs. Specifically, KCTMO emailed the manager that "we need good costs" for a meeting to be held the next morning with the project planner. The email suggested several cost-reduction measures. One was to swap the panels of zinc cladding, which were non-combustible and had a fire-retardant mineral core, with panels of combustible and flammable aluminum with a polyethylene core. The email said that this substitution would yield "a saving of £293,368."

50.     In the same time-period, between May and July of 2014, Deborah French, Arconic's U.K. Sales Manager for Reynobond, exchanged emails with the executives of the companies that refurbished the Grenfell Tower regarding the availability of Reynobond PE and FR panels to be used on the Grenfell Tower. In the end, Arconic supplied the project with PE panels.

14

51.     A company director for Omnis Exteriors, the company that cut the Reynobond panels to fit the building exterior and supplied them to the cladding contractor, told the *Guardian*, the British daily newspaper, that the companies that refurbished Grenfell Tower asked them to use Reynobond PE cladding, which is £2 cheaper per square meter than the alternative Reynobond fire retardant (FR).

52.     Architect and fire safety expert Sam Webb described the cladding system added to Grenfell Tower as part of the 2016 refurbishing program to the *Guardian* as "a disaster waiting to happen."

53.     Another architect quoted in a report issued in July 2017 by Architects for Social Housing stated that:

> If we are talking about the second issue, the cladding, ***no one in their right mind would specify the combustible type, partly because of case law, where architects who did specify that lost their defence at appeal in the High Court in 2003. You might as well clad the building in ten-pound notes dipped in Napalm***.

> The Principal Designer (in this case Studio E Architects) would normally seek ***written advice from the supplier – with a quote for supply*** – that the material is fit for purpose. In this case ***it is inconceivable that the manufacturer of Reynobond (Arconic Europe) would not recommend their "A2 Fire Solution"***, comprising an incombustible sandwich core that conforms with European fire certification EN 13501-1, class A2.[1]

54.     According to British Chancellor Philip Hammond, the flammable cladding supplied by Arconic was illegal on tall buildings in Britain.  The cladding installed on Grenfell Tower was not designed for use on buildings taller than 10 meters high, a fraction of the 67-meter Grenfell Tower.

55.     According to the British Department for Communities and Local Government ("DCLG"), cladding with a flammable core, like the one used on Grenfell Tower, was banned on buildings over 18 meters high.  A spokesman for the Department told *The Sunday Times* that

---

[1]     All emphasis in bold or italics is added throughout, unless otherwise noted.

"cladding using a composite aluminum panel with a polyethylene core should not be used for cladding on a building taller than 18m."

56.     Similarly, safety experts agreed that the decision to use the flammable panels on the Grenfell Tower was "disturbing" and "shocking."

57.     The director of the Fire Safety Engineering Group at the University of Greenwich explained that if fire penetrates the cladding, "[i]t is like you have got a high-rise building and you are encasing it in kerosene.  It is insanity, pure and simple."

58.     A breach of building regulations is a criminal offense in the United Kingdom, and corporations can be prosecuted for manslaughter.

59.     British police investigating the fire at Grenfell Tower said they have "reasonable grounds" to suspect that corporate manslaughter offenses may have been committed, along with breaches of health and safety laws.  A letter from the Metropolitan Police to surviving Grenfell Tower residents said that police officers had "seized a huge amount of material and taken a large number of witness statements."  The Metropolitan Police stated that it was a "complex and far reaching investigation that by its very nature will take a considerable time to complete."

60.     Arconic attempted to distance itself from the disaster as its profits skyrocketed.  In the second quarter of 2017—the period including the inferno—Arconic reported profits of $212 million, an increase of 57 per cent from the same quarter of the previous year.  "The business increased revenues and profitability, continued to expand margins and take out cost," touted David Hess, Arconic's interim chief executive.  "We ended the first half of 2017 with significantly less debt, a strong cash position and good liquidity."

61.     In the meantime, Arconic pinned the blame of the fire on others: "Cladding systems contain various components selected and put together by architects, contractors, fabricators and

16

building owners, and *those parties are responsible for ensuring that the cladding systems are compliant under the appropriate codes and regulations*," the company said in a statement.  That decision to stop selling the panels was made out of "an abundance of caution as *Arconic does not control the ultimate design and installation of the final cladding system*," the Company said:

> Our Reynobond products including Reynobond PE are permitted to be used in accordance with local building codes and regulations in the United States and the UK and other countries around the world.  Cladding systems contain various components selected and put together by architects, contractors, fabricators and building owners, and those parties are responsible for ensuring that the cladding systems are compliant under the appropriate codes and regulations.  For our portion in the supply chain, we believe we've been compliant in the sale of our product.

62.      Mr. Hess refused to discuss the size of Arconic's potential liability resulting from the fire.

63.      Following the tragedy at the Grenfell Tower, the DCLG ordered that the cladding be checked on any high-rise social housing under DCLG's control, specifically for the Reynobond PE cladding that was used on the Grenfell Tower refurbishment.  Melanie Dawes, the DCLG permanent secretary, said: "We are therefore asking local authorities and other registered providers of social housing to identify whether any panels used in new-build or refurbishment are a particular type of cladding made of ACM."

64.      After the blaze at Grenfell Tower, the British government established an independent expert advisory panel to advise on immediate measures that should be put in place to help make buildings safe (the "Expert Panel").  On July 6, 2017, the Expert Panel recommended that a series of large scale tests be performed in order to help building owners make decisions regarding remediation.

65.      This series of tests included six combinations of cladding systems.  The Expert Panel and other industry bodies inspected the design of the test systems to ensure that they matched ACM systems in common use.  The first test evaluated a cladding system that mimicked the system used at

Grenfell Tower and featured aluminum panels with core filler materials of unmodified polyethylene (PE), *i.e.*, ACM panels akin to the ones Arconic sells under the brand name Reynobond PE.

66.     The Expert Panel advised that the cladding panel system used in the first test did not meet U.K. building regulation guidance.  In fact, according to the test report, it was not possible to classify the ACM panels under U.K. building regulations, because "in order for a classification . . . to be undertaken, the cladding system must have been tested to the full test duration . . . without any early termination of the test."  The report stated that "[t]he minimum test duration is 40 minutes" and that the test was terminated after 8 minutes and 45 seconds, "due to flame spread above the test apparatus."  The report also found that the panel "would have failed to meet the external fire spread criterion if classification had been possible" because it reached a 15-minute fire spread marker in six-and-a-half minutes and exceeded the 600˚ Celsius temperature ceiling by over 200˚.

## NEWS ARTICLES REVEAL DEFENDANTS' MISCONDUCT

67.     On June 24, 2017, *The New York Times* published an article entitled "Why Grenfell Tower Burned: Regulators Put Cost Before Safety," describing the causes of the Grenfell Tower fire and attributing the rapid spread of the fire to the highly flammable Reynobond PE cladding panels manufactured by Arconic.  The article stated, in relevant part:

> The incineration of Grenfell Tower on June 14, the deadliest fire in Britain in more than a century, is now a national tragedy.  The London police on Friday blamed flammable materials used in the facade for the spread of the blaze and said the investigation could bring charges of manslaughter.  Hundreds of families were evacuated from five high-rises that posed similar risks.
>
> Flames consumed the tower so quickly that arriving firefighters wondered if they could even get inside.  People trapped on the higher floors screamed for their lives through broken windows.  At least 79 people died, a toll that is expected to rise as more bodies are recovered.  Survivors have charged that the facade was installed to beautify their housing project for the benefit of wealthy neighbors.

*                    *                    *

The facade, installed last year at Grenfell Tower, in panels known as cladding and sold as Reynobond PE, consisted of two sheets of aluminum that sandwich a combustible core of polyethylene.  It was produced by the American manufacturing giant Alcoa, which was renamed Arconic after a reorganization last year.

Arconic has marketed the flammable facades in Britain for years, even as it has adjusted its pitch elsewhere.  In other European countries, Arconic's sales materials explicitly instructed that "as soon as the building is higher than the firefighters' ladders, it has to be conceived with an incombustible material."  An Arconic website for British customers said only that such use "depends on local building codes."

*     *     *

Fire safety experts said the blaze at Grenfell Tower was a catastrophe that could have been avoided, if warnings had been heeded.

*     *     *

When the refrigerator on the fourth floor burst into flames, the fire ignited the flammable cladding and shot up the side of the building.  The London police confirmed that on Friday and identified the refrigerator brand as Hotpoint.  But experts who saw footage of the blaze had known the culprit at once.  "You can tell immediately it's the cladding," said Glenn Corbett, an associate professor of fire science at John Jay College of Criminal Justice in New York.

*     *     *

[S]ubcontractor, Omnis Exteriors, said on Friday that it had not been told that the flammable Reynobond cladding was going to be combined with flammable interior insulation.  That was a problem, the firm said in a statement, adding that the cladding "should only be used in conjunction with a noncombustible material."

The cladding itself was produced by Arconic, an industry titan whose chief executive recently stepped down after an unusual public battle with an activist shareholder. Arconic sells a flammable polyethylene version of its Reynobond cladding and a more expensive, fire-resistant version.

In a brochure aimed at customers in other European countries, the company cautions that the polyethylene Reynobond should not be used in buildings taller than 10 meters, or about 33 feet, consistent with regulations in the United States and elsewhere.  "Fire is a key issue when it comes to buildings," the brochure explains. "Especially when it comes to facades and roofs, the fire can spread extremely rapidly."

A diagram shows flames leaping up the side of a building.  "As soon as the building is higher than the firefighters' ladders, it has to be conceived with an incombustible material," a caption says.

But the marketing materials on Arconic's British website are opaque on the issue.

"Q: When do I need Fire Retardant (FR) versus Polyethylene (PR) Reynobond?  The answer to this, in part, depends on local building codes.  Please contact your Area Sales Manager for more information," reads a question-and-answer section.

For more than a week after the fire, Arconic declined repeated requests for comment.  Then, on Thursday, the company confirmed that its flammable polyethylene panels had been used on the building.

68.     On that same day, *Reuters* published an article entitled "Arconic knowingly supplied

flammable panels for use in tower: emails," revealing that Arconic sales managers were aware that

flammable panels would be distributed for use at Grenfell Tower.  The article stated, in relevant part:

LONDON (Reuters) - *Six emails sent by and to an Arconic Inc (ARNC.N) sales manager raise questions about why the company supplied combustible cladding to a distributor for use at Grenfell Tower, despite publicly warning such panels were a fire risk for tall buildings*.  The emails, dating from 2014 and seen by Reuters, were between Deborah French, Arconic's UK sales manager, and executives at the contractors involved in the bidding process for the refurbishment contract at Grenfell Tower in London, where 79 people died in a blaze last week.

When asked about the emails, Arconic said in a statement that it had known the panels would be used at Grenfell Tower but that it was not its role to decide what was or was not compliant with local building regulations.

The company manufactures three main types of Reynobond panel-- one with a polyethylene (PE) core, one with a fire retardant core and another with a non-combustible core, according to its website.

Diagrams in a 2016 Arconic brochure for its Reynobond panels describe how PE core panels are suitable up to 10 meters in height.  Panels with a fire resistant core -- the FR model -- can be used up to 30 meters, while above that height, panels with the non-combustible core -- the A2 model -- should be used, the brochure says.

Grenfell Tower is more than 60 meters tall.

The brochure also issued a blunt warning that cladding can be a fire risk.

"When conceiving a building, it is crucial to choose the adapted products in order to avoid the fire to spread to the whole building.  Especially when it comes to facades and roofs, the fire can spread extremely rapidly," the brochure said.

"As soon as the building is higher than the fire fighters' ladders, it has to be conceived with an incombustible material."  Nonetheless, between May and July 2014, French, who was based at Arconic's factory in Merxheim, France, responded

to requests from the companies involved in refurbishing Grenfell Tower on the availability of samples of five different types of Reynobond aluminum-covered panels, all of which were only available in the combustible PE and FR versions, according to Arconic brochures.

In the end, Arconic said on Friday, the company provided PE panels.  "While we publish general usage guidelines, regulations and codes vary by country and need to be determined by the local building code experts," the company said in an emailed statement in response to the Reuters enquiry.

*     *     *

French did not respond to requests for comment.

Arconic, which was known as Alcoa Inc until 2016, declined to say if it knew how tall the tower was and the emails seen by Reuters do not specifically refer to its height.  They do, however, refer to "Grenfell Tower" and mention other high rise projects where paneling has been used when discussing the appearance that was being sought for Grenfell Tower.

***Arconic also knew the quantity of panels being supplied and thus the total exterior coverage. A source at one of the companies involved in the process said Arconic had "full involvement" throughout the contract bidding process***.

Omnis Exteriors, which cut the Arconic tiles to shape and supplied them to the cladding contractor, said it was not responsible for the choice of panel.

"CEP played no part in the selection of Reynobond PE and simply fulfilled the order as directed by the design and build team," the company said in a statement on Saturday, referring to CEP Architectural Facades Ltd, the Omnis unit which fulfilled the contract.

*     *     *

In the emails, French and representatives of Harley and Rydon also discuss the choice of panel models and colors and how they were inching towards securing the contract with the local authority.

Harris did not respond to requests for comment.

On Sunday, ***British finance minister Philip Hammond said the type of panels used, which are cheaper than non-combustible panels, were banned for use in high rise buildings in Britain, as they are in Europe and the United States***.

*     *     *

The fatal fire was started by a faulty Hotpoint fridge-freezer in one of the apartments, London police said on Friday.  Detective Superintendent Fiona McCormack said

21

insulation on the building, and the ***cladding panels, had failed safety tests carried out after the disaster***.

***The police investigation was considering the possibility of manslaughter and criminal offences in respect of the fire***.

69.     Detective Superintendent Fiona McCormack said insulation on the building, and the cladding panels, had failed safety tests carried out after the disaster.  Experts who saw footage of the blaze were quick to blame the cladding: "You can tell immediately it's the cladding," said Glenn Corbett, an associate professor of fire science at John Jay College of Criminal Justice in New York.

70.     Following these news reports, the price of the Preferred Shares plummeted when trading resumed on Monday, June 26th, 2017, trading down as low as $36.50 per share in intraday trading, down nearly $4 per share, or 9.5% from their close of $40.11 on the evening of Friday, June 23rd, 2017, on unusually high volume of more than 1.4 million shares trading.

71.     On June 26, 2017, Arconic issued a press release announcing it would discontinue global sales of Reynobond PE for use in high-rise buildings after the material was suspected to have contributed to the spread of the deadly fire at the Grenfell Tower apartment complex in London.

72.     Following the publication of additional news reports, the price of the Preferred Shares fell further, trading down as low as $34.39 in intraday trading on June 27th, 2017, and closing down more than $3 per share, another approximately 9% decline from its close of $37.72 per share on June 26th, 2017, again on unusually high volume of 562,520 shares trading.

73.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## SECURITIES ACT ALLEGATIONS

## THE PREFERRED IPO

74.     On or about July 11, 2014, Arconic filed with the SEC a Registration Statement on

Form S 3, which would later be utilized for the Preferred IPO following an amendment made to it on

July 25, 2014.  The Registration Statement was filed pursuant to SEC Rule 415 permitting the

Company to sell up to $5 billion of any combination of its securities (including debt securities, Class

B Serial Preferred Stock, Depository Shares, Common Stock, Warrants, Stock Purchase Contracts or

Stock Purchase Units), in yet unspecified amounts, on yet undetermined dates.  The Registration

Statement expressly incorporated by reference certain past and future filings the Company made

with the SEC, stating, in pertinent part, as follows:

**Incorporation by Reference**

The rules of the SEC allow us to incorporate by reference in this prospectus the information in other documents that we file with it, which means that we can disclose important information to you by referring you to those documents.  The information incorporated by reference is considered to be a part of this prospectus, and certain information in documents that we file later with the SEC will automatically update and supersede information contained in documents filed earlier with the SEC or contained in this prospectus.  We incorporate by reference in this prospectus the documents listed below and any future filings that we may make with the SEC under Sections 13(a), 13(c), 14, or 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), on or after the date of this prospectus and before the termination of the offering . . . .

- Our Annual Report on Form 10-K for the year ended December 31, 2013;

- Our Quarterly Reports on Form 10-Q for the quarters ended March 31, 2014 and June 30, 2014; and

- Our Current Reports on Form 8-K filed January 10, 2014 (Item 1.01 and Exhibit 99.1 of Item 9.01), January 21, 2014, January 23, 2014, February 21, 2014, March 18, 2014, April 14, 2014 (Item 8.01), May 8, 2014 (Item 5.07) and June 27, 2014 (Items 1.01 and 3.02 and Exhibits 2.1, 10.1 and 10.2 of Item 9.01).

75.     On July 30, 2014, the SEC declared the Registration Statement effective.  On or about September 18, 2014, Arconic and the Underwriter Defendants priced the Preferred IPO and filed the final Prospectus for the Preferred IPO, which forms part of the Registration Statement (collectively, the "Registration Statement").

76.     The Preferred IPO was successful for the Company and the Underwriter Defendants, who sold 25 million Arconic Depositary Shares, each representing a 1/10th Interest in a Share of 5.375% Class B Mandatory Convertible Preferred Stock, Series 1, to the public at $50 per share, raising $1.25 billion in gross proceeds for the Company ($1.2125 billion in net proceeds from the Preferred IPO after deducting underwriting discounts, commissions and offering costs).

**The Registration Statement Contained Inaccurate Statements of Material Fact and Omitted Material Information Required to Be Disclosed Therein**

77.     The Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and was not prepared in accordance with the rules and regulations governing its preparation.

78.     First, the Registration Statement negligently failed to identify and disclose known trends, events, demands, commitments, and uncertainties that were reasonably likely to have a material effect on the Company's operating performance.  Second, the Registration Statement contained inaccurate statements of material fact concerning the Company's practices and policies concerning safety and risk management and its potential liability for criminal and civil penalties for failing to adhere to safety procedures programs.

79.     Item 2 of Form 10-Q requires SEC registrants to furnish the information called for under Item 303 of Regulation S-K [17 C.F.R. §229.303], *Management's Discussion and Analysis of Financial Condition and Results of Operations* ("MD&A").  Among other things, Item 303 of

Regulation S-K required Arconic's Form 10-K for the fiscal year ended December 31, 2013 (the "2013 10-K")—which Arconic filed with the SEC on February 13, 2014 and which was signed and certified pursuant to the Sarbanes Oxley Act of 2002 by the Officer Defendants—to disclose known trends or uncertainties that were reasonably likely to have a material impact on Arconic's revenues or income from continuing operations.

80.    In 1989, the SEC issued interpretative guidance associated with the requirements of Item 303 of Regulation S-K concerning the disclosure of material trends or uncertainties.   In particular, the interpretative guidance specifically states that when an SEC registrant knows of a known uncertainty that is reasonably likely to have a material effect on its future operating results exists, disclosure is required.   The interpretative guidance states, in pertinent part, as follows:

> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.
>
> *      *      *
>
> ***Events that have already occurred*** or are anticipated ***often give rise to known uncertainties***.   For example, a registrant may know that a material government contract is about to expire.   The registrant may be uncertain as to whether the contract will be renewed, but nevertheless would be able to assess facts relating to whether it will be renewed.   More particularly, the registrant may know that a competitor has found a way to provide the same service or product at a price less than that charged by the registrant, or may have been advised by the government that the contract may not be renewed.   The registrant also would have factual information relevant to the financial impact of non-renewal upon the registrant.   ***In situations such as these, a registrant would have identified a known uncertainty reasonably likely to have material future effects on its financial condition or results of operations, and disclosure would be required***.

81.    In 2003, the SEC issued additional interpretative guidance relating to the requirements of Item 303.   Such guidance states, in pertinent part:

> ***We believe that management's most important responsibilities include communicating with investors in a clear and straightforward manner. MD&A is a critical component of that communication***.   The Commission has long sought through its rules, enforcement actions and interpretive processes to elicit MD&A that

not only meets technical disclosure requirements but generally is informative and transparent.

82.     Thus, the MD&A disclosure in Arconic's 2013 10-K, which was incorporated by reference in the Registration Statement, contained inaccurate statements of material fact: (i) concerning Arconic's compliance with safety programs and risk management because it failed to disclose material uncertainties and trends, specifically that Arconic was selling Reynobond PE for use in construction projects in a manner that the Company knew was unsafe and presented a fire hazard, and which conflicted with the culture of safety and risk management the Company purported to offer; and (ii) regarding the exposure of Arconic to substantial civil, regulatory and criminal liability as a result of its improper sales of Reynobond PE panels.  At the time of the Preferred IPO, Arconic had been knowingly selling its Reynobond PE panels for use on high-rise residential towers and knew that Reynobond PE panels were being used in an inappropriate manner which potentially exposed the Company to significant civil, regulatory and/or criminal liability.  The uncertainty associated with these sales practices was reasonably likely to have a material impact on Arconic's profitability and, therefore, these practices were required to be, but were not, disclosed in the Registration Statement.

83.     In addition, Item 1A of Form 10-K requires SEC registrants to furnish the information called for under Item 503 of Regulation S-K.  This required that Arconic's 2013 Form 10-K, which was incorporated by reference in the Registration Statement, disclose the most significant matters that make an investment in Arconic risky.

84.     While the 2013 10-K represented that "Alcoa may be exposed to significant legal proceedings [and] investigations" and that the "Company is . . . subject to a variety of legal compliance risks," including "potential claims relating to product liability, health and safety . . . .and compliance with U.S. and foreign export laws . . . and sales and trading practices.  Alcoa could be

subject to fines, penalties, damages (in certain cases, treble damages), or suspension or debarment from government contracts," it also represented that the Company *"believes it has adopted appropriate risk management and compliance programs to address and reduce these risks."*

85.     The 2013 10-K also stated that "Alcoa is subject to a broad range of health, safety and environmental laws and regulations in the jurisdiction in which it operates and may be exposed to substantial costs and liabilities associated with such laws and regulations." "Compliance with . . . health and safety legislation and regulatory requirements may prove to be more limiting and costly than we anticipate. Alcoa's results of operations or liquidity in a particular period could be affected by certain health, safety or environmental matters, including remediation costs and damages related to certain sites. Additionally, evolving regulatory standards and expectations can result in increased litigation and/or increased costs, all of which can have a material and adverse effect on earnings and cash flows."

86.     The 2013 10-K also included a discussion regarding unexpected fires, stating in pertinent part as follows:

> Unexpected events may increase Alcoa's cost of doing business or disrupt Alcoa's operations.
>
> Unexpected events, including fires or explosions at facilities, natural disasters, war or terrorist activities, unplanned outages, supply disruptions, or failure of equipment or processes to meet specifications may increase the cost of doing business or otherwise impact Alcoa's financial performance.

87.     The statements referenced above in ¶¶ 84-86 were inaccurate statements of material fact because they failed to disclose the following material facts which existed at the time of the Preferred IPO:

(a)     that Arconic was knowingly selling Reynobond PE for use in construction projects where the product was to be used in a manner that the Company knew was unsafe and presented a fire hazard;

(b)     that Arconic's marketing and sales of highly-flammable Reynobond PE sales for use in high-rise tower projects directly conflicted with the purported strong culture of safety, ethics and legal compliance that the Company claimed to have and exposed Arconic to hundreds of millions of dollars in potential civil and criminal liability and reputational harm;

(c)     that Arconic's strong assurances of effective global safety and integrity practices concealed from investors the immense risk Arconic had assumed through its sales and marketing practices;

(d)     that Arconic's risk of an unexpected fire had dramatically increased because it was marketing and selling highly-flammable Reynobond PE panels for use in high-rise tower projects in a manner that the Company knew was unsafe and presented a fire hazard; and

as a result, Defendants' statements about safety, risk management and compliance, and efforts to address and reduce risk were materially false and misleading and/or lacked a reasonable basis.

## COUNT I

**(For Violation Of §11 Of The Securities Act Against All Defendants by Plaintiff Sullivan)**

88.    Plaintiff Sullivan repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.  Any allegations of fraud are hereby expressly disclaimed and not incorporated by reference in this Count.

89.    This Cause of Action is asserted by Plaintiff Sullivan, pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

90.     The Registration Statement for the Preferred IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

91.     Defendants are strictly liable to Plaintiff Sullivan and the Class for the misstatements and omissions.

92.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

93.     By reason of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated §11 of the Securities Act.

94.     Plaintiff Sullivan purchased Arconic Preferred Shares traceable to the Preferred IPO.

95.     Plaintiff Sullivan and the Class have sustained damages.  The value of Arconic Preferred Shares has declined substantially subsequent to and due to Defendants' violations.

96.     At the time of their purchases of Arconic Preferred Shares, Plaintiff Sullivan and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed from the time that Plaintiff Sullivan discovered or reasonably could have discovered the facts upon which the initial complaint is based to the time that Plaintiff Sullivan commenced this action.  Less than three years has elapsed between the time that the securities upon which this Cause of Action is brought were offered to the public and the time Plaintiff Sullivan commenced this action.

## COUNT II

### (For Violation of §15 of the Securities Act Against the Company and the Individual Defendants by Plaintiff Sullivan)

97.     Plaintiff Sullivan repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.  Any allegations of fraud are hereby expressly disclaimed and not incorporated by reference in this Count.

98.     This Cause of Action is asserted by Plaintiff Sullivan, pursuant to §15 of the Securities Act, 15 U.S.C. §77o, against the Company and the Individual Defendants.

99.     The Individual Defendants each were control persons of Arconic by virtue of their positions as directors and/or senior officers of Arconic.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Arconic.  The Company controlled the Individual Defendants and all of Arconic's employees.

100.     The Individual Defendants each were culpable participants in the violations of §11 of the Securities Act alleged in the Cause of Action above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the Preferred IPO to be successfully completed.

## EXCHANGE ACT ALLEGATIONS

### During the Class Period, Arconic Knowingly or Recklessly Supplied Flammable PE Panels for High-Rise Buildings, But Hid This Critical Fact From Investors

101.     Arconic's own brochures, featured prominently on the Company's official website during the Class Period, represent that its cladding products containing polyethylene (PE) should not be used in buildings over a height of 10 meters.  The brochures state that only "incombustible" material should be used on buildings higher than 10 meters.  Arconic's brochures state that "it is crucial to choose the adapted products in order to avoid the fire spreading to the whole building.

Especially when it comes to facades and roofs, the fire can spread extremely rapidly." Arconic warns that "[i]t is especially crucial for public establishments. Buildings are also classified according to their height, which will define which materials are safer to use. Another important rule when it comes to the height of buildings concerns the accessibility of the fire brigade—as soon as the building is higher than the firefighters' ladders, it has to be conceived with an incombustible material."

102.    Arconic's brochures contain a height guidance table. While PE can be used up to 10 meters, products which are fire retardant (FR) should be used on buildings up to 30 meters. Above that height, Arconic strictly advises that only cladding panels with non-combustible material—the "A2" model—should be used.



As soon as the building is higher than the firefighters' ladders, it has to be conceived with an incombustible material.

103.    Similarly, an informational series of Frequently Asked Questions available on Arconic's website during the Class Period states that use of Reynobond PE in buildings over 50′ above grade does not comply with the *International Building Code*®:

Q:  When do I need fire-resistant (FR) versus polyethylene (PE) Reynobond?

The answer to this, in part, depends on local building codes. However, the *International Building Code*® states that *in all cases over 50′ above grade, FR is needed.*

104.    According to fire safety experts, polyethylene must be avoided in tall buildings and has been linked to several rapidly spreading fires around the world, including fires at skyscrapers in Dubai and Melbourne.  "Polyethylene is a thermoplastic material, which . . . melts and drips as it burns, spreading the fire downwards as well as upwards," architectural consultants Probyn Miers said in a note on insulation materials posted on their website.

105.    Despite the known flammability of the Reynobond PE panels, resulting in prohibitions against installing them on high-rises in the U.S. and Europe, during the Class Period, Arconic knowingly or recklessly sold millions of dollars of the flammable panels for use in projects Arconic knew were not appropriate and which presented known fire risks.  The Reynobond PE panels were the cheapest of Arconic's three versions and the only ones that are not fire-resistant.

106.    On Saturday, June 24, 2017, *Reuters* published a report entitled "Arconic knowingly supplied flammable panels for use in [the Grenfell] tower – emails."  In its report, Reuters disclosed that Arconic employees knew Reynobond PE panels were being used on the more than 60 meter building, despite the warnings in its own sales brochures.  According to *Reuters*:

> Six emails sent by and to an Arconic Inc. [] sales manager raise questions about why the company supplied combustible cladding to a distributor for use at Grenfell Tower, despite publicly warning such panels were a fire risk for tall buildings.
>
> The emails, dating from 2014 and seen by Reuters, were between Deborah French, Arconic's UK sales manager, and executives at the contractors involved in the bidding process for the refurbishment contract at Grenfell Tower in London, where 79 people died in a blaze last week.
>
> ***When asked about the emails, Arconic said in a statement that it had known the panels would be used at Grenfell Tower but that it was not its role to decide what was or was not compliant with local building regulations***.
>
> The company manufactures three main types of Reynobond panel – one with a polyethylene (PE) core, one with a fire retardant core and another with a non-combustible core, according to its website.
>
> ***Diagrams in a 2016 Arconic brochure for its Reynobond panels describe how PE core panels are suitable up to 10 meters in height. Panels with a fire resistant core***

32

*– the FR model – can be used up to 30 meters, while above that height, panels with the non-combustible core – the A2 model – should be used*, the brochure says.

Grenfell Tower is more than 60 meters tall.

The brochure also issued a blunt warning that cladding can be a fire risk.

"When conceiving a building, it is crucial to choose the adapted products in order to avoid the fire to spread to the whole building. Especially when it comes to facades and roofs, the fire can spread extremely rapidly," the brochure said.

*"As soon as the building is higher than the fire fighters' ladders, it has to be conceived with an incombustible material." Nonetheless, between May and July 2014, French, who was based at Arconic's factory in Merxheim, France, responded to requests from the companies involved in refurbishing Grenfell Tower on the availability of samples of five different types of Reynobond aluminium-covered panels, all of which were only available in the combustible PE and FR versions, according to Arconic brochures.*

*In the end, Arconic said on Friday, the company provided PE panels.*

107.    The *Reuters* report provided additional detail confirming that Arconic had to have

known of the building's height, and thus the risk, and was directly involved in the sale of the product

for use in the project, stating, in pertinent part, as follows:

Arconic, which was known as Alcoa Inc until 2016, declined to say if it knew how tall the tower was and the emails seen by Reuters do not specifically refer to its height. *They do, however, refer to "Grenfell Tower" and mention other high rise projects where paneling has been used when discussing the appearance that was being sought for Grenfell Tower.*

*Arconic also knew the quantity of panels being supplied and thus the total exterior coverage. A source at one of the companies involved in the process said Arconic had "full involvement" throughout the contract bidding process.*

*           *           *

*In the emails, French and representatives of Harley, Omnis and Rydon also discuss the choice of panel models and colours and how they were inching towards securing the contract with the local authority, the Royal Borough of Kensington and Chelsea (RBKC).*

108.    As noted above, in a statement to Reuters responding to the June 24, 2017, report, Arconic openly acknowledged that it "had known the panels would be used at Grenfell Tower but that it was not its role to decide what was or was not compliant with local building regulations."

109.    On Monday June 26, 2017, Arconic issued a public statement essentially conceding its prior misconduct.  In that announcement, Arconic stated that *it was discontinuing the sale of its Reynobond PE core panels worldwide for use in "any high-rise applications regardless of local codes and regulations*."  Arconic cited the purported inconsistency of building codes across the world and issues that had arisen in the wake of the Grenfell Tower tragedy regarding code compliance of cladding systems in the context of buildings' overall designs.  Arconic's statement also confirmed that its aluminum product, Reynobond PE, was part of the cladding system on the outside of Grenfell Tower:

> The loss of lives, injuries and destruction following the Grenfell Tower fire are devastating, and our deepest condolences are with everyone affected by this tragedy. We have offered our full support to the authorities as they conduct their investigations.
>
> While the official inquiry is continuing and all the facts concerning the causes of the fire are not yet known, we want to make sure that certain information is clear:
>
> • Arconic supplied one of our products, Reynobond PE, to our customer, a fabricator, which used the product as one component of the overall cladding system on Grenfell Tower.  The fabricator supplied its portion of the cladding system to the façade installer, who delivered it to the general contractor.  The other parts of the cladding system, including the insulation, were supplied by other parties.  We were not involved in the installation of the system, nor did we have a role in any other aspect of the building's refurbishment or original design.
>
> • While we provided general parameters for potential usage universally, we sold our products with the expectation that they would be used in compliance with the various and different local building codes and regulations.  Current regulations within the United States, Europe and the U.K. permit the use of aluminum composite material in various architectural applications, including in high-rise buildings depending on the cladding system and overall building design.  Our product is one component in the overall cladding system; we don't control the overall system or its compliance.

> Nevertheless, in light of this tragedy, ***we have taken the decision to no longer provide this product in any high-rise applications, regardless of local codes and regulations***.

110.    As reported by the Guardian that day, "[t]he company emailed clients on Monday to tell them it would no longer sell Reynobond PE to buyers planning to use it on tower blocks."

111.    The *Guardian* also reported on June 26, 2017, that the U.K. DCLG had put in place a "combustibility testing programme" for aluminum composite materials and that in early testing, 60 samples from buildings in 25 areas were classed as combustible, with approximately 540 then-still yet to be tested.  Over the prior weekend, following the fire, hundreds of Londoners in public housing structures clad with ACM panels had been forced to evacuate due to safety concerns.

112.    That same day, on June 26, 2017, *Bloomberg* reported that U.K. investigators were targeting Arconic in their investigations as potentially liable, and that the investment community was taking note:

> The use of combustible cladding has become a focal point for investigators.  As the U.K. looks to hold someone responsible, Arconic could be subject to significant liabilities, Seaport Global analyst Josh Sullivan said in an interview.
>
> "The political sentiment on the ground in the U.K. is very aggressive right now," he said.  "Whether or not they are ultimately culpable, they are going to be a part of the inquiry process."
>
> While it's too early to determine the possible financial impact, the situation could make it more difficult for Arconic to find a permanent CEO, Cowen & Co. analyst Gautam Khanna said in a note.  David Hess has been serving on an interim basis since April, when Klaus Kleinfeld left the company.

113.    On September 14, 2017, U.K. officials opened a public inquiry into the cause and spread of the fire (the "Grenfell Tower Inquiry").  British Prime Minister Theresa May appointed retired jurist Sir Martin Moore-Bick to be chairman of the Grenfell Tower Inquiry.  Moore-Bick stated that the Grenfell Tower Inquiry "can and will provide answers to the pressing questions as to how a disaster of this kind could occur in 21st century London."

114.     Following the tragedy at the Grenfell Tower, the British government established a "Building Safety Programme" with the aim of ensuring that residents of high-rise residential buildings are safe, and feel safe from the risk of fire.  As part of the program, the U.K.'s Ministry of Housing, Communities & Local Government (the "MHCLG") publishes a monthly bulletin describing the ongoing work being done to remediate social housing buildings with confirmed ACM cladding in England.

115.     On February 7, 2018, the *New York Times* reported that three separate investigations could not unearth any evidence that the ACM cladding used in the Grenfell Tower had ever been tested for compliance with U.K. building regulations:

> Cladding systems like that installed at Grenfell Tower and since found on hundreds of buildings were not put through legally required fire safety tests, investigators believe.

> Eight months after the fire that killed 71 people, *The Times* understands that three separate investigations have yet to find any record of independent tests on the combination of cladding and insulation materials used at Grenfell Tower or similar materials at 299 other high-rise buildings across England.

> To comply with building regulations, external cladding should pass either a large-scale laboratory fire test or a "desktop study", modelling how the materials would behave in fire.

> Investigators from the Metropolitan Police, the government's expert panel on fire safety and Dame Judith Hackitt's review into building regulations have been shocked to discover that none of the recognised tests appears to have been carried out here or abroad. A failure to test the materials before using them in housing blocks would point to a failure of the building control and regulation regimes.

> "The question that has to be asked is how on earth did this material come to be installed on all of those buildings?" a source with knowledge of the investigations said. "Somehow or other, those materials have got on to 300 buildings without any tests being done or test results being produced."

> The buildings that were deemed "at risk" included 160 social housing blocks, 95 private residential blocks, 31 student residences and 13 public buildings, including at least nine hospitals.

\*          \*          \*

*The Times* has <u>previously revealed</u> how £293,000 was saved in the project budget by replacing Reynobond's fire-retardant cladding panels with a cheaper one made by the same manufacturer, but with a combustible polyethylene core. Tests carried out after the fire combined the combustible cladding with flammable, flame-retardant and non-combustible insulation materials. All systems containing the polyethylene core cladding failed the tests.

The latest report from the government's expert panel said that it was not aware of any tests of such combinations meeting fire regulation standards.

116.    The monthly MHCLG bulletin includes a current count of "high-rise buildings that have been confirmed as having ACM cladding that does not meet the limited combustibility requirements set out in [U.K.] building regulations guidance."

117.    The latest such bulletin, published by the MHCLG on March 28, 2018 and including data as of March 15, 2018, found that 306 buildings in 65 local authority areas in England had ACM cladding that failed flammability tests conducted by the Building Research Establishment.

118.    The MHCLG bulletin also stated that:

- The total number of residential buildings over 18 metres and public buildings in England on 15 March 2018 where it has been confirmed that Aluminium Composite Material (ACM) cladding is installed or was previously installed was 319. This is an increase of five since the last data release, which was based on data from 16 February 2018.

- Of these 319 buildings, 306 have ACM cladding systems that the expert panel advise are unlikely to meet current Building Regulations guidance and therefore present fire hazards on buildings over 18 metres (an increase of five buildings since 16 February 2018).

- Of these 306 buildings unlikely to meet current Building Regulations guidance:

    o   158 are social housing buildings (managed by either local authorities or housing associations);

    o   134 are private sector residential buildings, including hotels and student accommodation; and

    o   14 are public buildings, including hospitals and schools.

119.    Arconic still states on its website that combustible cladding should not be used above 30 meters—the height of a fireman's ladder.

## A RECENT INVESTIGATION BY THE BBC CONFIRMS ARCONIC'S SCIENTER

120.    On April 5, 2018, the British Broadcasting Corporation ("BBC") reported that, based on an investigation it conducted, "fire tests carried out as early as 2014 [by Arconic] showed cladding used on Grenfell Tower failed to meet the safety standards originally claimed by its manufacturer [Arconic]."[2]   According to the report:

> The firm Arconic knew the test rating had been downgraded, but the UK body that certifies building products said it was not told about the change.
>
> An industry source, who has worked on a number of cladding schemes, said he believed there should have been a product recall.
>
> Arconic said it did share the rating with "various customers and certification authorities."
>
> It said the results were also published on the website of the French facility that carried out the tests in 2014 and 2015.
>
> The cladding used on Grenfell was Reynobond PE, aluminium panels containing a plastic filling, that were popular in cost-conscious council refurbishment schemes.
>
> While zinc cladding was initially considered when the tower was refurbished in 2015, Reynobond PE was a cheaper option, saving nearly £300,000.
>
> In the standard European tests for "reaction to fire", products are rated A to F - with A being the top rating. Reynobond PE had a certificate based on a rating of B.
>
> Some in the construction industry regarded this to be the required standard for use on buildings over 18m in height, though the government says this was wrong and it should have been A rated.
>
> The rating was issued in 2008 by the British Board of Agrément (BBA), which used technical data provided by the manufacturer to assess the standard of the panels.
>
> However, the BBC has uncovered a series of reports commissioned by the manufacturer in 2014 and 2015, during the planning for the Grenfell refurbishment.

---

[2] *See* Tom Symonds & Claire Ellison, *Grenfell Tower Cladding Failed to Meet Standard*, BBC, April 5, 2018.

Two configurations of the cladding, both later to be fitted at Grenfell, were tested.

One, known as "riveted", was given a classification of C, not B as was stated on the certificate.

# Fire testing of Reynobond PE 55

| Year | Type | Test fully completed? | Classification |
|------|------|----------------------|----------------|
| 2011 | Riveted | ✓ | B |
| 2014 | Riveted | ✓ | C |
| 2014 | Cassette | ✗ | E |
| 2015 | Riveted* | ✓ | C |
| 2015 | Cassette* | ✗ | E |

*Translucent core and black core

Source: European classification under EN13501-1 carried out by CSTB, France       BBC

Another type, the "cassette system", where the panels are formed into shapes before being fitted, was classified as E. In this case, the reports suggest the testing process was not completed.

However, the BBC also obtained Arconic correspondence sent to clients from late 2015 in which the company appears to confirm some of the panels were rated class E.

The email specifically addresses "concerns about the product's fire reaction class in the UK".

The BBC spoke to one source, who has worked on major cladding schemes, though not Grenfell.

He told us the email was not sent to his company's technical department and was only found after an intensive search of all company records following the Grenfell fire.

# Letter from the cladding makers to clients, December 2015



The source said E rated cladding would have been unacceptable in the projects he worked on.

"To be blunt," he said, "you wouldn't put E on a dog kennel".

He said he should have been informed of the classification results by Arconic with a product recall.

"We would have had to inform our client who would have had a duty of care to say this material is no longer compliant with building control or building regs and should be removed from buildings."

That will now happen, but only as a result of the Grenfell fire and the loss of 71 lives.

Fire testing is carried out regularly by companies producing building materials and, because the results are commercially sensitive, they are not made public.

Instead, manufacturers share their results with The British Board of Agrément (BBA).

After seeing the BBC's evidence the BBA said it "was not notified that there were other test results available in addition to those quoted in the BBA Certificate."

"It is a requirement of the certification process that the BBA is informed of information like this."

The inspectors who "sign off" construction projects rely on the accuracy of the BBA certificates.

Barry Turner, the technical director of Local Authority Building Control, which represents all council building control teams, said: "We are very dependent on the manufacturer telling us there has been a change to that product.

"If someone comes with a classification which doesn't meet what's indicated in the building control guidance then we would say 'that's not suitable. Go away and find another product.'"

**What are the regulations in the UK?**

Since the Grenfell Tower fire, ministers and experts have argued that buildings over 18m needed to meet a class A standard, not B.

But many in the construction industry claim the guidance for meeting the building regulations was unclear until after the fire.

In England and Wales, class B is still regarded as the required standard for some buildings of less than 18m in height which are close to other structures.

The BBC's latest findings could also result in scrutiny of buildings in Scotland where a B classification can also be used on tall buildings under certain circumstances.

**How has Arconic responded?**

Arconic told us: "We previously provided the classification results to various customers and certification authorities, and they were also posted on the CSTB's publicly available website."

The CSTB is the French facility which carried out the tests.

***If the reports were available on its website, they are not now, and the CSTB was not able to provide them.*** The BBC obtained them through other sources.  [the documents are in French, as reflected in the video accompanying the BBC article, at http://www.bbc.com/news/uk-43558186]

***We could find no mention in Arconic's marketing material of the lower classifications for the cheaper Reynobond PE cladding.***

However, the company advertises more expensive versions of its cladding that were classified A2 and B in the European tests.

Arconic also suggested the BBA certificate could not be relied on alone as a mark of fire safety.

Its statement said: "The relevant UK building codes and regulations require entities who design the cladding system, such as architects, fabricators, contractors, or building owners, to conduct their own full systems testing or analysis of the entire cladding system."

**What more do we know about the Grenfell cladding?**

The BBC can also reveal Grenfell Tower was fitted with two different versions of the Reynobond PE cladding.

Arconic changed the makeup of its product, replacing the grey translucent plastic with a black material, also plastic, during the refurbishment of the tower.

It said the change was made to ensure cladding would weather better in direct sunlight and the test results suggest the new version performed better when exposed to flames.

Yet some of the older cladding was already installed on Grenfell and other towers, and was not removed.

**What did our testing of the panels show?**

We asked plastics experts at Impact Solutions in Aberdeen to analyse the older and newer versions of the panel for the BBC.

They concluded both were made of polyethylene plastic.

However, chemical analysis suggested the original Reynobond panel had a wax ingredient, possibly added to make it easier and cheaper to form into sheets.

The Impact Solutions experts believe this substance was removed for the newer version of the cladding.

42

At our request, the company exposed the panels to a flame under laboratory conditions, demonstrating that the newer version burned for a slightly shorter period than the older.

But both samples caught fire within two minutes, both dropped streams of melted, flaming plastic.

Les Rose, from Impact Solutions, described the speed at which the plastic burnt as "fairly dramatic", observing that it appeared to be "feeding the flames".

He regarded neither type of cladding as adequate for fixing to tall buildings.

Since the Grenfell disaster, Arconic has withdrawn Reynobond PE from the market for all building uses.

The company is now being forced to disclose evidence to investigations by the police and the Grenfell Tower public inquiry.

121.    The video accompanying the BBC article provides the following slides:





122. An internal Arconic document dated August 2017, from Mr. Wehrle, the Arconic Technical Manager for Arconic's Architectural Products, addressed to a "Dear partner," makes clear that Arconic knew that only Reynobond FR and Reynobond A2—but not Reynobond PE—met the EN 13501 fire safety standards:[3]

_____

[3] It is unclear whether this letter, which is now publicly available, was ever sent and to whom it was sent.



**ARCONIC ARCHITECTURAL PRODUCTS**

2, Rue Marie Curie

F- 68500 Merxheim

**Claude WEHRLE**
(33) 3.89.74.47.61
(33) 3.89.74.46.90

Merxheim, August 2017

Dear partner,

CE marking is a big issue for building products and is a proof of quality for the products used in a building.
To apply this mark on a product, it has to be tested and classified in accordance with some European harmonized norms.
ARCONIC ARCHITECTURAL PRODUCTS is very interested in applying the CE marking for Reynobond, but, for the moment, this is not possible because the technical requirements are not defined.

3- *How can you preceed until we can provide the CE marking on Reynobond ?*

Reynobond panels are already qualified in accordance with European standards based on the contribution to the fulfilment of the six Essential Requirements, as stated in the Construction Products Directive.

Essential Requirements (from ER1 to ER6) are:

**ER1: Mechanical Resistance and Stability**
　　　　This specifications are treated in the different national Reynobond Technical approvals.

| | |
|---|---|
| France (CSTB): | Avis Technique « Reynobond Système cassette » |
| | Avis Technique « Reynobond Système Riveté et vissé » |
| Germany (DIBt) : | Allgemeine bauaufsichtliche Zulassung |
| United kingdom (BBA) : | Agrément Certificate |
| Poland (ITB) : | Aprobata Techniczna |

**ER2: Safety in case of fire**
　　　　Reynobond FR is classified B-s1,d0 in accordance with EN 13501 standard
　　　　Reynobond A2 is classified A2-s1,d0 in accordance with EN 13501 standard

**ER3: Hygiene, Health and environment**
　　　　Merxheim plant is ISO 14001 Certified
　　　　An Environmental Product Declaration (EPD) is available

**ER4: Safety in use**
　　　　Effect of wind load action, impact resistance and effect of seismic actions, are validate in our national  technical approvals (see ER1)

**ER5: Protection against noise**
　　　　Not relevant


**ER6: Energy economy and heat retention**
　　　　Not relevant

All the ER's mentioned above must be fulfilled for the life of the product.

All those tests results can be provided by ARCONIC on request.

If you have further questions concerning these issues please don't hesitate to contact us.

Best Regards,

Arconic Architectural Products SAS
2 rue Marie Curie
F - 68500 Merxheim
Siret 916 220 502 000 71

ARCONIC ARCHITECTURAL PRODUCTS

*C.WEHRLE*
*Technical Manager*

## ADDITIONAL ALLEGATIONS OF SCIENTER RELEVANT TO THE EXCHANGE ACT VIOLATIONS

123.    During the Class Period, Arconic's management recognized its responsibility for conducting the Company's affairs according to the highest standards of personal and corporate conduct.  This responsibility was characterized and reflected in key policy statements issued from time to time regarding, among other things, conduct of its business activities within the laws of the host countries in which the Company operates and potentially conflicting outside business interests of its employees.  During the Class Period, the Company represented that it maintained a systematic program to assess compliance with these policies.

124.    During the Class Period, the Company also represented that its approach to safety included the following main activities, which it undertook at all times:

- Identifying hazards and assessing the risks associated with our products, services, and operations;

- Developing and implementing operational controls with built-in layers of protection to mitigate effectively the impact of those risks;

47

- Monitoring and maintaining our hazard recognition, risk assessment, and operational control activities to ensure they are current and effective; and

- Reacting to correct gaps in our protective systems and continuously improving system stability.

125.    The Company further represented to investors that "[t]he safety systems are reviewed at least annually.  Senior management participates in the review process, which is designed to ensure the continued sustainability, adequacy, and effectiveness of the organization's overall safety management system."

126.    The Company also stated that "[Arconic]'s chairman and CEO, who reports to and is a member of the Board of Directors, has ultimate responsibility for economic, environmental, and social topics.  The chief financial officer is responsible for economic topics, and the executive vice president of human resources and environment, health, safety, and sustainability has responsibility for environmental and social topics.  Both report to the chairman and CEO."

127.    The Company also informed investors that Arconic's "Approach to Safety" included an annual review by Arconic's Executive Council, which included the Company's CEO.  The Company stated that "[t]he review process is designed to ensure the continued suitability, adequacy, and effectiveness of the organization's overall enterprise risk management and includes significant risks for both personnel and process safety."

128.    Arconic also represented that "[w]e track key performance indicators for each business unit and operating location.  Periodically, we validate their effectiveness in measuring and monitoring our overall safety performance."

129.    According to a confidential witness ("CW1") with first-hand knowledge of the matters he/she discussed herein, Defendant Kleinfeld was very familiar with Arconic's Reynobond PE panels.  CW1 worked at Arconic as a Marketing Manager and as a Global Marketing Director between 2000 and 2011, including working at the Company's Merxheim, France office, where the

Reynobond PE products were manufactured for use in the U.K. and other parts of Europe. As a marketing manager for Arconic, CW1 oversaw the Company's efforts to market the brand names and product lines integrated into the company from Reynolds, namely the Reynobond product line which included both Reynobond and Reynolux panels. CW1 also worked with the Company's Commercial Director responsible for Reynobond in Merxheim, France, Guy Scheidecker. Scheidecker developed and implemented the Company's business strategy for Reynobond in the U.K., CW1 said.

130.   On Arconic's website, Scheidecker was quoted at length regarding the benefits of Reynobond, referred to by its brand name, "Reynobond Architecture":

> Scheidecker: Reynobond Architecture is a composite panel consisting of two coil-coated aluminium sheets that are fusion-bonded to both sides of a polyethylene core or – depending on the model – of a highly fire retardant core. This dual chemical and mechanical priming allows for exception, long-lasting resistance to peeling between the sheet and the core.
>
> And even more: Reynobond® Architecture Panels weigh 1.6 times less than comparable pure aluminium panels. And the Reynobond® Architecture Panels offer outstanding mechanical characteristics: They are extremely rigid and possess a very low coef cient of expansion during temperature fluctuations. Then top it off with the simple processing and increased impact resistance as well – all factors that are important in everyday use.
>
> \*       \*       \*
>
> Reynobond® Architecture was specially developed for complete façade concepts with the most diverse of fastening methods. You can screw, bolt, rivet, glue or solder it with hot air. And to create ventilated facades, you can use flat, bent or machined Reynobond® Architecture sheets in cassette systems.
>
> \*       \*       \*
>
> Reynobond® Architecture is suitable for use in temperature ranges from – 50 °C to + 80 °C. Let's take an example: In Alaska the temperatures in winter easily sink to negative 45 °C, but in summer it can get really hot in this region. For this reason the new Alaska Museum was clad with composite panels from Reynobond® Architecture, because the material can withstand their temperature extremes without a problem. Other parts of the world may not have it quite so extreme, but their

temperatures may fluctuate considerably as well. With Reynobond® Architecture you are always on the safe side with temperature fluctuations.

131.   CW1 also served as the liaison between Arconic's North American and European operations.  According to CW1, the European Sales and Marketing Department was made up of about only 12 sales and marketing employees, all reporting directly to Scheidecker.  Marketing Managers Gerard Sonntag and Virginie Leicht were two of those employees.  Another was U.K. Sales Manager Debbie French.  The European sales team was made up of one salesperson in Italy, one salesperson in the U.K., two or three in France and one in Germany, said CW1.  CW1 communicated with Scheidecker on a regular basis, coordinating global marketing efforts with him in Europe.  CW1 said that he/she did not recall hearing any specific marketing plans in the U.K. While "the sales approach would differ for different countries based on what building code testing was needed," CW1 said the "same marketing strategy was pretty much applicable everywhere."

132.   As a Marketing Manager with Arconic, CW1's job was to strategize ways of marketing Alcoa's Reynobond and Reynolux panels to architects and customers, typically subcontractors on construction projects.  CW1 worked with upper management and sales professionals at Arconic along with outside advertising firms to support Reynobond and Reynolux sales.  As a Global Marketing Director, CW1 was involved in product development and competitive market intelligence operations.  CW1's focus across those activities was always the Reynobond product line throughout his employment at Arconic.

133.   According to CW1, Defendant Kleinfeld was very familiar with the Reynobond products.  CW1 explained that Kleinfeld met with CW1 and other senior employees working at the Company's Merxheim, France office sometime in 2007 or 2008.  Kleinfeld was traveling in Basel, Switzerland and decided to visit the Merxheim office to learn more about the Reynobond business, CW1 said.  During the meeting, Craig Belnap (President of Alcoa Architectural Products) and

Claude Schmidt (General Manager at the Merxheim facility) lead a presentation on Reynobond and its products including Reynobond PE, Reynobond FR and Reynolux.  The two, with help from CW1, discussed Reynobond financials and sales and explained their roles within the business group. Scheidecker also attended the meeting.  CW1 created PowerPoint slides for the presentation.  The slides included pictures of various construction projects with Reynobond PE or FR cladding.

134.    As a result of the meeting, Kleinfeld knew that the PE and FR panels were different and that the FR panels were to be used when the specifications and building codes for a project called for fire resistant panels, CW1 said.

135.    CW1 explained that "everybody knew" that Reynobond PE panels would burn because they could not pass multi-story fire tests.  It was "universally known" throughout the construction industry that polyethylene panels were not supposed to be used on high rise buildings, CW1 said.

136.    For example, the polyethylene version of Reynobond, Reynobond PE, was only allowed to be used as a cladding material in the U.S. up to 40 feet as required by U.S. building codes, CW1 said.  The only Reynobond product allowed to be used above 40 feet high was the Company's fire-retardant product, Reynobond FR.  That was because Reynobond PE "burns very readily," as footage of the Grenfell Tower burning showed, according to CW1.  Further, Reynobond PE had not passed one of two major fire tests required by U.S. building codes.  Both Reynobond PE and Reynobond FR pass the U.S. "smoke and flame test" (ASTM E 84) but only Reynobond FR passes the U.S. "multi-story fire test" (NFPA 285), CW1 said.

137.    While the ASTM E 84 and NFPA 285 tests are standards for the U.S. specifically, there are equivalent standards in other jurisdictions, according to CW1.  In Canada, for example, construction materials need to pass the S134 multi-story fire test to be used above a certain height.

In Europe, each jurisdiction is different but most have a comparable test and standard for cladding materials like Reynobond.  In Britain, the multi-story fire test requirements were vague compared to U.S. and Canada, where the requirements were very specific, CW1 said.  The vague multi-story requirements were significant for general contractors and architects working in the U.K.  That is because architects across jurisdictions are required to design projects in accordance with local building codes.  General contractors and subcontractors are notorious for winning projects by bidding a low price and then making their money by substituting cheaper products for approved expensive products, CW1 said.

138.   According to CW1, all the sales managers at Arconic knew what type of materials the Company supplied for its projects.  They accessed and tracked information on the projects for which they sold Reynobond panels in a construction project database.  Senior level executives were briefed on statistics like Reynobond sales, market share and growth, CW1 said.

139.   Arconic salespeople used the construction project database to develop business, CW1 explained.  The database included information on new projects and their specifications as determined by each project's architect in accordance with local construction codes, CW1 said.  The specifications displayed in the database were detailed descriptions of materials to be used including prescribed wall panels and insulation systems.  A building's cladding material would be specified within the database, CW1 noted.

140.   As CW1 explained, Alcoa's sales team accessed the database to find projects that they could refer to potential customers—subcontractors who worked on the project's construction— with the goal of selling Reynobond panels for the project identified.  Subcontractors in turn used the database's specifications to guide them in their project bids.  It is not uncommon in the construction industry for subcontractors to bid on a project and then deviate from that project's specifications

after they have won the bid, according to CW1.  In those instances, Arconic sales employees would

learn which Reynobond product was being used for a project when a subcontractor asked for a new

quote, usually for a building material that was cheaper than the one specified in the database.  Those

quotes were requested and provided via email, CW1 said.

141.    CW1 explained that "[b]ecause you can't sell or market unless you have the testing—

that's your ticket to the market—and your building code approval or multistory fire test or the

system test."  "I know very well that you can't sell into a market unless you have the 'OK,' so to me

it was always an assumption that if we're selling there we have it," CW1 said.

## MATERIALLY FALSE AND MISLEADING STATEMENTS
## ISSUED DURING THE CLASS PERIOD RELEVANT TO THE EXCHANGE ACT
## VIOLATIONS

### False and Misleading Statements Made in 2013

142.    On or about November 20, 2013, the Company made the following representations

regarding its Reynobond ACM products, on its official website:

> [E]ach of our product offerings provide the durability to ensure your project will look
> pristine for years to come—with minimal maintenance.

> Safe and Compliant.  Reynobond is designed and tested to meet safety and
> environmental building codes around the world.  It is available with either a
> polyethylene (PE) core or a fire-resistant (FR) core material . . . .

> Reynobond® Aluminum Composite Material (ACM) is a high-performance wall
> cladding product from Alcoa Architectural Products, consisting of two sheets of
> nominal 0.020'' (0.50 mm) aluminum, each permanently bonded to an extruded
> thermoplastic core.  This is an elegant concept resulting in an extraordinary flat and
> highly formable material with an excellent strength-to-weight ratio.

> Reynobond is a fully tested product, with building-code approvals throughout the
> world.  It is available with either a Polyethylene (PE) core or a Fire Resistant (FR)
> core.

> Reynobond is manufactured to exacting tolerances with state-of-the-art equipment in
> a continual process.  Alcoa Architectural Products has a reputation for manufacturing
> products of the highest quality, and Reynobond is no exception.

Our Reynobond® Aluminum Composite Material delivers consistent . . . strength.

143.    The Company made the same or similar statements to those in ¶ 142 above on or about December 12, 17, and 27, 2013, on its website.

144.    On or about November 20, 2013, the Company made the following statements with respect to its development and implementation of operational controls, on its official website:

> Operations and activities that could result in risk or impact are controlled to ensure that our environment, health and safety (EHS) policy is followed and that management system objectives are achieved.  We develop procedures to cover . . . external activities, including contractor and product safety.

145.    On or about November 20, 2013, the Company also represented the following on its official website:

> The following are the four main activities undertaken in support of our safety system: Identifying hazards and assessing the risks associated with our products . . . .
>
> *       *       *
>
> Our global focus and attention on fatality prevention continues with the objection of building a system and culture that is more robust in its ability to . . . address contractor and contracted services safety.

146.    On or about November 20, 2013, the Company made the following statements with respect to its values, on its official website:

> Our Values
> We live our Values every day, everywhere, collaborating for the benefit of our customers, investors . . . communities and partners.
>
> Integrity
> We are open, honest, and accountable.
>
> Environment, Health & Safety
> We work safely . . . and protect the environment.

147.    The Company made the same or similar statements to those in ¶¶ 144-46 above on or about December 12, 17, and 27, 2013, on its website.

**REASONS WHY THE STATEMENTS MADE IN 2013 WERE FALSE AND
MISLEADING**

148.    The Arconic Defendants' statements made in 2013, which specifically discuss the

features of the Reynobond ACM products, including Reynobond PE, were false and misleading

because at the time these statements were made, the Arconic Defendants failed to disclose that

Arconic was selling Reynobond PE for use in construction projects, where the product was to be

used in a manner that the Company knew was unsafe and presented a fire hazard.

149.    The Arconic Defendants' statements made in 2013 related to the Company's adopted

procedures to cover contractor and product safety were false and misleading because at the time

these statements were made, (i) Arconic did not employ safety procedures to cover its contractors

and product safety, but instead supplied highly flammable Reynobond PE products in construction

projects, where the product was to be used in a manner that the Company knew was unsafe and

presented a fire hazard; and (ii) Arconic's assurances of safety practices concealed from investors

the immense risk Arconic had assumed through its marketing and sales of highly-flammable

Reynobond PE products for use in high-rise tower projects across the U.K. and other countries.

150.    The Arconic Defendants' statements made in 2013 vouching that Arconic is "open"

and "honest" were false and misleading because the Arconic Defendants failed to disclose that, at the

time these statements were made, Arconic was selling Reynobond PE for use in construction

projects, where the product was to be used in a manner that the Company knew was unsafe and

presented a fire hazard.

**False and Misleading Statements Made in 2014**

151.    On or about January 9, 2014, Arconic issued a press release announcing its financial

results for the quarter and year ended December 31, 2013 ("Q4 2013" and "FY 2013," respectively).

For Q4 2013, the press release reported that Arconic's Engineered Products and Solutions segment

had generated third-party sales of $1.4 billion and that "ATOI [after-tax operating income] was a "fourth quarter record" of $168 million, down $24 million sequentially and up $28 million, or 20 percent, year-over-year."

152.    For FY 2013, the press release reported that Arconic's Engineered Products and Solutions segment had generated $5.7 billion in third-party sales and $726 million of ATOI.

153.    On February 13, 2014, Arconic filed its Form 10-K for the fiscal year ended December 31, 2013 with the SEC ("2013 10-K"), which was signed and certified pursuant to the Sarbanes Oxley Act of 2002 by Defendants Kleinfeld, among others. Concerning sales in Arconic's "Engineered Products and Solutions" segment, which included sale of "integrated aluminum structural systems," the 2013 10-K stated that "[t]hird-party sales for the Engineered Products and Solutions segment improved 4% in 2013 compared with 2012 . . . .," "Third-party sales for this segment increased 3% in 2012 compared with 2011 . . . .," "ATOI [after-tax operating income] for the Engineered Products and Solutions segment rose $114 in 2013 compared with 2012, principally the result of net productivity improvements across all businesses . . . .," and "ATOI for this segment climbed $75 in 2012 compared with 2011 . . . ." The 2013 10-K also stated, in pertinent part, that "[i]n 2014, . . . the building and construction end market is expected to improve as the gradual recovery in North America continues and the decline in Europe slows down."

154.    The 2013 10-K also reported sales of architectural aluminum systems of $977 million for full year 2013.

155.    The 2013 10-K also represented that "Alcoa may be exposed to significant legal proceedings [and] investigations" and that the "Company is . . . subject to a variety of legal compliance risks," including "potential claims relating to product liability, health and safety . . . .and compliance with U.S. and foreign export laws . . . and sales and trading practices. Alcoa could be

subject to fines, penalties, damages (in certain cases, treble damages), or suspension or debarment from government contracts." "Alcoa believes it has adopted appropriate risk management and compliance programs to address and reduce these risks."

156.    The 2013 10-K also stated that "Alcoa is subject to a broad range of health, safety and environmental laws and regulations in the jurisdiction in which it operates and may be exposed to substantial costs and liabilities associated with such laws and regulations." "Compliance with . . . health and safety legislation and regulatory requirements may prove to be more limiting and costly than we anticipate.  Alcoa's results of operations or liquidity in a particular period could be affected by certain health, safety or environmental matters, including remediation costs and damages related to certain sites.  Additionally, evolving regulatory standards and expectations can result in increased litigation and/or increased costs, all of which can have a material and adverse effect on earnings and cash flows."

157.    The Company's 2013 Annual Report sent to investors in early 2014 included a Chairman's Letter signed by Defendant Kleinfeld that emphasized Reynobond panels' contribution to "the bright future for Alcoa's $1.5 billion commercial construction businesses," stating, in pertinent part:

> The beautiful cauldron holding the Olympic flame above the Sochi Winter Games was touted by the Russian hosts as a symbol of an environmentally-friendly Olympics.  Built with panels made from Alcoa's architectural aluminum, it is also a symbol of Alcoa innovation and *the bright future for Alcoa's $1.5 billion commercial construction businesses*.  The *Alcoa Reynobond® panels* in the cauldron were coated with an innovative technology called EcoClean™ that is self-cleaning and removes pollutants from the air.  In addition to aesthetic and emissions benefits, *Alcoa's new aluminum architectural systems provide buildings with stronger impact protection* and more than 50% better thermal performance than traditional methods.  As governments and customers seek to reduce the high energy consumption and resultant emissions of buildings, *Alcoa's "green building" innovations enabled Alcoa to grow our business during the construction drought of the past five years and position us for dramatic growth when the commercial real estate market rebounds*.

158.    The Chairman's Letter lauded the Company's purported strong commitment to safety

values on a global level, stating, in pertinent part:

> We continued to reaffirm Alcoa's Values during 2013.  *We launched a global Integrity Champion Network of high potential managers to further embed a values-based culture of integrity and compliance at all levels of the Company*.  *Our employees' strong commitment to* our Environment, *Health and Safety Value* resulted in Alcoa's first fatality free year in *the 70 years since the Company began monitoring safety on a global basis*.

159.    The 2013 Annual Report specifically emphasized the Company's purported strong

safety values, stating, in pertinent part:

> *Alcoa is a values-based company*.  *Our Values—Integrity*, Respect, Innovation, *Excellence and Environment, Health and Safety*—guide our work and help us accomplish our goals the right way. *They also align us with our stakeholders*, from employees, customers and suppliers to investors and the communities in which we operate.

160.    The 2013 Annual Report also specifically highlighted the successes of the Engineered

Products and Solutions segment, stating, in pertinent part:

> **ENGINEERED PRODUCTS AND SOLUTIONS**
>
> Our products . . . enable buildings that are . . . safe, . . . .  Engineered Products and Solutions, part of Alcoa's value-add portfolio, performed against targets set in 2010 and generated $970 million incremental revenue from share gains through innovation, while growing adjusted EBITDA margins from 2010 to 2013.

161.    On or about March 7, 2014, the Company made the following statements with respect

to its development and implementation of operational controls, on its official website:

> Operations and activities that could result in risk or impact are controlled to ensure that our environment, health and safety (EHS) policy is followed and that management system objectives are achieved. We develop procedures to cover . . . external activities, including contractor and product safety.

162.    On or about March 7, 2014, the Company also represented the following on its

official website:

> The following are the four main activities undertaken in support of our safety system: Identifying hazards and assessing the risks associated with our products . . . .

58

*      *      *

Our global focus and attention on fatality prevention continues with the objection of building a system and culture that is more robust in its ability to . . . address contractor and contracted services safety.

163.    On or about March 7, 2014, the Company made the following statements with respect

to its values on its official website:

> Our Values
> We live our Values every day, everywhere, collaborating for the benefit of our customers, investors . . . communities and partners.
>
> Integrity
> We are open, honest, and accountable.
>
> Environment, Health & Safety
> We work safely . . . and protect the environment.

164.    The Company made the same or similar statements to those in ¶¶ 161-63 above on or

about January 20, 27, February 8, 9, 14, 22, 27, March 7, 8, 20, 27, May 6, 16, 20, June 6, 23, 25, 27,

28, July 3, 23, September 22, 27, October 1, 2, 9, 13, 15, 17, November 18, December 16, 18 and 27,

2014, on its official website.

165.    On or about March 7, 2014, Arconic stated the following concerning "Environment,

Health and Safety" ("EHS") on its official website:

> EHS POLICY
>
> It is [Arconic]'s policy to operate worldwide in a safe, responsible manner which respects the environment and the health of our employees, our customers and the communities where we operate. We will not compromise environmental, health or safety values for profit or production.  All [Arconic]ans are expected to understand, promote and assist in the implementation of this Policy and the accompanying Principles.

166.    Under the heading "EHS Principles," Arconic further stated that:

> •      We value human life above all else and manage risks accordingly.

*      *      *

> •      We do not compromise our EHS Value for profit or production.

59

- We comply with all laws and set higher standards for ourselves and our suppliers where unacceptable risks are identified.

  *       *       *

- We supply and use safe and reliable products and services.

- We use our knowledge to enhance the safety and well-being of our communities.

167.    On or around March 10, 2014, the Company made the following representations regarding its Reynobond ACM products, on its official website:

[E]ach of our product offerings provide the durability to ensure your project will look pristine for years to come—with minimal maintenance.

Safe and Compliant.   Reynobond is designed and tested to meet safety and environmental building codes around the world.   It is available with either a polyethylene (PE) core or a fire-resistant (FR) core material . . . .

Reynobond® Aluminum Composite Material (ACM) is a high-performance wall cladding product from Alcoa Architectural Products, consisting of two sheets of nominal 0.020'' (0.50 mm) aluminum, each permanently bonded to an extruded thermoplastic core.  This is an elegant concept resulting in an extraordinary flat and highly formable material with an excellent strength-to-weight ratio.

Reynobond is a fully tested product, with building-code approvals throughout the world.  It is available with either a Polyethylene (PE) core or a Fire Resistant (FR) core.

Reynobond is manufactured to exacting tolerances with state-of-the-art equipment in a continual process.  Alcoa Architectural Products has a reputation for manufacturing products of the highest quality, and Reynobond is no exception.

Our Reynobond® Aluminum Composite Material delivers consistent . . . strength.

168.    The Company made the same or similar statements to those in ¶ 167 above on or about January 20, 27, February 8, 9, 14, 22, 27, March 7, 8, 20, 27, May 6, 16, 20, June 6, 23, 25, 27, 28, July 3, 23, September 22, 27, October 1, 2, 9, 13, 15, 17, November 18, December 16, 18 and 27, 2014, on its official website.

169.    On or about April 8, 2014, Arconic issued a press release announcing its financial results for the quarter ended March 31, 2014 ("Q1 2014").  For Q1 2014, the press release reported

that Arconic's Engineered Products and Solutions segment had generated third-party sales of $1.4 billion and that "ATOI was a first quarter record of $189 million, up $21 million, or 13 percent, sequentially and up $16 million, or 9 percent, year-over-year."

170.    On or about April 24, 2014, Arconic filed its Form 10-Q for the quarter ended March 31, 2014 with the SEC ("Q1 2014 10-Q").  The Q1 2014 10-Q was signed on behalf of Arconic by its CFO and its Controller.

171.    Also, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Defendant Kleinfeld certified that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

172.    The Q1 2014 10-Q set forth financial results substantially similar to those described above regarding Arconic's April 9, 2014 press release.

173.    On or about May 2, 2014, Arconic held an annual shareholders meeting, in which Defendant Kleinfeld participated.   At the meeting, Kleinfeld stated the following about the Company's safety record:

> So let's first start with our most important thing, safety. And as you can see here, this is our safety track record.  And we already are know [sic] not only in our industry, but beyond our industry, to have a very, very, very good safety record.

174.    On or about May 8, 2014, Arconic filed its Form 8-K current report with the SEC ("May 8, 2014 Form 8-K").  Attached to the May 8, 2014 Form 8-K as an exhibit and expressly incorporated into it by reference was Arconic's 2013 Sustainability Highlights Report.  The Report represented that "*[w]e also have developed state-of-the-art framing and wall systems that are hurricane and blast resistant*."   The 2013 Sustainability Highlights Report also stated that

"*architectural aluminum systems that use advanced thermal technologies can provide superior thermal performance without compromising structural performance*."

175.    The May 8, 2014 Form 8-K also advised that "[m]ore in-depth sustainability information and performance data for the company will be available online in the Sustainability section of the company's website at www.alcoa.com beginning May 13, 2014."

176.    On or about May 13, 2014, Arconic posted to the Sustainability section of its official website a "Chairman & CEO Statement" attributed to Defendant Kleinfeld.  In the Chairman & CEO Statement, Defendant Kleinfeld stated that "*[b]y reinforcing that nothing is more valuable than human life, [Arconic] has progressively improved its safety performance over the years*."

177.    On or about July 8, 2014, Arconic issued a press release announcing its financial results for the quarter ended June 30, 2014 ("Q2 2014").  For Q2 2014, the press release reported that Arconic's Engineered Products and Solutions segment had generated third-party sales of $1.5 billion, and that "ATOI was a quarterly record of $204 million, up $15 million, or 8 percent, sequentially and up $11 million, or 6 percent, year-over-year."

178.    On or about July 24, 2014, Arconic filed its Form 10-Q for the quarter ended June 30, 2014 with the SEC ("Q2 2014 10-Q").  The Q2 2014 10-Q was signed on behalf of Arconic by its CFO and its Controller.  Also, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Defendant Kleinfeld certified that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

179.    The Q2 2014 10-Q set forth figures substantially similar to those described above regarding Arconic's July 8, 2014 press release.

180.    On or about October 8, 2014, Arconic issued a press release announcing its financial results for the quarter ended September 30, 2014 ("Q3 2014").   For Q3 2014, the press release reported that Arconic's Engineered Products and Solutions segment had generated third-party sales of $1.495 billion, and that "ATOI was a quarterly record of $209 million, up $5 million, or 2 percent, sequentially and up $17 million, or 9 percent, year-over-year."   The press release also stated that "EPS delivered its eighteenth consecutive quarter of year-over-year ATOI improvement."

181.    On or about October 23, 2014, Arconic filed its Form 10-Q for the quarter ended September 30, 2014 with the SEC ("Q3 2014 10-Q").   The Q3 2014 10-Q was signed on behalf of Arconic by its CFO and its Controller.   Also, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Defendant Kleinfeld certified that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

182.    The Q3 2014 10-Q set forth figures substantially similar to those described above regarding Arconic's October 8, 2014 press release.

## REASONS WHY THE STATEMENTS MADE IN 2014 WERE FALSE AND MISLEADING

183.    The Arconic Defendants' statements made in 2014, which specifically discuss the features of the Reynobond ACM products, including Reynobond PE, were false and misleading because at the time these statements were made, the Arconic Defendants failed to disclose that Arconic was selling Reynobond PE for use in construction projects, where the product was to be used in a manner that the Company knew was unsafe and presented a fire hazard.

184.    The Arconic Defendants' statements made in 2014 related to the Company's commitment to safety, its touted safety performance, its adopted procedures to cover contractor and

product safety, and its assurances that the Company supplies and uses safe and reliable products and services were false and misleading because at the time these statements were made, (i) Arconic did not employ safety procedures to cover its contractors and product safety, but instead supplied highly flammable Reynobond PE products in construction projects, where the product was to be used in a manner that the Company knew was unsafe and presented a fire hazard; and (ii) Arconic's strong assurances of safety practices concealed from investors the immense risk Arconic had assumed through its marketing and sales of highly-flammable Reynobond PE products for use in high-rise tower projects across the U.K. and other countries.

185.    The Arconic Defendants' statements made in 2014 vouching that Arconic is "open" and "honest" were false and misleading because the Arconic Defendants failed to disclose that, at the time these statements were made, Arconic was selling Reynobond PE for use in construction projects, where the product was to be used in a manner that the Company knew was unsafe and presented a fire hazard.

186.    The Arconic Defendants' statements made in 2014 representing that Arconic has adopted appropriate risk management and compliance programs that address and reduce the risks associated with legal compliance risks related to product liability, safety, or noncompliance with US and foreign sale sales and trading practices, and their statements that Arconic complies with all laws (including safety laws) and sets high standards for suppliers where unacceptable risk are identified were false and misleading because, at the time these statements were made, Arconic was selling Reynobond PE for use in construction projects, where the product was to be used in a manner that the Company knew was non-compliant, unsafe and presented a fire hazard, exposing Arconic to hundreds of millions of dollars in potential civil and criminal liability.

187.   The Arconic Defendants' statements made in 2014 concerning sales metrics (*i.e.*, that the Company made millions of dollars in revenues and profits from, among other products, sales of Reynobond PE products, and that its sales were increasing) were false and misleading because the Arconic Defendants failed to disclose that Reynobond PE sales proceeds were the result of misleading and illicit marketing and sales practices, and subjected the Company to significant civil, regulatory, and criminal liability.

**False and Misleading Statements Made in 2015**

188.   On or about January 12, 2015, Arconic issued a press release announcing its financial results for the fourth fiscal quarter and year ended December 31, 2014 ("Q4 2014" and "FY 2014," respectively).   For Q4 2014, the press release reported that Arconic's Engineered Products and Solutions segment had generated third-party sales of $1.566 billion, and ATOI of $165 million, which was "its 19th consecutive quarter of year-over-year after-tax operating income growth, excluding Firth Rixson."

189.   For FY 2014, the press release reported that Arconic's Engineered Products and Solutions segment had generated $6.006 billion in third-party sales and $767 million of ATOI.

190.   On February 19, 2015, Arconic filed its Form 10-K for the fiscal year ended December 31, 2014 with the SEC ("2014 10-K"), which was signed and certified pursuant to the Sarbanes Oxley Act of 2002 by Defendant Kleinfeld.   Concerning sales in Arconic's "Engineered Products and Solutions" segment, which included sale of "integrated aluminum structural systems," the 2014 10-K stated that "[t]hird-party sales for the Engineered Products and Solutions segment increased 5% in 2014 compared with 2013, primarily due to higher volumes . . . ." "Third-party sales for this segment increased 4% in 2013 compared with 2012 . . . .," "ATOI [after-tax operating income] for the Engineered Products and Solutions segment climbed $41 in 2014 compared with

2013, mainly due to net productivity improvements across all businesses . . . .," and "ATOI for this segment climbed $114 in 2013 compared with 2012 . . . ."

191.    The 2014 10-K also stated, in pertinent part, that "[i]n 2015, . . . the building and construction end market is expected to improve through growth in North America for the non-residential sector but will be somewhat offset by overall weakness in Europe."

192.    The 2014 10-K also reported sales of architectural aluminum systems of $1,002 million for full year 2014.

193.    The 2014 10-K also represented that "Alcoa may be subject to significant legal proceedings [and] investigations" and that the "Company is . . . subject to a variety of legal compliance risks," including "potential claims relating to product liability, health and safety . . . .and compliance with U.S. and foreign export laws . . . and sales and trading practices.  Alcoa could be subject to fines, penalties, damages (in certain cases, treble damages), or suspension or debarment from government contracts."  "Alcoa believes it has adopted appropriate risk management and compliance programs to address and reduce these risks."

194.    The 2014 10-K also stated that "Alcoa is subject to a broad range of health, safety and environmental laws and regulations in the jurisdiction in which it operates and may be exposed to substantial costs and liabilities associated with such laws and regulations."  "Compliance with . . . health and safety legislation and regulatory requirements may prove to be more limiting and costly than we anticipate.  Alcoa's results of operations or liquidity in a particular period could be affected by certain health, safety or environmental matters, including remediation costs and damages related to certain sites.  Additionally, evolving regulatory standards and expectations can result in increased litigation and/or increased costs, all of which can have a material and adverse effect on earnings and cash flows."

195.    The Company's 2014 Annual Report sent to investors in early 2015 included a Chairman's Letter signed by Defendant Kleinfeld that emphasized that Arconic's "businesses benefit from a set of Alcoa Values that have endured the test of time—Integrity; Respect; Environment, Health and Safety; Innovation; and Excellence."

196.    The Chairman's Letter lauded the Company's purported strong commitment to safety values on a global level, stating, in pertinent part:

197.    Further expounding on the Company's purported "Values," the 2014 Annual Report emphasized the Company's strong commitments to safety, ethics and compliance in all of its product offerings, stating, in pertinent part:

> ***Our Alcoa Values – Integrity, Respect, Innovation, Excellence and Environment, Health and Safety – bring out the best in our employees and our Company. As Alcoa transforms, our Values serve as a bright beacon, continuing to guide how we work with our stakeholders and communities***.
>
> ***Safety***
>
> ***Our world-class safety culture values human life above all else, seeks to manage risk accordingly*** . . . .
>
> Ethics and Compliance
>
> . . . ***The Ethics and Compliance Program continues to focus on*** anti-corruption, trade compliance and ***adherence with all relevant U.S. and national laws and regulations***.

198.    The 2014 Annual Report also specifically highlighted the successes of the Engineered Products and Solutions segment, stating, in pertinent part:

> **ENGINEERED PRODUCTS AND SOLUTIONS**
>
> 2014 was the best year ever for our innovative, multi-material Engineered Products and Solutions (EPS) segment.  It generated $6.0 billion in third-party revenues and $767 million in after-tax operating income (ATOI) with an adjusted EBITDA margin of 21.9%.   By engineering proprietary ***products that are highly valuable to customers across*** its aerospace, commercial transportation, ***building and construction***, industrial gas turbine, and oil and gas end markets, ***EPS drove strong***

*share gains across all of its businesses.  The segment signed a number of valuable contracts throughout the year* . . . .

199.    On or around February 5, 2015, the Company made the following representations regarding its Reynobond ACM products, on its official website:

[E]ach of our product offerings provide the durability to ensure your project will look pristine for years to come—with minimal maintenance.

Safe and Compliant.  Reynobond is designed and tested to meet safety and environmental building codes around the world.  It is available with either a polyethylene (PE) core or a fire-resistant (FR) core material . . . .

Reynobond® Aluminum Composite Material (ACM) is a high-performance wall cladding product from Alcoa Architectural Products, consisting of two sheets of nominal 0.020'' (0.50 mm) aluminum, each permanently bonded to an extruded thermoplastic core.  This is an elegant concept resulting in an extraordinary flat and highly formable material with an excellent strength-to-weight ratio.

Reynobond is a fully tested product, with building-code approvals throughout the world.  It is available with either a Polyethylene (PE) core or a Fire Resistant (FR) core.

Reynobond is manufactured to exacting tolerances with state-of-the-art equipment in a continual process.  Alcoa Architectural Products has a reputation for manufacturing products of the highest quality, and Reynobond is no exception.

Our Reynobond® Aluminum Composite Material delivers consistent . . . strength.

200.    The Company made the same or similar statements to those in ¶ 199 above on or about February 6, 7, 25, 28, March 14, 15, 19, 29, April 2, 5, 11, 18, May 2, 17, 19, 22, June 21, 27, July 2, 6, 7, 9, 10, 11, August 1, 7, 11, 13, September 1, 5, 10, 20, 27, October 1, 8, 9, November 3, 13 and December 16, 2015, on its official website.

201.    On or about February 5, 2015, the Company made the following statements with respect to its development and implementation of operational controls on its official website:

Operations and activities that could result in risk or impact are controlled to ensure that our environment, health and safety (EHS) policy is followed and that management system objectives are achieved.  We develop procedures to cover . . . external activities, including contractor and product safety.

202.    On or about February 5, 2015, the Company also represented the following on its

official website:

> The following are the four main activities undertaken in support of our safety system:
> Identifying hazards and assessing the risks associated with our products . . . .
>
> *        *        *
>
> Our global focus and attention on fatality prevention continues with the objection of
> building a system and culture that is more robust in its ability to . . . address
> contractor and contracted services safety.

203.    On or about February 5, 2015, the Company made the following statements with

respect to its values on its official website:

> Our Values
> We live our Values every day, everywhere, collaborating for the benefit of our
> customers, investors . . . communities and partners.
>
> Integrity
> We are open, honest, and accountable.
>
> Environment, Health & Safety
> We work safely . . . and protect the environment.

204.    The Company made the same or similar statements to those in ¶¶ 201-03 above on or

about February 6, 7, 25, 28, March 14, 15, 19, 29, April 2, 5, 11, 18, May 2, 17, 19, 22, June 21, 27,

July 2, 6, 7, 9, 10, 11, August 1, 7, 11, 13, September 1, 5, 10, 20, 27, October 1, 8, 9, November 3,

13 and December 16, 2015, on its official website.

205.    On or about April 8, 2015, Arconic issued a press release announcing its financial

results for the quarter ended March 31, 2014 ("Q1 2015").  For Q1 2015, the press release reported

that Arconic's Engineered Products and Solutions segment had generated third-party sales of $1.689

billion, and that "After-tax operating income (ATOI) was a first quarter record of $191 million, up

$2 million, or 1 percent, year-over-year, and up $26 million, or 16 percent, sequentially."

206.     On or about April 23, 2015, Arconic filed its Form 10-Q for the quarter ended March 31, 2014 with the SEC ("Q1 2015 10-Q").  The Q1 2015 10-Q was signed on behalf of Arconic by its CFO and its Controller.  Also, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Defendant Kleinfeld certified that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

207.     The Q1 2015 10-Q set forth financial results substantially similar to those described above regarding Arconic's April 8, 2015 press release.

208.     On or about May 1, 2015, Arconic held an annual shareholders meeting, where Defendant Kleinfeld participated.  On the call, Kleinfeld stated the following about the Company's steps to guarantee safety:

> But as is customary and as it reflects our values, *we always start with safety, safety first*.  So on the left hand side, here you see the safety statistics and as you see, I mean, we have achieved a lot in the last year, and this is pretty amazing, I mean, many see us as a benchmark in not only in our industry but also in other industries. And if you look at those numbers here, I mean it is -- I'm always wondering how much further can we go down here but every year, we are able to get the safety one step further.
>
> *                   *                   *
>
> *. . . . [w]e have a very strong as you know, safety culture and we have also a very strong culture and reminding people on the risk. But we have created new tools and used this to basically shake the organization up to say, look, I mean we cannot afford to have anything routine in there because the moment people don't think, something terrible might happen*.
>
> *So we have introduced new tools to basically, recognize hazards, fix it -- find it, fix it and share it, program, we have created a -- we have this human performance certification process that every facility has to go through and almost all have gone through that in different rates*.

209.    On or about July 8, 2015, Arconic issued a press release announcing its financial results for the second fiscal quarter ended June 30, 2015 ("Q2 2015").  For Q2 2015, the press release reported that Arconic's Engineered Products and Solutions segment had generated sales of $1.733 billion, and that "[a]fter-tax operating income (ATOI) was a record $210 million, up $8 million, or 4 percent, year-over-year from $202 million (revised from $204 million*), and up $16 million, or 8 percent, from $194 million (revised from $191 million*) sequentially."

210.    On or about July 22, 2015, Arconic filed its Form 10-Q for the quarter ended June 30, 2015 with the SEC ("Q2 2015 10-Q").  The Q2 2015 10-Q was signed on behalf of Arconic by its CFO and its Controller.  Also, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Defendant Kleinfeld certified that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

211.    The Q2 2015 10-Q set forth figures substantially similar to those described above regarding Arconic's July 8, 2015 press release.

212.    On or about September 8, 2015, Arconic stated the following concerning "Environment, Health and Safety" ("EHS") on its official website:

EHS POLICY

It is [Arconic]'s policy to operate worldwide in a safe, responsible manner which respects the environment and the health of our employees, our customers and the communities where we operate.  We will not compromise environmental, health or safety values for profit or production.  All [Arconic]ans are expected to understand, promote and assist in the implementation of this Policy and the accompanying Principles.

213.    Under the heading "EHS PRINCIPLES," Arconic further stated that:

•       "We value human life above all else and manage risks accordingly."

- We do not compromise our EHS Value for profit or production.

- We comply with all laws and set higher standards for ourselves and our suppliers where unacceptable risks are identified.

- We supply and use safe and reliable products and services.

- We are all accountable for conforming with and deploying our EHS Value and Principles.

214. On or about October 8, 2015, Arconic issued a press release announcing its financial results for the third fiscal quarter ended September 30, 2015 ("Q3 2015"). For Q3 2015, the press release reported that Arconic's Transportation and Construction Solutions segment (separated as of Q3 2015 from Engineered Products and Solutions as a reportable segment, and which encompassed the business unit that made Reynobond) had generated third-party sales of $475 million, and ATOI of $44 million.

215. On or about October 23, 2015, Arconic filed its Form 10-Q dated October 22, 2015 for the quarter ended September 30, 2015 with the SEC ("Q3 2015 10-Q"). The Q3 2015 10-Q was signed on behalf of Arconic by its CFO and its Controller. Also, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Defendant Kleinfeld certified that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

216. The Q3 2015 10-Q set forth figures substantially similar to those described above regarding Arconic's October 8, 2015 press release.

**REASONS WHY THE STATEMENTS MADE IN 2015 WERE FALSE AND MISLEADING**

217. The Arconic Defendants' statements made in 2015, which specifically discuss the features of the Reynobond ACM products, including Reynobond PE, were false and misleading

because at the time these statements were made, the Arconic Defendants failed to disclose that Arconic was selling Reynobond PE for use in construction projects, where the product was to be used in a manner that the Company knew was unsafe and presented a fire hazard.

218.    The Arconic Defendants' statements made in 2015 related to related to the Company's commitment to safety, its touted safety performance, its adopted procedures to cover contractor and product safety, and its assurances that the Company supplies and uses safe and reliable products and services were false and misleading because at the time these statements were made, (i) Arconic did not employ safety procedures to cover its contractors and product safety, but instead supplied highly flammable Reynobond PE products in construction projects, where the product was to be used in a manner that the Company knew was unsafe and presented a fire hazard; and (ii) Arconic's strong assurances of safety practices concealed from investors the immense risk Arconic had assumed through its marketing and sales of highly-flammable Reynobond PE sales for use in high-rise tower projects across the U.K. and other countries.

219.    The Arconic Defendants' statements made in 2015 vouching that Arconic is "open" and "honest" were false and misleading because the Arconic Defendants failed to disclose that, at the time these statements were made, Arconic was selling Reynobond PE for use in construction projects, where the product was to be used in a manner that the Company knew was unsafe and presented a fire hazard.

220.    The Arconic Defendants' statements made in 2015 representing that Arconic has adopted appropriate risk management and compliance programs that address and reduce the risks associated with legal compliance risks related to product liability, safety, or noncompliance with US and foreign sale sales and trading practices, and their statements that Arconic complies with all laws (including safety laws) and sets high standards for suppliers where unacceptable risk are identified

were false and misleading because, at the time these statements were made, Arconic was selling Reynobond PE for use in construction projects, where the product was to be used in a manner that the Company knew was non-compliant, unsafe and presented a fire hazard, exposing Arconic to hundreds of millions of dollars in potential civil and criminal liability.

221.    The Arconic Defendants' statements made in 2015 concerning sales metrics (*i.e.*, that the Company made millions of dollars in revenues and profits from, among other products, sales of Reynobond PE products, and that its sales were increasing) were false and misleading because the Arconci Defendants failed to disclose that Reynobond PE sales proceeds were the result of misleading and illicit marketing and sales practices, and subjected the Company to significant civil, regulatory, and criminal liability.

### False and Misleading Statements Made in 2016

222.    On or about January 9, 2016, the Company made the following representations regarding its Reynobond ACM products on its official website:

> [E]ach of our product offerings provide the durability to ensure your project will look pristine for years to come—with minimal maintenance.

> Safe and Compliant.  Reynobond is designed and tested to meet safety and environmental building codes around the world.  It is available with either a polyethylene (PE) core or a fire-resistant (FR) core material . . . .

> Reynobond® Aluminum Composite Material (ACM) is a high-performance wall cladding product from Alcoa Architectural Products, consisting of two sheets of nominal 0.020'' (0.50 mm) aluminum, each permanently bonded to an extruded thermoplastic core.  This is an elegant concept resulting in an extraordinary flat and highly formable material with an excellent strength-to-weight ratio.

> Reynobond is a fully tested product, with building-code approvals throughout the world.  It is available with either a Polyethylene (PE) core or a Fire Resistant (FR) core.

> Reynobond is manufactured to exacting tolerances with state-of-the-art equipment in a continual process.  Alcoa Architectural Products has a reputation for manufacturing products of the highest quality, and Reynobond is no exception.

74

Our Reynobond® Aluminum Composite Material delivers consistent . . . strength.

223.    The Company made the same or similar statements to those in ¶ 222 above on or about January 10, 12, 13, 25, 27, 29, February 4, 5, 20, 29, March 1, 3, 4, 8, 9, 19, 13, 15, 18, 19, 20, 24, April 10, 11, 13, 19, May 3, 10, 14, 29, June 3, 17, 28, July 3, 29, August 3, 22, 31, September 3, 4, 9, 10, 12, 14, 17 24, 30, October 1, 2, 3, 8, 15, 16, 20, 22, 23, 29, November 1, 3 and 5, 2016, on its official website.

224.    On or about January 9, 2016, the Company made the following statements with respect to its development and implementation of operational controls on its official website:

> Operations and activities that could result in risk or impact are controlled to ensure that our environment, health and safety (EHS) policy is followed and that management system objectives are achieved. We develop procedures to cover . . . external activities, including contractor and product safety.

225.    On or about January 9, 2016, the Company also represented the following on its official website:

> The following are the four main activities undertaken in support of our safety system: Identifying hazards and assessing the risks associated with our products . . . .
>
> *        *        *
>
> Our global focus and attention on fatality prevention continues with the objection of building a system and culture that is more robust in its ability to . . . address contractor and contracted services safety.

226.    On or about January 9, 2016, the Company made the following statements with respect to its values on its official website:

> Our Values
> We live our Values every day, everywhere, collaborating for the benefit of our customers, investors . . . communities and partners.
>
> Integrity
> We are open, honest, and accountable.
>
> Environment, Health & Safety
> We work safely . . . and protect the environment.

227.     The Company made the same or similar statements to those in ¶¶ 224-26 above on or about January 10, 12, 13, 25, 27, 29, February 4, 5, 20, 29, March 1, 3, 4, 8, 9, 19, 13, 15, 18, 19, 20, 24, April 10, 11, 13, 19, May 3, 10, 14, 29, June 3, 17, 28, July 3, 29, August 3, 22, 31, September 3, 4, 9, 10, 12, 14, 17 24, 30, October 1, 2, 3, 8, 15, 16, 20, 22, 23, 29, November 1, 3 and 5, 2016, on its official website.

228.     On or about January 11, 2016, Arconic issued a press release announcing its financial results for the quarter and year ended December 31, 2015 ("Q4 2015" and "FY 2015," respectively). For Q4 2015, the press release reported that Arconic's Transportation and Construction Solutions segment had generated third-party sales of $444 million, and ATOI of $40 million.

229.     For FY 2015, the press release reported that Arconic's Transportation and Construction Solutions segment had generated $1.882 billion in third-party sales and $166 million of ATOI.

230.     On February 19, 2016, Arconic filed its Form 10-K for the fiscal year ended December 31, 2015 with the SEC ("2015 10-K"), which was signed and certified pursuant to the Sarbanes Oxley Act of 2002 by Defendant Kleinfeld.   Concerning sales in Arconic's new "Transportation and Construction Solutions" segment, which included sale of "integrated aluminum structural systems," the 2015 10-K stated that "[t]hird-party sales for the Transportation and Construction Solutions segment decreased 7% in 2015 compared with 2014, primarily driven by unfavorable foreign currency movements . . ." "ATOI [after-tax operating income] for the Transportation and Construction Solutions segment declined $14 in 2015 compared with 2014, mainly due to higher costs, net unfavorable foreign currency movements, primarily related to a weaker euro and Brazilian real, and unfavorable price/product mix. . . . ."

231.    The 2015 10-K also stated, in pertinent part, that "[i]n 2016, . . . net productivity improvements [were] anticipated while pricing pressure across all markets [was] expected. . . ."

232.    The 2015 10-K also reported sales of architectural aluminum systems of $951 million for full year 2015.

233.    The 2015 10-K also represented that "Alcoa may be exposed to significant legal proceedings [and] investigations" and that the "Company is . . . subject to a variety of legal compliance risks," including "potential claims relating to product liability, health and safety . . . .and compliance with U.S. and foreign export laws . . . and sales and trading practices.  Alcoa could be subject to fines, penalties, damages (in certain cases, treble damages), or suspension or debarment from government contracts."  "Alcoa believes it has adopted appropriate risk management and compliance programs to address and reduce these risks."

234.    The 2015 10-K also stated that "Alcoa is subject to a broad range of health, safety and environmental laws and regulations in the jurisdiction in which it operates and may be exposed to substantial costs and liabilities associated with such laws and regulations."  "Compliance with . . . health and safety legislation and regulatory requirements may prove to be more limiting and costly than we anticipate.  Alcoa's results of operations or liquidity in a particular period could be affected by certain health, safety or environmental matters, including remediation costs and damages related to certain sites.  Additionally, evolving regulatory standards and expectations can result in increased litigation and/or increased costs, all of which can have a material and adverse effect on earnings and cash flows."

235.    The Company's 2015 Annual Report sent to investors in early 2016 included a Chairman's Letter signed by Defendant Kleinfeld emphasizing that in Arconic's "building and construction business, [its] innovative architectural systems [were] helping builders meet E.U. and

U.S. commitments for zero energy buildings and [were] driving [its] business' expansion into China and the Middle East."

236.    The Chairman's Letter went on to emphasize in pertinent part that "[w]hile applying disruptive technologies and strategies and working toward the separation, [the Company] ha[d] been careful to retain the core Values that ha[d] been [its] bedrock for 127 years."

237.    Elsewhere the 2015 Annual Report highlighted the financial results achieved in the "Construction Solutions" segment that sold the Reynobond panels, stating that it had "reported ATOI [after-tax operating income] of $166 million in 2015. It also delivered a solid 2015 adjusted EBITDA [earnings before interests, taxes, depreciation and amortization] margin of 14.4 percent."

238.    As in past years, the 2015 Annual Report also emphasized the Company's purported strong values, stating they "center on *Integrity . . . and Safety*," and that the Company "*live[d] [its] Values every day, everywhere for the benefit of [its] customers, investors, employees, communities and partners*."

239.    The 2015 Annual Report further emphasized that the Company's "Ethics and Compliance Program continue[d] to focus on . . . *adherence with all relevant U.S. and international laws and regulations*."

240.    On or about March 2, 2016, Arconic stated the following concerning "Environment, Health and Safety" ("EHS") on its official website:

EHS POLICY

It is [Arconic]'s policy to operate worldwide in a safe, responsible manner which respects the environment and the health of our employees, our customers and the communities where we operate. We will not compromise environmental, health or safety values for profit or production.  All [Arconic]ans are expected to understand, promote and assist in the implementation of this Policy and the accompanying Principles.

241.    Under the heading "EHS Principles," Arconic further stated that:

- We value human life above all else and manage risks accordingly.

\* \* \*

- We do not compromise our EHS Value for profit or production.

▪ We comply with all laws and set higher standards for ourselves and our suppliers where unacceptable risks are identified.

\* \* \*

- We supply and use safe and reliable products and services.

- We use our knowledge to enhance the safety and well-being of our communities.

242. The statements made on March 2, 2016 above were also made by Arconic on its official website on October 27, 2016.

243. On or about April 11, 2016, Arconic issued a press release announcing its financial results for the quarter ended March 31, 2016 ("Q1 2016"). For Q1 2016, the press release reported that Arconic's Transportation and Construction Solutions segment had generated third-party sales of $429 million, and ATOI of $39 million.

244. On or about May 5, 2016, Arconic filed its Form 10-Q for the quarter ended March 31, 2014 with the SEC ("Q1 2016 10-Q"). The Q1 2016 10-Q was signed on behalf of Arconic by its CFO and its Controller. Also, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Defendant Kleinfeld certified that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

245. The Q1 2016 10-Q set forth financial results substantially similar to those described above regarding Arconic's April 11, 2016 press release.

246.    On or about May 6, 2016, Arconic held an annual shareholders meeting, in which Defendant Kleinfeld participated.  At the shareholders meeting, Kleinfeld stated the following about the Company's emphasis on safety:

> And let me go through starting with Safety. So as those that are longer shareholders know, we take safety very, very seriously and we have made great progress, as you can see on the left hand side. And really are setting benchmarks for others.

247.    On or about May 13, 2016, Arconic posted its 2015 Sustainability Report to its official website and posted a link to the report on Arconic's official Twitter account.

248.    The 2015 Sustainability Report featured a "Chief Executive Officer Statement" attributed to Defendant Kleinfeld that represented the following about Arconic:

> We create thermally efficient architectural aluminum systems that help improve building energy-efficiency by up to 50%. ***Our state-of-the-art framing and wall systems are also hurricane and blast-resistant, making buildings more resilient and increasing occupant safety***.

249.    The 2015 Sustainability Report also stated that "Many of our top leaders and employees around the world are involved in the writing of individual sections of our sustainability report, or they provide significant input and feedback," and that "the draft report is provided to the Public Issues Committee of the Alcoa Board of Directors and our Executive Council for review."

250.    Kleinfeld served on Arconic's Executive Council at the time that the 2015 Sustainability Report was posted to Arconic's website and had served on the Executive Council from the beginning of the Class Period.

251.    Regarding Arconic's "Building and Construction" business unit, whose "recent innovations include Reynobond NC Double Sheet aluminum composite material panels," the 2015 Sustainability Report stated the following:

> - We also have developed state-of-the-art framing and wall systems that are hurricane- and blast-resistant and have been tested to industry standards and state mandates. ***These systems are designed to minimize vulnerabilities and***

>    ***provide increased security to protect occupants against damage and devastation***.

- Architectural aluminum systems that use advanced thermal technologies can provide superior thermal performance ***without compromising on structural performance***.

- Aluminum architectural systems can improve energy efficiency, reduce carbon dioxide emissions, help achieve green building standards, and ***increase occupant comfort and security***.

252. Additionally, the 2015 Sustainability Report described "Health and Safety" as one of eight "Material Aspects" of its business.

253. Regarding Health and Safety at Arconic, the 2015 Sustainability Report represented that:

- Arconic observed two boundaries: an "internal boundary" consisting of "All global operations where we have financial and operational control" and an "external boundary" consisting of "Government agencies focused on health and safety in each country in which we operate and communities surrounding our operating locations."

- Arconic was "Committed to Truth in Reporting" and to that end had "a rigorous internal audit process that evaluates our locations on five areas: environmental; health and safety; operational excellence; financial and business processes; and information technology.

- As part of its stated commitment to "Truth in Reporting," Arconic maintained "Health and Safety Committees: Each location has various task, department, ad hoc, and other committees to develop and implement health and safety programs based on the location's strategic health and safety plan.  These leadership groups include a cross-section of personnel from the facility."

- "We were the first aluminum company to receive Cradle to Cradle Certification, which is a multi-attribute eco-label that assesses a product's safety to humans and potential impact on the natural environment."

254. Concerning "Customer Health/Product Safety," the 2015 Sustainability Report represented that Arconic's "efforts to ensure customer health and product safety" included "Challenging misguided/bad science with best available scientific research" and "Engaging regulators as appropriate."

255.    The 2015 Sustainability Report further stated that:

[Arconic has] a Product Safety Standard to identify what is required for product safety management systems developed by our businesses. The standard includes requirements for raw material sources, production practices, chemical composition of our products, and *communication of risks associated with use or abuse of these products*.

We also provide safety data sheets and other documents that communicate information on the proper use, reuse, and/ or disposal of our products. *These sheets include the potential health risks associated with use and misuse of these products and the precautionary measures that can be used to reduce or eliminate these risks*.

256.    On or about July 11, 2016, Arconic issued a press release announcing its financial results for the second fiscal quarter ended June 30, 2016 ("Q2 2016"). For Q2 2016, the press release reported that Arconic's Transportation and Construction Solutions segment had generated third-party sales of $467 million, and ATOI of $46 million.

257.    On or about July 29, 2016, Arconic filed its Form 10-Q for the quarter ended June 30, 2016 with the SEC ("Q2 2016 10-Q"). The Q2 2016 10-Q was signed on behalf of Arconic by its CFO and its Controller. Also, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Defendant Kleinfeld certified that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

258.    The Q2 2016 10-Q set forth financial results substantially similar to those described above regarding Arconic's July 11, 2016 press release.

259.    On or about November 9, 2016, Arconic filed its Form 10-Q for the quarter ended September 30, 2016 with the SEC ("Q3 2016 10-Q"). The Q3 2016 10-Q was signed on behalf of Arconic by its CFO and its Controller. Also, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Defendant Kleinfeld certified that "[b]ased on my knowledge, this report does not contain any

untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

260.    The Q3 2016 10-Q reported that, for Q3 2016, Arconic's Transportation and Construction Solutions segment had generated third-party sales of $475 million, and ATOI of $44 million.

261.    On or about November 12, 2016, the Company made the following representations on its official website regarding the use of its architectural products in buildings:

Fire is a key issue when it comes to buildings.

When conceiving a building, it is crucial to choose the adapted products in order to avoid the fire to spread to the whole building.  Especially when it comes to facades and roofs, the fire can spread extremely rapidly.

Important to take the "fire characteristic" into account when starting the construction or refurbishment of a building in order to protect the people and assets while limiting fire propagation.  It is especially crucial for public establishments such as hospitals, schools, offices, etc.

Buildings are also classified according to their height and destination (public buildings, industrial building, housings…): it will also define which materials are safer to use.  Another important rule when it comes to the height of buildings concerns the accessibility of the fire brigade to the fire in the building: as soon as the building is higher than the firefighters' ladders, it has to be conceived with an incombustible material.



As soon as the building is higher than the firefighters' ladders, it has to be conceived with an incombustible material.

83

262.    The Company made the same or substantially similar statements to those in ¶ 261 above on its official website on or about November 20, 21, 24-27, December 2-4, 7, 9, 17, 24, and 31, 2016.

263.    On December 14, 2016, Arconic made a presentation in connection with the Company's Investor Day.  Defendant Kleinfeld participated, as did Tim Myers ("Myers"), the Group President of Arconic's Transportation and Construction Solutions segment ("TCS").

264.    Regarding Arconic's "architectural products," including Reynobond, Myers stated that "We need to have products that are offering differentiated safety benefits for the occupant, right?  So that gives us the opportunity then to unleash Arconic's technology[.]"  Regarding Reynobond, a slide accompanying the Investor Day presentation stated that Arconic was "*[i]mproving [Reynobond's] core technology to increase fire retardant performance*."

### REASONS WHY THE STATEMENTS MADE IN 2016 WERE FALSE AND MISLEADING

265.    The Arconic Defendants' statements made in 2016, which specifically discuss the features of the Reynobond ACM products, including Reynobond PE, were false and misleading because at the time these statements were made, the Arconic Defendants failed to disclose that Arconic was selling Reynobond PE for use in construction projects, where the product was to be used in a manner that the Company knew was unsafe and presented a fire hazard.

266.    The Arconic Defendants' statements made in 2016 related to the Company's commitment to safety, its touted safety performance, its adopted procedures to cover contractor and product safety, and its assurances that the Company supplies and uses safe and reliable products and services were false and misleading because at the time these statements were made, (i) Arconic did not employ safety procedures to cover its contractors and product safety, but instead supplied highly flammable Reynobond PE products in construction projects, where the product was to be used in a

84

manner that the Company knew was unsafe and presented a fire hazard; and (ii) Arconic's strong assurances of safety practices concealed from investors the immense risk Arconic had assumed through its marketing and sales of highly-flammable Reynobond PE sales for use in high-rise tower projects across the U.K. and other countries.

267.    The Arconic Defendants' statements made in 2016 vouching that Arconic is "open" and "honest" were false and misleading because the Arconic Defendants failed to disclose that, at the time these statements were made, Arconic was selling Reynobond PE for use in construction projects, where the product was to be used in a manner that the Company knew was unsafe and presented a fire hazard.

268.    The Arconic Defendants' statements made in 2016 representing that Arconic has adopted appropriate risk management and compliance programs that address and reduce the risks associated with legal compliance risks related to product liability, safety, or noncompliance with US and foreign sale sales and trading practices, and their statements that Arconic complies with all laws (including safety laws) and sets high standards for suppliers where unacceptable risk are identified, were false and misleading because, at the time these statements were made, Arconic was selling Reynobond PE for use in construction projects, where the product was to be used in a manner that the Company knew was non-compliant, unsafe and presented a fire hazard, exposing Arconic to hundreds of millions of dollars in potential civil and criminal liability.

269.    The Arconic Defendants' statements made in 2016 concerning sales metrics (*i.e.*, that the Company made millions of dollars in revenues and profits from, among other products, sales of Reynobond PE products) were false and misleading because the Arconic Defendants failed to disclose that Reynobond PE sales proceeds were the result of misleading and illicit marketing and sales practices, and subjected the Company to significant civil, regulatory, and criminal liability.

270.    The Arconic Defendants' statements made in 2016 concerning the use of its architectural products in buildings, including the representations related to the fact that "fire is a key issue when it comes to buildings," were false and misleading because, at the time these statements were made, the Arconic Defendants failed to disclose that Arconic was selling Reynobond PE for use in construction projects, where the product was to be used in a manner that the Company knew was unsafe and presented a fire hazard, directly contradicting the Company's representations.

**False and Misleading Statements Made in 2017**

271.    On or about January 31, 2017, Arconic issued a press release announcing its financial results for the fourth fiscal quarter and full year ended December 31, 2016 ("Q4 2016" and "FY 2016," respectively).  For Q4 2016, the press release reported that Arconic's Transportation and Construction Solutions segment had generated third-party sales of $456 million, and "record fourth quarter ATOI of $44 million, up $4 million, or 10 percent, year over year."

272.    For FY 2016, the press release reported that Arconic's Transportation and Construction Solutions segment had generated $1.802 billion in third-party sales and $176 million of ATOI.

273.    On February 28, 2017, Arconic filed its Form 10-K for the fiscal year ended December 31, 2016 with the SEC ("2016 10-K"), which was signed and certified pursuant to the Sarbanes Oxley Act of 2002 by Defendant Kleinfeld.  Concerning sales in Arconic's new "Transportation and Construction Solutions" segment, which included sale of "integrated aluminum structural systems," the 2016 10-K stated that "[t]hird-party sales for the Transportation and Construction Solutions segment decreased 4% in 2016 compared with 2015, primarily driven by lower demand from the North American commercial transportation end market, which was partially offset by rising demand from the building and construction end market. . . ."  "ATOI [after-tax operating income] for the Transportation and Construction Solutions segment increased $10, or 6%,

86

in 2016 compared with 2015, principally driven by net productivity improvements across all businesses and growth in the building and construction segment . . . ."

274.     The 2016 10-K also reported sales of architectural aluminum systems of $1,010 million for full year 2016.

275.     The 2016 10-K also represented that "Alcoa may be exposed to significant legal proceedings [and] investigations" and that the "Company is . . . subject to a variety of legal compliance risks," including "potential claims relating to product liability, health and safety . . . .and compliance with U.S. and foreign export laws . . . and sales and trading practices. Alcoa could be subject to fines, penalties, damages (in certain cases, treble damages), or suspension or debarment from government contracts." "Alcoa believes it has adopted appropriate risk management and compliance programs to address and reduce these risks."

276.     The 2016 10-K also stated that "Alcoa is subject to a broad range of health, safety and environmental laws and regulations in the jurisdiction in which it operates and may be exposed to substantial costs and liabilities associated with such laws and regulations." "Compliance with . . . health and safety legislation and regulatory requirements may prove to be more limiting and costly than we anticipate. Alcoa's results of operations or liquidity in a particular period could be affected by certain health, safety or environmental matters, including remediation costs and damages related to certain sites. Additionally, evolving regulatory standards and expectations can result in increased litigation and/or increased costs, all of which can have a material and adverse effect on earnings and cash flows."

277.     The cover of the 2016 Annual Report emphasized that [w]orking in close partnership with our customers, we solve complex engineering challenges to transform the way we . . . build . . . ," and that "[t]hrough the ingenuity of our people and cutting-edge, advanced manufacturing

techniques, *we deliver these products at a quality and efficiency that ensure customer success and shareholder value*."

278.    Arconic's 2016 Annual Highlights Report sent to investors in early 2017 lauded the financial performance in its new Transportation and Construction Solutions segment, stating that it had "recorded revenue of $1.8 billion in 2016, down four percent year over year, ATOI of $176 million, up six percent year over year, adjusted EBITDA of $291 million, up seven percent year over year, and an adjusted EBITDA margin of 16.1 percent."  It further highlighted that Arconic was deriving 10% of its sales from the building and construction industries, and a full 6% of its revenues from the U.K., the only other country than the U.S. whose sales were so significant to Arconic that they were individually broken-out:



279.    In a section entitled "Living Our Values," the 2016 Annual Highlights Report emphasized that Arconic "excel[s] as high-performance teams – safely, with respect and integrity." The section next emphasized "Safety", representing that *"[n]othing matters more than human life*," and that this had "long been a guiding principle at Arconic, and *safety [was] one of [its] most cherished values*."

280.   The Company also represented the following with respect to its Ethics and Compliance Program:

Our Ethics and Compliance Program drives a global culture of . . . ***compliance, prevention and risk identification and mitigation*** . . . ..

281.   On or around March 8, 2017, the Company made the following representations on its official website regarding the use of its architectural products in buildings:

Fire is a key issue when it comes to buildings.

When conceiving a building, it is crucial to choose the adapted products in order to avoid the fire to spread to the whole building.  Especially when it comes to facades and roofs, the fire can spread extremely rapidly.

Important to take the "fire characteristic" into account when starting the construction or refurbishment of a building in order to protect the people and assets while limiting fire propagation.  It is especially crucial for public establishments such as hospitals, schools, offices, etc.

Buildings are also classified according to their height and destination (public buildings, industrial building, housings…): it will also define which materials are safer to use.  Another important rule when it comes to the height of buildings concerns the accessibility of the fire brigade to the fire in the building: as soon as the building is higher than the firefighters' ladders, it has to be conceived with an incombustible material.



As soon as the building is higher than the firefighters' ladders, it has to be conceived with an incombustible material.

282.   The Company made the same or substantially similar statements to those in ¶ 281 above on its official website on or around May 18, 2017 and June 18, 2017.

283.     On or about April 25, 2017, Arconic issued a press release announcing its financial results for the first fiscal quarter ended March 31, 2017 ("Q1 2017").  For Q1 2017, the press release reported that Arconic's Transportation and Construction Solutions segment had generated third-party sales of $449 million and adjusted earnings before interest, tax, depreciation and amortization ("Adjusted EBITDA," which in Q1 2017 replaced ATOI as Arconic's primary measure of segment performance) of $72 million.

284.     On or about May 2, 2017, Arconic filed its Form 10-Q for the quarter ended March 31, 2017 with the SEC ("Q1 2017 10-Q").  The Q1 2017 10-Q was signed on behalf of Arconic by its CFO and its Controller.  Also, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Arconic's Interim Chief Executive Officer David Hess certified that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

285.     The Q1 2017 10-Q set forth financial results substantially similar to those described above regarding Arconic's April 25, 2017 press release.

### REASONS WHY THE STATEMENTS MADE IN 2017 WERE FALSE AND MISLEADING

286.     The Arconic Defendants' statements made in 2017, which specifically discuss the features of the Reynobond ACM products, including Reynobond PE, were false and misleading because at the time these statements were made, the Arconic Defendants failed to disclose that Arconic was selling Reynobond PE for use in construction projects, where the product was to be used in a manner that the Company knew was unsafe and presented a fire hazard.

287.     The Arconic Defendants' statements made in 2017 related to the Company's procedures and practices concerning safety, compliance, risk identification and mitigation were false

and misleading because at the time these statements were made, (i) Arconic did not employ safety procedures to cover its contractors and product safety, but instead supplied highly flammable Reynobond PE products in construction projects, where the product was to be used in a manner that the Company knew was unsafe and presented a fire hazard; and (ii ) Arconic's assurances of safety practices concealed from investors the immense risk Arconic had assumed through its marketing and sales of highly-flammable Reynobond PE sales for use in high-rise tower projects across the U.K. and other countries.

288.   The Arconic Defendants' statements made in 2017 representing that Arconic has adopted appropriate risk management and compliance programs that address and reduce the risks associated with legal compliance risks related to product liability, safety, or noncompliance with US and foreign sale sales and trading practices were false and misleading because, at the time these statements were made, Arconic was selling Reynobond PE for use in construction projects, where the product was to be used in a manner that the Company knew was non-compliant, unsafe and presented a fire hazard, exposing Arconic to hundreds of millions of dollars in potential civil and criminal liability.

289.   The Arconic Defendants' statements made in 2017 concerning sales metrics (*i.e.*, that the Company made millions of dollars in revenues and profits from, among other products, sales of Reynobond PE products) were false and misleading because the Arconic Defendants failed to disclose that Reynobond PE sales proceeds were the result of misleading and illicit marketing and sales practices, and subjected the Company to significant civil, regulatory, and criminal liability.

290.   The Arconic Defendants' statements made in 2017 concerning the use of its architectural products in buildings, including the representations related to the fact that "fire is a key issue when it comes to buildings," were false and misleading because, at the time these statements

were made, the Arconic Defendants failed to disclose that Arconic was selling Reynobond PE for use in construction projects, where the product was to be used in a manner that the Company knew was unsafe and presented a fire hazard, directly contradicting the Company's representations.

### THE TRUTH EMERGES

291.    During the Class Period, the Arconic Defendants made false and misleading statements and engaged in a scheme to deceive the market as detailed herein. The Arconic Defendants undertook a course of conduct which artificially inflated the price of Arconic securities by misrepresenting the Company's business, prospects, and attention to safety. When the Arconic Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Arconic securities fell precipitously as artificial inflation came out of the price.  As a result of their purchases of Arconic securities during the Class Period and the revelation of the Arconic Defendants' conduct, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, incurred damages, under the federal securities laws.

292.    On Saturday, June 24, 2017, news sources revealed that Arconic had knowingly supplied Reynobond PE for use on Grenfell Tower, despite warnings Arconic issued against use of this flammable product above a height which the Grenfell Tower far exceeded.  Reuters reported that internal emails from Arconic employees revealed that "Arconic knowingly supplied flammable panels for use in tower…".[4]  In its response regarding this disclosure, as quoted in the *Reuters* article, Arconic admitted it had known its product would be used on Grenfell Tower, but denied responsibility for its use there on the grounds that its role was not "to decide what was or was not compliant with local building regulations." There is no indication in the Reuters article that Arconic

---

[4] *Reuters*, "REFILE:Arconic knowingly supplied flammable panels for use in tower- - emails" (Refiles to amend editing credit; no changes to story text), June 24, 2017, 8:05 am; original time stamp 7:12 am ET.

addressed the fundamental issue of why, regardless of local building regulations, Arconic sold

Reynobond PE for use on Grenfell Tower when it knew the danger of using this flammable product

on a high-rise residential building.

Six emails sent by and to an Arconic Inc sales manager raise questions about why the company supplied combustible cladding to a distributor for use at Grenfell Tower, despite publicly warning such panels were a fire risk for tall buildings.

The emails, dating from 2014 and seen by Reuters, were between Deborah French, Arconic's UK sales manager, and executives at the contractors involved in the bidding process for the refurbishment contract at Grenfell Tower in London, where 79 people died in a blaze last week.

When asked about the emails, Arconic said in a statement that it had known the panels would be used at Grenfell Tower but that it was not its role to decide what was or was not compliant with local building regulations. The company manufactures three main types of Reynobond panel -- one with a polyethylene (PE) core, one with a fire retardant core and another with a non-combustible core, according to its website.

Diagrams in a 2016 Arconic brochure for its Reynobond panels describe how PE core panels are suitable up to 10 metres in height. Panels with a fire resistant core -- the FR model -- can be used up to 30 metres, while above that height, panels with the non-combustible core -- the A2 model -- should be used, the brochure says.

Grenfell Tower is more than 60 metres tall.

The brochure also issued a blunt warning that cladding can be a fire risk.

"When conceiving a building, it is crucial to choose the adapted products in order to avoid the fire to spread to the whole building. Especially when it comes to facades and roofs, the fire can spread extremely rapidly," the brochure said.

"As soon as the building is higher than the fire fighters' ladders, it has to be conceived with an incombustible material." Nonetheless, between May and July 2014, French, who was based at Arconic's factory in Merxheim, France, responded to requests from the companies involved in refurbishing Grenfell Tower on the availability of samples of five different types of Reynobond aluminium-covered panels, all of which were only available in the combustible PE and FR versions, according to Arconic brochures.

In the end, Arconic said on Friday, the company provided PE panels. "While we publish general usage guidelines, regulations and codes vary by country and need to be determined by the local building code experts," the company said in an emailed statement in response to the Reuters enquiry……

Arconic would not state whether it knew the height of the Grenfell Tower, but the context of the discussion in the emails obtained by Reuters was said to be that of high-rise projects. Reuters' reporting also indicated Arconic must have known the building was a high-rise because, as Reuters observed, Arconic knew the quantity and coverage of the panels it sold for this project. Arconic was said by a source from another contractor on the project to have had "full involvement" in the bidding process for the tower's exterior coverage.

French did not respond to requests for comment.

Arconic, which was known as Alcoa Inc until 2016, declined to say if it knew how tall the tower was and the emails seen by Reuters do not specifically refer to its height. They do, however, refer to "Grenfell Tower" and mention other high rise projects where panelling has been used when discussing the appearance that was being sought for Grenfell Tower.

Arconic also knew the quantity of panels being supplied and thus the total exterior coverage. A source at one of the companies involved in the process said Arconic had "full involvement" throughout the contract bidding process……

In the emails, French and representatives of Harley, Omnis and Rydon also discuss the choice of panel models and colours and how they were inching towards securing the contract with the local authority, the Royal Borough of Kensington and Chelsea (RBKC)….

293.    Also on June 24, 2017, *The New York Times* published a critical article which also confirmed Arconic's awareness of the risk in selling flammable Reynobond PE as cladding covering high-rise buildings. *The New York Times* explicitly contrasted Arconic's "opaque" marketing of flammable cladding in the U.K., where it had sold flammable facades for years, with Arconic's cautionary sales pitch elsewhere in Europe:[5]

The incineration of Grenfell Tower on June 14, the deadliest fire in Britain in more than a century, is now a national tragedy. The London Police on Friday blamed flammable materials used in the façade for the spread of the blaze and said the investigation could bring charges of manslaughter….

---

[5] *The New York Times*, "Why Grenfell Tower Burned: Regulators Put Cost Before Safety," June 24, 2017.

Promising to cut "red tape," business-friendly politicians evidently judged that cost concerns outweighed the risks of allowing flammable materials to be used in facades. Builders in Britain were allowed to wrap residential apartment towers – perhaps several hundred of them – from top to bottom in highly flammable materials, a practice forbidden in the United States and many European countries.  And companies did not hesitate to supply the British market…..

Arconic has marketed the flammable facades in Britain for years, even as it has adjusted its pitch elsewhere. In other European countries, Arconic's sales materials explicitly instructed that "as soon as the building is higher than the firefighters' ladders, it has to be conceived with an incombustible material." An Arconic website for British customers said only that such use "depends on local building codes"….

Fire safety experts said the blaze at Grenfell Tower was a catastrophe that could have been avoided, if warnings had been heeded….

Flames in an ordinary fire burst out of windows, moving from the inside out. Grenfell Tower burned in reverse, moving inward from the building's exterior. The flames quickly tore upward in streaks through the façade, filling apartments with toxic black smoke. Torrents of orange and red branched out of the first streaks and shot upward. The flames encased the building in a cylinder of fire…..

….by 1998, regulators in the United States – where deaths from fires are historically more common than in Britain or Western Europe – began requiring real-world simulations to test any materials to be used in buildings taller than a firefighter's two-story ladder. "The U.S. codes say you have to test your assembly exactly the way you install it in a building," said Robert Solomon, an engineer at the National Fire Protection Association, which is funded in part by insurance companies and drafts model codes followed in the United States and around the world.

No aluminum cladding made with pure polyethylene – the type used at Grenfell Tower – has ever passed the test, experts in the United States say. The aluminum sandwiching always failed in the heat of a fire, exposing the flammable filling. And the air gap between the cladding and the insulation could act as a chimney, intensifying the fire and sucking flames up the side of a building. Attempts to install nonflammable barriers at vertical and horizontal intervals were ineffective in practice.

As a result, American building codes have effectively banned flammable cladding in high-rises for nearly two decades….

And partly because of the influence of American architects, many territories around the world follow the American example. But not Britain…..

*The New York Times* article summarized the history of major fires involving cladding on high-rise buildings, including fires at high-rise buildings with the same type of cladding as had been installed on the Grenfell Tower:

> In 2014, the Fire Protection Research Foundation, an organization in the United States, counted 20 major high-rise fires involving cladding. In at least a half-dozen – in France, Dubai, South Korea, the United States and elsewhere – the same type of panels installed at Grenfell tower caught fire.  A 2014 fire in Melbourne, Australia, resulted in multiple investigations into the dangers of combustible cladding. Another fire broke out in Dubai, around a 60-story skyscraper, on New Year's Eve of 2015, and yet another, around a 70-story skyscraper there, this April.

*The Times* contrasted Arconic's "opaque" marketing of flammable cladding in Britain with its more forthcoming description of fire hazard in Arconic marketing material targeted at customers elsewhere in Europe.  To those customers, Arconic acknowledged that "[f]ire is a key issue when it comes to buildings . . . [e]specially when it comes to facades and roofs …."

> The cladding itself was produced by Arconic, an industry titan….Arconic sells a flammable polyethylene version of its Reynobond cladding and a more expensive, fire-resistant version.

> In a brochure aimed at customers in other European countries, the company cautions that the polyethylene Reynobond should not be used in buildings taller than 10 meters, or about 33 feet, consistent with regulations in the United States and elsewhere. "Fire is a key issue when it comes to buildings," the brochure explains. "Especially when it comes to facades and roofs, the fire can spread extremely rapidly."

> A diagram shows flames leaping up the side of a building. "As soon as the building is higher than the firefighters' ladders, it has to be conceived with an incombustible material," a caption says.

> But the marketing materials on Arconic's British website are opaque on the issue.

> "Q: When do I need Fire Retardant (FR) versus Polyethylene (PR) Reynobond? The answer to this, in part, depends on local building codes. Please contact your Area Sales Manager for more information," reads a question-and-answer section.

As quoted in the article, Arconic attempted to deflect responsibility for safety in use of its cladding products from itself to local building codes and their local interpreters.

Asked about its varying product guidelines, the company added, "While we publish general usage guidelines, regulations and codes vary by country and need to be determined by the local building code experts."

294.    News releases over the weekend tracked the growing realization of the severity of the problem of flammable cladding on high-rises across the U.K.  Ongoing tests of cladding installed on U.K. high-rises resulted in a growing number of high-rise residential buildings found to have flammable cladding.

All 60 council and social housing blocks that have so far undergone mandatory checks have failed combustibility tests, the government said on Sunday evening.[6]

295.    On Monday June 26, 2017, Arconic effectively conceded the unfitness of this cladding product for Grenfell Tower and for high-rise projects generally. According to The Guardian, Arconic sent an email to clients notifying them that it would no longer sell Reynobond PE for use in high-rise buildings. Arconic attributed this decision to "inconsistency of building codes across the world":[7]

The company that manufactures an element of the cladding believed to have contributed to the rapid spread of fire through Grenfell Tower has pulled the material from sale around the world.

Arconic said on Monday that it was discontinuing Reynobond PE, panels that are combined with insulation to form cladding that was revealed as flammable in the wake of the blaze that killed at least 79 people in west London.

The firm said it had stopped global sales of the material for tall buildings over concerns about the "inconsistency of building codes across the world."

The manufacturer said in a statement: "Arconic is discontinuing global sales of Reynobond PE for use in high-rise applications. We believe this is the right decision because of the inconsistency of building codes across the world and issues that have arisen in the wake of the Grenfell Tower tragedy regarding code compliance of

[6] *The Financial Times*, "UK social housing: Insurers warned of tower fire risk in month before Grenfell," June 25, 2017.

[7] *The Guardian*, "Grenfell Tower: cladding material linked to fire pulled from sale worldwide," June 26, 2017, 11:11 EDT.

cladding systems in the context of buildings' overall designs. We will continue to fully support the authorities as they investigate this tragedy."

The company emailed clients on Monday to tell them it would no longer sell Reynobond PE to buyers planning to use it on tower blocks. It said this would apply globally due to the difficulty of being sure that its material would be used in a way compliant with building regulations in multiple countries.

*The Guardian* observed that Arconic's decision to cease sales of Reynobond PE as cladding for skyscrapers, followed Reuters' revelation that the Company had been aware in 2014 that Reynobond PE would be installed on Grenfell Tower despite Arconic's own warning about its use on high-rise projects.

> …..The decision to stop selling Reynobond PE for use in skyscraper cladding comes after it emerged that the company knew that the less fire-resistant version, Reynobond PE, would be used on Grenfell Tower, despite its own guidelines warning that it was unsuitable for buildings above 10m tall. Emails obtained by Reuters showed Arconic was involved in discussions about the use of cladding on the building during 2014.[8]

296.   Analysts expressed concern over the impact on Arconic of the weekend's revelations.

ARNC's role in the Grenfell Tower fire raises questions about the firm's broader exposure and makes its quest to hire a high quality CEO harder.

Grenfell Tower Fire Raises Many Questions - Reuters reported that in 2014-15, RNC knowingly supplied flammable cladding that was used in UK's Grenfell Tower. Tragically, 79 people were killed when the building caught fire. Besides the obvious question of ARNC's financial liability (which we don't have a way to ballpark yet), this incident raises other important questions: how many other structures may have ARNC's flammable cladding in inappropriate areas, and what internal safeguards/firewalls does ARNC have in place to diligence that products are used in the intended (i.e. safe) way? We have asked ARNC's IR team about these questions and are awaiting a response.

Doesn't Help With CEO Search - ARNC's search for a permanent, operating focused CEO is made harder by this incident (public relations fallout may linger).[9]

Combustible cladding supplied to Grenfell Tower

---

[8] *Id.*

[9] Cowen, "Cladding Overhang May Linger," June 26, 2017.

Reuters reports state Arconic knowingly provide *[sic]* non-fire rated materials for Grenfell Tower, but did provide warnings as to their appropriate installation use. Responsibility for the Grenfell Tower fire which claimed the lives of 79 people has been linked to a faulty electrical appliance and is believed to have spread quickly due to the new exterior cladding installed in 2014......

Stock down 10% in early-morning trading, shedding ~$1bn of market cap

Arconic's 2016 annual revenue from its Transportation & Construction Solutions (TCS) segment was $1.8bn (15% of company total) and EBITDA contribution was $291m (19%). Architectural Systems accounted for $1bn of revenue and an undisclosed amount of EBITDA. The $1bn selloff appears to represent more-than-half the entire value of the TCS business.[10]

Arconic shares fall as much as 11% in the biggest decline since going public in November, after Reuters reported that jet- and auto-parts maker the [sic] knowingly supplied flammable panels used on London's Grenfell Tower where 79 people died in a fire earlier this month. Although Arconic said it would stop selling the panels for use in high rises, analysts say the bigger concern than lost revenue is the fire-related investigation and possible product liability, While it is difficult to put a figure on the expected liabilities at this point, Seaport analyst Josh Sullivan noted it was a historic case that is likely to have a "historic settlement as well."[11]

297.    Late in the trading day on June 26, Chris Olin, a representative of institutional asset manager Longbow Research, was interviewed by CNBC about the effect of Arconic's liability in the Grenfell Tower fire. Mr. Olin stated that although the cladding business was perhaps 2-3% of Arconic's annual revenue, "what we are waiting to see is how the liabilities do play out."  A CNBC anchor asked directly "Why would the Company sell a product it knew shouldn't be used in buildings over 10 meters in height?" Mr. Olin replied "That I cannot answer for you right

---

[10] Deutsche Bank, "TCS segment panels linked to Grenfell Tower fire," June 26, 2017.

[11] *Bloomberg First Word*, "Arconic London Fire Liability Threatens the Shares: Street Wrap," June 26, 2017, 14:57 ET.

now.....that's what's going to keep investors away from this story at least for the near term..…it's something that's going to be a risk for, for the foreseeable future."[12]

298.    The revelations about Arconic's decision to sell Reynobond PE for Grenfell Tower with full knowledge of the danger posed for a high-rise building by this flammable product, and contrary to Arconic's own warnings, caused sharp declines in price of Arconic common and preferred stock.  By market close on Monday, June 26, 2017, the price of Arconic common stock had fallen 5.99% to $24.01 from its closing price of $25.54 on Friday, June 23, 2017.  Also on June 26, 2017, the price of Arconic preferred stock fell 6.08% to $37.72, from $40.16 at close on June 23, 2017.

299.    In its June 26, 2017 press release issued after market close, Arconic again attempted to distance itself from responsibility for the Grenfell Tower fire. Arconic pointed to other contributors to the Grenfell Tower's cladding system, as well as to building codes and regulations or violation thereof, minimizing the role Arconic played in the tragic fire as manufacturer and supplier of Reynobond PE.

- Arconic supplied one of our products, Reynobond PE, to our customer, a fabricator, which used the product as one component of the overall cladding system on Grenfell Tower.  The fabricator supplied its portion of the cladding system to the façade installer, who delivered it to the general contractor.  The other parts of the cladding system, including the insulation, were supplied by other parties. We were not involved in the installation of the system, nor did we have a role in any other aspect of the building's refurbishment or original design.

- While we provided general parameters for potential usage universally, we sold our products with the expectation that they would be used in compliance with the various and different local building codes and regulations.  Current regulations within the United States, Europe and the U.K. permit the use of aluminum composite material in various architectural applications, including

---

[12] CNBC, "Investors will stay away from Arconic because of bad PR: Longbow Research," June 26, 2017, 3:37 pm ET, accessed April 4, 2018.  https://www.cnbc.com/video/2017/06/26/investors-will-stay-away-from-arconic-because-of-bad-pr-longbow-research.html.

in high-rise buildings depending on the cladding system and overall building design. Our product is one component in the overall cladding system; we don't control the overall system or its compliance.

- Nevertheless, in light of this tragedy, we have taken the decision to no longer provide this product in any high-rise applications, regardless of local codes and regulations.[13]

300. Market discussion and analysis of disclosures about Arconic's conduct in knowingly providing a flammable cladding product for use on Grenfell Tower, and its marketing and sales practices, continued on June 27, 2017. In addition, news on June 27, 2017, indicated that law enforcement and regulatory investigation of past application of flammable cladding to high-rise buildings in the U.K., would intensify. In a Cabinet meeting on June 27, U.K. Prime Minister Theresa May called for a major national investigation specifically into use of cladding on high-rise structures, in addition to the previously announced investigation into the Grenfell Tower fire. Prime Minister May's call to the Cabinet and the public came after discovery that flammable cladding had been applied in all 95 samples amounting to 100% of the U.K. high-rises investigated to date following the Grenfell Tower fire. This was a further materialization of the risk that the liability of Arconic as manufacturer and seller of flammable cladding, extended beyond liability in the Grenfell Tower fire.

Prime Minister Theresa May has said there must be a "major national investigation" into the use of potentially flammable cladding on high-rise towers across the country over a period of decades.

Mrs. May's call came as Cabinet was informed 95 samples of cladding from tower blocks in 32 English local authority areas have failed fire safety tests – amounting to 100 per cent of all samples submitted by councils in the wake of the Grenfell Tower tragedy.

The PM's official spokesman said the national investigation could be conducted as a second phase of the public inquiry already announced into the west London blaze, which claimed the lives of at least 79 people earlier this month.[14]

---

[13] Business Wire, "Arconic Issues Statement on Reynobond PE," June 26, 2017, 5:47 pm EDT.

301.    On June 27, 2017, prices of Arconic common and preferred stock fell again as a result of the above revelations. Arconic common stock closed on June 27 at $21.84, down 9.04% from its closing price of $24.01 on June 26, 2017.  Arconic preferred stock closed on June 27 at $34.55, down 8.40% from its closing price of $37.72 on June 26, 2017.

## PRESUMPTION OF RELIANCE

302.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- the Arconic Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Arconic securities traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts; and

- the misrepresentations and omissions alleged would tend to induce a  reasonable investor to misjudge the value of the Company's securities.

303.    Plaintiffs and members of the Class purchased, acquired and/or sold Arconic securities between the time the Arconic Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

304.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

---

[14] *The Telegraph*, "Grenfell fire: Theresa May pledges 'major national investigation' into cladding on high-rise buildings," June 27, 2017, 1:17 pm GMT (9:17 am ET).

305.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as the Arconic Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT III

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants Arconic and Kleinfeld by Plaintiff Ironworkers, and by Plaintiff Sullivan With Respect to the Defined "Preferred Shares" Only)**

306.    This Cause of Action is asserted by Plaintiff Ironworkers on behalf of purchasers of all Arconic securities except the Preferred Shares defined above in connection with the 2014 Preferred IPO, which are brought by Plaintiff Sullivan.

307.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

308.    This Count is asserted against the Arconic Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

309.    During the Class Period, the Arconic Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Arconic securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire

Arconic securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, the Arconic Defendants, and each of them, took the actions set forth herein.

310.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Arconic Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Arconic securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Arconic's finances and business prospects.

311.    By virtue of their positions at Arconic, the Arconic Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, the Arconic Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Arconic Defendants.  Said acts and omissions of the Arconic Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Arconic Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

312.    Information showing that the Arconic Defendants acted knowingly or with reckless disregard for the truth is peculiarly within the Arconic Defendants' knowledge and control.  As the CEO of Arconic, Defendant Kleinfeld had knowledge of the details of Arconic's internal affairs.

313.    Defendant Kleinfeld is liable both directly and indirectly for the wrongs complained of herein.  Because of his position of control and authority, Defendant Kleinfeld was able to and did,

directly or indirectly, control the content of the statements of Arconic.  As officer and/or director of a publicly-held company, Defendant Kleinfeld had a duty to disseminate timely, accurate, and truthful information with respect to Arconic's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Arconic securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Arconic's business, operational and compliance processes and procedures, which were concealed by the Arconic Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Arconic securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by the Arconic Defendants, and were damaged thereby.

314.    During the Class Period, Arconic securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Arconic Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Arconic securities at prices artificially inflated by the Arconic Defendants' wrongful conduct.  Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Arconic securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class.  The market price of Arconic securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

315.     By reason of the conduct alleged herein, the Arconic Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

316.     As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT IV

**(Violations of Section 20(a) of the Exchange Act Against Defendant Kleinfeld by Plaintiff Ironworkers, and by Plaintiff Sullivan With Respect to the Defined "Preferred Shares" Only)**

317.     This Cause of Action is asserted by Plaintiff Ironworkers on behalf of purchasers of all Arconic securities except the Preferred Shares defined below in connection with the 2014 Preferred IPO, which are brought by Plaintiff Sullivan.

318.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

319.     During the Class Period, Defendant Kleinfeld participated in the operation and management of Arconic, and conducted and participated, directly and indirectly, in the conduct of Arconic's business affairs.   Because of his senior position, he knew the adverse non-public information about Arconic's misstatement of income and expenses and false financial statements.

320.     As officer and/or director of a publicly owned company, Defendant Kleinfeld had a duty to disseminate accurate and truthful information with respect to Arconic's financial condition and results of operations, and to correct promptly any public statements issued by Arconic which had become materially false or misleading.

321.    Because of his position of control and authority as senior officer, Defendant Kleinfeld was able to, and did, control the contents of the various reports, press releases and public filings which Arconic disseminated in the marketplace during the Class Period concerning Arconic's results of operations.  Throughout the Class Period, Defendant Kleinfeld exercised his power and authority to cause Arconic to engage in the wrongful acts complained of herein. Defendant Kleinfeld therefore, was a "controlling person" of Arconic within the meaning of Section 20(a) of the Exchange Act.  In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of Arconic securities.

322.    Defendant Kleinfeld, therefore, acted as a controlling person of Arconic.  By reason of his senior management position and/or being a director of Arconic, Defendant Kleinfeld had the power to direct the actions of, and exercised the same to cause, Arconic to engage in the unlawful acts and conduct complained of herein.  Defendant Kleinfeld exercised control over the general operations of Arconic and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

323.    By reason of the above conduct, Defendant Kleinfeld is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Arconic.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the respective Class representatives;

B.    Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: April 9, 2018                    **POMERANTZ LLP**

/s/ *Jeremy A. Lieberman*
Jeremy A. Lieberman (Pro Hac Vice)
(New York Bar No. 4161352)
Emma Gilmore
Adam G. Kurtz
Matthew C. Moehlman
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
         egilmore@pomlaw.com
         agkurtz@pomlaw.com
         mmoehlman@pomlaw.com

POMERANTZ LLP
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Lead Counsel for Lead Plaintiff Ironworkers for
All Shares Other Than the Defined Preferred
Shares*

ROBBINS GELLER RUDMAN
   & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
LINDSAY LA MARCA
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
llamarca@rgrdlaw.com

*Lead Counsel for Lead Plaintiff of the Defined
Preferred Shares*

LAW OFFICE OF ALFRED G. YATES, JR., P.C.
ALFRED G. YATES, JR. (PA17419)
GERALD L. RUTLEDGE (PA62027)
300 Mt. Lebanon Boulevard, Suite 206-B
Pittsburgh, PA 15234-1507
Telephone: (412) 391-5164
412/471-1033 (fax)
yateslaw@aol.com

*Local Counsel*

LAW OFFICES OF CURTIS V. TRINKO, LLP
CURTIS V. TRINKO
16 West 46th Street, 7th Floor
New York, NY  10036
Telephone: 212/490-9550
212/986-0158 (fax)
ctrinko@trinko.com

*Additional Local Counsel*

110