# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARTIN HOWARD, | ) |
| | ) |
| Plaintiff, | ) 2:17-cv-1057 |
| | ) |
| v. | ) |
| | ) |
| ARCONIC INC ET AL, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## OPINION

**Mark R. Hornak, Chief United States District Judge**

In 2017, a tragic fire at Grenfell Tower in London, England, claimed 71 lives and injured 70 more. One of Arconic's architectural products, Reynobond PE paneling, formed part of the Tower's exterior cladding system, and some news outlets reported that the panels contributed to the fire's rapid spread. Plaintiffs allege, on behalf of themselves and a securities class, that a UK-based sales employee had reason to know that the Reynobond PE that Arconic's subsidiary supplied would be improperly used by a third party on that high-rise tower. But this is not a products liability case. Plaintiffs claim that 81 of Arconic's statements in prior SEC filings, customer brochures, and presentations to investors violated federal securities laws by failing to disclose alleged sales of Reynobond PE for unsafe uses. However, Plaintiffs have failed to adequately, plausibly plead that Defendants had knowledge of the facts they allegedly failed to disclose, or that Defendants made materially false or misleading statements or failed to disclose facts they had a duty to disclose, so as to make out a violation of the federal securities laws they invoke. For these and the other following reasons, the Court will grant Defendants' Motion to Dismiss.

1

# I. BACKGROUND

## A. Facts

For purposes of ruling on the pending Motion to Dismiss, the Court will accept the facts as alleged in the First Amended Complaint as true and review it in its entirety. The Court also may review and consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice," including documents required by law to be filed with the Securities and Exchange Commission and press releases. *Winer Family Tr. v. Queen*, 503 F.3d 319, 327 (3d Cir. 2007) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007)).[1] In reviewing the First Amended Complaint, the Court notes that, for their claims under

---

[1] Defendants have requested that the Court take judicial notice of the eighteen (18) exhibits appended to their memorandum in support of their Motion to Dismiss. (*See* ECF Nos. 72–3-20.) These include Arconic's Certificate of Incorporation, Ex. 1, ECF No. 72–3, Excerpts from Arconic's 10-K reports, Ex. Nos. 2–6, ECF Nos. 72–4-8, a presentation regarding Arconic's Transportation and Construction Solutions segment, dated December 14, 2016, Ex. No. 9, ECF No. 72–9, an excerpt from Arconic's July 24, 2017 Second Quarter 2017 Earnings Call Transcript, Ex. No. 8, ECF No. 72–10, an excerpt from Arconic's May 2, 2014 annual shareholder meeting, Ex. 9, ECF No. 72–11, an archived copy of "Chairman and CEO Statement" webpage, Ex. 10, ECF No. 72–12, an excerpt from Arconic's 2014 Annual Report to shareholders, Ex. 11, ECF No. 72–13, an excerpt from Arconic's May 6, 2016 annual shareholder meeting, Ex. 12, ECF No. 72–14, an excerpt from Arconic's 2016 Annual Highlights Report, Ex. 13, ECF No. 72–15, an excerpt from Arconic's 2015 Sustainability Report, Ex. 14, ECF No. 72–16, and three product brochures, Ex. Nos. 15–17, ECF Nos. 72–17-19. The Court concludes that Exhibits 2–5, 7, and 9–18 are incorporated by reference in or integral to the First Amended Complaint, and the Court may therefore consider them on the Motion. Exhibits 1 and 6, a certificate of incorporation and an SEC filing, are documents of which the Court may take judicial notice. *See, e.g., Carpenter Tech. v. Allegheny Techs.*, 646 F. Supp. 2d 726, 735 (E.D. Pa. 2009) (taking judicial notice of SEC filings).

However, Exhibit 8, an excerpt from Arconic's July 24, 2017 Second Quarter 2017 Earnings Call Transcript, stands on a different footing. The Court has not identified reference to this document in the FAC. Nor have Defendants explained why the Transcript is integral to the First Amended Complaint. The Court must therefore determine whether it may take judicial notice of the Earnings Call Transcript.

Some district courts have concluded that transcripts of earnings calls are in the same boat as SEC filings, and thus merit judicial notice. *See, e.g., Sapir v. Averback*, No. 14–7331, 2016 WL 554581, at *10 (D.N.J. Feb. 20, 2016); *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1058 (N.D. Cal. 2012). The Federal Rules of Evidence permit the Court to take judicial notice of any fact "not subject to reasonable dispute" because it either "(1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. Numerous district courts have taken judicial notice of earnings transcripts when the accuracy of the transcripts' contents is undisputed. *See, e.g., Rosenbaum Capital, LLC v. McNulty*, 549 F. Supp. 2d 1185, 1189 (N.D. Cal. 2008) ("This [earnings call] transcript . . . is publicly available and was disclosed to the market, and therefore is appropriate for judicial notice."), *abrogated on other grounds as recognized in In re ECOtality, Inc. Sec. Litig.*, No. 13–3791, 2014 WL 4634280 (N.D. Cal. Sept.

the Securities Exchange Act of 1934, Plaintiffs must satisfy the heightened pleading requirements established by the Private Securities Litigation Reform Act as discussed in Section III, *infra*.

Arconic, Inc. ("Arconic" or the "Company") is a global company engaged in "the engineering and manufacturing of aluminum and other lightweight metals into products used worldwide in the aerospace, automotive, commercial transportation, packaging, building and construction, oil and gas, defense, consumer electronics, and industrial industries." (First Amended Complaint, ECF No. 61 ("FAC" or "Complaint") ¶ 19.) Arconic is incorporated in Delaware and its common stock was listed on the New York Stock Exchange at all relevant times. (Ex. 1, ECF No. 72–3 (certificate of incorporation); FAC ¶ 2.) In September 2014, shares of Arconic's Class B Mandatory Convertible Preferred Stock were sold to the public ("Preferred Offering"), pursuant to a registration statement filed with the SEC ("Registration Statement"). (FAC ¶ 74–76.)

One product Arconic manufactures and sells is Reynobond wall cladding. (*Id.* ¶ 40.) Reynobond is the Company's brand of aluminum composite material ("ACM"), and consists of two thin sheets of aluminum bonded to either side of a non-aluminum core. (*Id.* ¶ 40.) Arconic manufactured two Reynobond products: Reynobond PE, which featured a polyethylene core, and Reynobond FR, which featured a fire-resistant material at the core. (*Id.*) Combined with insulation, panels of Reynobond can be used to form a cladding system affixed to a building's exterior. (*Id.*) Reynobond was sold by Arconic's Engineered Products and Solutions business segment until the

---

16, 2014); *California Pub. Employees' Ret. Sys.*, No. 00–4285, 2002 WL 33934282, at \*13 (taking judicial notice when, "for the purposes of this motion, there is no material dispute as to the transcripts of the conference calls").

The Transcript was publicly available to investors at the time of the allegations in the Complaint, but the Plaintiffs dispute the accuracy of the figures contained therein. (*See* Pls.' Br., ECF No. 75, at 33 n.18 ("[T]here is no back-up support for the numbers recited in passing during the call so their accuracy is highly questionable.").) As this is a factual matter not resolvable at this time, the Court will consider the Transcript not for the truth of its contents, but only for the undisputed fact that the call took place, was recorded, and that the matters reported were actually stated during the call. *See In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 384–85 (S.D. Tex. 2011).

third quarter of 2015, and then by its Transportation and Construction Solutions segment. (*Id.*
¶ 214.) Plaintiffs allege that Arconic's sales personnel pushed Reynobond PE, which was cheaper
than Reynobond FR, to customers, particularly when engaged in competitive bidding. (*Id.* ¶ 40.)

According to Arconic's 10-Ks, sales for Arconic's product grouping of "architectural
aluminum systems," of which Reynobond PE formed part, accounted for approximately 4 percent
of the Company's overall sales in 2013 through 2015, and approximately 8 percent in 2017. (*See*
Ex. 2, ECF No. 72–4 (2013 10-K), at 132 ($977 million out of $23 billion in total sales); Ex. 3,
ECF No. 72–5 (2014 10-K), at 134 ($1.002 billion out of just under $24 billion); Ex. 4, ECF No.
72–6 (2015 10-K), at 140 ($951 million out of $22.5 billion); Ex. 6, ECF No. 72–8 (2017 10-K),
at 91 ($1.065 billion out of $12.9 billion).)

From May 8, 2010, until April 17, 2017, Defendant Klaus Kleinfeld was the Company's
Chief Executive Officer ("CEO") and Chairman of its Board of Directors. (FAC ¶ 20.) In addition
to Defendant Arconic, the remaining Defendants are current and former officers and directors of
Arconic who signed the Registration for the Preferred Offering (those individuals, together with
Kleinfeld, the "Individual Defendants"), and investment banking firms that acted as underwriters
for the Preferred Offering (together, the "Underwriter Defendants"). (*Id.* ¶¶ 25–26.)

On June 14, 2017, a fire broke out at Grenfell Tower in North Kensington, London,
England, a 24-story, 67-meter-high tower block of public housing apartments. (*Id.* ¶ 43.) Seventy-
one (71) people died, and over seventy (70) people were injured. (*Id.* ¶ 45.)

Grenfell Tower had been recently renovated, and in connection with that renovation,
Reynobond PE was installed by Harley Facades as part of the building's cladding system in 2015–
2016. (*Id.* ¶ 47.) A French subsidiary of Arconic, Alcoa Architectural Products SAS (later known
as Arconic Architectural Products SAS) ("AAP SAS"), sold the panels to Omnis Exteriors, a

4

fabricator, who cut the panels into shape and supplied them to the Grenfell contractors. (*Id.* ¶¶ 47,

50.) Approximately 3,125 square meters of Reynobond PE were used to clad the Tower. (*Id.* ¶

44.) The cladding was combined with Celotex RS50000 PIR Thermal insulation. (*Id.* ¶ 47.) Studio

E Architects, of Ryton Ltd., oversaw the project. (*Id.* ¶ 13.) Ryton, who had outbid another bidder,

called for the installation of Reynobond PE. (*Id.* ¶ 48.) Although the initial building plans from

2012 specified zinc cladding, the Kensington and Chelsea Tenant Management Organisation

("KCTMO"), who managed Grenfell Tower, pressured the project manager on the Grenfell

renovation to cut costs, and suggested swapping the panels of zinc cladding for panels of

Reynobond PE. (*Id.* ¶ 49.)

Ten days after the fire, on June 24, 2017, *The New York Times* and *Reuters* published

articles suggesting a link between the fire's rapid spread and Grenfell Tower's cladding system,

including Reynobond PE. (*Id.* ¶¶ 67–68.) These reports also detailed emails from mid-2014

between Deborah French, Arconic's UK sales manager for Reynobond, and executives at the

contractors involved in the bidding process for the renovation at Grenfell Tower. (*Id.* ¶ 68; *see*

*id.* ¶ 50.) In those emails, French responded to requests from the companies on the availability of

samples of five different types of Reynobond panels, all of which were available in the PE and FR

versions. (*Id.* ¶ 68.) Those emails did not refer to how tall Grenfell Tower was, but did refer to

other high-rise projects where paneling had been used when discussing the desired appearance for

Grenfell Tower. (*Id.*)

Following these news reports, the price of the Preferred Shares decreased when trading

resumed on Monday, June 26th, 2017, trading down as low as $36.50 per share in intraday

trading—down nearly $4 per share, or 9.5%, from their close of $40.11 on the evening of Friday,

June 23rd, 2017, on the high volume of more than 1.4 million shares trading. (*Id.* ¶ 70.)

On June 26, 2017, the same day as the stock price drop, Arconic announced that it was discontinuing global sales of Reynobond PE for use on high-rise buildings. (*Id.* ¶¶ 61, 109.) In that announcement, Arconic stated:

> The loss of lives, injuries and destruction following the Grenfell Tower fire are devastating, and our deepest condolences are with everyone affected by this tragedy. We have offered our full support to the authorities as they conduct their investigations.
>
> While the official inquiry is continuing and all the facts concerning the causes of the fire are not yet known, we want to make sure that certain information is clear:
>
> - Arconic supplied one of our products, Reynobond PE, to our customer, a fabricator, which used the product as one component of the overall cladding system on Grenfell Tower. The fabricator supplied its portion of the cladding system to the façade installer, who delivered it to the general contractor. The other parts of the cladding system, including the insulation, were supplied by other parties. We were not involved in the installation of the system, nor did we have a role in any other aspect of the building's refurbishment or original design.
> - While we provided general parameters for potential usage universally, we sold our products with the expectation that they would be used in compliance with the various and different local building codes and regulations. Current regulations within the United States, Europe and the UK permit the use of aluminum composite material in various architectural applications, including in high-rise buildings depending on the cladding system and overall building design. Our product is one component in the overall cladding system; we don't control the overall system or its compliance.
>
> Nevertheless, in light of this tragedy, we have taken the decision to no longer provide this product in any high-rise applications, regardless of local codes and regulations.

(*Id.* ¶ 109.)

A 2016 AAP SAS brochure represented that cladding products containing polyethylene (PE) should not be used in buildings over a height of ten (10) meters, and stated that "it is crucial to choose the adapted products in order to avoid the fire spreading to the whole building. Especially when it comes to facades and roofs, the fire can spread extremely rapidly." (*Id.* ¶ 101.) The

6

brochure also warned that "[b]uildings are also classified according to their height, which will define which materials are safer to use. Another important rule when it comes to the height of buildings concerns the accessibility of the fire brigade—as soon as the building is higher than the firefighters' ladders, it has to be conceived with an incombustible material." (*Id.*)

Arconic's brochure also contained a visual height guidance table, noting that PE can be used on buildings up to ten (10) meters tall, fire-retardant (FR) materials should be used on buildings up to thirty (30) meters tall, and only cladding panels with non-combustible material (the A2 model) should be used above that height. (*Id.* ¶ 102.) That table is displayed below:



As soon as the building is higher than the firefighters' ladders,
it has to be conceived with an incombustible material.

(*Id.*)

After the fire, the British government established an independent expert advisory panel to advise on immediate measures to implement to secure the safety of the buildings. (*Id.* ¶ 64.) That panel conducted a test to evaluate a cladding system that mimicked the one used on Grenfell Tower. (*Id.* ¶ 65.) The panel concluded that the PE system did not meet UK building regulation guidance. (*Id.* ¶ 66.) According to the test report, a classification was impossible because the cladding testing had been terminated early, after eight (8) minutes rather than the minimum forty (40), "due to flame spread above the test apparatus." (*Id.*)

7

A 2018 BBC report also stated that the fire rating for Reynobond PE had been downgraded, after "fire tests carried out as early as 2014" (around the time of the Grenfell Tower sale), to a rating that did not comply with UK building code requirements for high-rise use. (*Id.* ¶¶ 101, 120, 186, 281.) According to the BBC report, "Arconic knew the test rating had been downgraded, but the UK body that certifies building products said it was not told about the change." (*Id.* ¶ 120.) Reynobond PE had a certificate based on a B rating issued in 2008, on a scale from A to F with A being the top rating. (*Id.*). The BBC report stated that a series of reports commissioned by Arconic in 2014 and 2015, which tested two configurations of the cladding, were given a classification of C and E. (*Id.*)

The BBC also obtained Arconic correspondence with clients from late 2015, after the Grenfell Tower sale, in which the Company confirmed that some of the panels were rated class E, and addressed "concerns about the product's fire reaction class in the UK." (*Id.*)

## B. **Procedural History**

The first of four related complaints in this litigation was filed on July 13, 2017, in the Southern District of New York as *Brave v. Arconic Inc. et al.*, No. 1:17-cv-05312 (S.D.N.Y.). (ECF No. 38, at 2.) Shortly after the first notice was published on July 13, 2017, two additional complaints were filed in the Southern District of New York: *Tripson v. Arconic*, No. 17-cv-05369 (filed July 14, 2017), and *Sullivan v. Arconic*, No. 17-cv-05457 (filed July 18, 2017). (ECF No. 38, at 2.) On August 11, 2017, the instant action—the *Howard* Complaint—was filed in this District. *Id.* Ultimately, *Brave*, *Tripson*, and *Sullivan* were each voluntarily dismissed in the Southern District of New York before the September 11, 2017, lead plaintiff motion deadline. *Id.* at 3. *Sullivan* was refiled in the Western District of Pennsylvania (Docket Number 2:17-cv-1213) on September 15, 2017.

8

The Court then granted a Motion to Consolidate the cases into *Howard v. Arconic*, No. 2:17-cv-1057, and to appoint Iron Workers Local 580 – Joint Funds and Ironworkers Locals 40, 361 & 417 – Union Security Funds (collectively, "Ironworkers") as the Lead Plaintiff for purchasers of all Arconic securities except purchasers of Arconic Depositary shares sold pursuant and/or traceable to Arconic's September 18, 2014, initial public offering ("Preferred IPO Purchasers"), and to appoint Janet L. Sullivan as the Lead Plaintiff for purchasers of Preferred IPO Purchasers. (ECF No. 56). The Court also appointed Plaintiffs' chosen counsel. (*Id.*) The remaining defendants are Arconic, the Individual Defendants, and the Underwriter Defendants.

On April 9, 2018, Plaintiffs filed the First Amended Complaint (Consolidated), at ECF No. 61. Pending before the Court is Defendants' Motion to Dismiss for Failure to State a Claim, ECF No. 71. The Court has reviewed the Motion, the brief in support therein ("Defs.' Br.," ECF No. 72), Plaintiffs' Brief in Opposition ("Pls.' Br.," ECF No. 75), and Defendants' Reply Brief ("Defs.' Reply," ECF No. 80). The Court held oral argument on the Motion on November 27, 2018. (ECF No. 87.) At the Court's request, the parties submitted supplemental briefing at ECF Nos. 90, 91, 98, and 99. The parties also submitted supplemental letters to the Court at ECF Nos. 101 and 103. The Court has reviewed this record and the applicable law, and the matter is ripe for disposition.

## II. LEGAL STANDARD FOR MOTIONS TO DISMISS

In considering a motion to dismiss pursuant to Rule 12(b)(6), the court is to "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)). Ordinarily, to survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl.*

9

*Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## III.    DISCUSSION

In the Complaint, Plaintiffs allege that Arconic and Kleinfeld violated § 10(b) of the Securities Exchange Act of 1934 ("'34 Act") and the rules and regulations promulgated thereunder, that all Defendants violated § 11 of the Securities Act of 1933 ("'33 Act") and the rules and regulations promulgated thereunder, that Kleinfeld violated § 20(a) of the '34 Act, and that Arconic and the Individual Defendants violated § 15 of the '33 Act.

At the outset, the Court observes that Plaintiffs' Complaint suffers from three related and fundamental flaws. These flaws pervade Plaintiffs' claims under both the '33 and '34 Acts, and (in addition to the other deficiencies explained in this Opinion) pretermit any potential for their pleadings to establish a violation of federal securities laws. The Complaint's three hundred and twenty-three (323) paragraphs do not cure these basic defects.

First, Plaintiffs have not adequately and plausibly alleged that Reynobond PE was being or had been sold for inappropriate end uses other than on the Grenfell Tower. At most, Plaintiffs allege that one of Arconic's foreign subsidiary's employees was responsible for the single Grenfell Tower sale and that she had reason to know that Reynobond PE would ultimately be used for that high-rise project. That is not nearly enough. Plaintiffs seek an inference that more improper sales had occurred, or were occurring, based on the fact that Arconic said in a press release that it would discontinue global sales of Reynobond PE for use in high-rise buildings. But Plaintiffs seek to create an inference that is not plausibly supported by either that logic or any facts actually pleaded in the Complaint. And they ignore the more compelling inference: that in the wake of damaging

news stories suggesting a connection between Reynobond PE and the tragic fire's spread, Arconic sought to bring to zero any chance that Reynobond PE would be sold in the future for *any* high-rise building use, and to assure the public of the same. Plaintiffs' assertions do not plausibly connect the dots to provide a basis for a plausible inference that, in doing so, Arconic was somehow admitting to a practice of prior sales of Reynobond PE for improper end uses. Beyond that, although Plaintiffs refer to highly flammable cladding used on other buildings in the UK, they do not plead, plausibly or otherwise, that such cladding was Reynobond PE (or, for that matter, FR), nor do they refer to Reynobond PE being used on any building other than Grenfell Tower. (*See* FAC ¶¶ 294, 300.) This unsupported suggestion permeates the Complaint, and the Court cannot credit any of its iterations.

Second, Plaintiffs have failed to adequately and plausibly allege that Kleinfeld or any other Arconic executive knew that Reynobond PE was allegedly being sold for improper end uses. The Complaint contains no averments that Kleinfeld knew that Reynobond PE had been used on Grenfell Tower or any other high rise. Any suggestion that Kleinfeld "should have known" does not bear examination. At best, Plaintiffs' allegations as to Kleinfeld add up to the inference that he knew that there was a difference between Reynobond PE and Arconic's other Reynobond product, "FR," whose name denotes its *fire resistance.* This does not suffice to establish his culpable knowledge of sales leading up to an improper end use of Reynobond PE.

Third, Plaintiffs repeatedly point to Arconic's alleged failure to inform investors that Reynobond PE had been sold for use on Grenfell Tower, and that the end use on a high-rise building was unsafe. The Complaint sets forth in exacting detail the tragic events of the fire. The Grenfell Tower sale may well form the basis of a products liability claim under UK law—an issue most certainly not before this Court. But for the reasons that follow, as pleaded, the Complaint

does not plausibly show that a failure to inform investors of this single sale to an end user who wound up using the product unsafely provides a basis for a *securities* law claim.

Because of these basic deficiencies, and for the reasons that follow, Defendants' Motion to Dismiss will be granted, and Plaintiffs' Complaint will be dismissed without prejudice.

### A. **Section 10(b) '34 Act Claims**

Section 10(b) of the Exchange Act makes it unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations" prescribed by the SEC. 15 U.S.C. § 78j(b). To implement § 10(b), the SEC promulgated Rule 10b-5, which makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b).

The Supreme Court has implied a private cause of action from the text and purpose of § 10(b) to investors who have been injured by its violation. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 318 (2007). To state a securities fraud claim under § 10(b), a plaintiff must allege the following elements: (1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005); *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014).

In addition to pleading the foregoing elements, the Private Securities Litigation Reform Act ("PSLRA") imposes two distinct, heightened pleading requirements that must be satisfied for a complaint alleging § 10(b) claims to survive a motion to dismiss. *See Inst'l Inv'rs Group v.*

*Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009). First, the PSLRA requires that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Second, the complaint must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A). That state of mind is "scienter," which is defined as a "mental state embracing intent to deceive, manipulate, or defraud" and it requires knowledge or recklessness. *Avaya*, 564 F.3d at 252 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976)). Both provisions require that facts be pleaded with particularity. This standard "requires plaintiffs to plead the who, what, when, where and how: the first paragraph of any newspaper story." *Id.* at 253 (quoting *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir. 1999)).

In addition to the traditional Rule 12(b)(6) standard, the Supreme Court has prescribed a three-step process for considering a motion to dismiss in a § 10(b) case. *See Tellabs*, 551 U.S. at 322–23. First, as with any motion to dismiss, the court must "accept all factual allegations in the complaint as true." *Id.* at 322. Second, the court must "consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Id.* On this point, the inquiry is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323. Third, "in determining whether the

pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Id.*

Plaintiffs aver in Count III of the Complaint that Arconic and Kleinfeld violated § 10(b) of the '34 Act and Rule 10b-5 by making false statements of material fact and/or omitting material facts, which deceived the investing public, artificially inflated Arconic's securities' prices, and caused Plaintiffs and members of the Class to purchase Arconic's securities at artificially inflated prices.[2] (*See* FAC ¶¶ 306–16.)

Defendants contend that Plaintiffs' § 10(b) claim must be dismissed because: (1) Plaintiffs fail to allege materially false or misleading statements; (2) Plaintiffs fail to plead facts raising a strong inference of scienter; and (3) any claims based on purchases of Arconic securities before the sale of Reynobond PE for use on Grenfell Tower must be dismissed. The Court will address each of these arguments in turn.

### i. Materiality

The first element of a securities fraud claim under §10(b) is a material misrepresentation or omission. Under the PSLRA's heightened pleading standard, a plaintiff first must specify each allegedly misleading statement, why the statement was misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity. 15 U.S.C. § 78u–4(b)(1).

Plaintiffs identify the allegedly misleading statements made by Defendants. (*See* FAC ¶¶ 141–43, 145, 147, 151–54, 156–69, 171–82, 188–89, 190–95, 197–205, 207–16, 222–46, 248–49, 251–62, 264, 271–85.) Plaintiffs also aver why they are alleged to be misleading. (*See* FAC ¶¶ 148–50, 183–87, 217–21, 265–70, 286–90). Defendants argue that the allegedly misleading

---

[2] Defendants do not contest the sufficiency of the pleadings as to economic loss or loss causation.

14

statements and omissions are not actionable because they are immaterial, not false or misleading, and/or non-actionable puffery or as forward-looking statements protected by the PSLRA's safe harbor provision. *See* 15 U.S.C. §78u-5(c)(1).

To prevail on a § 10(b) claim, a plaintiff must show that the defendant made a misleading statement or omission as to a material fact. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)). A misrepresentation or omission "is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). The Supreme Court has held that to satisfy the materiality requirement "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc.*, 485 U.S. at 231–32 (quoting *TSC Indus.*, 426 U.S. at 449).

The Third Circuit has held that the question of materiality "typically presents a mixed question of law and fact," which traditionally has been viewed as appropriate for the trier of fact. *Semerenko v. Cendant Corp.*, 223 F.3d 165, 178 (3d Cir. 2000). However, "complaints alleging securities fraud often contain claims of omissions or misstatements that are obviously so unimportant that courts can rule them immaterial as a matter of law at the pleading stage." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). The Court determines materiality as of the date of the alleged misstatement or omission, not with the benefit of hindsight. *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002).

Plaintiffs have identified five categories of statements[3] that they contend violated § 10(b) of the '34 Act: (1) statements in product brochures about Reynobond; (2) statements about

---

[3] Plaintiffs have identified 81 statements that they allege violated § 10(b). These statements are reproduced in their entirety in the Appendix to this Opinion.

Arconic's values, commitment to safety, and safety-related policies and goals; (3) financial disclosues; (4) risk disclosures; and (5) statements highlighting Reynobond and other Arconic products. The Court concludes that Plaintiffs have not adequately alleged that any of these were materially misleading, and Plaintiffs' § 10(b) claims will be dismissed.

## 1. Statements in Brochures

Plaintiffs allege that throughout the class period, Defendants misrepresented statements about Arconic's products in product brochures on Arconic's official website. The brochures stated, in relevant part,[4] that:

- Arconic's PE products were "safe and compliant,"
- Reynobond PE was "designed and tested to meet safety and environmental building codes around the world," and
- Reynobond PE "was a fully tested product, with building-code approvals around the world."

(FAC ¶¶ 167–69; 199–200.)

The principal question for the Court is whether these statements were material; that is, whether the statements in customer brochures concerning Reynobond PE plausibly would have made a "significant difference" to an investor's choice to buy or sell Arconic securities?

Plaintiffs allege that these statements were materially misleading, if not demonstrably false, because at the time they were made, Arconic had commissioned reports showing that its Reynobond PE products had failed to meet UK fire-safety standards, and had been downgraded from Class B to Class C and E grades. Moreover, Plaintiffs point to the UK's post-Grenfell ban on Reynobond PE's use (no matter what local codes permitted) on high-rise buildings to illustrate that a reasonable investor could not have known that Arconic was engaging in reckless sales of Reynobond PE which would in turn increase the risk of civil and criminal liability. Also, Plaintiffs

---

[4] The complete statements can be found at the Appendix to this Opinion.

point out that Defendants' assurances that Reynobond PE was "fully tested" are in tension with reports that testing on the product could not be fully completed.

### a. *"In connection with" element*

The first, threshold question for the Court to decide is whether the brochure statements can even give rise to liability to investors—that is, were they made "in connection with" the sale of securities? Plaintiffs aver that the statements, disseminated through Arconic's website, were part of the "total mix" of information relied upon by investors, under a fraud-on-the-market theory. Plaintiffs claim they are actionable because a reasonable investor could have read and relied on these publicly available statements, even if they were not geared toward investors. Defendants argue that the statements could not, as a matter of law, be relied upon by investors because they were customer-facing publications, and it is implausible that such publications would have made a significant difference to any reasonable investor's decisionmaking.

Rule 10b-5's "in connection with" requirement will be satisfied if a statement "is material to a decision by one or more individuals . . . to buy or sell" a security. *Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 387 (2014) (interpreting the Securities Litigation Uniform Standards Act of 1998 ("SLUSA")'s identical language).[5] The statement must "make[] a *significant difference* to someone's decision to purchase or sell" a security. *Id.* The Supreme Court has outlined some broad parameters for evaluating the "in connection with" requirement. First, Rule 10b-5 must be "flexibly" construed to "effectuate its remedial purposes." *SEC v. Zandford*, 535 U.S. 813, 819 (2002). Second, although 10b-5 protects the integrity of the securities markets, its remedial

---

[5] The Third Circuit has clarified that "existing case law under § 10(b) and Rule 10b–5 informs the interpretation of SLUSA's 'in connection' requirement." *Rowinski v. Salomon Smith Barney Inc.*, 398 F.3d 294, 299 (3d Cir. 2005). Moreover, the Supreme Court, interpreting SLUSA in *Chadbourne & Parke*, cited Rule 10b-5 cases. 571 U.S. at 388–89; *see id.* at 389 ("[W]e read [SLUSA] in light of and consistent with the underlying regulatory statutes, the Securities Exchange Act of 1934 and the Securities Act of 1933.").

purposes are not limited to that goal. *Id.* at 821–22. Therefore, the "in connection with" requirement can be met even if a "transaction is not conducted through a securities exchange or an organized over-the-counter market." *Superintendent of Ins. of State of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 10 (1971). Third, the fraud can be "in connection with" the purchase or sale of securities even if an identifiable purchaser or seller is not the individual who is deceived. *United States v. O'Hagan*, 521 U.S. 642, 658 (1997).

Plaintiffs appear to argue that by virtue of their publication on Arconic's website, a reasonable investor would rely on the statements in the product brochures. This assertion does not find support in caselaw. That is because "[a]lthough an investor might read these promotional materials, the brochure and pamphlet are geared to consumers of a product, not investors in a corporation. It would distort the meaning of rule 10(b)(5) to allow such materials to serve as a basis for liability." *Hemming v. Alfin Fragrances, Inc.*, 690 F. Supp. 239, 244–45 (S.D.N.Y. 1988). The goal of the brochures is to persuade a customer to purchase Arconic's products, not its stocks. The brochures are not directed at the financial community. Even assuming the brochures were inaccurate, Arconic could be a wise investment for a whole host of other reasons. By the same token, if the brochures were entirely accurate, Arconic could still be too risky an investment for other reasons. The Court therefore declines to adopt a *per se* rule that any publication on a website will be considered "in connection with" a purchase or sale of securities.

While the Supreme Court embraced a "broad reading" of Rule 10b-5 in *Zandford*, that reading is "not boundless," *Rowinski v. Salomon Smith Barney Inc.*, 398 F.3d 294, 301–02 (3d Cir. 2005). Rather, "the 'in connection' criteria is satisfied where material misrepresentations are 'disseminated to the public in a medium upon which a reasonable investor would rely.'" *Rowinski*, 398 F.3d at 301 (quoting *Semerenko v. Cendant Corp.*, 223 F.3d 165, 176 (3d Cir. 2000)). The

18

Court must therefore determine whether consumer product brochures on Arconic's website are a medium upon which a reasonable investor would rely.

"[T]he market can absorb technical information." *In re Carter-Wallace, Inc. Sec. Litig.*, 150 F.3d 153, 156–67 (2d Cir. 1998). But that information must be something that an analyst would use to study the financial prospects of a company. For example, in *Carter-Wallace*, the plaintiffs alleged that the defendant company had violated Rule 10b-5 by making false statements about its anti-epileptic drug in advertisements in two medical journals. *Id.* The Court concluded that "false advertisements in technical journals may be 'in connection with' a securities transaction if the proof at trial establishes that the advertisements were used by market professionals in evaluating the stock of the company." *Id.* at 156–57.

The Third Circuit also concluded in *Rowinski* that publicly disseminated investment research reports may form the basis for liability. There, retail brokerage customers of Salomon Smith Barney sued the company, alleging that, to "reap hundreds of millions of dollars in investment banking fees," Salomon Smith Barney had produced investment research reports reflecting excessively favorable views of its investment banking clients. *Rowinski*, 398 F.3d at 296–97.[6] The Court determined that the securities transactions coincided with the alleged fraud because the transactions were "necessary" to the fraud's success. *Id.* at 302. The Court explained that without the transactions, the share prices of the investment banking clients would not have increased, and without that share price increase, the clients would not have given Salomon Smith Barney the investment banking business it wanted. *Id.*

---

[6] As noted above, the Court was interpreting the SLUSA, because the customer-plaintiffs alleged state-law claims rather than 10b-5 claims. But to answer whether the state law claims were permitted under SLUSA, the Court applied precedent interpreting 10b-5's "in connection with" requirement. *Rowinski*, 398 F.3d at 296–97.

So, considering whether a customer-facing product brochure may similarly give rise to liability, the Court will consider whether Plaintiffs have adequately alleged that market professionals, in evaluating Arconic's stock, plausibly would have used the brochures as they would an advertisement in a technical journal or an investment research report. Plaintiffs cite empirical research that product advertising may affect investor decisions, and that managers may use advertising in order to affect such decisionmaking. (Pls.' Br., at 33.)[7] However, these studies analyzed the effects of increased overall advertising spending on stock prices, not whether investors typically consider specific customer-facing material in making investment decisions. It may well be that investors would view, say, a Super Bowl ad campaign for a well-known tech company's new phone or tablet, and decide that said company was a wise investment. But Plaintiffs have not alleged anything of the sort happened here. That Arconic advertised its products in brochures or on its website does not, without more, drive a plausible inference that investors would rely on them.

Plaintiffs' cited authority regarding whether statements appearing on Arconic's website were "publicly disseminated"—and therefore part of the mix of information on which a reasonable investor would rely—does not counsel a different result. For instance, in *SEC v. Stinson*, although the Court concluded that the "in connection element" was satisfied, that was because the defendants communicated material misstatements and omissions in direct email solicitations, a webinar sponsored by an IRA custodian, *and* websites. No. 10-3130, 2011 U.S. Dist. LEXIS 65723, at *12 (E.D. Pa. June 20, 2011). And in *Last Atlantis Capital LLC v. AGS Specialist*

---

[7] Plaintiffs cite Dong Lou, *Attracting Investor Attention Through Advertising*, at 8 (Jan. 2014), http://personal.lse.ac.uk/loud/advertising.pdf (although Plaintiffs cite to a 2011 draft of this article, that version is no longer available online and the Court has reviewed the updated 2014 version instead); Amit Joshi & Dominique M. Hanssens, *The Direct and Indirect Effects of Advertising Spending on Firm Value*, 74 J. Marketing 20, 30 (Jan. 2010); Thomas Chemmanur & An Yan, *Advertising, Attention, and Stock Returns* 34 (Feb. 2009), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1340605; Shuba Srinivasan et al., *Product Innovations, Advertising and Stock Returns* 24 (May 7, 2008), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1136319.

*Partners*, the Court concluded that "it is reasonable for members of the public who trade in options to rely on statements *made by options specialists* on their public websites, just as it is reasonable for companies maintaining websites to anticipate that current or potential investors might read and rely on website statements." 749 F. Supp. 2d 828, 834 (N.D. Ill. 2010) (emphasis added). In these cases, information was either communicated directly to investors or was designed to interface with investors. The information in Arconic's brochures was neither directly communicated to nor designed to communicate with investors. And Plaintiffs have not provided any examples from caselaw where a purely customer-facing brochure published on a website, on its own, gave rise to Rule 10b-5 liability.

The Court therefore concludes that Plaintiffs have not plausibly pleaded that the statements made in Arconic's product brochures were made "in connection with" the sale of securities on a fraud-on-the-market theory. On this basis alone, these statements cannot form the basis for 10b-5 liability. The Court will nevertheless also consider whether these alleged misstatements could be plausibly found to be materially false or misleading.

### b. *Alleged Falsity*

Defendants argue that Plaintiffs' claims pertaining to Reynobond product brochures should be dismissed for another reason: that the statements in the brochures were not materially misleading. The Court will first address Plaintiffs' quantitative materiality argument, and then address whether Plaintiffs have adequately alleged that the statements were materially misleading.

### i. *Quantitative Materiality*

The parties agree that quantitative measurement is not enough to establish materiality, though it can be persuasive. Throughout their pleadings, Plaintiffs refer to the Arconic's precipitous stock price drop after the Grenfell fire as evidence of materiality. (*See, e.g.*, FAC ¶ 296;

300–01 (describing stock price declines of anywhere between 8–11% allegedly flowing from the damaging news stories in the fire's wake stating that Arconic was no longer selling Reynobond PE and that Arconic had known the panels would be used on Grenfell Tower).) Defendants do not squarely address whether the downturn in stock prices alone suffices to establish materiality. However, they do they point to the relatively small share of business Reynobond PE sales in the UK represented, to suggest that any statements in Reynobond PE product brochures were immaterial.

The Third Circuit has established that, in an efficient securities market such as the New York Stock Exchange, "information important to reasonable investors . . . is immediately incorporated into the stock price." *Burlington*, 114 F.3d at 1425. Thus, when stock is traded in an efficient market, materiality may be measured *post hoc* by considering the movement of a firm's stock price immediately after the pertinent disclosure. *Oran v. Stafford*, 226 F.3d 275, 285 (3d Cir. 2000). "Because in an efficient market 'the concept of materiality translates into information that alters the price of the firm's stock,' if a company's disclosure of information has no effect on stock prices, 'it follows that the information disclosed . . . was immaterial as a matter of law.'" (*Id.* (quoting *Burlington*, 114 F.3d at 1425)).

Plaintiffs argue that the drop in Arconic's prices evinces materiality because "the risk of fire, and the attendant exposures to significant civil and criminal liabilities, materialized." (Pl.'s Br., at 34.) However, although Plaintiffs have alleged that Arconic's prices dropped as a result of the negative press coverage, the precise relationship between those publications and the price drop does not map on to the relationship between the post-fire *disclosure* (which is the specific disclosure Plaintiffs allege should have occurred years earlier) and the price drop. Plaintiffs allege

that Arconic should have disclosed earlier in time that it was selling Reynobond PE to end users that were using the panels in ways that, at minimum, violated local regulations.

Perhaps it would be one thing if Arconic's disclosure that it knew Reynobond PE was being sold for use on the Grenfell Tower was the sole piece of information the market received, in a vacuum, before markets reopened on June 26, 2017, and Arconic's stock price dropped. That would specifically tie a price drop to that single disclosure, conceivably creating an inference that the same disclosure made earlier would itself cause the price drop. But the information that the market received was not only the disclosure of a sale for an improper purpose. The market had also learned, for the first time, that the panels shared the blame for a horrific fire with a large number of injuries and deaths. Plaintiffs have not alleged facts pointing to any disclosure earlier than ten (10) days after the fire that Arconic's product was involved in the fire. It is therefore impossible to logically disentangle the stock drop attributable to the disclosure of the Grenfell Tower sale from that attributable to the disclosure that the product sold may have contributed to a high-fatality fire at the property. This distinction is critical, because the crux of Plaintiffs' case is an alleged failure to make a public disclosure at or near the time of the sale in which Ms. French was involved. To point to a stock price drop on the heels of the actual fire in an effort to demonstrate that that very price drop would likewise be attributable to *just* the disclosure of the sale involved years before (e.g., made at or near the time of that sale) seeks to conflate at least two potentially causative events to generate an implausible inference. The Court thus declines to reach a conclusion about materiality on the basis of the stock price drop alone.

For their part, Defendants argue the flip side of the coin—that because Reynobond PE contributed only a small fraction of Arconic's overall business, any statements in its product brochures cannot be considered material. Plaintiffs dispute the percentage of the business that

Reynobond should be considered to represent, and also allege that due to the high risk from Reynobond PE panels, their relatively small share of Arconic's business should not doom the materiality analysis, because risky sales of a highly dangerous product representing a small segment of a business would still be material to a reasonable investor.

The Supreme Court has noted that "[s]tatistical significance" is not dispositive in every case. *Matrixx Initiatives, Inc.*, 563 U.S. at 44. The inquiry is "contextual." *Id.* The SEC's internal guidance in Staff Accounting Bulletin (SAB) No. 99 provides that both quantitative and qualitative factors should be considered in assessing a statement's materiality. SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45150, 45150–52 (August 19, 1999). SAB No. 99 suggests that a numerical threshold, as a "rule of thumb" for registrants, "may provide the basis for a preliminary assumption that . . . a deviation of less than the specified percentage with respect to a particular item on the registrant's financial statements is unlikely to be material." *Id.* at 45151. But it emphasizes that "quantifying . . . the magnitude of a misstatement is only the beginning of an analysis of materiality." *Id.* The Third Circuit has not yet discussed SAB 99, but the Second Circuit has adopted it as persuasive authority. *See ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197–98 (2d Cir. 2009).

The Complaint alleges that aluminum products formed an important segment of the Company, and contributed significantly to Arconic's revenues. (FAC ¶ 296.) Plaintiffs allege that sales of Reynobond PE are quantitatively material because Architectural Systems accounted for 50% of the Transportation and Construction Solutions ("TCS") segment. However, TCS's annual revenues were only 15% of the Company's total, and so it follows that Architectural Systems accounted for about 7.5% of Arconic's total revenues. Public documents also establish that Reynobond was not part of the Aluminum Architectural Systems product grouping. (*See* Ex. 7,

24

ECF No. 72–9 at 7 (distinguishing between "Arconic Architectural Products," which included the "Reynobond" brand, and "Arconic Architectural Systems," which included Arconic's "Kawneer" brand and "framing" product).) The Court therefore does not conclude that statements pertaining to Reynobond were material simply because of their proportionality to the Company's overall revenues. In sum, the Court will not draw any inferences on materiality in either direction based on quantitative measures.

ii. *Qualitative materiality*

Even if customer brochures could give rise to § 10(b) liability, for Plaintiffs' claims to survive, the Court would have to conclude that the statements they identify were false and misleading for failing to disclose risks posed by alleged sales of Reynobond PE for unsafe end uses. Plaintiffs allege that at the time the statements were made, Arconic was supplying Reynobond PE for use in high-rise buildings, in contravention of its statements in the brochures. Defendants contend that Plaintiffs' claims must be dismissed because no reasonable investor would take the statements in Arconic's brochures to mean that Reynobond PE would never be or had never been misused.

To sustain their brochure-related claims, Plaintiffs must allege facts indicating that Defendants were under a duty to disclose Reynobond PE's UK rating downgrade and that Arconic had allegedly sold the product for use on high-rise buildings. The Court notes that a company does not have a freestanding responsibility to disclose all good or bad news that might influence its stock price. *Basic, Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988). "No matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not." *Brody v. Transitional Hosps. Corp.*, 280 F. 3d 997, 1006 (9th Cir. 2002).

25

"[N]either Rule 10b–5 nor Section 14(e) contains a freestanding completeness requirement . . . ." *Id.*

Instead of a system of continuous disclosure, an issuer may keep silent unless there is a duty to disclose. *Id.* "Such a duty to disclose may arise when there is insider trading, a statute requiring disclosure, or an inaccurate, incomplete or misleading prior disclosure." *Oran v. Stafford*, 226 F.3d 275, 285–86 (3d Cir. 2000).

As explained below, the Court concludes that Plaintiffs have not plausibly alleged that the brochure statements give the false or misleading impression that Reynobond PE is always safe for all uses, or that no customer had ever used Reynobond PE unsafely, that it had the highest rating on every test, or that Reynobond PE complied with all building codes wherever it was sold. Arconic's statements did not provide absolute guarantees to its customer audience. That Reynobond PE was used in Grenfell Tower's cladding does not contradict the statements in Arconic's product brochures. Therefore, Arconic was not required to disclose any further information about Reynobond PE.

To begin, Arconic's statements that Reynobond is "designed and tested to meet safety and environmental building codes," is "fully tested" and is "of the highest quality" (FAC ¶¶ 142, 167, 199, 222,) would not plausibly mislead investors into thinking that Reynobond PE in particular will be or is always safely used by end users, or that there are no unsafe uses of it. Also, many of the statements in these brochures refer to Reynobond products in general, and expressly clarify that Reynobond "is available with either a polyethylene (PE) core *or* a fire-resistant (FR) core." (FAC ¶¶ 142, 167, 199, 222.) An investor could not plausibly have been misled into thinking that the PE product was always fire-safe given that there was a specifically designated fire-resistant Reynobond product available and referred to in those same sales materials.

26

Additionally, although Plaintiffs argue that Defendants' statement that Reynobond PE was "fully tested" was contradicted by media reports showing that the product had been downgraded after testing two different configurations of the cladding, (*see id.* ¶ 120,) the fact that the product was downgraded in the UK and that some configuration testing was not completed as part of that evaluation does not render the statement that Reynobond PE was "fully tested" misleading. It is not plausible that the statement represented to Arconic's customers (let alone its investors) that Reynobond PE received the highest rating on every test to which it was subject in every country, or that every test performed by anybody on Reynobond PE was completed. And Plaintiffs have not plausibly alleged that a reasonable investor would read "fully tested" to mean that. "Fully tested" does not comment on Reynobond PE's quality of manufacture, whether every potential end use of it is safe, or whether it would comply with regulatory codes anywhere and everywhere no matter its end use. Plaintiffs do not adequately support an inference that "fully tested" means anything other than exactly what it says—that at some point, Reynobond PE had been "fully tested."

Nor do Plaintiffs' averments that in 2018, a test of PE panels commissioned by the BBC could not be completed because the plastic burst into flames give rise to an inference that the product was not "fully tested." *Post-hoc* investigative testing does not inform what Arconic would have been aware of, or what investors would have understood from its brochures, in 2014.

Moreover, Plaintiffs' allegations that the ACM cladding system (combining Reynobond PE with insulation materials) had never been tested before the installation on Grenfell Tower do not render misleading Arconic's statement that *Reynobond PE* was "fully tested." (*See* FAC ¶ 115.) The Complaint does not allege that Arconic was responsible for any such testing in the first instance, or that it was responsible for ensuring that an overall cladding system including its

product complied with local regulations. In fact, the brochure in which the "fully tested" language appears specifically tells customers that "[t]esting is advisable to determine the performance of any fastening system" for Reynobond. (Ex. 17, ECF No. 72–19, at 9.) If "fully tested" meant that no future testing would ever be (or need to be) done, or that the full ACM cladding system had already been tested in every instance, it would make no sense to expressly advise customers to test the completed cladding system to determine its suitability and performance.

Further, Defendants' statement that Reynobond PE met building codes "throughout the world" is not contradicted by the allegation that the product failed to meet UK fire safety standards, because standards "throughout the world" plainly vary. Additionally, the brochure on which Plaintiffs rely notes that "[a] variety of fasteners are used to fabricate and install Reynobond panels. Fastener selection is the construction project engineer's responsibility. You may successfully use specific fasteners for panel load-testing purposes in obtaining building-code recognition. We can provide this information upon request." (Ex. 17, 72–19, at 9.) It would contravene logic to state that a customer might need to "obtain[] building-code recognition" for use of Reynobond PE if the brochure were also guaranteeing that the product in every use met every building code standard in the world. Plaintiffs have not plausibly alleged that the statement about compliance with building codes could have misled investors into believing that *every* use of Reynobond PE complied with *every* building code requirement anywhere in the world.

Finally, the statements in a November, 2016, brochure regarding the need for a fire-resistant core when using Reynobond above certain heights, and advising of the importance of fire safety, were not rendered misleading by the Grenfell Tower sale in 2014. These statements graphically disclose the risk of fire and advise how Reynobond PE should (and should not) be used. The brochure specifically advised, both textually and graphically, that PE should not be used

28

on buildings over ten (10) meters in height. Plaintiffs argue that a reasonable investor would have been misled by the statements in the 2016 brochure because Defendants were allegedly supplying Reynobond PE to projects where it would be used in an allegedly unsafe manner, and after the fire "even construction experts were shocked when the truth about Arconic's sales practices emerged," (Pls.' Br., at 24.) The actual verbal and visual content of that brochure belies such a suggestion.

Whether construction experts disapproved of the use of the sale of Reynobond for use on high-rise buildings does not bear on whether Arconic affirmatively misled investors when it made statements about fire safety and the proper use of Reynobond PE in its brochure. And a reasonable investor could not plausibly have inferred from reading the brochure that Reynobond PE had never been used on a high-rise project before 2016, or that it never would be used unsafely by an end user. Nothing in the Complaint contradicts the statements in the 2016 brochure about how Reynobond PE *should* be used. This allegation is essentially "fraud by hindsight," which the Third Circuit has "long rejected," *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 498 (3d Cir. 2016).

It is unremarkable that a product might have safety issues if used improperly by an end user. The fact that Defendants allegedly failed to disclose in their public statements that Reynobond PE had received a lower rating by one country's regulatory body, or that Reynobond PE had been sold for use on Grenfell Tower, does not create an actionable federal securities law claim. Arconic's statements do not suggest that Reynobond PE was safe for all uses (and in fact, the graphic in the brochure disclaimed such), or that it had never been sold for use on a high-rise building. Plaintiffs' brochure snippets are not the kind of incomplete disclosures or "half-truths" that would require additional information about Reynobond or product sales to clarify them.

In sum, Plaintiffs have failed to allege facts supporting a conclusion that the statements in Arconic's product brochures were part of the "total mix" of information influencing investors, or that they were materially false or misleading.

## 2. Values-Based Statements

Arconic also made statements about its commitment to safety, development of safety-related processes and procedures, values and ethics, and compliance program.[8] For example, Arconic stated that:

- "[O]perations and activities that could result in risk or impact are controlled to ensure that our . . . safety policy is followed . . . [and] [w]e develop procedures to cover . . . external activities, including contractor and product safety" (*see, e.g.,* FAC ¶¶ 144, 161, 201);

- As part of the "main activities undertaken in support of our safety system . . . [we] identify[] hazards and assess[] the risks associated with our products" (*id.* ¶¶145, 162);

- "Our products . . . enable buildings that are . . . safe" (*id.* ¶ 160);

- "We do not compromise our EHS [Environment, Health and Safety] Value for profit or production," and "[w]e supply and use safe and reliable products;" and "We comply with all laws and set higher standards for ourselves and our suppliers where unacceptable risks are identified." (*id.* ¶ 166).

- "[W]e always start with safety, safety first" (*id.* ¶ 208);

- "[Arconic has] a Product Safety Standard to identify what is required for product safety management systems developed by our businesses. The standard includes . . . communication of risks associated with use . . . of these products;" "We also provide safety data sheets and other documents that communicate information on the proper use . . . of our products. These sheets include the potential health risks associated with use and misuse of these products and the precautionary measures that can be used to reduce or eliminate these risks" (*id.* ¶ 255);

- "[W]e deliver [our] products at a quality and efficiency that ensure customer success and shareholder value" (*id.* ¶ 277).

---

[8] These statements are reproduced in their entirety in the Appendix to this Opinion.

Plaintiffs allege that these statements were materially false or misleading. Defendants argue that they are not misleading, and that they are mere puffery that could not mislead the reasonable investor.

### a. Alleged Falsity

First, Plaintiffs allege that these statements were materially false or misleading because Defendants were supplying Reynobond PE for use on high–rise buildings, and that a reasonable investor would have interpreted these statements as applying to all of Arconic's products, including Reynobond PE. Defendants argue that these general statements did not relate to Reynobond PE (or any other specific product), and only expressed Arconic's overall commitment to compliance, ethics, and safety.

As an initial matter, Plaintiffs claim that a reasonable investor would have interpreted all of Arconic's statements about ethics and safety as applying to all of its products, including Reynobond PE, and therefore would have been misled into thinking that Reynobond PE lived up to all such standards. This assertion is not plausible. A reasonable investor would not plausibly have taken Arconic's general statements as guaranteeing that all of Arconic's products were safe in any and all of their potential end uses. *See Gaines v. Guidant Corp.*, No. 03–892, 2004 WL 2538374, at *10–11 (S.D. Ind. Nov. 8, 2004) ("[T]he mere fact that Defendants allegedly failed to disclose the complications with [their biomedical product] in their public statements does not create an actionable claim. . . . No investor could reasonably conclude, based on the news releases, that [the product] had no pending FDA issues." (internal quotation marks omitted) (citations omitted) (quoting *Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894, 906 (N.D. Ill. 2001)).

Next, Plaintiffs allege that these statements concerning safety and compliance put product safety "in play," such that Arconic was bound to discuss the topic in a non-misleading way.

31

Defendants argue that Arconic's general statements regarding its values and ethics did not put its product safety "in play," or imply that it had no product-safety issues and never would.

When a defendant affirmatively characterizes management practices using phrases such as "adequate," "conservative," "cautious," the subject is "in play." *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992). "By addressing the quality of a particular management practice, a defendant declares the subject of its representation to be material to the reasonable shareholder, and thus is bound to speak truthfully." *Id.* For instance, in *Shapiro*, the defendant characterized its financial management as "adequate," and its lending policies as "prudent," "cautious," and "conservative," while allegedly concealing the truth about the company's loan loss reserves, financial health, lending practices, and internal controls. *Id.* at 276, 281–82. The *Shapiro* Court concluded that the mere failure to competently perform management tasks would not implicate the federal securities laws, nor would the failure to characterize management practices as inadequate, or ineffective. But once the defendant began to characterize management practices in a positive way, it was bound to speak truthfully. *Id.* at 282.

Here, Arconic's general statements about values, workplace safety, ethics, and the like did not put those topics "in play." Unlike in *Shapiro*, where incompetent management practices were plainly at odds with statements touting management's prowess, there is no nexus between Arconic's averred commitment to safety and ethics and alleged unsafe end use of one of its products. Rather, this case more closely resembles *Heartland Payment Systems, Inc.*, where the plaintiffs alleged that a company's disclosures emphasizing data security were misleading for failing to disclose a data breach. *In re Heartland Payment Sys., Inc., Sec. Litig.*, No. 09–1043, 2009 WL 4798148, at *6 (D.N.J. Dec. 7, 2009). There, the court held that disclosures emphasizing data security only sought to discuss the system in general and the fact that company had suffered a

security breach did not render the general statements misleading. *Id.* at \*7. Just so here. Arconic's general statements about its values, workplace safety, and ethics—which read like mission statements rather than guarantees—were not rendered misleading by product safety issues related to Reynobond PE's ultimate use.

As another illustration, *Equifax Inc. Securities Litigation* came to the opposite conclusion because plaintiffs alleged with specificity that, *inter alia*, the company "stored personal data in easily accessible public channels" and "relied on outdated and obsolete software" yet made affirmative representations that the company used "strong data security and confidentiality standards on the data that we provide and on the access to that data." *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1218–19 (N.D. Ga. 2019). There are no such specific allegations here. It is not reasonable to interpret Arconic's general values statements as a covenant that each of its products would be safe in any use made by an end user.

Nor does the allegation that Arconic sold Reynobond PE for improper use on the Grenfell Tower render its general statements about its own values misleading. The fact that the sale occurred does not demonstrate that the Company does not put "safety first," (FAC ¶ 208,) or that the Company did not adequately follow its safety policies (FAC ¶ 144, 161, 201). It is equally (if not more) plausible that Arconic did place a high emphasis on its values but nonetheless a subsidiary made a sale resulting in the product being used unsafely. The allegations in the Complaint do not render Arconic's value statements "demonstrably false," *Ong. v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 232 (S.D.N.Y. 2018). At most, the allegations demonstrate that Arconic "failed to live up to its own . . . safety standards," *id.*, as to one sale. They are therefore inactionable.

33

Finally, as Defendants correctly point out, many of Arconic's statements relate to its own workplace safety, not product safety. Any alleged product-safety issues certainly would not render Arconic's *workplace*-safety statements false or misleading.

The Court concludes that Plaintiffs have failed to allege with specificity facts from which a jury could plausibly conclude that Arconic's statements about its values and ethics were materially false or misleading. Although Plaintiffs' claims based on these statements could be dismissed based on this conclusion alone, the Court will nonetheless address Defendants' remaining contentions regarding these statements.

### b. *Puffery*

Next, Defendants argue that the challenged statements concerning Arconic's commitment to its values are inactionable puffery. Alleged misrepresentations will only be actionable if they are based upon a material fact. Subjective characterizations of a company's performance or future performance, absent a misstatement of fact, will not give rise to liability. *In re Aetna, Inc. Set. Litig.*, 617 F.3d 272, 283 (3d Cir. 2010); *see In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*, 7 F.3d 357, 369 n.11 (3d Cir. 1993) ("The term soft information refers to statements of subjective analysis or extrapolation, such as opinion, motives, and intentions, or forward looking statements, such as projections, estimates, and forecasts." (quoting *In re Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 642 (3d Cir. 1989)). Such "puffery" statements do not violate the securities laws because they lack an underlying factual basis and they fail to meet Rule 10b-5's materiality requirement. *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 172, 176 (3d Cir. 2014). In short, puffery cannot mislead the reasonable investor.

"The quintessential examples of such inactionable 'puffery' are 'general statements about reputation, integrity, and compliance with ethical norms' . . . ." *In re Banco Bradesco S.A. Sec.*

34

*Litig.*, 277 F. Supp. 3d 600, 647 (S.D.N.Y. 2017) (*quoting City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014)). And "[s]tatements of general corporate optimism" are inactionable "unless 'they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them.'" *Id.* (alteration in original) (quoting *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 392 (2d Cir. 2015)).

Context informs the puffery analysis. *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 669 & n.18 (6th Cir. 2005). Accordingly, general statements about safety and training are not *per se* inactionable. For instance, a company's statement that it conducted extensive training and safety programs in a highly dangerous industry, such as deepwater drilling, was not puffery. *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 243–44 (S.D.N.Y. 2012). On the other hand, aspirational statements that a food service company is "committed to serving safe, high quality food to customers" and that its "food safety programs are also designed to ensure that [the company] compl[ies] with applicable federal, state, and local food safety regulations" were nothing *but* puffery. *Ong*, 294 F. Supp. 3d at 232 (second alteration in original).

Here, according to Defendants, a reasonable investor would not rely upon Arconic's value-based statements, which they contend were general, aspirational, and vague. Plaintiffs contend that in the context of Defendants' alleged omissions, the statements were materially misleading.

The Court concludes that a reasonable investor would not have relied on these value-based statements as important to an investment decision. These statements were not made to reassure investors that Arconic's products were always safe or that end users always employed them in a safe manner. They were not a guarantee that no safety issues would ever occur. Instead, they

presented a declaration of goals and aspirations for the Company. "It is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery' . . . ." *City of Pontiac*, 752 F.3d at 183.

Additionally, Arconic's product-safety-specific statements in its "EHS Principles" that "[w]e supply and use safe and reliable products and services" and "[w]e comply with all laws and set higher standards for ourselves and our suppliers where unacceptable risks are identified," (FAC ¶ 166,) when read in context, are plainly aspirational goals for Environmental Health and Safety. In fact, they are identified as "Principles." They do not warrant any results, nor are they backward-looking factual statements.

Nor are any of these statements "determinate" or "verifiable," as in Justice Kagan's hypothetical positing that "[a] Company's CEO states: 'the TVs we manufacture have the highest resolution available on the market.'" *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1326 (2015). If Arconic had put out a statement that "Reynobond PE is 100% safe in all uses," or "Reynobond PE is the safest paneling on the market" (which could not be true because the company also sold a Reynobond product with the abbreviation for *fire resistant* in its name), then Plaintiffs would be closer to plausibly alleging that Arconic made a false statement. But as it stands, Arconic's statements were neither verifiable nor determinate.

Based on Arconic's statements, a reasonable investor might fairly conclude that Arconic took safety, compliance, and ethics seriously. However, no reasonable investor would plausibly rely on a statement such as "[o]ur Ethics and Compliance Program drives a global culture of . . . compliance, prevention and risk identification and mitigation," (FAC ¶ 280,) to conclude that each of Arconic's products would always be used safely. And Arconic did not guarantee 100% end-user compliance, 100% of the time. "Such compliance may often be unobtainable, and reasonable

36

investors may be deemed to know that." *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014). The challenged statements could not dupe the market. Instead, they are the kind of hazy statement of optimism that has been found to be inactionable puffery. All that Plaintiffs have shown is that Arconic might not have fully lived up to its aspirations. This does not form the basis for a securities law violation.

In sum, Plaintiffs have failed to adequately allege that Arconic's statements about its values were materially false or misleading.

### 3. Financial Disclosures

Defendants also seek dismissal of any § 10(b) claims that are premised on Arconic's financial disclosures. Plaintiffs allege that numerous financial disclosures in Arconic's 10-Ks, 10-Qs, quarterly financial press releases, and annual reports were misleading on the grounds that at the time the statements were made, "Defendants failed to disclose that Reynobond PE sales proceeds were the result of banned sales practices, subjecting the Company to significant civil and criminal liability." (Pls.' Br., at 30.)

The Court concludes that Arconic was not required to disclose that some unstated portion of its income was derived from Reynobond PE sales for allegedly improper end uses. "Factual recitations of past earnings, so long as they are accurate, do not create liability under Section 10(b)." *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538 (3d Cir. 1999), *abrogated on other grounds as recognized in City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159 (2014). In support of their argument, Plaintiffs analogize to *Craftmatic*, where statements that "attributed the company's past success primarily to its advertising, promotion, and marketing program" were held to be misleading because "the concerns of the securities acts are implicated by allegations that the prospectus failed to disclose facts material to the evaluation of the offered security such as: [the

37

fact that] the success of the advertising, promotion, and marketing program depended on deceptive illegal practices." *In re Craftmatic Sec. Litig.*, 890 F.2d 628, 640 (3d Cir. 1989).

This argument misses the mark. The Third Circuit in *Craftmatic* was clear that the misleading statements at issue were not only factual recitations of earnings, they were affirmative representations in the prospectus that Craftmatic believed it was "presently in compliance with consumer protection requirements." *Id.* at 631. Plaintiff's logic that income attributed to allegedly improper sales is similarly misleading does not find support in current law. Indeed, a panel of the Third Circuit has held that factual recitations of past earnings, when those earnings were driven in part by executives' *criminal acts*, were not misleading. *Galati v. Commerce Bancorp, Inc.*, 220 F. App'x 97, 101–02 (3d Cir. 2007). That Reynobond PE sales formed part of Arconic's income cannot render its factual recitations of earnings misleading. *See Emps. Ret. Sys. of City of Providence v. Embraer S.A.*, No. 16–6277, 2018 WL 1725574, at *7 (S.D.N.Y. Mar. 30, 2018) ("[T]he allegation that a corporation properly reported income that is alleged to have been, in part, improperly obtained is insufficient to impose Section 10(b) liability." (quoting *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 404 (S.D.N.Y. 2016)).

Plaintiffs also allege that statements in two Arconic 10-Ks that the "building and construction end market is expected to improve" are misleading. (FAC ¶¶ 153, 191.) Plaintiffs argue that Defendants failed to disclose that Arconic was supplying Reynobond PE for dangerous uses, which could expose Arconic to liability, and therefore the statements are actionable. But they cite to cases in which issuers made statements expressing confidence in projected growth where there was reason to believe otherwise. *See, e.g.*, *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 320 (3d Cir. 1997) (stating public statement that Quaker was "confident of achieving at least 7% real earnings growth" could be actionable because it was a "specific figure regarding a particular,

38

defined time period" but concluding that the statement was not actionable because it was later modified by the Annual Report). By contrast, Plaintiffs have not alleged that Arconic made any specific, false forecasts about the market. Nor have they alleged facts with particularity to support a conclusion that Arconic had reason to believe the building and construction market would not improve.

In sum, Plaintiffs have failed to allege facts from which a reasonable jury could conclude that Arconic's financial disclosures were false or misleading to a prudent investor.

### 4. Risk Disclosures

Finally, the Complaint identifies the relevant risk disclosures as Arconic's statements in its 2013 10-K that (i) it "may be exposed to substantial costs and liabilities associated with" health, safety and environmental laws; (ii) "[c]ompliance with . . . health and safety legislation and regulatory requirements may prove to be more limiting and costly than" anticipated; (iii) the Company's "results of operations or liquidity in a particular period could be affected by certain health, safety or environmental matters"; and (iv) evolving regulatory standards and expectations can result in increased litigation and/or increased costs, all of which can have a material and adverse effect on earnings and cash flows." (FAC ¶ 155.)[9] The Company further stated that "Arconic believes it has adopted appropriate risk management and compliance programs to address and reduce these risks."[10] (*Id.*)

---

[9] As written, the Complaint alleges that these statements violated § 11, and that only one disclosure, containing the embedded opinion that "Arconic believes it has adopted appropriate risk management . . . ." violated § 10(b). In their opposition to the Motion to Dismiss, Plaintiffs included these statements as violative of § 10(b) as well. The Court sees no reason not to address them under both theories, given that Plaintiffs could amend their Complaint to assert them under both theories. These statements are available in their entirety in the Appendix to this Opinion.

[10] The complete statement reads: "While Arconic believes it has adopted appropriate risk management and compliance programs to address and reduce these risks, the global and diverse nature of its operations means that these risks will continue to exist, and additional legal proceedings and contingencies may arise from time to time." (Defs.' Ex. 2, 2013 10-K, at 33.)

Defendants argue that Plaintiffs' claims related to Arconic's risk disclosures must be dismissed because (1) they were not false or misleading, and (2) the statements are non-actionable or protected by the PSLRA safe harbor and the common-law "bespeaks caution" doctrine. Plaintiffs aver that the statements were misleading because Arconic had allegedly been selling Reynobond PE products for use on high-rise buildings, and that that the warnings are too generalized to adequately warn investors of these allegedly improper sales.

### a. Alleged Falsity

Plaintiffs allege that the risk disclosure statements were "inaccurate" because they did not disclose that: (1) "Arconic was knowingly selling Reynobond PE for use in construction projects where the product was to be used in a manner that the Company knew was unsafe and presented a fire hazard";[11] (2) its marketing and sales of Reynobond PE for such uses conflicted with statements about its culture of safety and compliance and exposed Arconic to potential liability and reputational harm; (3) its assurances of global safety and integrity practices concealed the risk Arconic assumed from its sales and marketing of Reynobond PE; and (4) the risk of an unexpected fire was "dramatically increased" as a result of such sales. (FAC ¶ 87.)

Defendants argue that the alleged omissions are too attenuated from Arconic's risk disclosures to render those statements misleading. Plaintiffs counter that once Arconic chose to speak on its health and safety compliance, "it had an obligation not to mislead," *In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901, 927 (D.N.J. 1998). They argue that these omissions were material

---

[11] Statements akin to this one abound in Plaintiffs' briefing, but are based on the false premise that Arconic's public statement in the wake of the Grenfell Tower fire that it would discontinue sales of Reynobond PE for use on high-rise buildings necessarily (or even plausibly) means that it was admitting to past sales for high-rise uses beyond the Grenfell Tower. Plaintiffs' allegation that this statement "essentially conced[ed] its prior misconduct" is utterly conclusory. (*See* FAC ¶ 109.) As discussed in the introduction to Section III, *supra*, and Section III.A.i.4.b, *infra*, this premise is implausible, and it is far more plausible that Arconic made such an announcement to reassure the public going forward, rather than to imply anything about any past sales. For efficiency's sake, the Court will not analyze this premise each time it appears, but will instead emphasize here that the premise that Arconic's announcement implied any admission of multiple past sales lacks plausible support.

because a reasonable investor would want to know that past sales of Reynobond PE that ended up being used unsafely were partially driving Arconic's revenue.

First, as to Arconic's statements on its legal and compliance risks, a reasonable investor reading the 10-K risk disclosures would not conclude that Arconic faced *no* legal or compliance risks, or that the risk management and compliance programs Arconic had adopted were completely adequate to prevent all such risks. That a foreign employee of Arconic's subsidiary had sold Reynobond PE for an allegedly improper use does not, without more, render those programs insufficient. Nor does *Bricklayers & Masons Local Union No. 5 v. Transocean Ltd.*, 866 F. Supp. 223, 244 (S.D.N.Y 2012), counsel a different result. There, plaintiffs sufficiently alleged that Transocean's statements about its "extensive" training and safety programs were misleading when Transocean had allegedly understaffed its safety personnel, failed to staff rigs with qualified engineers, inadequately trained its personnel, and had not considered workers' behavior contributing to an unsafe environment. *Id.* at 243.

Here, by contrast, although investors may have wanted to know that Arconic sold Reynobond PE for use on Grenfell Tower, that sale is too far removed from Arconic's company-wide risk disclosure to be actionable. In actuality, Arconic's disclosures contemplated that Arconic's risk management and compliance measures may not be 100% effective, particularly in light of "the global and diverse nature of its operations," (Defs.' Ex. 2 ("2013 10-K"), ECF No. 72–4, at 11.) It would appear that these disclosures were designed to deal with just such a situation as a sale of a product that no longer complied with local regulations. Arconic, by communicating that changing regulations might affect its exposure, did not put the sale of one of its products "at issue" such that it needed to say more.

41

It also bears noting that Plaintiffs' suggestion in their briefing that Defendants' conduct was "illegal" (and not merely improper), (Pls.' Br., at 44,) does not withstand scrutiny. Plaintiffs aver that Grenfell Tower's use of Reynobond PE did not comply with local regulations. It is another thing entirely to aver that Arconic broke the law by *selling* the product.

Nor is Arconic's statement that it must comply with health and safety legislation and regulations, and that such compliance "may prove to be more limiting and costly" than anticipated, or that changing standards may result in increased litigation or costs, rendered misleading by a sale of Reynobond PE for an inappropriate use. Plaintiffs allege that Arconic put its compliance with health and safety legislation and regulations "at issue," but their theory would impose securities liability any time a company spoke on its compliance programs and then had any sort of compliance gap or issue.

Plaintiffs are correct that "[w]arnings of possible adverse events are insufficient to make omissions of present knowledge of certain future events legally immaterial." (Pls.' Br., at 46 (quoting *In re MobileMedia*, 28 F. Supp. 2d at 930).) But Plaintiffs have not adequately alleged that the officers responsible for Arconic's 10-Ks knew that there was any sale of Reynobond PE for an improper use, or that such a sale posed risks incompatible with the disclosure statements. In *In re MobileMedia*, by contrast, the defendant warned investors that integrating new acquisitions "could" prove difficult, while stating it believed acquisition would "enhance its competitive position" and failing to disclose that it knew the company was *currently* experiencing difficulties integrating a new acquisition. 28 F. Supp. 2d at 927–28.

Plaintiffs also underscore the disclosure highlighting the potential for unexpected events, such as fires or explosions at Arconic facilities or terroristic acts, to disrupt Arconic's business or affect its financial performance. (FAC ¶ 86.) That Arconic was selling Reynobond PE does not

42

match up with any of the discussion in this disclosure. The mention of "fire" does not invoke securities liability for any future fire involving an Arconic product. Additionally, that Arconic discussed unexpected fires *at its facilities* did not require it to disclose more information regarding the potential for a fire involving one of its products as used by a third party at a non-Arconic location. No reasonable investor would plausibly read this disclosure and believe that all of Arconic's products were safe at any location in all their potential uses by any of their end users.

Plaintiffs' citations to *Meyer v. JinkoSolar* do not persuade the Court otherwise. In that case, the company made confident, detailed statements about its compliance practices, including that:

We have installed pollution abatement equipment at our facilities to process, reduce, treat, and where feasible, recycle the waste materials before disposal, and we treat the waste water, gaseous and liquid waste and other industrial waste produced during the manufacturing process before discharge. We also maintain environmental teams at each of our manufacturing facilities to monitor waste treatment and ensure that [these] waste emissions comply with [People's Republic of China] environmental standards. Our environmental teams are on duty 24 hours. We are required to comply with all PRC national and local environmental protection laws and regulations . . . .

761 F.3d at 247 (alterations in original) (emphasis omitted). At the same time, the company did not disclose that the touted equipment and 24-hour team were "failing to prevent substantial violations of the Chinese regulations." *Id.* at 251. The Court concluded that this omission rendered misleading the statements about compliance measures, and that additional language that non-compliance may be costly did not insulate the company from securities liability. *Id.* By contrast, the broad disclosures here could not mislead investors into thinking that Arconic would never face any product-safety risks or that it had completely eliminated such risks. Moreover, the complete language from the risk disclosure indicated that even though Arconic had a risk management program, "the global and diverse nature of [Arconic's] operations means these risks will continue

43

to exist, and additional legal proceedings and contingencies may arise from time to time." (2013 10–K, at 33.)

Additionally, the statement that Arconic "believes it has adopted appropriate risk management and compliance programs to address and reduce" risks, (FAC ¶ 84,) is an opinion statement. Plaintiffs are correct that such a belief does not provide a company *carte blanche*, but one sale of Reynobond PE resulting in inappropriate use, about which Plaintiffs do not allege that any member of management knew, does not contradict Arconic's basis for a general opinion about its global risk management programs.

### b. *PSLRA safe harbor and the "bespeaks caution" doctrine.*

Defendants further argue that the risk disclosures are protected by the PSLRA's safe harbor and/or the "bespeaks caution" doctrine. Plaintiffs aver that these protections do not apply to the statements because the risk-related statements were themselves false and misleading and were not sufficiently meaningful.

The PSLRA safe harbor "immunizes from liability any forward-looking statement, provided that: the statement is identified as such and accompanied by meaningful cautionary language; or is immaterial; or the plaintiff fails to show the statement was made with actual knowledge of its falsehood." *Avaya*, 564 F.3d at 254 (citing 15 U.S.C. § 78u–5(c)). The warning must be "'extensive yet specific' to prevent a reasonable investor from relying on specific projections." *Semerenko v. Cendant Corp.*, 223 F.3d 165, 182 (3d Cir. 2000) (quoting *In re Trump*, 7 F.3d at 369).

Defendants also argue that the challenged statements are inactionable pursuant to the judicially adopted "bespeaks caution" doctrine. The bespeaks caution doctrine, which overlaps with, but is not supplanted by, the PSLRA safe harbor, provides that when:

44

> [F]orecasts, opinions or projections are accompanied by meaningful cautionary statements, the forward-looking statements will not form the basis for a securities fraud claim if those statements did not affect the 'total mix' of information . . . provided investors. In other words, cautionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law.

*In re Trump*, 7 F.3d at 371. The doctrine is a "shorthand for the well-established principle that a statement or omission must be considered in context, so that accompanying statements may render it immaterial as a matter of law." *Id.* at 363. However, the doctrine does not automatically render all disclaimers inactionable. A "vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation." *Id.* at 371. To be protected under the doctrine, "the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge." *Id.* at 371–72.

First, the risk factors here are plainly forward-looking because they project possible consequences should a risk related to safety, product liability, unexpected events, or other contingencies, materialize. Such risk statements "are inherently *prospective* in nature. They warn an investor of what harms *may* come to their investment. They are not meant to educate investors on what harms are currently affecting the company." *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 491 (6th Cir. 2015). Moreover, the 2013 10-K explicitly defines "Forward-Looking Statements" to include all expectations and assumptions other than statements of historical fact. (2013 10-K, at 4.)

Next, as to the adequacy of the cautionary language, Arconic's risk disclosures speak to the company's exposure to specific risks, for example, product liability and compliance risks. They also state Arconic's "belie[f] [that] it has adopted appropriate risk management and compliance programs to address and reduce these risks." (FAC ¶ 84.) According to Defendants, the "belief"

45

wording renders this statement inactionable because Plaintiffs do not allege that Defendants did not honestly believe what they said, or that they lacked a reasonable basis for believing it. Plaintiffs counter that the risk disclosures are not protected by the PSLRA safe harbor or the bespeaks caution doctrine because the risk had already materialized when Arconic sold Reynobond PE for an allegedly unsafe use before the Preferred Offering.

Plaintiffs are correct that "no amount of general cautionary language can protect a company from failure to disclose a specific, known risk or a risk that has already occurred." *Lin v. Interactive Brokers Grp., Inc.*, 574 F. Supp. 2d 408, 417 (S.D.N.Y. 2008). However, Plaintiffs' theory depends on their assertion that "Arconic was supplying highly dangerous PE products for use in high rise buildings" "*for years*." (Pls.' Br., at 17 (emphasis added).) But the Complaint does not plausibly allege with requisite specificity that any sales occurred other than the Grenfell Tower sale, nor does it provide a plausible basis for drawing such an inference. The allegation that Arconic "discontinue[d]" sales of Reynobond PE for high-rise use following the Grenfell Tower fire because of inconsistencies in building codes and Arconic's lack of control over the product's end use, (FAC ¶ 109,) would have to be stretched beyond its bounds to support Plaintiffs' assertion that "Arconic sold millions of dollars of the flammable panels for use in projects Arconic knew were not appropriate and presented significant fire risks." (Pls.' Br., at 15.) Plaintiffs have therefore not adequately alleged that Arconic was selling Reynobond PE for high-rise uses "for years."

Moreover, Arconic's statements were far from the type of vague boilerplate that other courts have held inadequate. For instance, in *In re Harman International Industries, Inc.*, the defendant company relied on cautionary statements such as its conference call moderator's opening remarks that "certain statements made by the Company during this call are forward-looking statements" that "include the Company's beliefs and expectations as to future events and

trends affecting the Company's business and are subject to risks and uncertainties." *In re Harman International Industries, Inc. Sec. Litig.*, 791 F.3d 90, 98 (D.C. Cir. 2015), *cert. denied*, 136 S. Ct. 1167 (2016). The D.C. Circuit concluded that this vague language was "mere boilerplate" and insufficient to warn investors. *Id.* at 102. Similarly, in *Lormand v. US Unwired, Inc.*, the Fifth Circuit determined that disclaimers that forward-looking statements "involve known and unknown risks and other factors that could cause action results to be materially different from any future results expressed or implied by them" did not qualify as meaningful cautionary language. 565 F.3d 228, 244 (5th Cir. 2009).

By contrast here, the risk disclosures were extensive, spanning nine (9) single-spaced pages, and including tailored and cautionary language informing investors of Arconic's potential exposure to "significant" legal and compliance risks, including "potential claims relating to product liability, health, and safety." (2013 10-K, at 32.) The disclosures are not mere boilerplate.

In a closer case, *Avaya*, the defendant company had made statements that it was "on track" to realize financial projections, but allegedly omitted that it had fired sales staff in order to cut costs, and the company was offering unusually steep discounts to customers. 564 F.3d at 248. The Third Circuit concluded that the "on track" statements fell within the safe harbor because they were accompanied with disclosures of the threat of competition and a potential failure to "successfully execute [its] strategy to expand [its] sales in market segments with higher growth rates." *Id.* at 257–58. Similarly here, Arconic adequately apprised its investors of the risks posed by product-safety liability. Its risk-related statements were tailored, consistent with historical facts at the time of the statement, and sufficiently addressed the actual hazards Arconic faced.

Nor does the Complaint allege that anyone responsible for the disclosures had actual knowledge of any allegedly improper Reynobond PE sales, as would be required for statements to

47

escape the PSLRA's safe harbor. *See* 15 U.S.C. § 78u-5(c)(1)(B) (liability will not attach if "the plaintiff fails to prove that the forward-looking statement . . . was made or approved by [an executive] officer with actual knowledge by that officer that the statement was false or misleading"). For substantially the same reasons that the Court concludes in Section III.A.ii, *infra*, that Plaintiffs do not sufficiently plead scienter, the Court also concludes that the risk disclosures were not alleged to have been made with any actual knowledge of Reynobond PE sales for unsafe uses, regardless of whether those sales would render the risk disclosures false or misleading. *Cf. Meyer*, 761 F.3d at 252 (concluding that statements warning about potential environmental risks were misleading because they failed to disclose known, substantial violations of environmental regulations that had already occurred and were ongoing).

The Court concludes that Arconic's risk disclosures fall within the PSLRA safe harbor, or in the alternative were protected by bespeaks caution doctrine.

### 5. Statements Highlighting Reynobond PE

The Complaint also alleges that certain statements highlighting Arconic's products, including Reynobond PE, were false or misleading. Those statements, appearing in Arconic's 2013 Annual Report, its 2015 Sustainability Report, 10-Ks, and its 2016 Investor Day Presentation, and which are reproduced in their entirety in the Appendix to this Opinion, include the following examples:

- "Our products . . . enable buildings that are . . . safe . . . ." (FAC ¶ 160);

- "We also have developed state-of-the-art framing and wall systems that are hurricane and blast resistant. . . . [A]rchitectural aluminum systems that use advanced thermal technologies can provide superior thermal performance without compromising structural performance." (FAC ¶ 174);

- "The beautiful cauldron holding the Olympic flame above the Sochi Winter Games was touted by the Russian hosts as a symbol of an environmentally-friendly Olympics. Built with panels made from Alcoa's architectural aluminum, it is also

48

a symbol of Alcoa innovation and the bright future for Alcoa's $1.5 billion commercial construction businesses. The Alcoa Reynobond® panels in the cauldron were coated with an innovative technology called EcoClean™ that is self cleaning and removes pollutants from the air. In addition to aesthetic and emissions benefits, Alcoa's new aluminum architectural systems provide buildings with stronger impact protection and more than 50% better thermal performance than traditional methods. As governments and customers seek to reduce the high energy consumption and resultant emissions of buildings, Alcoa's 'green building' innovations enabled Alcoa to grow our business during the construction drought of the past five years and position us for dramatic growth when the commercial real estate market rebounds." (FAC ¶ 157);

- "We create thermally efficient architectural aluminum systems that help improve building energy-efficiency by up to 50%. Our state-of-the-art framing and wall systems are also hurricane and blast-resistant, making buildings more resilient and increasing occupant safety." (FAC ¶ 248.)

- Regarding Arconic's architectural product, Tim Myers, the Group President of Arconic's Transportation and Construction Solutions segment, stated: "We need to have products that are offering differentiated safety benefits for the occupant, right? So that gives us the opportunity then to unleash Arconic's technology . . . ." Regarding Reynobond, a slide accompanying the Investor Day presentation stated that Arconic was "[i]mproving core technology to increase fire retardant performance." (FAC ¶ 264.)

Defendants argue that the § 10(b) claims based on these statements must be dismissed because these statements were not false or misleading, and because some of the statements were aspirational (and therefore inactionable) assertions. Plaintiffs counter that these statements were demonstrably false because Reynobond PE was sold for use on Grenfell Tower and because as early as 2014, Arconic had commissioned reports showing that Reynobond PE products failed to meet UK safety standards and had been downgraded from Class B to Classes C and E. The Court concludes that these statements are not rendered false or misleading in light of the facts Plaintiffs claim were omitted.

As an initial matter, only the statements in FAC paragraphs 157, 248, 251, and 264 relate directly to Reynobond PE or the Architectural Aluminum Systems product grouping. Arconic's statements to the effect that some of its products were "hurricane and blast resistant" and that some

of its other products that use "advanced thermal technologies can provide superior thermal performance" (FAC ¶ 248,) are thus not contradicted by the fact that Reynobond PE had been downgraded or sold for the Grenfell Tower project. None of Arconic's statements gave the impression that all its products were completely safe and/or fire-resistant in every use, or that no product had ever been used unsafely by an end user. And whether a product was "hurricane and blast resistant" has nothing to do with whether Reynobond products met *fire* safety tests or complied with local regulations as to all risks. "[I]nvestors may very well have an interest in knowing about" the ins and outs of Arconic's product safety or regulatory compliance, *see Galati*, 220 F. App'x at 102, but that interest does not render violative any of Defendants' non-disclosure of such information.

Additionally, Arconic's statement that its framing and wall systems "have been tested to industry standards and state mandates" and were "designed to minimize vulnerabilities and provide increased security to protect occupants against damage and devastation" *from hurricanes and blast*s, (FAC ¶ 251,) even if it could be connected to Reynobond PE's fire safety rating (which it could not plausibly be), would not plausibly be interpreted by investors as representing that Arconic's products met every industry standard or complied with all regulations as to all risks. Nor would that statement change the general gist of information available to investors considering whether Arconic was a wise investment.

And Myers's statement in the Investor Day presentation that Arconic was improving Reynobond's core technology to increase fire retardant performance could not have misled investors into thinking that Reynobond PE was never used on high-rise buildings or that it was safe for all uses. It is only plausible that that statement would remind investors that Reynobond PE

50

was *not* completely fire retardant, that is, exactly the information that Plaintiffs believed needed to be disclosed.[12]

Moreover, statements that Arconic's products are "highly valuable," (FAC ¶ 187,) "state-of-the-art," (*id.* ¶ 248,) or part of Arconic's "bright future," (*id.* ¶ 157,) are too aspirational to give rise to securities liability. None of these general statements would alter the total mix of information available to an investor, nor is there a substantial likelihood that a reasonable investor would consider them important in deciding whether to buy or sell Arconic securities. Instead, a reasonable investor would understand that these challenged statements are "general statements of optimism" about Arconic's products, *EP Medsystems, Inc., v. EchoCath, Inc.*, 235 F.3d 865, 872 (3d Cir. 2000), and would treat them as mere puffery.

As the Sixth Circuit noted in *In re Ford Motor Company*, "[a]ll public companies praise their products and their objectives." *In re Ford Motor Company Sec. Litig.*, 381 F.3d 563, 570 (6th Cir. 2004). Moreover, courts "have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace—loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." *Id.* (quoting *Shaw v. Digital Equip Corp.*, 82 F.3d 1194, 1217 (1st Cir. 1996)). Arconic's praise for its products, even a product that could be dangerous if used improperly, would not change the mix of information available to investors, and therefore 10b-5 liability does not attach to these statements.

\*\*\*

---

[12] That Arconic also sold a specifically fire-retardant Reynobond product, the "FR" model, creates the strong plausible inference either that the PE product was not fire retardant at all, or was at least meaningfully less fire-retardant than the FR version.

In summary, the Court concludes that the statements alleged by the Complaint to violate § 10(b) of the '34 Act did not contain material misstatements or omissions, or enjoyed the protections of the PSLRA's safe harbor or bespeaks caution doctrine. Plaintiffs have therefore failed to plausibly allege one of the essential elements of a securities fraud claim. While this conclusion is enough to dismiss Plaintiffs' § 10(b) claims in their entirety, the Court will address the remaining elements of Plaintiffs' '34 Act claims.

## ii. Scienter

To the extent that Plaintiffs' '34 Act claims rest on allegations that Defendants knowingly misrepresented material facts, the Complaint is additionally deficient because it fails to adequately plead scienter. "Scienter" is defined as a "mental state embracing intent to deceive, manipulate, or defraud" and "requires a knowing or reckless state of mind." *Avaya*, 564 F.3d at 252 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976)). Recklessness involves "not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* at 267, n.42 (quoting *Advanta*, 180 F.3d at 535 (internal quotation marks omitted)).

The PSLRA requires that a plaintiff plead scienter with particularity. *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276 (3d Cir. 2006). The particularity requirement is satisfied by a complaint that pleads "facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A).

As the Supreme Court explained in *Tellabs*, "[t]he inference that the defendant acted with scienter need not be irrefutable . . . or even 'the most plausible of competing inferences,'" but a complaint adequately pleads a *strong* inference of scienter "only if a reasonable person would

52

deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." 551 U.S. at 324 (quoting *Fidel v. Farley*, 392 F.3d 220, 227 (6th Cir. 2004)). A plaintiff need not come forward with "smoking-gun" evidence to plead scienter. *Id.* Rather, the Court "analyze[s] the complaint holistically to determine whether its allegations, 'taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" *In re Hertz Global Holdings Inc.*, 905 F.3d 106, 114 (3d Cir. 2018) (quoting *Tellabs*, 551 U.S. at 323).

Defendants argue that Plaintiffs have failed to allege facts giving rise to a strong inference that either Kleinfeld or Arconic acted with the requisite scienter to violate § 10(b). For the reasons that follow, the Court agrees.

### 1. Kleinfeld

Plaintiffs allege that Kleinfeld acted with scienter because he knew or recklessly disregarded the fact that his statements and public documents attributable to him were materially false and misleading as to Arconic's sales of Reynobond PE. (*See* FAC ¶¶ 124–25, 127, 249–50). According to Plaintiffs, Kleinfeld's scienter is demonstrated by the following: (1) his Executive Council position overseeing the implementation of Arconic's safety management system; (2) his alleged visit to the company's Merxheim, France, office sometime in 2007 or 2008, where he learned about the difference between the PE and the FR panels; and (3) his self-presentation to investors as being knowledgeable about Arconic's product safety, and Reynobond in particular.

Defendants counter that Plaintiffs' allegations of scienter do not suffice because it is not enough to allege that by virtue of his position, Kleinfeld had actual knowledge of Reynobond PE's sales for use on high-rise buildings generally or on Grenfell Tower specifically. Moreover, Defendants point to Reynobond PE's supposed fraction of total sales for Arconic and its

53

subsidiaries as corroborating that Kleinfeld would not have had knowledge of issues affecting a small segment of Arconic's total revenues.

### a. *Kleinfeld's position*

The Complaint alleges that "[b]y virtue of [his] position[] at Arconic," Kleinfeld had actual knowledge of alleged materially false and misleading statements and material omissions. (FAC ¶ 311.) Plaintiffs argue that because he was the Company's CEO from 2008–2017, and because during the class period he was a member of Arconic's Executive Council and therefore oversaw and was responsible for the Company's safety management system, including identifying hazards and risks associated with products, Kleinfeld was therefore in a position to know about sales of Reynobond PE for improper end use.

The Court must consider these allegations in tandem with Plaintiffs' other averments regarding Kleinfeld's knowledge, but "[g]eneralized imputations of knowledge do not suffice" to establish scienter, "regardless of the defendant's position within the company." *Oran v. Stafford*, 226 F.3d 275, 290 (3d Cir. 2000). Nor can scienter "rest on a bare inference that a defendant must have had knowledge of the facts" rendering a statement false or misleading. *Advanta*, 180 F.3d at 539. Kleinfeld's responsibility for safety and his CEO position do not, by themselves, support an inference that he knew or recklessly disregarded facts about Reynobond PE that would make his statements misleading.

### b. *Confidential witness*

Next, Plaintiffs contend that Kleinfeld was "very familiar" with the Reynobond business and products, based on statements from a confidential witness, "CW1." (FAC ¶ 133.) Defendants argue that even taking CW1's statements as true, they do not support a strong inference of scienter.

54

"[W]here plaintiffs rely on confidential personal sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false. Moreover, even if personal sources must be identified, there is no requirement that they be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 244 (3d Cir. 2013) (quoting *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 146 (3d Cir. 2004)).

In *Avaya*, the Third Circuit explained that when dealing with confidential witnesses, courts should assess the "'detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia.'" *Avaya*, 564 F.3d at 261 (quoting *Chubb*, 394 F.3d at 147). "If, after that assessment, 'anonymous source allegations are found wanting with respect to these criteria . . . [courts] must discount them steeply.'" *Rahman*, 736 F.3d at 244 (3d Cir. 2013) (quoting *Avaya*, 564 F.3d at 263) (alterations in original).

Here, the Court must assess CW1's statements that Kleinfeld met with CW1 and other senior employees at the Merxheim office to learn more about Reynobond. To begin, "the fact that a CEO visited a subsidiary's premises to meet with its president will not establish that the CEO had knowledge of illegal activities at the subsidiary. After all, it would be expected that the CEO would visit his company's subsidiaries in the course of conducting legitimate business." *Id.* at 245. Thus, the fact that Kleinfeld visited Merxheim and inquired about Reynobond PE does not create an inference that he knew of any alleged sales of the product for an unsafe end use. And, importantly, the Grenfell Tower sale happened, at minimum, seven years later.

As to the specific allegations linked to CW1's statements, the Court has no reason to doubt CW1's statements that at the meeting, the employees informed Kleinfeld about the differences between Reynobond PE and Reynobond FR, including that the FR product was, as its name suggests, fire resistant. But CW1's allegation that "everybody knew" that Reynobond PE would burn because it could not pass multi-story fire tests, and that it was "universally known" throughout the construction industry that PE panels were not supposed to be used on high rise buildings,[13] (FAC ¶ 135,) comes up short. The Complaint lacks a basis for the source's knowledge of any industry- or company-wide standards, and does not provide other corroborative details as to how the source would know what the construction industry supposedly "universally" knows. Nor is there another source to corroborate or confirm any such statements. Finally, the Court declines Plaintiffs' invitation to imply that "everybody" means "everybody [at the Company]" as they alter his or her statement in their brief, because there is no basis to conclude that CW1 intended that as his or her meaning. (*See* Pls.' Br., at 37.) And even assuming that CW1 meant "everybody at Arconic," the Court does not find it plausible that CW1, from his or her position at Merxheim, could have been aware of what "everybody" at Arconic knew about Reynobond PE.

And more importantly, CW1's statements also do not lead to a plausible inference that *Kleinfeld* knew that Reynobond PE panels were being sold for an improper use—or that they would be sold for use on Grenfell Tower many years later. Indeed, if CW1's statements are accurate, they would actually support the competing inference that Kleinfeld believed consumers of Reynobond would understand that a fire-resistant model of the product was available.

---

[13] A reality the Complaint acknowledges was graphically set out in one of the brochures Plaintiffs challenge. (FAC ¶¶ 261, 281.)

56

### c. Statements in Sustainability Highlights Reports

The Complaint also refers to statements in Arconic's Sustainability Highlights Report ("Report") that, for example, "We work safely . . . and protect the environment," (FAC ¶ 146,) and "[w]e supply and use safe and reliable products and services." (FAC ¶ 166.) These statements are "group-published" and presumably constitute the collective actions of individuals involved in the Company's day-to-day affairs. *See Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1440 (9th Cir. 1987), *abrogated on other grounds by Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1575 (9th Cir. 1990) (en banc). To the extent that the Plaintiffs seek to attribute group-published information to Kleinfeld under a "group pleading doctrine," that doctrine did not survive the PSLRA's enactment. *See Winer Family Tr. v. Queen*, 503 F.3d 319, 336–37 (3d Cir. 2007). That is because "[t]he PSLRA requires Plaintiffs to specify the role of each defendant, demonstrating each defendant's involvement in misstatements and omissions." *Id.* Any group-published statements therefore cannot give rise to an inference that Kleinfeld acted with scienter.

Plaintiffs have identified only one statement in the Report attributable to Kleinfeld: the 2014 "Chairman & CEO Statement" in which Kleinfeld stated that "[b]y reinforcing that nothing is more valuable than human life, [Arconic] has progressively improved its safety performance over the years." (FAC ¶ 176.) Any other statements in the Report cannot be attributed to Kleinfeld. And this statement does not establish the requisite strong inference of scienter, because it points to Arconic's safety performance as to its employees and contractors. (*See* Defs.' Ex. 10, ECF No. 72–12 ("By reinforcing that nothing is more valuable than human life, [Arconic] has progressively improved its safety performance over the years. The year 2013 was our safest ever, with *no employee or contractor fatalities* and 30% fewer days away, restricted and transfer . . . incidents than the prior year's historic low.") (emphasis added).) It cannot be plausibly inferred that

57

Kleinfeld was referring to Arconic's product safety, or that he made the statement knowingly or with reckless disregard to its falsity as to the safety of all end uses of Reynobond PE, or that in 2014 he made a false statement about a sale of PE that was installed in 2015–2016.

### d. Statement by Tim Myers

Plaintiffs also point to a statement about Reynobond made by Tim Myers, Group President of Arconic's Transportation and Construction Solutions segment. In an "Investor Day" presentation, in which Kleinfeld also participated, one of the slides accompanying the presentation stated that Arconic was "[i]mproving [Reynobond's] core technology to increase fire retardant performance." (FAC ¶ 264.) This statement is not misleading, even if one assumes that Myers knew that Arconic was selling Reynobond for unsafe uses. It expressly clarifies that Reynobond PE was not, as of the date of the statement, completely fire retardant. However, even if this statement could lead to an inference that *Myers* had knowledge of improper sales of Reynobond PE—which is a stretch, at best—it cannot support an inference that *Kleinfeld* had knowledge of such sales, just because he participated in the presentation.

### e. Motive

Plaintiffs have also not sufficiently pleaded that Kleinfeld had any motive for any allegedly wrongful conduct. "Though it is not necessary to plead motive to establish that a defendant acted with scienter, its presence can be persuasive when conducting a holistic review of the evidence." *Rahman*, 736 F.3d at 237. But "motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from this fraud." *Avaya*, 564 F.3d at 278 (alteration omitted) (quoting *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237 (3d Cir. 2004)). Here,

Plaintiffs have not alleged any facts that Kleinfeld received a concrete or personal benefit, and therefore cannot support an assertion that Kleinfeld had a motive to engage in wrongful conduct.

## f. *Percentage of sales*

Defendants pepper their briefing with the statistic that in 2016, sales of Reynobond PE for building applications in the UK totaled less than .03 percent of Arconic's and its subsidiaries' total sales, accounting for just $3 million of more than $12 billion in total sales across all businesses. (*See, e.g.*, Defs.' Br. at 12, 20 & 36.) Defendants have not made a formal argument based on that percentage of sales, but contend that: "[i]n light of the small amount of these Reynobond PE sales in the context of Arconic's overall business, it is not surprising that the Complaint does not contain a single, specific, factual allegation that Arconic or its senior executives knowingly or recklessly made materially false and misleading statements to the market about Reynobond PE's use in the UK, or for that matter elsewhere." (Defs.' Reply, at 7.) Defendants cite to the 2017 Earnings Call Transcript for this figure. However, as noted *supra* note 1, the Court will not consider the Earnings Call Transcript's figures for their truth, as Plaintiffs have placed them in dispute and did not rely on them in their Complaint.

The Court has not used Defendants' .03% figure to draw any conclusions in the scienter analysis, nor will it. However, the Court notes that the sales for the "architectural aluminum systems" product grouping, which included Reynobond PE, accounted for only approximately 4 percent of the Company's sales in 2013 through 2015, and 8 percent in 2017. It makes sense that a scienter analysis would take note of the Reynobond PE's fractional contribution to Arconic's revenues when considering whether the Company's CEO would implicitly have actual knowledge of any improper sales of that product. The low percentage of actual sales bolsters the Court's

conclusion that Plaintiffs have failed to adduce facts giving rise to a strong inference of Kleinfeld's scienter.

\*\*\*

Although the Court has discussed each of the alleged facts regarding Kleinfeld's alleged scienter, the Court has obeyed *Tellabs*'s command to evaluate Plaintiffs' allegations collectively and holistically, not individually. *See Avaya*, 564 F.3d at 280. In accordance with that holistic evaluation, the Court concludes that Plaintiffs have failed to plead facts which, viewed together, would support a strong inference that Kleinfeld acted with scienter. The Court will next consider whether Plaintiffs can establish that Arconic had scienter.

## 2. Arconic

With respect to Arconic, Plaintiffs allege a "corporate scienter" theory. A corporate scienter theory permits a plaintiff "to plead an inference of scienter against a corporate defendant without raising the same inferences required to attribute scienter to an individual defendant." *Rahman*, 736 F.3d at 246.

Plaintiffs argue that the following alleged facts support a strong inference of corporate scienter: (1) Arconic's announcement that it would discontinue global sales of Reynobond PE for use on high-rise buildings, which they claim supports an inference of contemporaneous knowledge; (2) Arconic's failure to disclose that Reynobond PE products had been downgraded in their classifications; and (3) its sales motive to conceal the unsuitability of its products. Defendants counter that the Third Circuit has not recognized corporate scienter, and even if it did, the Complaint fails to adequately plead facts supporting that theory.

Thus far, Third Circuit has not permitted plaintiffs to establish a corporation's scienter on this theory. The Court most recently stated that it "neither ha[s] accepted nor rejected the doctrine

60

of corporate scienter in securities fraud actions." *Rahman*, 736 F.3d at 246; *see In re Hertz Global Holdings Inc.*, 905 F.3d 106, 121 n.6 (3d Cir. 2018).

The other Courts of Appeals are currently split when it comes to corporate scienter. The Fifth Circuit has rejected the doctrine, holding that a plaintiff can adequately plead that a corporation acted with scienter only if the *officer* of the corporation making the fraudulent or misleading statement also acted with scienter. *Southland Sec. Corp. v. INSpire Ins. Sols. Inc.*, 365 F.3d 353, 365 (5th Cir. 2004). Similarly, the Eleventh Circuit has noted in dictum that "the most plausible reading [of the PSLRA] in light of congressional intent is that a plaintiff, to proceed beyond the pleading stage, must allege facts sufficiently demonstrating *each defendant's* state of mind regarding his or her alleged violations." *Phillips v. Sci.-Atlanta, Inc.*, 374 F.3d 1015, 1018 (11th Cir. 2004) (emphasis added) (footnote omitted).

The Second, Sixth, and Seventh Circuits have held that the knowledge of any corporate employee may be considered collectively, and that a finding that an employee of a corporation acted with scienter may raise a strong inference of a corporate defendant's scienter. *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 668 (6th Cir. 2005); *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 197 (2d Cir. 2008); *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008). And the Ninth Circuit has "opined that the doctrine might be appropriate in some cases." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063 (9th Cir. 2014).

The Third Circuit in *Rahman* cited the *Bridgestone* case, in which the Sixth Circuit recognized corporate scienter. In *Bridgestone*, the plaintiff alleged that the defendant's subsidiary engaged in a massive cover-up (including a large-scale, secret settlement with State Farm insurance) to hide that the tires it manufactured were rupturing and causing many accidents.

*Rahman*, 736 F.3d at 246 (citing *Bridgestone*, 399 F.3d at 656–69). Plaintiffs similarly rely upon *Bridgestone* in an attempt to persuade the Court to adopt their corporate scienter theory.

Yet the extraordinary facts from *Bridgestone* lack resemblance to Plaintiffs' allegations. Plaintiffs believe that they are entitled to the inference that because Arconic announced on June 26, 2017, that it was "discontinuing global sales of Reynobond PE for use in high-rise applications" due to "the inconsistency of building codes across the world and issues that have arisen in the wake of the Grenfell Tower tragedy regarding code compliance of cladding systems in the context of the buildings' overall designs," (FAC ¶ 109,) it must have been selling Reynobond PE for use on high-rise buildings knowing that it was unsafe.

But Plaintiffs' own pleadings, quoting major articles in *The New York Times* and *Reuters* published on June 24 and 25, 2017, illustrate why that suggested inference is implausible (and therefore insufficient), and why the competing inference is far more plausible. That more plausible inference is that Arconic was attempting to repair its image in the wake of a devastating fire and damaging news reports by publicly declaring it would no longer sell Reynobond PE for use on any high-rise buildings.

The Complaint pleads that one employee of an Arconic subsidiary made one sale of Reynobond PE for use on one high-rise building. It does not plead with specificity any facts regarding additional improper sales. Nor does it plead that those at Arconic responsible for public statements knew that the Grenfell sale did not comply with UK building codes or that the product had been downgraded. These allegations simply are not in the same league as the massive coverup of tire blowouts and a secret settlement alleged in *Bridgestone*. They also do not compare with the hypothetical offered by a panel of the Third Circuit as to what facts might sustain a pleading of collective scienter—an announcement by General Motors "that it had sold one million SUVs in

2006, [while] the actual number was zero." *City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 442 F. App'x 672, 676 (3d Cir. 2011) (quoting *Makor*, 513 F.3d at 710).

As to Deborah French's allegedly culpable knowledge that Reynobond PE would be used on Grenfell Tower, the Sixth Circuit, which has adopted collective scienter, soundly rejected "that a company could be liable for a statement made regarding a product so long as a low-level employee, perhaps in another country, knew something to the contrary." *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 476 (6th Cir. 2014); *see Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 744–45 (9th Cir. 2008) (rejecting theory that "so long as *any* employee . . . had knowledge of the violation of *any* law, scienter could be imputed to the company"). Here, Deborah French's knowledge, even if culpable, cannot establish *Arconic*'s scienter.

Nor have Plaintiffs sufficiently alleged a culpable motive. While not necessary to establish scienter, motive can be persuasive in a holistic review of the allegations made. *Tellabs*, 551 U.S. at 325–26. Plaintiffs aver that Arconic had a motive to conceal the negative testing of Reynobond PE, because disclosing its downgrade to a C and E rating would have hurt sales on low-rise units as well. But "motives that are generally possessed by most corporate directors and officers do not suffice" to establish scienter. *Rahman*, 736 F.3d at 245 (quoting *Avaya*, 564 F.3d at 278). Rather, a "concrete and personal benefit to the individual defendants" is required to establish motive. *Id.* (quoting *Avaya*, 564 F.3d at 278). A general desire to continue selling a product for profit is not the kind of concrete and personal benefit that would demonstrate motive to engage in wrongful conduct.

Finally, Plaintiffs have also not identified factual allegations that the Arconic officers responsible for the allegedly false statements knew of, or recklessly disregarded, the facts they claim render those statements misleading, specifically that Reynobond PE had been downgraded

63

or that it was being sold for use on Grenfell Tower. It bears noting that Congress in the PSLRA specifically heightened scienter pleading requirements. To impose a standard that culpable knowledge by any employee, anywhere, about one sale of one product, suffices to establish a strong inference of corporate scienter, would run squarely contrary to that directive.

***

In sum, Plaintiffs have failed to plead facts from which a jury could conclude that Kleinfeld or Arconic acted with scienter.

### iii. Class Period

Finally, Defendants argue that all claims based on purchases of Arconic securities before the Grenfell Tower sale must be dismissed. They point out that the class period begins in November of 2013, but the only alleged sale of Reynobond PE for use on a high-rise building is the Grenfell Tower sale, which the Complaint alleges was first discussed in emails in May of 2014 and installed in 2015–2016. (FAC ¶¶ 47 & 50.) The Court need not make a ruling on this basis, as it will dismiss the § 10(b) claims on the grounds that Plaintiffs have failed to allege material misrepresentations or the requisite scienter to survive a motion to dismiss.

### B. Section 11 '33 Act Claims

Section 11 of the '33 Act imposes civil liability on preparers and signers of materially misleading registration statements. 15 U.S.C. § 77k(a). A § 11 claim may be brought against the issuer of securities, its directors or partners, underwriters, and accountants who prepared or signed the registration statement. *Id.* It is limited to registered public offerings. It provides for broader liability than the '34 Act because a plaintiff need only show that she bought the security and the registration statement contained a material misrepresentation. Reliance is not required. *In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 783 (3d Cir. 2009). Nor does § 11 require scienter. *In*

64

*re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 273 n.5 (3d Cir. 2004). The issuer will be strictly liable once the plaintiff proves that she bought the security and there was a material misstatement in the registration statement. Section 11 thus acts as a "virtually absolute liability provision," even for innocent statements. *In re Adams Golf,* 381 F.3d, 274 n.7. It protects the proverbial, purportedly unsophisticated widows, widowers, and orphans seeking to buy and sell securities. Under § 11, a plaintiff must allege that a registration statement "(1) contained an untrue statement of material fact, (2) omitted to state a material fact required to be stated therein, or (3) omitted to state a material fact necessary to make the statements therein not misleading." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 269 (3d Cir. 2006) (quoting 15 U.S.C. § 77k(a)) (internal quotation marks omitted). Because Plaintiffs' § 11 claims do not sound in fraud, they are only subject to Federal Rule of Civil Procedure 8's more relaxed pleading requirements, and not the PSLRA's heightened standard. *See id.* at 269.

Defendants argue that Plaintiffs have not sufficiently pleaded § 11 claims because Arconic was under no duty to disclose its alleged sales of Reynobond PE for use on high-rise buildings. Plaintiffs, on the other hand, allege that Arconic's 2013 10-K, incorporated by reference into its Registration Statement for the Preferred Offering, omitted information required to be disclosed by SEC rules (Items 303 and 503), and also omitted information necessary to make the statements in the 10-K not misleading.

Plaintiffs identify the following Risk Factors in the Management Discussion and Analysis portion of Arconic's 2013 10-K as inaccurate and/or misleading:

> A. "[The Company] may be exposed to significant legal proceedings [and] investigations. ... The Company is also subject to a variety of legal compliance risks [including] potential claims relating to product liability, health and safety ... and compliance with U.S. and foreign export laws ... and sales and trading practices. [The Company] could be subject to fines, penalties, damages (in certain cases, treble damages), or suspension or

65

debarment from government contracts. While [the Company] believes it has adopted appropriate risk management and compliance programs to address and reduce these risks, the global and diverse nature of its operations means that these risks will continue to exist, and additional legal proceedings and contingencies may arise from time to time." (FAC ¶ 84.)

B. [The Company] is subject to a broad range of health, safety and environmental laws and regulations in the jurisdiction[s] in which it operates and may be exposed to substantial costs and liabilities associated with such laws and regulations. ... Compliance with ... health and safety legislation and regulatory requirements may prove to be more limiting and costly than we anticipate. [The Company's] results of operations or liquidity in a particular period could be affected by certain health, safety or environmental matters, including remediation costs and damages related to certain sites. Additionally, evolving regulatory standards and expectations can result in increased litigation and/or increased costs, all of which can have a material and adverse effect on earnings and cash flows. (*Id.* ¶ 85.)

C. Unexpected events may increase [the Company's] cost of doing business or disrupt [the Company's] operations. Unexpected events, including fires or explosions at facilities, natural disasters, war or terrorist activities, unplanned outages, supply disruptions, or failure of equipment or processes to meet specifications may increase the cost of doing business or otherwise impact [the Company's] financial performance. (*Id.* ¶ 86.)

The Court will first consider whether Arconic violated Items 303 and 503 of Regulation S-K, and then whether Arconic omitted or misrepresented information required to make the registration statement not misleading. For the reasons that follow, the Court concludes that Plaintiffs have not plausibly alleged that Defendant Arconic violated § 11, and the '33 Act claims against Defendants will be dismissed.

### i. Item 303

Section 11 liability attaches if a registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Because registration statements must comply with Regulation S-K, Item 303 information is "required to be stated therein" and therefore must be disclosed.

Item 303 requires a public company to affirmatively disclose, *inter alia*, trends or uncertainties that are (1) presently known to management and (2) reasonably likely to have material effects on the registrant's financial condition or results of operation. 17 C.F.R. § 229.303(a)(3)(ii). Instruction 3 to Item 303 requires that:

> The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past, and (B) matters that have had an impact on reported operations and are not expected to have an impact upon future operations.

*Id.* instr. 3.

The SEC's guidance on Item 303 provides examples of what trends require disclosure. *See Management's Discussion and Analysis of Financial Condition and Results of Operations*, Securities Act Release No. 6835, Exchange Act Release No. 26,831, Investment Company Act Release No. 16,961, 43 SEC Docket 1330 (May 18, 1989). "Required disclosure is based on currently known trends, events, and uncertainties that are reasonably expected to have material effects, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract." *Id.*

The Complaint alleges that at the time of the Preferred Offering, there was a trend (requiring disclosure) of knowing and unlawful sales of Reynobond PE for use on high-rise buildings. Defendants argue that these allegations cannot support § 11 liability for an Item 303 violation because a single sale cannot constitute a "trend," that an alleged misuse after the Registration Statement's filing does not require disclosure, and that the Complaint does not allege that *management* knew of such alleged trend or uncertainty. Plaintiffs counter that a single sale can indeed meet Item 303's disclosure requirements, that the Complaint alleges that as early as

May 2014, Arconic began knowingly selling Reynobond PE for unsafe uses, and that management knew of the allegedly improper sales.

Plaintiffs principally rely on *In re Adams Golf, Inc. Securities Litigation*, 381 F.3d 267 (3d Cir. 2004), for the proposition that an isolated sale can constitute a trend requiring disclosure under Item 303. In *Adams Golf*, the company told investors that revenue for its high-end golf clubs was driven, in part, by its exclusive sales to sporting goods stores, and not to general discount warehouses. *Id.* at 271. However, 5,000 of its 235,000 golf clubs were being sold at Costco, a popular discount warehouse. *Id.* The Third Circuit concluded that this "one-time occurrence" was nonetheless material for § 11 liability purposes because "isolated incidents can result in immediate and negative consequences for a company" and "[a]n aberrant event such as an oil tanker crash may nevertheless be material in the eyes of a reasonable investor in the unlucky oil company." *Id.* at 275.

The Court does not disagree that "a fact need not be part of a pattern to be material," *id.* However, *Adams Golf* is not an Item 303 case. The SEC expressly distinguishes the Item 303 materiality standard from the *Basic Inc.* standard. "[Item 303] mandates disclosure of specified forward-looking information, and specifies its own standard for disclosure, i.e., reasonably likely to have a material effect. . . . The probability/magnitude test for materiality approved by the Supreme Court in *Basic Inc.* . . . is inapposite to Item 303 disclosure." *Business and Financial Disclosure Required by Regulation S-K*, Securities Act Release No. 10064, Exchange Act Release No. 77599, 113 S.E.C. Docket 4731, 2016 WL 1458170 (Apr. 13, 2016). Thus, although *Adams Golf* is instructive, the materiality standard governing that case differs from Item 303.

Accordingly, whether the Grenfell Tower sale is material for the purposes of other provisions of the '33 and '34 Acts, the Court concludes that it does not fit with the SEC's examples

of "trends, events, and uncertainties" that a company must disclose. A single sale of one product—though its end results were disastrous—does not for these purposes compare to, for instance, the SEC's example of the non-renewal of a material contract.

Nor does such a sale compare to trends, events, and uncertainties that other District Courts in the Third Circuit have determined required disclosure. For example, in *Underland v. Alter*, the Court concluded that Item 303 required defendant Advanta, an issuer of credit cards to small businesses, to disclose that it was "repricing the credit lines of approximately 68% of its customers, often without regard to the customer's credit standing or payment history, and raising interest rates as high as 37%," which was likely to cause "a significant increase in delinquent payments." No. 10–3621, 2012 WL 2912330, at * 6 (E.D. Pa. July 16, 2012). And in *Curran v. Freshpet, Inc.*, the Court determined that the plaintiffs had adequately alleged an Item 303 violation when the defendant stated in its registration statement that it planned to install 6,000 "Freshpet Fridges" in North America in the next three years, with the opportunity to ultimately install 35,000, when in actuality it had "experienced issues with its largest customers and most popular products, which ultimately stunted the growth of its Fridges." No. 16–2263, 2018 WL 394878, at *1, 7–8 (D.N.J. Jan. 12, 2018).

Here, as explained, there are insufficient facts to support an inference that Arconic was knowingly selling Reynobond PE for use in an unsafe manner beyond the Grenfell Tower sale. Even if there were, Reynobond PE's small percentage of Arconic's overall sales does not support a conclusion that a products liability issue with Reynobond PE would be "reasonably expected to have material effects" as contemplated by the SEC's guidance. Unlike the trends in *Underland* and *Freshpet* (or the sale in *Adams Golf*), an issue with Reynobond PE does not go to the heart of Arconic's business, nor does it concern the main product or group of products Arconic was selling.

All in all, Reynobond PE sales for high-rise projects were not a "trend or uncertainty" that could have materially affected Arconic's revenues or income.

Nor have Plaintiffs alleged that Defendants had actual knowledge of the alleged undisclosed relevant event or uncertainty. Although the Third Circuit has not spoken directly on this requirement, a knowledge requirement finds ample support in the regulation's text. That is because Item 303 requires that "the registrant" describe "*known* trends and uncertainties," 17 C.F.R. § 229.303(a)(1)–(3), and also requires disclosure when "the registrant *knows* of events that will cause a material change in the relationship between costs and revenue," *Id.* § 229.303(a)(3)(ii).

Additionally, the Second Circuit, based in part on the SEC's interpretation of Item 303 advising that trends or uncertainties must be "presently known to management," has held that Item 303 requires that the company have actual knowledge of trends or uncertainties when it files with the SEC. *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95 (2d Cir. 2016). In that case, the Court concluded that the defendant, a major state government contractor, violated Item 303 when it knowingly failed to disclose in its 10-K that it had overbilled New York City by hundreds of millions of dollars over a multi-year period, and that it could be implicated in the fraud and be required to repay the City the revenue from the contract. *Id.* at 95. District Courts in the Third Circuit have also concluded that a plaintiff must plead knowledge to state a claim concerning Item 303. *See, e.g., In re Hertz Global Holdings, Inc. Sec. Litig.*, No. 13–7050, 2017 WL 1536223, at *19 n.7 (D.N.J. Apr. 17, 2017); *In re Adams Golf, Inc., Sec. Litig.*, 618 F. Supp. 2d 343, 349 (D. Del. 2009). Indeed, the title of Item 303 is "Management's discussion and analysis of financial condition and results of operations," which implies that it is *management*'s knowledge that matters.

Here, the Complaint fails to allege that Arconic's management had actual knowledge of any sale of Reynobond PE for an inappropriate use. The Complaint cites a Reuters article

70

discussing emails that Ms. French exchanged with a Grenfell Tower contractor and stating that "Arconic said in a statement [to Reuters] that it had known the panels would be used at Grenfell Tower but that it was not its role to decide what was or was not compliant with local building regulations."[14] (FAC ¶¶ 107–08.) That article also mentioned "[a] source at one of the companies involved in the process" who stated that Arconic had "full involvement" in the contract bidding process for Grenfell Tower. (*Id.* ¶ 107.)

Arconic's after-the-fact statement to a news outlet, seeking to emphasize that it did not know that the Grenfell Tower use of Reynobond PE was non-compliant with local regulations, and the news article's statements from a source outside Arconic do not suffice to allege that *management* knew of any sales for improper uses (to the extent such sales could even constitute a trend at all). (*See* FAC ¶ 107.) In fact, the Arconic statement emphasized that "it was not its role to decide what was or was not compliant with local building regulations." (*Id.* ¶ 108.) Whatever Ms. French or other employees involved with the bidding process knew about the Grenfell Tower sale, Plaintiffs cannot—without more—impute that knowledge to Arconic's management. Broad statements about what "Arconic" knew do not fill the bill.

Plaintiffs have not alleged facts from which a jury could plausibly conclude that Defendants violated Item 303, because Reynobond PE sales were not a "trend or uncertainty" known to management and therefore requiring disclosure.

---

[14] Tom Bergin, *Arconic knowingly supplied flammable towers for use in tower: emails*, Reuters (June 24, 2017), https://www.reuters.com/article/us-britain-fire-arconic/arconic-knowingly-supplied-flammable-panels-for-use-in-tower-emails-idUSKBN19F05M. The Court may take judicial notice of this news article and the full quote (rather than the Complaint's selected citation) because it is a "document integral to or explicitly relied upon in the complaint" and the Court has no doubt as to its authenticity. *Burlington*, 114 F.3d at 1426.

## ii. Item 503

Next, Plaintiffs have averred that Defendants violated Item 503, giving rise to § 11 liability. Item 503 of Regulation S-K addresses risk factors associated with the issuer's business or the securities being distributed. If the registrant chooses to include a section on risk factors in the registration statement, it must present the factors in plain English and avoid "boilerplate" risk factors. *See Plain English Disclosure*, Securities Act Release No. 33–7497, 63 Fed. Reg. 6370–01, 1998 WL 44199 (Feb. 6, 1998). In the prospectus, the issuer must, "where appropriate," "provide under the caption 'Risk Factors' a discussion of the most significant factors that make the offering speculative or risky." 17 C.F.R. 229.503(c); 17 C.F.R. § 229.105.[15] The issuer is instructed not to "present risks that could apply to any issuer or any offering." ." 17 C.F.R. 229.503(c); 17 C.F.R. § 229.105. The SEC emphasized that 503(c) is "principles based," and therefore recently removed a non-exhaustive list of example risk factors that it first published in 1964. *FAST Act*, 84 Fed. Reg. at 12689.[16] The agency further explained that it sought to "encourage registrants to focus on their own risk identification processes," and "provide risk disclosure that is more precisely calibrated to their particular circumstances and therefore more meaningful to investors." *Id.* However, the SEC also stated that the amendments (including removing the examples) do not "substantively chang[e] the underlying disclosure requirements." *Id.* at 12712.

---

[15] On April 2, 2019, the SEC relocated Item 503(c) to Item 105 of Regulation S-K to streamline disclosure requirements, because Subpart 100 covers business information in both '33 Act and '34 Act filings. This change reflects that, as of 2005, the Item applies to periodic reporting as well as registration statements associated with initial offerings. *See* FAST Act Modernization and Simplification of Regulation S-K, 84 Fed Reg. 12674, 12688–89 (Apr. 2, 2019); 17 CFR § 229.105. For ease of reference, the Court will continue to refer to this set of requirements as Item 503, although Item 503(c) has been relocated to Item 105.

[16] Item 503(c), before the recent amendments, provided a non-exhaustive list of risk factors that the registrant may wish to disclose in its Risk Factors section, including the registrant's (1) "lack of an operating history;" (2) "lack of profitable operations in recent periods;" (3) "financial position;" (4) "business or propose business;" or (5) "lack of a market for [the registrant's] common equity securities or securities convertible into or exercisable for common equity securities." 17 C.F.R. § 503(c).

Plaintiffs aver that Arconic had a duty to disclose under Item 503, and that the Registration

Statement omitted material facts necessary to make its risk disclosures not misleading. (FAC ¶ 83.)

Defendants counter that Item 503(c) is discretionary, that 503(c) did not require disclosure of the

kind of specific facts and circumstances Plaintiffs claim should have been disclosed, and that

503(c)'s disclosure obligations extend only to *known* risks.[17]

### 1. Duty to disclose

The Supreme Court has emphasized risk evaluation as one goal of securities law. *See SEC

v. Variable Annuity Life Ins. Co. of Am.*, 359 U.S. 65, 77 (1959) ("The emphasis is on disclosure;

the philosophy of the ['33] Act is that full disclosure of the details of the enterprise in which the

investor is to put his money should be made so that he can intelligently appraise the risks involved.

. . . [T]he Securities Act of 1933 was keyed to free, informed choice."). Item 503(c) does not

facially *require* including a risk factors section. Rather, it requires the registrant to include,

"[w]here appropriate," a discussion of the most significant risk factors. 17 C.F.R. § 229.105. One

securities law treatise notes that "the initial words 'where appropriate' leave to the issuer the

decision as to whether or not to include a 'Risk Factors' section in its prospectus," but warns that

"it would appear sensible and prudent for most issuers to incorporate" a risk factors section. 2

*Bromberg & Lowenfels on Securities Fraud* § 5:277 (2d ed. 2012).

Generally, "an omission is actionable under the securities laws only when the corporation

is subject to a duty to disclose the omitted facts." *Dalberth v. Xerox Corp.*, 766 F.3d 172, 183 (2d

---

[17] After Oral Argument in this case, the Third Circuit decided *Jaroslawicz v. M&T Bank Corp.*, No. 17-3695, and discussed 503(c)'s requirements in its Opinion. *See* 912 F.3d 96 (3d Cir. 2018), *panel rehearing granted, judgment vacated by* ---F.3d---, 2019 WL 2347354 (3d Cir. June 4, 2019). The panel then granted M&T Bank Corporation's petition for panel rehearing, and vacated the opinion and judgment entered December 26, 2018. 2019 WL 2347354. The panel directed the parties in that case to file supplemental briefing addressing questions which, *inter alia*, implicate Item 503's requirements and scope. The Court does not find it necessary to stay the disposition of this case until the Third Circuit issues a ruling in *Jaroslawicz*, as the issues it appears the Third Circuit will address will not entirely resolve the present dispute concerning Item 503. Also, the Court can rule on the parties' Item 503(c) contentions without relying on the analysis of the now-vacated *Jaroslawicz* Opinion.

Cir. 2014) (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993)). The parties and the Court have identified no authority holding that Item 503(c) *mandates* risk disclosures in all circumstances. *See In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 690–91 (S.D.N.Y.) ("When and if a prospectus must include a risk factor disclosure pursuant to Item 503 does not appear to have been discussed within the case law."). Indeed, the SEC instructed that "*If* you include a risk factors section in your prospectus, you must write the risk factors in plain English and avoid 'boilerplate' risk factors." *Plain English Disclosure*, 63 Fed Reg. at 6373 (emphasis added).

The Court therefore concludes that, although disclosure of Item 503's Risk Factors has become nearly universal, Item 503 does not impose a stand-alone disclosure requirement and a failure to disclose cannot alone form the basis for § 11 liability. The Court will therefore proceed to consider whether, since Arconic did provide risk disclosures, those disclosures were sufficient.

### 2. Sufficiency of 503 Disclosures

Plaintiffs aver that Item 503 required Arconic to disclose that "Arconic was supplying its flammable cladding in a way that could (and ultimately did) tragically claim numerous lives, thereby subjecting the Company to substantial civil and criminal liabilities." (Pls.' Supp. Memo., ECF No. 90 ("Pls.' Supp."), at 4.) Plaintiffs argue that disclosure was required because Arconic could be subject to significant civil and criminal liabilities that would be material to a reasonable investor. Defendants counter that Arconic *did* adequately disclose its most significant risk factors, and that Arconic's sale of Reynobond PE was not one of them. The Court concludes that the Complaint contains insufficient allegations to establish that Arconic's alleged improper sale of Reynobond PE was one of the "most significant" risk factors facing investors in the Preferred Offering.

74

The "most significant factors" standard is "considerably higher" than the general *Basic Inc.* materiality standard. *See In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 89 (S.D.N.Y. 2017) (concluding that alleged omissions under Item 503(c) satisfied the *Basic Inc.* materiality standard, but not the "most significant factor" standard). Item 503(c) disclosure is reserved for the "most significant factors that make the offering speculative or risky," not any and all risks, or any information that an investor might wish to know. As the Third Circuit emphasized, our securities laws do not impose a "general duty ... to provide the public with all material information." *In re Burlington*, 114 F.3d at 1432. "Disclosure is not a rite of confession, and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing." *City of Pontiac*, 752 F.3d at 184 (quoting *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 365 (2d Cir. 2010) and *Ciresi v. Citicorp*, 782 F. Supp. 819, 823 (S.D.N.Y. 1991)) (internal quotation marks omitted).

However, "generic risks ... should be avoided." FAST Act, 84 Fed. Reg. at 12689. The SEC explained that its choice to amend 503(c) to remove specific risk factor examples was based in part on concern that the examples were "written generically and, as such, [were] not well suited to the particular circumstances and material risks of individual registrants." *Id.* Rather, risk disclosures should be "precisely calibrated to [the registrant's] particular circumstances." *Id.*

Here, Plaintiffs have failed to plead facts from which a jury could conclude that the Grenfell Tower sale was one of the "most significant factors," such that Arconic was required to disclose it. Plaintiffs have not even alleged that at the time of the Preferred Offering, that sale had taken place. It would not comport with the securities laws to require Arconic to disclose that an employee of its subsidiary was corresponding with a contractor regarding whether Reynobond PE (or other Reynobond paneling) was available for a project. Arconic could not have informed investors of an event that had yet to occur. *See Hoey v. Insmed, Inc.*, No. 16–4323, 2018 WL 902266, at *25

(D.N.J. Feb. 15, 2018) (dismissing Item 503(c) claim in part because the challenged prospectus was filed before a drug trial's problematic results were available to the issuer).

But even if the Court assumes that Arconic made other sales of Reynobond PE for high-rise buildings—an assumption not justified by the Complaint—in the context of Arconic's multi-industry business, the risks of sales relating to one product could not have been among its "most significant." This case diverges from *Silverstrand*, in which the defendant's profitability "*entirely depended* on [the] commercial success" of one drug, for which the defendant failed to disclose significant and life-threatening safety risks in violation of Item 503. *Silverstrand Invs. v. Amag Pharm., Inc.*, 707 F.3d 95, 103–04 (1st Cir. 2013) (emphasis added). Here, Plaintiffs have not alleged that Arconic's profits entirely depend on Reynobond PE, or even on the larger architectural products grouping.

Nevertheless, Plaintiffs make much of the Court's observation at Oral Argument, that while the chances of an event occurring from improper sales "may be low, the chances of an event occurring being really, really bad are high." (Tr. of Mot. H'g, 76:4–6). But this emphasis ignores that the Court was not commenting on whether Arconic was a risky investment. Rather, the Court was merely encapsulating the gist of Plaintiffs' argument. If, taking Plaintiffs' argument to its logical conclusion, issuers were definitionally required to disclose all product-safety risks specific to third-party end uses (or misuses) of each and every one of their products, investors would indeed be swamped by generalized information, contrary to the intent of our securities laws that issuers disclose tailored and useful information to investors for their own evaluation of whether the investment was too risky. *See In re Trump*, 7 F.3d at 375 (warning against inundating investors with "an avalanche of trivial information" (quoting *TSC Indus.*, 426 U.S. at 438)).

In contrast to Plaintiffs' argument, *Silverstrand* emphasizes how significant a risk must be for 503(c) to require its disclosure. In *Silverstrand*, the defendant allegedly "fail[ed] to disclose 23 reports of serious adverse effects (including a death) linked to Feraheme, a make-or-break drug for [the defendant]'s future." 707 F.3d at 97. The First Circuit pointed out that the defendant was on notice that the FDA would likely act in response to these adverse effect reports, because it had previously declined to approve the drug after a single case of anaphylaxis during clinical trials. *Id.* at 103. And, as noted above, the defendant's profitability depended entirely on the success of that drug. *Id.* Therefore, Item 503(c) required the defendant to disclose the risk to the drug's commercial success as one of the "most significant factors" for investors to consider.

Unlike in *Silverstrand*, the Grenfell Tower sale did not pose a looming threat to Arconic's overall profitability such that it would be among the most significant factors making an investment in Arconic risky. Plaintiffs' theory would conflate Item 503(c)'s "most significant" standard with required disclosure of *any* fact that might present any risk. But mandatory disclosures are limited. Omissions are not actionable unless "SEC regulations specifically require disclosure of the omitted information," or "the omission makes other statements in the proxy statement materially false or misleading." *Seinfeld v. Becherer*, 461 F.3d 365, 369 (3d Cir. 2006) (quoting *Resnik v. Swartz*, 303 F.3d 147, 151 (2d Cir. 2002) (analyzing § 14(a) context).

Arconic *did* disclose, at the level of detail Item 503(c) demands, the risks that Plaintiffs allege have now come to pass. It disclosed that the Company "may be exposed to significant legal proceedings [and] investigations," and that it was "subject to a variety of legal compliance risks," including "potential claims relating to product liability, health and safety . . . .and compliance with U.S. and foreign export laws . . . and sales and trading practices." (FAC ¶¶ 155, 193, 233, 275.) It further disclosed that its "results of operations or liquidity in a particular period could be affected

by certain health, safety or environmental matters," (FAC ¶¶ 156, 194, 234, 276) and that "evolving regulatory standards and expectations can result in increased litigation and/or increased costs, all of which can have a material and adverse effect on earnings and cash flows," (*Id.*) Finally, Arconic disclosed that "[u]nexpected events, including fires or explosions at facilities, natural disasters, war or terrorist activities, unplanned outages, supply disruptions, or failure of equipment or processes to meet specifications may increase the cost of doing business or otherwise impact [Arconic]'s financial performance. (FAC ¶ 86.) These are the kinds of company-specific facts and circumstances that Item 503(c) and caselaw contemplate.

The SEC has recently considered changing Item 503 to require registrants to disclose with more specificity. In 2016, the SEC sought public comment for whether the agency should require registrants to "discuss the probability of occurrence and the effect on performance of each risk factor." *Business and Financial Disclosure Required by Regulation S-K*, 2016 WL 1458170, at *67, ¶ 146. The SEC also asked if it should ask registrants to "describe their assessment of risks," and to "disclose their known uncertainties about their risk management and risk management policies." *Id.* at *67, ¶ 146; *75, ¶ 179. That the SEC solicited such comment on whether it should revise Item 503(c) fairly implies that Item 503(c) does not *currently* require the specificity that Plaintiffs desire.

In sum, Item 503(c) did not require that Arconic disclose its sale of Reynobond PE for use on Grenfell Tower as one of its "most significant" risk factors, and the alleged omission of this sale did not make any other statements in the registration statement false or misleading.

### 3. Knowledge

Finally, Defendants aver that Plaintiffs have not alleged that Arconic was aware of the risks posed by sales of Reynobond PE. Whether Item 503(c) requires knowledge for liability to attach

is a question that that the Third Circuit may resolve after panel rehearing in *Jaroslawicz*. For that reason, the Court will not rule on whether 503(c) requires knowledge. The Court need not so rule, because it concludes that the Grenfell Tower sale was not one of the "most significant factors" requiring disclosure.

The Court does, however, observe the following. Unlike Item 303, Item 503 does not contain the word "know." However, the Third Circuit has repeatedly emphasized that "fraud by hindsight" is inactionable. *Winer Family Tr.*, 503 F.3d 319, 331 (3d Cir. 2007). Other courts have inferred a knowledge requirement from the commonsense notion that for a registrant to disclose a "most significant" factor, a sufficiently senior member of management has to know about it. *See, e.g.*, *Silverstrand*, 707 F.3d at 103 ("[T]o withstand dismissal at the pleading stage, a complaint needs to allege sufficient facts to infer *that a registrant knew*, as of the time of an offering, that (1) a risk factor existed; (2) the risk factor could adversely [a]ffect the registrant's present or future business expectations; and (3) the offering documents failed to disclose the risk factor." (emphasis added)); *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 669 (S.D.N.Y 2008) ("The critical inquiry . . . is whether—and to what extent—[the registrant] *was aware of* the issues and their potential impacts at the time of the offering statements." (emphasis added)).

Here, Plaintiffs allege that "Arconic said in a statement that it had known the panels would be used at Grenfell Tower." (FAC ¶ 68.) For the same reasons addressed in its § 10(b) scienter analysis, Plaintiffs have failed to allege facts that anyone responsible for making the statements in the 2013 10-K, or anyone in management, was aware of any issues requiring disclosure under 503. There is no plausible basis in the pleadings to conclude that those officials at Arconic knew, or should have known, at the time of the Preferred Offering, that Reynobond PE panels would be sold for improper use on Grenfell Tower.

### iii. Alleged Falsity

In addition to their claims under Items 303 and 503, Plaintiffs also allege that Arconic's stated "Risk Factors" in its 2013 10-K were misleading for failing to disclose the risks presented by its alleged sales of Reynobond PE for improper uses. For the same reasons as discussed in the Court's analysis in Section III.A.4, *supra*, for § 11 purposes, the risk disclosures were not false or misleading, and they fell within the protection of the PSLRA safe harbor and/or the bespeaks caution doctrine.

\*\*\*

In a nutshell, Plaintiffs have failed to adequately plead that Arconic's choice not to disclose any allegedly improper sales of Reynobond PE in the 2013 10-K was a material omission from its Registration Statement and that federal securities law required its disclosure.

### D. Control Person Liability 20(a)

The Individual Defendants also argue that Plaintiffs failure to allege a primary §10(b) violation is fatal to their control person claim under § 20(a), thus the § 20(a) claim must be dismissed as well.

Section 20(a) of the '34 Act imposes joint and several liability on any individual who exercises control over a "controlled person" who violates § 10(b). 15 U.S.C. § 78t(a); *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 275 (3d Cir. 2005). The three elements of a § 20(a), or "control person" claim, are as follows: (1) the defendant controlled another person or entity; (2) the controlled person or entity committed a primary violation of the securities laws; and (3) the defendant was a culpable participant in the fraud. *In re Suprema Specialties*, 438 F.3d at 286. "Under the plain language of the statute, plaintiffs must prove not only that one person controlled another person, but also that the 'controlled person' is liable under the ['34 Act." *Belmont v. MB*

*Inv. Partners, Inc.*, 708 F.3d 470, 484 (3d Cir. 2013) (quoting *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 153 (3d Cir. 2004), *abrogated on other grounds by Tellabs*, 551 U.S. 308)). Accordingly, liability under § 20(a) depends upon sufficiently pleading an underlying violation of § 10(b) by the controlled person. Culpable participation refers to either knowing and substantial participation in the wrongdoing or inaction with the intent to further the fraud or prevent its discovery. *Rochez Bros., Inc. v. Rhoades*, 527 F.2d 880, 890 (3d Cir. 1975).

Similarly, "[t]o state a claim for control person liability under Section 15 of the Securities Act, the plaintiff must allege (1) a primary violation of the federal securities laws by a controlled person or entity; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful way a culpable participant in the primary violation." *Dutton v. Harris Stratex Networks, Inc.*, 270 F.R.D. 171, 178 (D. Del. 2010).

In this case, Plaintiffs have failed to plausibly allege primary violations of the '33 or '34 Acts. Because control person liability under § 20 or § 15 is contingent on such primary violations, Plaintiffs' control person claims will be dismissed as well.

## IV.   CONCLUSION

For the foregoing reasons, the Court concludes that Plaintiffs have failed to state a claim upon which relief can be granted. Rule 15(a)(2) provides that leave to amend should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). However, "a court may deny leave to amend when such amendment would be futile"—that is, "the amended complaint would not survive a motion to dismiss for failure to state a claim." *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 259 (3d Cir. 2014) (citations omitted).

In view of the Complaint's deficiencies identified above, giving Plaintiffs leave to amend may well be futile. However, in the interests of justice, if Plaintiffs believe that amendment would

not be futile, Plaintiffs may file a Second Amended Complaint ("SAC") within 30 days of the date of the Court's Order. The SAC shall precisely specify any new allegations, and shall also include a filed "redlined" copy of the SAC which clearly identifies the new or modified allegations as compared against the current First Amended Complaint.

Defendants' Motion to Dismiss will be granted without prejudice. Should Plaintiffs not file a SAC in compliance with this Opinion and Order by the specified date, the dismissal shall convert to a dismissal with prejudice without further notice or Order.

An appropriate Order will follow.

Mark R. Hornak
Chief United States District Judge

Date:   June 21, 2019