UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARTIN HOWARD, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> ARCONIC INC., KLAUS KLEINFELD, WILLIAM F. OPLINGER, ROBERT S. COLLINS, ARTHUR D. COLLINS, JR., KATHRYN S. FULLER, JUDITH M. GUERON, MICHAEL G. MORRIS, E. STANLEY O'NEAL, JAMES W. OWENS, PATRICIA F. RUSSO, SIR MARTIN SORRELL, RATAN N. TATA, ERNESTO ZEDILLO, MORGAN STANLEY & CO. LLC, CREDIT SUISSE SECURITIES (USA) LLC, CITIGROUP GLOBAL MARKETS INC., GOLDMAN SACHS & CO., J.P. MORGAN SECURITIES LLC, BNP PARIBAS SECURITIES CORP., MITSUBISHI UFJ SECURITIES (USA), INC., RBC CAPITAL MARKETS, LLC, and RBS SECURITIES INC. <br><br> Defendants. | Civ. Action No. 2:17-cv-01057-MRH **(Consolidated)** <br><br> **SECOND AMENDED CLASS ACTION COMPLAINT** <br><br> JURY TRIAL DEMANDED |

TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................................1

JURISDICTION AND VENUE ..........................................................................................4

PARTIES ..............................................................................................................................5

PLAINTIFFS' CLASS ACTION ALLEGATIONS..........................................................8

OVERVIEW OF THE COMPANY .................................................................................10

ARCONIC REPEATEDLY SOLD REYNOBOND PE FOR UNSAFE INSTALLATION ........12

THE GRENFELL TOWER BURNS TO THE GROUND KILLING AT LEAST 71 PEOPLE.............................................................................................................................25

NEWS ARTICLES AND GOVERNMENT INVESTIGATIONS REVEAL DEFENDANTS' MISCONDUCT......................................................................................32

CONFIDENTIAL WITNESSES CONFIRM THAT ARCONIC'S MANAGEMENT KNEW THAT THE COMPANY WAS DEPLOYING UNSAFE SALES TACTICS BY SELLING REYNOBOND PE FOR UNAUTHORIZED USE ....................................................56

SECURITIES ACT ALLEGATIONS ............................................................................67

THE PREFERRED IPO.....................................................................................................67

    The Registration Statement Contained Inaccurate Statements of Material Fact and Omitted Material Information Required to Be Disclosed Therein ....................................69

    Omissions Based On Violations of Items 303 and 503 ....................................................71

COUNT I .............................................................................................................................76

    (For Violation Of §11 Of The Securities Act  Against All Defendants by Plaintiff Sullivan)...............................................................................................................................76

COUNT II ...........................................................................................................................77

    (For Violation of §15 of the Securities Act Against the Company and the Individual Defendants by Plaintiff Sullivan) ....................................................................77

ADDITIONAL EXCHANGE ACT ALLEGATIONS...................................................78

MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD RELEVANT TO THE EXCHANGE ACT VIOLATIONS .............................84

    False and Misleading Statements Made in 2013.................................................................84

REASONS WHY THE STATEMENTS MADE IN 2013 WERE FALSE AND MISLEADING..........................................................................................................85

    False and Misleading Statements Made in 2014...............................................86

REASONS WHY THE STATEMENTS MADE IN 2014 WERE FALSE AND MISLEADING..........................................................................................................93

    False and Misleading Statements Made in 2015...............................................95

REASONS WHY THE STATEMENTS MADE IN 2015 WERE FALSE AND MISLEADING........................................................................................................103

    False and Misleading Statements Made in 2016.............................................105

REASONS WHY THE STATEMENTS MADE IN 2016 WERE FALSE AND MISLEADING........................................................................................................114

    False and Misleading Statements Made in 2017.............................................116

REASONS WHY THE STATEMENTS MADE IN 2017 WERE FALSE AND MISLEADING........................................................................................................121

THE TRUTH EMERGES.......................................................................................123

PRESUMPTION OF RELIANCE..........................................................................133

COUNT III............................................................................................................134

    (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants Arconic and Kleinfeld by Plaintiff Ironworkers, and by Plaintiff Sullivan With Respect to the Defined "Preferred Shares" Only) ..........134

COUNT IV.............................................................................................................137

    (Violations of Section 20(a) of the Exchange Act Against Defendant Kleinfeld by Plaintiff Ironworkers, and by Plaintiff Sullivan With Respect to the Defined "Preferred Shares" Only)................................................................................137

PRAYER FOR RELIEF .......................................................................................139

DEMAND FOR TRIAL BY JURY .....................................................................139

Lead Plaintiffs Iron Workers Local 580 – Joint Funds and Ironworkers Locals 40, 361 & 417 – Union Security Funds ("Ironworkers") and Janet L. Sullivan ("Sullivan" and together with Ironworkers, "Lead Plaintiffs" or "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against Defendants (defined below), allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of Defendants' public documents, conference calls and statements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Arconic Inc. ("Arconic" or the "Company"), interviews with former employees of the Company, analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired: (i) Arconic securities between November 4, 2013 and June 23, 2017, both dates inclusive (the "Class Period"), seeking to recover damages caused by the Arconic Defendants' (defined below) violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder; and (ii) Arconic Depositary Shares, each representing a 1/10th interest in a share of 5.375% Class B Mandatory Convertible Preferred Stock, Series 1, par value $1 per share, liquidation preference $500 per share (the "Preferred Shares") pursuant to and/or traceable to the Registration Statement and Prospectus issued in connection with Arconic's September 18, 2014 initial public preferred stock offering (the

1

"Preferred IPO"), seeking to pursue remedies under Sections 11 and 15 the Securities Act of 1933 (the "Securities Act") against the Company and certain of its top officials, and the Underwriter Defendants (defined below).

2.      Arconic is a global provider of lightweight multi-material solutions, focused on the aerospace market, as well as the automotive, industrial gas turbine, commercial transportation, and building and construction markets.   Specifically, the Company manufactured and sold an aluminum composite material, called Reynobond PE, that was applied as cladding to the exterior of buildings.

3.      Lead Plaintiff Sullivan alleges claims under the Securities Act for the filing of a Registration Statement and incorporated prospectus supplements in connection with the Preferred IPO that contained inaccurate statements of material fact and omitted material information that was required to be disclosed.   Specifically, Defendants made inaccurate statements of material fact and/or failed to disclose: (i) that the Company was knowingly selling Reynobond PE for unsafe and unauthorized use even after it knew that simulation tests showed that Reynobond had not earned the safety rating that the Company touted; (ii) the risks associated with these practices; and (iii) the potential civil, regulatory and criminal risks that stemmed from these practices.

4.      Separately, Plaintiffs allege claims under the Exchange Act for fraud against the Arconic Defendants (defined below) for making materially false and misleading statements regarding the Company's business, operations and compliance policies.   Specifically, the Arconic Defendants made false and/or misleading statements and/or failed to disclose that: (i) Arconic knowingly or recklessly supplied its highly flammable Reynobond polyethylene (PE) cladding panels for use in high-rise buildings; (ii) the foregoing conduct significantly increased the risk of property damage, injury and/or death in buildings constructed with Arconic's Reynobond PE

panels; and (iii) as a result of the foregoing, Arconic's public statements were materially false and misleading at all relevant times.

5.      On June 14, 2017, a fire broke out at the 24-story Grenfell Tower apartment block in London.  The fire burned for roughly 60 hours, destroying the building and causing at least 71 deaths and over 70 injuries.

6.      On June 24, 2017, *The New York Times* published an article entitled "Why Grenfell Tower Burned: Regulators Put Cost Before Safety," describing the causes of the Grenfell Tower fire and attributing the rapid spread of the fire to the highly flammable Reynobond PE cladding panels manufactured by Arconic.  The article stated, in relevant part:

> The facade, installed last year at Grenfell Tower, in panels known as cladding and sold as Reynobond PE, consisted of two sheets of aluminum that sandwich a combustible core of polyethylene. It was produced by the American manufacturing giant Alcoa, which was renamed Arconic after a reorganization last year.
>
> Arconic has marketed the flammable facades in Britain for years, even as it has adjusted its pitch elsewhere. In other European countries, Arconic's sales materials explicitly instructed that "as soon as the building is higher than the firefighters' ladders, it has to be conceived with an incombustible material." An Arconic website for British customers said only that such use "depends on local building codes."
>
> *      *      *
>
> Fire safety experts said the blaze at Grenfell Tower was a catastrophe that could have been avoided, if warnings had been heeded.
>
> *      *      *
>
> For more than a week after the fire, Arconic declined repeated requests for comment. Then, on Thursday, the company confirmed that its flammable polyethylene panels had been used on the building.

7.      On that same day, *Reuters* published an article entitled "Arconic knowingly supplied flammable panels for use in tower: emails," revealing that Arconic sales managers were aware that flammable panels would be distributed for use at Grenfell Tower.

3

8.      On June 26, 2017, Arconic issued a press release announcing it would discontinue global sales of Reynobond PE for use in high-rise buildings after the material was suspected to have contributed to the spread of the deadly fire at the Grenfell Tower apartment complex in London.

9.      An investigation conducted by the British Broadcasting Corporation shows that Arconic knew − but did not disclose to investors − that, at least as early as October 12, 2011, the Reynobond PE products it supplied to high-rise buildings posed a high risk of fire and had in fact failed to meet critical fire safety tests.

10.     On these and other related disclosures, Arconic's common share price fell $3.70 per share, or 14.49%, to close at $21.84 per share, and Arconic's preferred stock fell $5.56 per share or 13.9% per share on June 27, 2017.

11.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

**JURISDICTION AND VENUE**

12.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5) and pursuant to §§11 and 15 of the Securities Act.

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and §27 of the Exchange Act, and §22 of the Securities Act.

14.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa), §22 of the Securities Act and 28 U.S.C. §1391(b) and (c).  Arconic maintains its U.S. corporate center within this Judicial District.

In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

15.     Lead Plaintiff Ironworkers, as set forth in its previously filed Certification, purchased Arconic securities at artificially inflated prices during the Class Period, and was damaged thereby.

16.     Lead Plaintiff Sullivan, as set forth in her previously filed Certification, purchased Preferred Shares of Arconic during the Class Period, including traceable to the Preferred IPO, and was damaged thereby.

17.     Defendant Arconic is incorporated in Delaware.

18.     Before November 1, 2016, when the Company spun-off its mining and manufacture of raw aluminum operations to the new "Alcoa Corporation" (the "Spin-Off"), Arconic was known as Alcoa Inc.  In connection with the Spin-Off, the Company also changed its name to Arconic. Defendant Arconic's corporate center is located at 201 Isabella Street, Pittsburgh, Pennsylvania, and the Arconic Technology Center for research and development is located at 100 Technical Drive, New Kensington, Pennsylvania.   Arconic remains engaged in the engineering and manufacturing of aluminum and other lightweight metals into products used worldwide in the aerospace, automotive, commercial transportation, packaging, building and construction, oil and gas, defense, consumer electronics, and industrial industries.  Following the Preferred IPO, and until the time of the Spin-Off, Arconic Preferred Shares traded on the NYSE under the ticker symbol "AA-PRB" and have traded on the NYSE under the ticker symbol "ARNC-PB" since the time of the Spin-Off.

19.     Defendant Klaus Kleinfeld ("Kleinfeld") served as the Company's Chief Executive Officer ("CEO") from May 8, 2008 until he was asked to resign on April 17, 2017, after displaying flagrant behavior toward one of the Company's largest shareholders.  Kleinfeld was elected to Alcoa's Board of Directors in November 2003 and became Chairman on April 23, 2010.  He was President and Chief Operating Officer of Alcoa from October 1, 2007 to May 8, 2008.  This was not the first time Kleinfeld was asked to resign from his position as a Chief Executive Officer. According to media outlets, in 2007, Kleinfeld resigned from his positions as President and CEO of Siemens AG after a scandal surfaced uncovering evidence of bribery and kickbacks in more than a dozen countries where Siemens AG operated and bid for contracts.

20.     Defendant William F. Oplinger ("Oplinger") was, at the time of the Preferred IPO, the Executive Vice President and Chief Financial Officer of Arconic.

21.     Defendant Robert S. Collins ("Collins") was, at the time of the Preferred IPO, the Vice President and Controller of Arconic.

22.      Defendants Kleinfeld, Oplinger and Collins are referred to herein as the "Officer Defendants" and Defendants Arconic and Kleinfeld are collectively referred to herein as the "Arconic Defendants."

23.     Defendants Arthur D. Collins, Jr. ("A. Collins"), Kathryn S. Fuller, Judith M. Gueron, Michael G. Morris, E. Stanley O'Neal ("O'Neal"), James W. Owens, Patricia F. Russo ("Russo"), Sir Martin Sorrell, Ratan N. Tata and Ernesto Zedillo were, at the time of the Preferred IPO, directors of Arconic.

24.     The defendants named in ¶¶ 19-23 are referred to herein as the "Individual Defendants."  The Individual Defendants each signed the Registration Statement.

25.     Defendants Morgan Stanley & Co. LLC, Credit Suisse Securities (USA) LLC, Citigroup Global Markets Inc., Goldman, Sachs & Co., J.P. Morgan Securities LLC, BNP Paribas Securities Corp., Mitsubishi UFJ Securities (USA), Inc., RBC Capital Markets, LLC and RBS Securities Inc., (the "Underwriter Defendants") are investment banking firms that acted as underwriters of Arconic's Preferred IPO, helping to draft and disseminate the offering documents. Underwriter Defendants Morgan Stanley & Co. LLC and Credit Suisse Securities (USA) LLC were both joint book-running managers for the Preferred IPO and representatives of the Underwriter Defendants in the Preferred IPO, and Underwriter Defendants Citigroup Global Markets Inc., Goldman, Sachs & Co., and J.P. Morgan Securities LLC were book-running managers for the Preferred IPO.  Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements and omissions in the Registration Statement.

26.     The Underwriter Defendants are investment banking houses that specialize, *inter alia*, in underwriting public offerings of securities; they served as the underwriters of the Preferred IPO and collectively shared $37.5 million in fees.  The Underwriter Defendants determined that in return for their share of the Preferred IPO proceeds, they were willing to merchandize Arconic preferred stock in the Preferred IPO.

27.     The Underwriter Defendants also demanded and obtained an agreement from Arconic that Arconic would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws.  They also made certain that Arconic had purchased millions of dollars in directors' and officers' liability insurance.

28.     Representatives of the Underwriter Defendants also assisted Arconic and the Individual Defendants in planning the Preferred IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of Arconic, an undertaking known as a

"due diligence" investigation.  The due diligence investigation was required of the Underwriter Defendants in order to engage in the Preferred IPO.  During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Arconic's operations and financial prospects.

29.     In addition to availing themselves of virtually unbridled access to internal corporate documents, agents of the Underwriter Defendants met with Arconic's lawyers, management and top executives and engaged in "drafting sessions" between at least July 2014 and September 2014. During these sessions, understandings were reached as to: (i) the strategy to best accomplish the Preferred IPO; (ii) the terms of the Preferred IPO, including the price at which Arconic Preferred Shares would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about Arconic would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement.  As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Arconic management and top executives, the Underwriter Defendants would or should have learned of Arconic's existing problems as detailed herein.

30.     The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with offers and sales thereof, including to Plaintiff Sullivan and the Class.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

31.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of Classes, consisting of all those who purchased or otherwise acquired Arconic securities during the Class Period (the "Exchange Act Class,") or traceable to the Preferred IPO (the "Securities Act Class" and together with the Exchange Act Class, the "Classes") and were damaged thereby.  Excluded from the Classes are Defendants herein, the

officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

32.     The members of the Classes are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Arconic securities were actively traded on the NYSE. While the exact number of members of the Classes is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Classes.  Record owners and other members of the Classes may be identified from records maintained by Arconic or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

33.     Plaintiffs' claims are typical of the claims of the members of the Classes as all members of the Classes are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

34.     Plaintiffs will fairly and adequately protect the interests of the members of the Classes and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Classes.

35.     Common questions of law and fact exist as to all members of the Classes and predominate over any questions solely affecting individual members of the Classes.  Among the questions of law and fact common to the Classes are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Arconic;

- whether the Registration Statement issued in connection with the Preferred IPO negligently omitted and/or misrepresented material facts about and the Company's business, operations and management;

- with regard to claims under the Exchange Act only, whether the Arconic Defendants acted knowingly or recklessly in issuing false and misleading statements; and

- whether the members of the Classes have sustained damages and, if so, what is the proper measure of damages.

36.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Classes may be relatively small, the expense and burden of individual litigation make it impossible for members of the Classes to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## OVERVIEW OF THE COMPANY

37.     Founded in 1888, the Company's predecessor, Alcoa, Inc., was the world's fifth largest producer of aluminum.  On November 1, 2016, Alcoa spun-off its Alumina and Primary Metals segments, the rolling mill at the Warrick, Indiana, operations and a 25.1% stake in the Ma'aden Rolling Company in Saudi Arabia into a new separately-held company, Alcoa Corporation.  The predecessor company changed its name to Arconic.  All references in this Complaint to Arconic include its predecessor company.

38.     Before the Spin-Off, the Company's operations consisted of four worldwide reportable segments: (i) Alumina; (ii) Primary Metals; (iii) Global Rolled Products; and (iv) Engineered Products and Solutions (which included aluminum).  Post Spin-Off, Arconic has continued to engage in lightweight metals engineering and manufacturing.  Arconic's multi-

material products, which include aluminum, titanium, and nickel, are used worldwide in aerospace, automotive, commercial transportation, packaging, building and construction, oil and gas, defense, consumer electronics, and industrial applications.  Arconic's operations now consist of three worldwide reportable segments: (i) Global Rolled Products; (ii) Engineered Products and Solutions; and (iii) Transportation and Construction Solutions.

39.     Reynobond Aluminum Composite Material ("ACM") is a wall cladding product sold by Arconic that consists of two sheets of thin aluminum, each permanently bonded to an extruded thermoplastic core.  The ACM panels are combined with insulation to form cladding used to cover residential and office towers and other buildings.  Reynobond is sold with either a Polyethylene ("PE") core, which is combustible, or a more expensive Fire Resistant ("FR") core. The Polyethylene core product, Reynobond PE, the cheaper of the two products, was the one Arconic's sales personnel pushed to customers, particularly when engaged in competitive bidding, in order to win projects.

40.     At all relevant times, Arconic was a leading producer of aluminum products.  The Company represented that aluminum and alumina constituted approximately 80% of Alcoa's revenues.  In November 2016, Arconic's upstream business segments separated to become a stand-alone company, and in 2016, Arconic operated in 19 countries.  Based upon the country where the point of sale occurred, the U.S. and Europe generated 51% and 26%, respectively, of Arconic's sales in 2013; 51% and 27%, respectively, of Arconic's sales in 2014; 51% and 26%, respectively, of Arconic's sales in 2015; and 63% and 26%, respectively, of Arconic's sales in 2016.

41.     In filings with the SEC, Arconic acknowledged that it was subject to highly competitive conditions in all aspects of its aluminum businesses, with competition from both U.S.

and non-U.S. companies in all major markets.  Arconic's brand names faced brand recognition, with brand loyalty also playing an important competitive role.

**ARCONIC REGULARLY SOLD REYNOBOND PE FOR UNSAFE INSTALLATION**

42.     Throughout the relevant period, Arconic knew, but hid from its investors, that it had been selling its product for unsafe and unauthorized use, while the risk that the buildings to which Reynobond PE had been applied laid dormant, like a ticking time bomb.

43.     Arconic's own brochures, featured prominently on the Company's official website during the Class Period, represent that its cladding products containing polyethylene (PE) should not be used in buildings over a height of 10 meters.  The brochures state that only "incombustible" material should be used on buildings higher than 10 meters.

44.     Arconic's brochures state that "it is crucial to choose the adapted products in order to avoid the fire spreading to the whole building.  Especially when it comes to facades and roofs, the fire can spread extremely rapidly."  Arconic warned that "[i]t is especially crucial for public establishments.  Buildings are also classified according to their height, which will define which materials are safer to use.  Another important rule when it comes to the height of buildings concerns the accessibility of the fire brigade -- as soon as the building is higher than the firefighters' ladders, it has to be conceived with an incombustible material."

45.     Arconic's brochures contain a height guidance table.  While PE can be used up to 10 meters, products which are fire retardant (FR) should be used on buildings up to 30 meters.  Above that height, Arconic strictly advises that only cladding panels with non-combustible material – the "A2" model – should be used.



As soon as the building is higher than the firefighters' ladders,
it has to be conceived with an incombustible material.

46.      Similarly, an informational series of Frequently Asked Questions available on Arconic's website during the Class Period states that use of Reynobond PE in buildings over 50º above grade does not comply with the *International Building Code®*:

Q:  When do I need fire-resistant (FR) versus polyethylene (PE) Reynobond?

The answer to this, in part, depends on local building codes.  However, the *International Building Code®* states that *in all cases over 50´ above grade, FR is needed*.

47.      According to fire safety experts, polyethylene must be avoided in tall buildings and has been linked to several rapidly spreading fires around the world.  "Polyethylene is a thermoplastic material, which . . . melts and drips as it burns, spreading the fire downwards as well as upwards," architectural consultants Probyn Miers said in a note on insulation materials posted on their website.

48.      Despite these warnings, and unbeknownst to investors, the Company regularly sold Reynobond for unsubscribed use on high-rise towers, like the Grenfell Tower, across the globe. In fact, as described more fully below, the Company methodically tracked the specifications for each construction project that it was supplying the PE panels to. To this end, Arconic knew that it was inappropriately selling Reynobond PE for use on high-rise towers and creating substantial

13

risks that, what may have been a manageable fire under ordinary circumstances, would turn into an inferno because of Reynobond PE.

49.    For example, Reynobond PE was sold for use on an 18-meter tall student housing building known as The Shield Building, located in Newcastle, England.  According to the article entitled "A Newcastle Block of Student Flats Has the Same Reynobond PE Cladding as Grenfell Tower,"[1] the student housing building was under construction in the summer of 2017 when the tragic Grenfell Tower fire occurred.  A spokesperson for the developer, BAM Properties, admitted that "the facade to the building is clad with four products, one of which is Reynobond ACM PE panels."  The BBC also reported in an article called "Grenfell Tower: Same Cladding on Newcastle Student Flats" that "*at its highest point, [The Shield] will be taller than 18m*."[2]  Government regulations prohibited the cladding from being installed on buildings taller than 18 meters.[3]

50.    In the wake of the Grenfell Tower fire, BAM Properties later requested permission from the local building authorities to replace the Reynobond PE cladding with aluminum panels that would not pose a threat to the hundreds of university students planning to move into The Shield in September 2017.[4]

51.    Arconic also improperly supplied another high-rise student housing building in Newcastle, which is owned by a private company called St. James's Point, with Reynobond PE

---

[1] Simon Meechan, *A Newcastle block of student flats has the same Reynobond PE cladding as Grenfell Tower*, CHRONICLE LIVE (June 23, 2017, 3:23 pm), https://www.chroniclelive.co.uk/news/north-east-news/newcastle-block-student-flats-same-13230420.

[2] All emphasis in bold or italics is added throughout, unless otherwise noted.

[3] *Grenfell Tower: Same cladding on Newcastle student flats*, BBC (June 23, 2017), https://www.bbc.com/news/uk-england-tyne-40338955.

[4] Newcastle City Counsel, *Planning – Application Summary* (July 14, 2017) https://publicaccessapplications.newcastle.gov.uk/online-applications.

according to the article "Tab Investigation Finds Student Accommodation Buildings Across the UK Are Covered in Grenfell-Style Cladding."[5]

52.      According to the same article, a high-rise building that was also a student resident hall in Edinburgh, Scotland was furnished with Reynobond PE as described below:

> Home to 778 students, Reynobond PE was discovered on a quarter of the building's walls.
>
> A spokesperson for Edinburgh Napier University said: "Work has already begun to remove and replace the cladding as a precautionary measure, and we are working closely with the Scottish Fire and Rescue Service to ensure it is safe to continue to use the building as normal."

53.      Similarly, as reported by the BBC in the article "Grenfell Cladding on Nottingham Trent University Halls," three student housing buildings at Nottingham Trent University were built in 2013 that were covered in Reynobond PE, which is now being removed from the buildings.[6]

54.      In addition to Grenfell Tower, scores of various towers and apartment buildings throughout the United Kingdom were also improperly fitted with Reynobond PE.  In an article published by *The Guardian* entitled "Cladding to Be Removed in Camden as Councils Scramble to Check Tower Blocks,"[7] four other housing buildings were clad in the dangerous paneling.  The article stated:

> In north London, Barnet council has written to residents in three towers which inspections on Monday revealed were clad in the same aluminium sandwich panels believed to have been used at Grenfell Tower.

---

[5] Joe Banfield, *Tab Investigation Finds Student Accommodation Buildings Across the UK Are Covered in Grenfell-Style Cladding*, THE TAB (June 28, 2017), https://thetab.com/uk/2017/06/28/student-accommodation-buildings-across-uk-covered-grenfell-style-flammable-cladding-41981.

[6] *Grenfell Cladding On Nottingham Trent University Halls*, BBC (June 28, 2017), https://www.bbc.com/news/uk-england-nottinghamshire-40429627.

[7] Robert Booth, *et al.*, *Cladding to be removed in Camden as councils scramble to check tower blocks*, THE GUARDIAN (June 22, 2017, 7:32 am), https://www.theguardian.com/uk-news/2017/jun/22/grenfell-tower-camden-council-to-remove-cladding-from-five-tower-blocks.

Granville Point, Harpenmead Point and Templemead Point all have the Reynobond PE panels that were supplied to the Grenfell Tower refurbishment project.

*     *     *

In Tottenham, north London, Newlon Housing Trust has discovered the same panels as used on Grenfell Tower were used on its Rivers Apartments complex and is carrying out tests.  The shared ownership block was built just two years ago and is clad in Reynobond PE.

55.    According to an article published by *Evening Standard* entitled "Combustible Cladding Found on 14 High-Rise Blocks Around the UK Putting Thousands at Risk, Government Reveals," the PE cladding was installed on the aforementioned Granville Point, Harpenmead Point and Templemead Point towers in 2012.[8]

56.    Likewise, there are four high-rise apartment buildings in Camden, England that were improperly installed with Reynobond PE.  In the article "'Banned' Grenfell Tower Cladding in Use on Nearby London Estate" *ITV News* reported as follows:

[T]he type of cladding that covered the exterior of the Grenfell Tower has also been used on a nearby estate in North London.

***Harley Facades Ltd has confirmed it installed aluminium composite material (ACM) panels made from Reynobond at the Chalcots Estate in Camden and that the panels have a combustible polyethylene core***.

At the weekend the chancellor, Philip Hammond, said this type of cladding is banned from use in high rise developments.

***The Chalcots Estate comprises four 22-storey tower-blocks and one 18-storey tower block.  The blocks were erected in the late 1960s and re-clad in 2006 as part of a £66 million refurbishment***.

The work was carried out by the same group of companies that were used on the refurbishment at Grenfell Tower.  The main contractor was Rydon.  Rydon subcontracted the design and installation of the external cladding to Harley Facades.  Omnis supplied Harley with the cladding panels.

---

[8] Patrick Grafton-Green, *Combustible Cladding Found On 14 High-Rise Blocks Around The UK Putting Thousands At Risk, Government Reveals*, EVENING STANDARD (June 23, 2017, 4:13 pm https://www.standard.co.uk/news/uk/combustible-cladding-found-on-14-highrise-blocks-putting-thousands-at-risk-government-reveals-a3572046.html.

In a statement Ray Bailey, the MD of Harley, said: "These works were as described in the contractual specification and approved in the usual process for construction and building control by the London Borough of Camden."

He added: "There is no evidence to suggest that this product and cladding system installed in Camden is unsafe."

A fire expert we spoke to told us that polyethylene-core cladding "does not conform with the government's guidance that supports the building regulations" and that Camden would have to remove it.

"A polyethylene core as contained in the standard Reynobond product does not have 'limited combustibility'," the fire expert told ITV News.

***"It is flammable, it is combustible.  Polyethylene products cannot be of limited combustibility.  Reynobond has alternative products which would have been suitable."***

We asked Camden Council whether it intends to remove the cladding panels at the Chalcots Estate and, if so, what steps it intended to take in the interim to mitigate risk for residents.

Camden does not deny polyethylene-core cladding has been installed at the Chalcots Estate but was unable to confirm that it approved the Reynobond material for use in the project.  The council argues the exterior cladding "system" is different to Grenfell in important respects.

The speed at which the fire spread at Grenfell Tower has led to speculation the polyethylene cladding may have been a contributing factor.[9]

57.     Arconic also supplied Reynobond PE for use at the Clements Court tower in London.  Clements Court is listed on the Harley Facade website as an example of an overcladding project using 4mm ACM product.[10]  The location of the tower block was listed as Hounslow on the website.  The cladding company D+B Facades has posted a case study on its website describing how the ACM product used was identified as a fire risk following the Grenfell Tower fire and how

---

[9] Joel Hills, '*Banned' Grenfell Tower Cladding in Use on Nearby London Estate*, ITV NEWS, (June 21, 2017, 9:03 pm), https://www.itv.com/news/2017-06-21/grenfell-cladding-used-on-nearby-north-london-estate/.

[10] http://www.harleyfacades.co.uk/page/clements-court

the company was contracted to remove the existing cladding.[11]  They completed the project on 17

November 2017.[12]  The tower is described by D+B Facades as a 13-story tower block owned by

the London Borough of Hounslow.

58.    A BBC article from 19 July 2017 states that outer cladding on the tower block,

"made of two thin aluminium sheets with **polyethylene filler** in between," was to be removed.[13]

Hounslow Council issued a statement on 23 June 2017 to say that the cladding would be removed

as soon as possible.[14]

59.    According to the original cladding proposal documents filed on Hounslow

Council's planning portal, an application to re-clad Clements Court was initiated in 2008.  The

application was to install new rain screen cladding to the block of flats No: 1 to No 78.[15]  The

application document names Reynobond three times, once in the summary, then again in the details

of the application:

> "It would involve changes to the existing external cladding with a **reynobond decorative panel**, colours steel metal and dark blue, and with red bricks slip panel at the bottom of the block. The windows would be Upvc rehau profile."

> "The block comprises of 13 floors with No. 1 to 78 flats in the block. The ground floor would be cladded with red brick slip panel rain screen cladding (100mm cavity) 70mm insulation. The redundant fresh air inlet vents would be removed. Floors 2 to 13 would be clad with a **reynobond decorative panel** rain screen cladding (180mm cavity) 100mm insulation. The colours would be steel metallic Ref E5101S and dark blue Ref A5105S."

60.    Arconic also supplied Reynobond PE for use in the Byron House, a Nottingham

Trent University student residence.   The building  was clad in **Reynobond PE** according to

---

[11] http://www.dbfacades.com/wp-content/uploads/2017/11/db-Clements-Court-Case-Study.pdf

[12] http://www.dbfacades.com/db-facades-make-clements-court-hounslow-fire-safe-in-10-days/

[13] https://www.bbc.co.uk/news/uk-40396448

[14] www.hounslow.gov.uk/news/article/239/cladding_at_clements_court_to_be_removed_as_soon_as_possible

[15] http://democraticservices.hounslow.gov.uk/documents/s35992/Clements%20Court.pdf

Nottingham press.[16]  E-architect also confirmed its use.[17]  On June 28, 2017 the BBC reported that three of seven blocks at Byron House have the **Reynobond PE ACM panels**.[18]

61.    Planning details submitted in 2012 under discharge condition 9 (design details) show drawings that confirm the proposed use of both Alucobond and Reynobond in the scheme:



62.    Further planning documents detail which areas of the exterior of the building make use of both "Reynobond feature profiles" and "Reynobond Cassette Panels."  The £60m complex was completed in 2013.

63.    Arconic supplied Reynobond PE for use in the Castlemain Tower, a 21-story tower block located in London.  The BBC reported that the building failed fire safety tests and that its cladding was to be removed as soon as possible.[19]  The London Borough of Wandsworth released a press notice on June 24, 2017 stating that the block was one of two which had external cladding that had "failed to meet fire safety standards," according to a report by the London Fire Brigade.[20]

---

[16] www.nottinghampost.com/news/nottingham-news/work-begins-remove-potentially-dangerous-871668

[17] https://www.e-architect.co.uk/birmingham/byron-house-nottingham-trent-university-building

[18] https://www.bbc.co.uk/news/uk-england-nottinghamshire-40429627

[19] https://www.bbc.co.uk/news/uk-40396448

[20]https://web.archive.org/web/20170629015018/https://www.wandsworth.gov.uk/news/article/14021/fire_brigade_carries_out_detailed_assessment_of_castlemaine_tower

64.     A technical summary of the tower notes that the existing over-cladding is Reynobond of the following type:

> 108mm composite panel comprising: 4mm **Reynobond ACM** + /103mm **Styrofoam insulation** + 0.7mm steel tray inner skin.  U value of 0.25W/m2K for 108mm composite panels. In some areas the ACM panel has been installed in front of glass fibre insulation.

65.     The Design and Access statement also notes that the Reynobond ACM did not meet fire safety criteria for the building:

> This panel doesn't achieve the A2 rating requirement and glass fibre insulation is not adequate. 86mm composite panel comprising: 4mm **Reynobond ACM + 81 Styrofoam insulation** + 0.7mm steel tray inner skin.

> The rain screen cladding system and the infill windows are 13 years old. The solid infill panels are not compliant with the required fire certification. Removal of the whole system and replacement with a new system that complies with current regulations in terms of acoustic, thermal and fire performance is recommended.

66.     Similarly, Arconic supplied Reynobond PE for use at Bainfield Halls, a six-story residence at Edinburgh Napier University.  On June 27, 2017 the BBC reported that Bainfield Halls, a residence at Edinburgh Napier University, was found to have the same kind of cladding used on the Grenfell Tower block.[21]  The *Independent* listed Bainfield Halls as one of several student accommodations that had the same sort of cladding as Grenfell Tower.[22]

67.     The university issued a statement that confirmed it would be removing and replacing the cladding.[23]  It stated that "the 'wood-effect' exterior cladding being removed – **Reynobond PE** – is made up of two thin aluminium sheets with a polyethylene filler."

---

[21] https://www.bbc.co.uk/news/uk-scotland-edinburgh-east-fife-40414502

[22] https://www.independent.co.uk/news/uk/home-news/grenfell-tower-fire-combustible-cladding-flammable-university-accommodation-blocks-nottingham-trent-a7812946.html

[23] https://www.napier.ac.uk/about-us/news/bainfield-cladding-update

68.     According to The Edinburgh Reporter of June 27, 2017, a contractor was appointed to replace the cladding which would take about 4 weeks to complete.[24]

69.     Arconic also supplied Reynobond PE for use in Horatia House, a tower in Portsmouth, England.  A report by James Hill, Interim Director Property & Housing at Portsmouth Council, noted that each tower had ACM cladding, with two types used in each tower.[25]  According to the report, "Each block is fully clad on two elevations and partially clad on the remaining elevations.  Horatia House is clad using ACM (**Reynobond product**)…"

70.     Arconic's dangerous sales tactics were not limited to the United Kingdom – domestically, Reynobond PE was being sold for application on high-rise buildings that the Company knew was unsafe and presented a fire hazard.  According to an October 24, 2017 *Wall Street Journal* article entitled "Buildings Across U.S. Are Wrapped In Same Panels That Fueled Deadly London Fire," "[i]n Baltimore, the 32-story Marriott Waterfront Hotel, which opened in 2001, was clad in 83,000 square feet of combustible-core panels, according to the website for Arconic, formerly part of aluminum producer Alcoa Inc."

71.     According to the October 29, 2017 *Wall Street Journal* article, Arconic also supplied "Reynobond PE panels − with combustible polyethylene cores − [to] a terminal at the Dallas/Fort Worth International Airport, the Cleveland Browns football stadium and the multistory building that houses the office of the chancellor of the California State University System in Long Beach, Calif."

---

[24]        https://www.theedinburghreporter.co.uk/2017/06/cladding-at-bainfield-flats-is-same-as-grenfell-tower/

[25] https://democracy.portsmouth.gov.uk/documents/s16502/Fire%20Safety%20-%20Local%20Authority%20Housing.pdf

72.     However, the polyethylene version of Reynobond is banned in the United States for use in buildings exceeding 40 feet (12 meters) height because they pose a substantial risk of spreading fire and smoke.  Nearly all jurisdictions in the United States (except three states – Minnesota, Indiana, and Massachusetts – and the District of Columbia) have enacted the International Building Code (IBC) requirement that external wall assemblies, *i.e.*, cladding on high-rise buildings with combustible components, must pass a rigorous real-world simulation test promulgated by the National Fire Protection Association ("NFPA") under the name NFPA 285. As of mid-2017, ACM cladding with a polyethylene core had not been able to pass the NFPA 285 test, and thus had been effectively banned on U.S. high-rise buildings for decades.

73.     Despite this nearly universal ban, Arconic supplied its combustible Reynobond PE panels for use at the multistory building that houses the office of the chancellor of the California State University System in Long Beach, California.  This building is approximately 24 meters in height.

74.     Arconic also supplied flammable Reynobond PE for use at a terminal at the Dallas/Fort Worth International Airport.  The terminal is around 26 meters in height.

75.     Arconic similarly supplied Reynobond PE for use at the seven-story clinic of the University of Texas Southwestern Medical Center.  The clinic is over 20 meters in height.

76.     Arconic supplied flammable Reynobond PE for use at the Cleveland Browns stadium, which exceeds 52 meters in height.

77.     Arconic's combustible Reynobond PE panels were all over River East Center's 20-story hotel and 58-story condominium building.  Judy Frydland, Commissioner of the Department of Buildings, confirmed Reynobond PE was used on River East Center and said, "Of course, it's concerning."

78.     In Canada, Arconic engaged in the same prohibited practice.  For example, the Gordon B. Isnor Manor in Halifax is a 15-story residential building for social housing for seniors. The building utilized Reynobond PE, which is a violation of federal building codes under Canadian law.

79.     Arconic eventually admitted it was engaged in globally supplying Reynobond PE for use in high-rises, stating in a press release issued after the Grenfell Tower inferno that  it was discontinuing the sale of its Reynobond PE core panels worldwide for use in "any high-rise applications regardless of local codes and regulations."

80.     A 210-page draft report prepared by fire investigation experts BRE Global as part of the Metropolitan Police inquiry of the Grenfell Tower fire revealed that the blaze would have had little opportunity to spread beyond the apartment it started in, had the building not been renovated with Arconic's combustible Reynobond PE panels.

81.     The danger of using highly flammable cladding was obvious to Arconic years before the Grenfell Tower tragedy.  There were numerous occurrences where similar fires spread through exterior wall assemblies such as cladding containing combustible components.  Most of them involved high-rise buildings:

**United Kingdom and Isle of Man:**

- 1973 Summerland disaster – leisure center fire in Douglas, Isle of Man, worsened by the ignition of flammable acrylic sheeting covering the building, led to at least 50 deaths.

- 1991 Knowsley Heights fire – a fire in a tower block in Liverpool that had recently been fitted with rain screen cladding spread from the bottom to the top of the building via the 90 mm air gap behind the cladding.

- 1999 Garnock Court fire – the fire in a tower block in Irvine, North Ayrshire, spread rapidly up combustible cladding, resulting in one death and four injured. The incident led to a parliamentary inquiry into the fire risk of external cladding and a change of the law in Scotland in 2005 requiring any cladding to inhibit the spread of fire.

- 2005 Harrow Court fire – in a tower block in Stevenage, Hertfordshire, led to three deaths.

- 2009 Lakanal House fire – in a tower block in Camberwell, South London, led to six deaths and at least twenty injured; an inquest "found the fire spread unexpectedly fast, both laterally and vertically, trapping people in their homes, with the exterior cladding panels burning through in just four and a half minutes.

- 2016 Shepherd's Court fire – in a tower block in Shepherd's Bush, West London, a faulty tumble-dryer caught fire on the seventh floor, 19 August 2016. The fire spread up six floors on the outside of the building, which is owned by Hammersmith and Fulham Council.

**Other regions**:

- 2007 fire at The Water Club (Atlantic City, New Jersey, US) – a fire that occurred as the building was nearing completion spread rapidly up aluminium composite panel cladding with a polyethylene core, from the 3rd floor to the top of the 41-floor building.

- 2009 Beijing Television Cultural Center fire (China) – believed to have spread via insulating foam panels on the building's facade.

- 2010 Wooshin Golden Suites fire (Marine City, South Korea) – spread within 20 minutes from the 4th floor to the top of the 38-storey building, which featured flammable aluminium composite cladding with a polyethylene core, along with insulation made of glass wool or polystyrene.

- 2010 Shanghai fire (China) – destroyed a 28-storey high-rise apartment building, killing at least 58 people; flammable polyurethane insulation applied to the outside of the building was reported to have been a possible contributory factor.

- 2012 Al Tayer Tower fire (Sharjah, United Arab Emirates) – the rapid spread of the fire, which started in a first-floor balcony and spread to the top of the 40-story (34 residential, six parking floors) tower, was attributed to aluminium sandwich panels featuring a thermo-plastic core.

- 2012 Mermoz Tower fire (Roubaix, France) – saw fire spread rapidly up PE flammable cladding, resulting in one death and six injured.

- 2012 Tamweel Tower fire (Dubai, United Arab Emirates) – spread across dozens of floors via flammable aluminium cladding.

- 2014 Lacrosse Tower fire (Melbourne, Australia) – a fire started on an eighth-floor balcony took just 11 minutes to travel up 13 floors to the

building's roof, spreading via the same type of aluminium composite cladding as was used in Grenfell Tower.  In a report prepared in connection with the investigation of the Lacrosse fire, the Melbourne metropolitan fire brigade said the rapid vertical spread of the fire was "directly associated" with the external cladding.  "Had the external wall cladding been of a non-combustible type, the likelihood of fire spread beyond the level of ignition would have been greatly reduced," it said.  Australia's national science agency, the CSIRO, conducted tests on the cladding and found it was combustible and did not meet building codes.

- 2015 fire at The Marina Torch (Dubai, United Arab Emirates) – fire spreading up the cladding of several dozen storys from the 50th floor to the top of the building. A second fire occurred on August 4, 2017, again spreading rapidly up the exterior of the building.

- 2015 fire at The Address Downtown Dubai (United Arab Emirates) – cladding fire in a high-rise hotel and residential skyscraper.

- 2016 Ramat Gan high-rise fire (Ramat Gan, Israel) – a small fire in a flat quickly spread to the top of a 13-story tower block via combustible external insulation paneling.

- 2016 Neo Soho fire (Jakarta, Indonesia) – the fire occurred while the building was still under construction and spread rapidly up dozens of floors via flammable cladding.[26]

## THE GRENFELL TOWER BURNS TO THE GROUND KILLING AT LEAST 71 PEOPLE

82.    On June 14, 2017, a fire engulfed Grenfell Tower, a 24-story, 220-foot (67 meter) high tower block of public housing flats in North Kensington, west London, in the United Kingdom.

83.    The Grenfell Tower contained flammable cladding supplied by Arconic.  That cladding fueled the inferno that eradicated the Grenfell Tower.  Approximately 3,125 square meters of PE panels were used to coat the tower.

---

[26] *See* https://en.wikipedia.org/wiki/Grenfell_Tower_fire.

**SPREADING OF FIRE**



Flammable cladding and insulation enabled the fire to spread rapidly on the exterior of the building.

84.     The Grenfell Tower fire is the deadliest in the U.K. for more than a century.  The inferno resulted in at least 71 fatalities and over 70 injuries.  The tower contained 127 flats, with 227 bedrooms, at the time of the fire.  The fire started in a fourth-floor flat.  The speed at which the fire spread accelerated as a result of the building's exterior cladding.  Flames consumed the tower quickly.  People trapped on the higher floors screamed for their lives through broken windows.  Flames in an ordinary fire burst out of windows, moving from the inside out.  Grenfell Tower burned in reverse, moving inward from the building's exterior.  The flames quickly tore upward in streaks through the facade, filling apartments with toxic black smoke.  Torrents of orange and red branched out of the first streaks and shot upward.  The flames encased the building in a cylinder of fire.  More than 200 firefighters battled the blaze.  They brought 40 fire engines and other vehicles.



85.     Grenfell Tower had undergone a major renovation, which was completed in 2016. Plans for the renovation were publicized in 2012.  The £8.7 million renovation was overseen by Studio E Architects, Rydon Ltd. of Forest Row, East Sussex, in conjunction with Artelia for contract administration and Max Fordham as specialist mechanical and electrical consultants.  As part of the project, in 2015-2016, the concrete structure received new windows and new aluminum composite rainscreen cladding supplied by Arconic, in part to improve the appearance of the building.  Two types were used: Arconic's Reynobond and Reynolux aluminum sheets.  Beneath these and fixed to the outside of the walls of the flats was Celotex RS5000 PIR thermal insulation. Arconic sold its ACM panels to Worcester-based Omnis Exteriors, which acted as the "fabricator," cutting the panels into shape and supplying them to the contractors working on the Grenfell Tower. The cladding installation work was carried out by Harley Facades of Crowborough, East Sussex, at a cost of £2.6 million.

86.     The original contractor, Leadbitter, had been dropped by Grenfell Tower's manager, Kensington and Chelsea Tenant Management Organisation ("KCTMO"), because its price of £11.278 million was £1.6 million higher than the proposed budget for the refurbishment.

The contract was put out to competitive bidding.  Rydon's bid was £2.5 million less than Leadbitter's.  Rydon's bid called for the installation of Reynobond PE rather than Reynobond FR, despite that Grenfell Tower is 67 meters tall and despite the fact that Arconic's own marketing literature states it should not be used on buildings higher than 10 meters, due to its lack of fire retardant.

87.     Initial building plans for Grenfell Tower approved by residents in 2012 specified zinc cladding.  Documents from June and July of 2014 show that KCTMO pressured the project manager for the refurbishing of Grenfell Tower to cut costs.  Specifically, KCTMO emailed the manager that "we need good costs" for a meeting to be held the next morning with the project planner.  The email suggested several cost-reduction measures.  One was to swap the panels of zinc cladding, which were non-combustible and had a fire-retardant mineral core, with panels of combustible and flammable aluminum with a polyethylene core.  The email said that this substitution would yield "a saving of £293,368."

88.     In the same time-period, between May and July of 2014, Deborah French, Arconic's U.K. Sales Manager for Reynobond, exchanged emails with the executives of the companies that refurbished the Grenfell Tower regarding the availability of Reynobond PE and FR panels to be used on the Grenfell Tower.  In the end, Arconic supplied the project with PE panels.

89.     A company director for Omnis Exteriors, the company that cut the Reynobond panels to fit the building exterior and supplied them to the cladding contractor, told *The Guardian*, the British daily newspaper, that the companies that refurbished Grenfell Tower asked them to use Reynobond PE cladding, which is £2 cheaper per square meter than the alternative Reynobond FR.

90.     Architect and fire safety expert Sam Webb described the cladding system added to Grenfell Tower as part of the 2016 refurbishing program to *The Guardian* as "a disaster waiting to happen."

91.     Another architect quoted in a report issued in July 2017 by Architects for Social Housing stated that:

> If we are talking about the second issue, the cladding, ***no one in their right mind would specify the combustible type, partly because of case law, where architects who did specify that lost their defence at appeal in the High Court in 2003. You might as well clad the building in ten-pound notes dipped in Napalm***.

> The Principal Designer (in this case Studio E Architects) would normally seek ***written advice from the supplier – with a quote for supply*** – that the material is fit for purpose. In this case ***it is inconceivable that the manufacturer of Reynobond (Arconic Europe) would not recommend their "A2 Fire Solution"***, comprising an incombustible sandwich core that conforms with European fire certification EN 13501-1, class A2.

92.     According to British Chancellor Philip Hammond, the flammable cladding supplied by Arconic was illegal on tall buildings in Britain.  The cladding installed on Grenfell Tower was not designed for use on buildings taller than 10 meters high, a fraction of the 67-meter Grenfell Tower.

93.     According to the British Department for Communities and Local Government ("DCLG"), cladding with a flammable core, like the one used on Grenfell Tower, was banned on buildings over 18 meters high.  A spokesman for the Department told *The Sunday Times* that "cladding using a composite aluminum panel with a polyethylene core should not be used for cladding on a building taller than 18m."

94.     Similarly, safety experts agreed that the decision to use the flammable panels on the Grenfell Tower was "disturbing" and "shocking."

95.     The director of the Fire Safety Engineering Group at the University of Greenwich explained that if fire penetrates the cladding, "[i]t is like you have got a high-rise building and you are encasing it in kerosene.  It is insanity, pure and simple."

96.     A breach of building regulations is a criminal offense in the United Kingdom, and corporations can be prosecuted for manslaughter.

97.     British police investigating the fire at Grenfell Tower said they have "reasonable grounds" to suspect that corporate manslaughter offenses may have been committed, along with breaches of health and safety laws.  A letter from the Metropolitan Police to surviving Grenfell Tower residents said that police officers had "seized a huge amount of material and taken a large number of witness statements."  The Metropolitan Police stated that it was a "complex and far reaching investigation that by its very nature will take a considerable time to complete."

98.     Arconic attempted to distance itself from the disaster as its profits skyrocketed.  In the second quarter of 2017—the period including the inferno—Arconic reported profits of $212 million, an increase of 57% from the same quarter of the previous year.  "The business increased revenues and profitability, continued to expand margins and take out cost," touted David Hess, Arconic's interim chief executive.  "We ended the first half of 2017 with significantly less debt, a strong cash position and good liquidity."

99.     In the meantime, Arconic pinned the blame of the fire on others: "Cladding systems contain various components selected and put together by architects, contractors, fabricators and building owners, and *those parties are responsible for ensuring that the cladding systems are compliant under the appropriate codes and regulations*," the company said in a statement.  That decision to stop selling the panels was made out of "an abundance of caution as *Arconic does not control the ultimate design and installation of the final cladding system*," the Company said:

> Our Reynobond products including Reynobond PE are permitted to be used in accordance with local building codes and regulations in the United States and the UK and other countries around the world. Cladding systems contain various components selected and put together by architects, contractors, fabricators and building owners, and those parties are responsible for ensuring that the cladding systems are compliant under the appropriate codes and regulations. For our portion in the supply chain, we believe we've been compliant in the sale of our product.

100.    Following the tragedy at the Grenfell Tower, the DCLG ordered that the cladding be checked on any high-rise social housing under DCLG's control, specifically for the Reynobond PE cladding that was used on the Grenfell Tower refurbishment. Melanie Dawes, the DCLG permanent secretary, said: "We are therefore asking local authorities and other registered providers of social housing to identify whether any panels used in new-build or refurbishment are a particular type of cladding made of ACM."

101.    After the blaze at Grenfell Tower, the British government established an independent expert advisory panel to advise on immediate measures that should be put in place to help make buildings safe (the "Expert Panel"). On July 6, 2017, the Expert Panel recommended that a series of large scale tests be performed in order to help building owners make decisions regarding remediation.

102.    This series of tests included six combinations of cladding systems. The Expert Panel and other industry bodies inspected the design of the test systems to ensure that they matched ACM systems in common use. The first test evaluated a cladding system that mimicked the system used at Grenfell Tower and featured aluminum panels with core filler materials of unmodified polyethylene (PE), *i.e.*, ACM panels akin to the ones Arconic sells under the brand name Reynobond PE.

103.    The Expert Panel advised that the cladding panel system used in the first test did not meet U.K. building regulation guidance. In fact, according to the test report, it was not possible to classify the ACM panels under U.K. building regulations, because "in order for a classification

. . . to be undertaken, the cladding system must have been tested to the full test duration . . . without any early termination of the test."   The report stated that "[t]he minimum test duration is 40 minutes" and that the test was terminated after 8 minutes and 45 seconds, "due to flame spread above the test apparatus."   The report also found that the panel "would have failed to meet the external fire spread criterion if classification had been possible" because it reached a 15-minute fire spread marker in six-and-a-half minutes and exceeded the 600˚ Celsius temperature ceiling by over 200˚.

### NEWS ARTICLES AND GOVERNMENT INVESTIGATIONS REVEAL DEFENDANTS' MISCONDUCT

104.     On June 24, 2017, *The New York Times* published an article entitled "Why Grenfell Tower Burned: Regulators Put Cost Before Safety," describing the causes of the Grenfell Tower fire and attributing the rapid spread of the fire to the highly flammable Reynobond PE cladding panels manufactured by Arconic.   The article stated, in relevant part:

> The incineration of Grenfell Tower on June 14, the deadliest fire in Britain in more than a century, is now a national tragedy.   The London police on Friday blamed flammable materials used in the facade for the spread of the blaze and said the investigation could bring charges of manslaughter.   Hundreds of families were evacuated from five high-rises that posed similar risks.

> Flames consumed the tower so quickly that arriving firefighters wondered if they could even get inside.   People trapped on the higher floors screamed for their lives through broken windows.   At least 79 people died, a toll that is expected to rise as more bodies are recovered.   Survivors have charged that the facade was installed to beautify their housing project for the benefit of wealthy neighbors.

> *        *        *

> The facade, installed last year at Grenfell Tower, in panels known as cladding and sold as Reynobond PE, consisted of two sheets of aluminum that sandwich a combustible core of polyethylene.   It was produced by the American manufacturing giant Alcoa, which was renamed Arconic after a reorganization last year.

> Arconic has marketed the flammable facades in Britain for years, even as it has adjusted its pitch elsewhere.   In other European countries, Arconic's sales materials explicitly instructed that "as soon as the building is higher than the firefighters'

ladders, it has to be conceived with an incombustible material."  An Arconic website for British customers said only that such use "depends on local building codes."

*      *      *

Fire safety experts said the blaze at Grenfell Tower was a catastrophe that could have been avoided, if warnings had been heeded.

*      *      *

When the refrigerator on the fourth floor burst into flames, the fire ignited the flammable cladding and shot up the side of the building.  The London police confirmed that on Friday and identified the refrigerator brand as Hotpoint.  But experts who saw footage of the blaze had known the culprit at once.  *"You can tell immediately it's the cladding," said Glenn Corbett, an associate professor of fire science at John Jay College of Criminal Justice in New York.*

*      *      *

[S]ubcontractor, Omnis Exteriors, said on Friday that it had not been told that the flammable Reynobond cladding was going to be combined with flammable interior insulation.  That was a problem, the firm said in a statement, adding that the cladding "should only be used in conjunction with a noncombustible material."

The cladding itself was produced by Arconic, an industry titan whose chief executive recently stepped down after an unusual public battle with an activist shareholder.  Arconic sells a flammable polyethylene version of its Reynobond cladding and a more expensive, fire-resistant version.

In a brochure aimed at customers in other European countries, the company cautions that the polyethylene Reynobond should not be used in buildings taller than 10 meters, or about 33 feet, consistent with regulations in the United States and elsewhere.  "Fire is a key issue when it comes to buildings," the brochure explains.  "Especially when it comes to facades and roofs, the fire can spread extremely rapidly."

A diagram shows flames leaping up the side of a building.  "As soon as the building is higher than the firefighters' ladders, it has to be conceived with an incombustible material," a caption says.

But the marketing materials on Arconic's British website are opaque on the issue.

"Q: When do I need Fire Retardant (FR) versus Polyethylene (PR) Reynobond?  The answer to this, in part, depends on local building codes.  Please contact your Area Sales Manager for more information," reads a question-and-answer section.

For more than a week after the fire, Arconic declined repeated requests for comment.  Then, on Thursday, the company confirmed that its flammable polyethylene panels had been used on the building.

105.    On that same day, *Reuters* published an article entitled "Arconic knowingly supplied flammable panels for use in tower: emails," revealing that Arconic sales managers were aware that flammable panels would be distributed for use at Grenfell Tower.  The article stated, in relevant part:

> LONDON (Reuters) - ***Six emails sent by and to an Arconic Inc (ARNC.N) sales manager raise questions about why the company supplied combustible cladding to a distributor for use at Grenfell Tower, despite publicly warning such panels were a fire risk for tall buildings***.   The emails, dating from 2014 and seen by Reuters, were between Deborah French, Arconic's UK sales manager, and executives at the contractors involved in the bidding process for the refurbishment contract at Grenfell Tower in London, where 79 people died in a blaze last week.
>
> ***When asked about the emails, Arconic said in a statement that it had known the panels would be used at Grenfell Tower*** but that it was not its role to decide what was or was not compliant with local building regulations.
>
> The company manufactures three main types of Reynobond panel – one with a polyethylene (PE) core, one with a fire retardant core and another with a non-combustible core, according to its website.
>
> Diagrams in a 2016 Arconic brochure for its Reynobond panels describe how PE core panels are suitable up to 10 meters in height.  Panels with a fire resistant core – the FR model – can be used up to 30 meters, while above that height, panels with the non-combustible core – the A2 model – should be used, the brochure says.
>
> Grenfell Tower is more than 60 meters tall.
>
> The brochure also issued a blunt warning that cladding can be a fire risk.
>
> "When conceiving a building, it is crucial to choose the adapted products in order to avoid the fire to spread to the whole building.  Especially when it comes to facades and roofs, the fire can spread extremely rapidly," the brochure said.
>
> "As soon as the building is higher than the fire fighters' ladders, it has to be conceived with an incombustible material."  Nonetheless, between May and July 2014, French, who was based at Arconic's factory in Merxheim, France, responded to requests from the companies involved in refurbishing Grenfell Tower on the availability of samples of five different types of Reynobond aluminum-covered panels, all of which were only available in the combustible PE and FR versions, according to Arconic brochures.

In the end, Arconic said on Friday, the company provided PE panels.  "While we publish general usage guidelines, regulations and codes vary by country and need to be determined by the local building code experts," the company said in an emailed statement in response to the Reuters enquiry.

*      *      *

French did not respond to requests for comment.

Arconic, which was known as Alcoa Inc until 2016, declined to say if it knew how tall the tower was and the emails seen by Reuters do not specifically refer to its height.  They do, however, refer to "Grenfell Tower" and mention other high rise projects where paneling has been used when discussing the appearance that was being sought for Grenfell Tower.

***Arconic also knew the quantity of panels being supplied and thus the total exterior coverage. A source at one of the companies involved in the process said Arconic had "full involvement" throughout the contract bidding process***.

Omnis Exteriors, which cut the Arconic tiles to shape and supplied them to the cladding contractor, said it was not responsible for the choice of panel.

"CEP played no part in the selection of Reynobond PE and simply fulfilled the order as directed by the design and build team," the company said in a statement on Saturday, referring to CEP Architectural Facades Ltd, the Omnis unit which fulfilled the contract.

*      *      *

In the emails, French and representatives of Harley and Rydon also discuss the choice of panel models and colors and how they were inching towards securing the contract with the local authority.

Harris did not respond to requests for comment.

On Sunday, ***British finance minister Philip Hammond said the type of panels used, which are cheaper than non-combustible panels, were banned for use in high rise buildings in Britain, as they are in Europe and the United States***.

*      *      *

The fatal fire was started by a faulty Hotpoint fridge-freezer in one of the apartments, London police said on Friday.  Detective Superintendent Fiona McCormack said insulation on the building, and the ***cladding panels, had failed safety tests carried out after the disaster***.

The police investigation was considering the possibility of manslaughter and criminal offences in respect of the fire.

35

106.    Detective Superintendent Fiona McCormack said insulation on the building, and the cladding panels, had failed safety tests carried out after the disaster.  Experts who saw footage of the blaze were quick to blame the cladding: "You can tell immediately it's the cladding," said Glenn Corbett, an associate professor of fire science at John Jay College of Criminal Justice in New York.

107.    Following these news reports, the price of the Preferred Shares plummeted when trading resumed on Monday, June 26th, 2017, trading down as low as $36.50 per share in intraday trading, down nearly $4 per share, or 9.5% from their close of $40.11 on the evening of Friday, June 23rd, 2017, on unusually high volume of more than 1.4 million shares trading.

108.    On June 26, 2017, Arconic issued a press release announcing it would discontinue global sales of Reynobond PE for use in high-rise buildings after the material was suspected to have contributed to the spread of the deadly fire at the Grenfell Tower apartment complex in London.

109.    Following the publication of additional news reports, the price of the Preferred Shares fell further, trading down as low as $34.39 in intraday trading on June 27th, 2017, and closing down more than $3 per share, another approximately 9% decline from its close of $37.72 per share on June 26th, 2017, again on unusually high volume of 562,520 shares trading.

110.    Then, on April 5, 2018, the BBC reported that, based on an investigation it conducted, "fire tests carried out as early as 2014 [by Arconic] showed cladding used on Grenfell Tower failed to meet the safety standards originally claimed by its manufacturer [Arconic]."[27]

---

[27] *See* Tom Symonds & Claire Ellison, *Grenfell Tower Cladding Failed to Meet Standard*, BBC, April 5, 2018. https://www.bbc.com/news/uk-43558186

111.     Plaintiffs' counsel was able to obtain the results of the fire tests, which demonstrate that since at least October 12, 2011, Arconic knew, but hid from investors, that its product failed to obtain the safety rating necessary to classify the PE cladding as a Class 0 rating that was necessary to meet the government guidelines.  From October 2011 and throughout 2014 and 2015 Reynobond PE consistently failed safety tests as follows:

> **Oct. 12, 2011 CSTB report No. RA11-0244**
> <u>Test</u>: NF EN  13501-1
> <u>Product: Reynobond Architecture PE cassette system 4mm</u>
> **Rated: E**
>
> **Jan. 31, 2014 CSTB report No. 13-0333**
> **Test:** NF EN 13501-1+A1:2013
> Product: Reynobond 55 PE riveted and cassette system
> **Rated: E**
>
> **Dec. 4, 2014** CSTB report No. RA13-0333
> Test: NF EN 13501-1+A1:2013
> Product: Reynobond 55 PE cassette system
> **Rated: E**
>
> **Dec. 4, 2014** CSTB report No. RA14 – 0339
> Test: NF EN 13501-1+A1:2013
> Product: Reynobond 55 PE riveted
> **Rated: C**
>
> **Sept. 22, 2015** CSTB report RA15 – 0200
> Test: NF EN 13501-1+A1:2013
> Product: Reynobond PE riveted system 4mm
> **Rated: C**
>
> **Sept. 22, 2015** CSTB report No. RA15-0201
> Test: NF EN 13501-1+A1:2013
> Product: Reynobond 55 PE cassette system 4mm
> **Rated: E**

112.     These test results, reflecting significant downgrades in the safety classification of Arconic's Reynobond PE products, were concealed from the market.

113.    As explained in the April 5, 2015 BBC, Arconic knew that Reynobond PE had failed the safety tests and as a result, its safety rating had been downgraded.  Nevertheless, Arconic kept this fact hidden.  According to the BBC:

> **The firm Arconic knew the test rating had been downgraded, but the UK body that certifies building products said it was not told about the change.**
>
> An industry source, who has worked on a number of cladding schemes, said he believed there should have been a product recall.
>
> Arconic said it did share the rating with "various customers and certification authorities."
>
> It said the results were also published on the website of the French facility that carried out the tests in 2014 and 2015.
>
> The cladding used on Grenfell was Reynobond PE, aluminium panels containing a plastic filling, that were popular in cost-conscious council refurbishment schemes.
>
> While zinc cladding was initially considered when the tower was refurbished in 2015, Reynobond PE was a cheaper option, saving nearly £300,000.
>
> In the standard European tests for "reaction to fire", products are rated A to F - with A being the top rating. Reynobond PE had a certificate based on a rating of B.
>
> Some in the construction industry regarded this to be the required standard for use on buildings over 18m in height, though the government says this was wrong and it should have been A rated.
>
> The rating was issued in 2008 by the British Board of Agrément (BBA), which used technical data provided by the manufacturer to assess the standard of the panels.
>
> However, the BBC has uncovered a series of reports commissioned by the manufacturer in 2014 and 2015, during the planning for the Grenfell refurbishment.
>
> Two configurations of the cladding, both later to be fitted at Grenfell, were tested.

## Fire testing of Reynobond PE 55

| Year | Type | Test fully completed? | Classification |
|------|------|----------------------|----------------|
| 2011 | Riveted | ✓ | B |
| 2014 | Riveted | ✓ | C |
| 2014 | Cassette | ✗ | E |
| 2015 | Riveted* | ✓ | C |
| 2015 | Cassette* | ✗ | E |

*Translucent core and black core

Source: European classification under EN13501-1 carried out by CSTB, France        B B C

One, known as "riveted", was given a classification of C, not B as was stated on the certificate.

**Another type, the "cassette system", where the panels are formed into shapes before being fitted, was classified as E. In this case, the reports suggest the testing process was not completed.**

*However, the BBC also obtained Arconic correspondence sent to clients from late 2015 in which the company appears to confirm some of the panels were rated class E.*

*The email specifically addresses "concerns about the product's fire reaction class in the UK".*

*The BBC spoke to one source, who has worked on major cladding schemes, though not Grenfell.*

# Letter from the cladding makers to clients, December 2015



Dear partners,

We kindly are coming back to you concerning the issue; you have on the Reynobond fire reaction class in UK.

The British Standard BS476 part 6&7 are not relevant to distinguish between our Reynobond PE and our Reynobond FR. Both are classified "Class 0" when tested in accordance with this standard.

But those 2 products are very different in their behavior when exposed to a flame.
This difference is shown when tested in accordance with the European standard EN 13501 where following classes are achieved:

> Reynobond PE      class E
> Reynobond FR      class B-s1,d0

If further help and ... ... ... then please let us know and we will be happy ... ... for a solution.

Best Regards,

**Claude WEHRLE**
Technical Manager

Reynobond PE      class E

BBC

*He told us the email was not sent to his company's technical department and was only found after an intensive search of all company records following the Grenfell fire.*

*The source said E rated cladding would have been unacceptable in the projects he worked on.*

*"To be blunt," he said, "you wouldn't put E on a dog kennel".*

*He said he should have been informed of the classification results by Arconic with a product recall.*

"We would have had to inform our client who would have had a duty of care to say this material is no longer compliant with building control or building regs and should be removed from buildings."

That will now happen, but only as a result of the Grenfell fire and the loss of 71 lives.

**Fire testing is carried out regularly by companies producing building materials and, because the results are commercially sensitive, they are not made public.**

*Instead, manufacturers share their results with The British Board of Agrément (BBA).*

*After seeing the BBC's evidence the BBA said it "was not notified that there were other test results available in addition to those quoted in the BBA Certificate."*

*"It is a requirement of the certification process that the BBA is informed of information like this."*

*The inspectors who "sign off" construction projects rely on the accuracy of the BBA certificates.*

*Barry Turner, the technical director of Local Authority Building Control, which represents all council building control teams, said: "We are very dependent on the manufacturer telling us there has been a change to that product.*

*"If someone comes with a classification which doesn't meet what's indicated in the building control guidance then we would say 'that's not suitable. Go away and find another product.'"*

\*      \*      \*

**How has Arconic responded?**[28]

Arconic told us: "We previously provided the classification results to various customers and certification authorities, and they were also posted on the CSTB's publicly available website."

The CSTB is the French facility which carried out the tests.

*If the reports were available on its website, they are not now, and the CSTB was not able to provide them.* The BBC obtained them through other sources.

---

[28]   Emphasis in original.

*We could find no mention in Arconic's marketing material of the lower classifications for the cheaper Reynobond PE cladding.*

However, the company advertises more expensive versions of its cladding that were classified A2 and B in the European tests.

Arconic also suggested the BBA certificate could not be relied on alone as a mark of fire safety.

Its statement said: "The relevant UK building codes and regulations require entities who design the cladding system, such as architects, fabricators, contractors, or building owners, to conduct their own full systems testing or analysis of the entire cladding system."

### What more do we know about the Grenfell cladding?[29]

The BBC can also reveal Grenfell Tower was fitted with two different versions of the Reynobond PE cladding.

Arconic changed the makeup of its product, replacing the grey translucent plastic with a black material, also plastic, during the refurbishment of the tower.

It said the change was made to ensure cladding would weather better in direct sunlight and the test results suggest the new version performed better when exposed to flames.

Yet some of the older cladding was already installed on Grenfell and other towers, and was not removed.

### What did our testing of the panels show?[30]

We asked plastics experts at Impact Solutions in Edinburgh to analyse the older and newer versions of the panel for the BBC.

They concluded both were made of polyethylene plastic.

However, chemical analysis suggested the original Reynobond panel had a wax ingredient, possibly added to make it easier and cheaper to form into sheets.

The Impact Solutions experts believe this substance was removed for the newer version of the cladding.

---

[29]   Emphasis in original.

[30]   Emphasis in original.

At our request, the company exposed the panels to a flame under laboratory conditions, demonstrating that the newer version burned for a slightly shorter period than the older.

But both samples caught fire within two minutes, both dropped streams of melted, flaming plastic.

Les Rose, from Impact Solutions, described the speed at which the plastic burnt as "fairly dramatic", observing that it appeared to be "feeding the flames".

He regarded neither type of cladding as adequate for fixing to tall buildings.

Since the Grenfell disaster, Arconic has withdrawn Reynobond PE from the market for all building uses.

The company is now being forced to disclose evidence to investigations by the police and the Grenfell Tower public inquiry.

114.    The video accompanying the April 5, 2015 BBC article provides the following slide:



115.    Arconic concealed from the market the downgraded results and during the Class Period continued to publish on its official website directed to investors false and misleading

certifications about the safety of its Reynobond PE products, claiming that they had a B classification on the Euroclass scale and a Class 0 behavior in relation to fire, meaning they were very safe.

116.    Class 0 rating under U.K. building regulations means that the product has the highest rating for preventing the spread of flames and preventing the spread of heat.  Under U.K. official guidance, in a document entitled "Approved Document B" in place during the Class Period (Approved Document B),[31] Class 0-rated materials can be used as the external surface of walls of buildings over 18 meters.

117.    The BBA certified the Reynobond PE cladding panels as Class 0 in 2008.  More specifically, on January 14, 2008, the BBA issued an Agrément Certification for "Reynobond Architecture Wall Cladding Panels, aluminium/polyethylene composite panels."  The certification states in pertinent part: "Behaviour in relation to fire - in relation to the Building Regulations for reaction to fire, the panels may be regarded as having a Class 0 surface on England and Wales, and a 'low risk' material in Scotland."

118.    The BBA said it was not notified by Arconic about the results of the new tests, which showed that Arconic's Reynobond PE products had been downgraded and did not pass fire tests, thus they could not be used in high rise buildings.

119.    The 210-page report referenced above found that the PE cladding used on Grenfell Tower failed to meet fire safety standards set out in Approved Document B, which caused the rapid spread of flames across the length and breadth of the building.

120.    In connection with the Grenfell Tower investigation in the United Kingdom, described more fully below, an expert witness, Dr. Barbara Lane ("Lane"), prepared an exhaustive

---

[31]    Available at https://www.gov.uk/government/publications/fire-safety-approved-document-b.

report about the fire.  As part of her investigation, Lane was provided with and reviewed the fire safety tests conducted on Arconic's Reynobond PE panels from 2005 to 2015.  She also reviewed the requirements the panels would have to meet to obtain Class 0 status.   In her report, Lane notes that Arconic had its Reynobond PE panels tested for their reaction to fire multiple times by the Scientific and Technical Centre for Building ("CSTB") in France.   CSTB uses the Euroclass standard to classify building products on their level of combustibility and fire resistances.   The highest rating on the Euroclass scale is A1 and the lowest is F.

121.    Lane found that several types of Reynobond PE panels were tested in 2005, 2011, 2014 and 2015.  During those tests, the Reynobond PE panels referred to as the "cassette" style never rated above an E on the Euroclass scale.  An E rating would make the panels ineligible for Class 0 in the U.K. system.  Lane inspected the Grenfell Tower after the fire, and concluded that the cladding used was the cassette style of Reynobond PE.  Thus, even the 2008 BBA  certificate was not factually correct because Reynobond PE panels did not perform as required on fire safety tests.

122.    In 2005, CSTB tested Reynobond 55 PE in its two styles – cassette and riveted. The riveted style met the standard for a B rating in 2005.  As for the cassette style, CSTB could not complete the tests in 2005, so they received no rating. Lane notes the failure to complete the test translates to an E rating.

123.    When the BBA certified the "Reynobond Architecture Wall Cladding Panels, aluminium/polyethylene composite panels," it reviewed the CSTB test for the riveted style, which was rated B, the report states.

124.     Products certified by the BBA are subject to formal review every three years as well as intermediate "variation reports" with associated "corrective actions" after their initial certification, Lane's report states.

125.     The BBA conducted six reviews from 2014 to 2017 of the certification for "Reynobond Architecture Wall Cladding Panels, aluminium/polyethylene composite panels." None of the reports mention any updated fire reaction reports about the panels.

126.     Yet in 2011, 2014 and 2015, CSTB tests of Reynobond PE cassette style rated them an E.   And in 2014, the CSTB tests downgraded the riveted style from a B to a C.  A 2015 CSTB test of the riveted style again rated it a C.  Ratings of E and C on the Euroclass scale make the panels ineligible for a Class 0 rating in the U.K., Lane states in her report.

127.     According to Lane's report, the BBA stated they did not receive any information about the 2011, 2014 or 2015 tests from Arconic.   The BBA statement as cited in Lane's report is as follows:

> It is a contractual requirement on our clients that any changes to formulation and specification of their Certified products are notified to the BBA and that this disclosure takes place prior to the proposed change to the production process being implemented. Arconic did not do this.

128.     In the report, Lane states:

> "I do not know why the BBA appear to have been unaware of the additional test data that I have referred to above. It is concerning that the BBA have indicated that relevant test data was not provided."

129.     In preparing her report, Lane reviewed emails between Arconic and the Grenfell Tower building refurbishment team before the construction.  In an email exchange on April 23, 2014, Arconic sent Harley Facades the outdated 2008 BBA Certificate along with other documents. Lane's report states:

I have seen e-mail correspondence (HAR00000933), disclosed by Harley, that Alcoa (now Arconic Inc.) provided a series of documents on 3rd April, 2014, as a result of a project team exchanges regarding panel colour and costs for Grenfell Tower.

Agrement Certificate 08/4510 (HAR00000934) was attached to this email but is not specifically referred to in the correspondence. The other attachments were COSHH data, colour data, cleaning data and a sample Warranty Specimen document.

Harley forwarded this email and its attachments to Rydon 23rd April 2014 (HAR00000933).

Rydon forwarded the e-mail and attachments including BBA Agrement Certificate 08/4510 to Studio E on 23/04/2014 (SEA00002686). The e-mail contained no instructions or otherwise for Studio E.[32]

130.    HAR0000093 and HAR00000934 are replicated below:

---

[32] Studio E, Rydon, and Harley Facades were the architect and contractors on the Grenfell Tower refurbishment team.

**From:** Mark Harris
**Sent:** 23 April 2014 14:43
**To:** ████████Brydon.co.uk
**Cc:** Mike Albiston
**Subject:** FW: FW: Planning - Rainscreen cladding samples/material
**Attachments:** BBA CERT 08 4510.pdf; COSHH Safety Data Sheet - R8.pdf; Warranty SPECIMEN uk.pdf; Reynobond - cleaning recommendation.pdf; Reynobond_ColourChart_Stendard-GB2011.pdf; Colourchart_BRUSHED-Look_BR14INT_102013.pdf; Reynobond_ColourChart_Effects-GB2011.pdf; ATT00001.txt

Simon

Thought it would be easier to forward you the email and all attachments as received from Debbie French at Aloca. I can't see a reason for this not to be sent as it is, to Bruce, but will leave that decision to your good self!

Regards

Mark Harris
HARLEY.

**From:** French, Deborah █████████████@alcoa.com]
**Sent:** 23 April 2014 13:37
**To:** Mark Harris
**Cc:** Mike Albiston; Geof Blades
**Subject:** RE: FW: Planning - Rainscreen cladding samples/material

Hi Mark

As per your couple of emails I have attached copies of our Reynobond BBA – Specimen Warranty, we will supply the original warranty once we have produced and shipped material, it will be drawn up Project and Site specific, FYI I have also attached copy of our COSHH and Cleaning documents.

In terms of the colour categories and pricing – I can confirm that the following colours are not going to carry any up-charge on prices already discussed and quoted
Anodized Look beginning with L ref – in the Effects Brochure
Chameleon Colours - in the effects brochure
STD Metallic and Solid colours as per our STD colour chart (attached)
We will also include the Stainless Steel B 4537S and Aluminium Brushed Look B 4536S in the attached colour chart.

There would be an up-charge for other colours in the design range for example.

Hope this information is OK but any other questions just let me know or ring me.

WR
Thanks
Debbs

**\*\* Please note I will be away on Holiday from Wed 30th April returning to work on Tuesday 6th May \*\***

1

HAR00000933_0001

5.3  The maximum allowable wind pressure/suction will be the lesser value obtained by considering the panels and fixings separately.

5.4  When calculating wind loads, higher pressure coefficients applicable to corners of the building should be used.

5.5  Design of the sub-frame should be such as to limit mid-span deflections to L/200 and cantilever deflections to L/150.

5.6  Design of the sub-frame attachment to the substrate wall should be such as to ensure adequate pull-out capacity due to wind suction.

5.7  A suitably qualified engineer must check the design and installation of the cladding system.

5.8  The supporting wall must be able to take the full wind, as well as any racking, loads on its own – any contribution from the cladding should be ignored.

5.9  Wind loads should be calculated in accordance with BS EN 1991-1-4 : 2005 and BS 6399-2 : 1997.

**Impact**

5.10  As the products are susceptible to damage from hard body impacts, it is recommended that use is limited to locations where there is little possibility of such impacts, ie at ground level in private areas where there is some incentive to exercise care, and at higher levels in public areas, as described in categories C to F of BS 8200 :1985.

## 6  Behaviour in relation to fire

6.1  A standard sample of the product, with a grey/green Duraglass 5000 coating, when tested for reaction to fire, achieved a classification of B-s2, d0 in accordance with EN 13501-1 : 2002. A fire retardant sample of the product, with a gold-coloured Duraglass finish, when tested for reaction to fire, achieved a classification B-s1, d0 in accordance with EN 13501 : 2002.

6.2  A fire retardant sample of the product, with a metallic grey PVDF finish, when tested in accordance with BS 476-6 : 1989, achieved a fire propagation index (I) of 0 and, when tested in accordance with BS 476-7 : 1997, achieved a Class 1 surface spread of flame.

6.3  As a consequence of sections 6.1 and 6.2, the products may be regarded as having a Class 0 surface in relation to the Approved Document B of The Building Regulations 2000 (as amended) (England and Wales) and Technical Booklet E of The Building Regulations (Northern Ireland) 2000 (as amended) and a 'low risk' material as defined in Annex 2C[1] and Annex 2E[2] of The Building (Scotland) Regulations 2004 (as amended). The unexposed side of the products may also be regarded as having a class 0 surface.

6.4  These performances may not be achieved by other colours of the product and the designations of a particular colour should be confirmed by:

*England and Wales* — Test or assessment in accordance with Approved Document B, Appendix A, Clause 1

*Scotland* — Test to conform with the Table to Annex 2C[1] or Annex 2E[2] of Regulation 9

[1]  Technical Handbook (Domestic).

[2]  Technical Handbook (Non Domestic).

*Northern Ireland* — Test or assessment by a UKAS accredited laboratory or an independent consultant with appropriate experience.

6.5  For resistance to fire, the performance of a wall incorporating the product, can only be determined by tests from a suitably accredited laboratory, and is not covered by this Certificate.

6.6  Cavity barriers should be incorporated behind the cladding, as required by the national Building Regulations, but should not block essential ventilation pathways. Particular attention should be paid to preventing the spread of fire from within a building breaching the cladding system through window and door openings.

## 7  Air and water penetration

7.1  The products are suitable for use in back-ventilated and drained cladding systems.

7.2  The supporting wall must be watertight and reasonably airtight.

7.3  Providing all joints are adequately baffled, the amount of water entering the cavity by wind-driven rain will be minimal. Water collecting in the cavity due to rain or condensation will be removed by drainage and ventilation.

7.4  The air space between the back of the panels and the supporting wall or insulation should be as wide as possible and allow for conventional building tolerances. Guidance on recommended cavity widths is given in NHBC Standards 2007, Chapter 6.9.

## 8  Maintenance

8.1  The painted surface may be cleaned using hot and cold water with a mild cleaning agent using a non-abrasive pad or sponge. General household cleaners should not be used. After cleaning, the surface should be rinsed with clean water. For more difficult chemical soiling, the manufacturer's specialist advice must be sought.

8.2  Annual maintenance inspections should be carried out to ensure that rain-ware is complete and in good order and that such features as tiles, flashings and seals are in place and secure.

HAR00000934_0005



HAR00000934_0001

131.   Later, when the BBA issued a new certificate for the panels in 2017, it downgraded the panels from U.K. Class 0 to a B class on the Euroclass scale.  At the time of their 2017 classification, however, Arconic did not provide the BBA with the 2014 CSTB tests that determined the riveted panels were rated a C and the cassette style was rated an E.  Lane's report concluded that those CSTB tests results make the 2017 BBA also factually incorrect.

132.   An internal Arconic document dated August 2017, from Mr. Claude Wehrle, the Arconic Technical Manager for Arconic's Architectural Products, addressed to a "Dear partner,"

makes clear that Arconic knew that only Reynobond FR and Reynobond A2—but not Reynobond

PE—met the EN 13501 fire safety standards:[33]



**ARCONIC ARCHITECTURAL PRODUCTS**

2, Rue Marie Curie

F- 68500 Merxheim

**Claude WEHRLE**
(33) 3.89.74.47.61
(33) 3.89.74.46.90

Merxheim, August 2017

Dear partner,

CE marking is a big issue for building products and is a proof of quality for the products used in a building.
To apply this mark on a product, it has to be tested and classified in accordance with some European harmonized norms.
ARCONIC ARCHITECTURAL PRODUCTS is very interested in applying the CE marking for Reynobond, but, for the moment, this is not possible because the technical requirements are not defined.

---

[33] It is unclear whether this letter, which is now publicly available, was ever sent and to whom it was sent.

3- *How can you preceed until we can provide the CE marking on Reynobond ?*

Reynobond panels are already qualified in accordance with European standards based on the contribution to the fulfilment of the six Essential Requirements, as stated in the Construction Products Directive.

Essential Requirements (from ER1 to ER6) are:

**ER1: Mechanical Resistance and Stability**
This specifications are treated in the different national Reynobond Technical approvals.

| | |
|---|---|
| France (CSTB): | Avis Technique « Reynobond Système cassette » |
| | Avis Technique « Reynobond Système Riveté et vissé » |
| Germany (DIBt) : | Allgemeine bauaufsichtliche Zulassung |
| United kingdom (BBA) : | Agrément Certificate |
| Poland (ITB) : | Aprobata Techniczna |

**ER2: Safety in case of fire**
Reynobond FR is classified B-s1,d0 in accordance with EN 13501 standard
Reynobond A2 is classified A2-s1,d0 in accordance with EN 13501 standard

**ER3: Hygiene, Health and environment**
Merxheim plant is ISO 14001 Certified
An Environmental Product Declaration (EPD) is available

**ER4: Safety in use**
Effect of wind load action, impact resistance and effect of seismic actions, are validate in our national  technical approvals (see ER1)

**ER5: Protection against noise**
Not relevant

**ER6: Energy economy and heat retention**
Not relevant

All the ER's mentioned above must be fulfilled for the life of the product.

All those tests results can be provided by ARCONIC on request.

If you have further questions concerning these issues please don't hesitate to contact us.

Best Regards,

Arconic Architectural Products SAS
2 rue Marie Curie
F - 68500 Merxheim
Siret 916 220 502 000 71

ARCONIC ARCHITECTURAL PRODUCTS

*C.WEHRLE*
*Technical Manager*

     133.    During the Class Period, Wehrle in his capacity as Arconic's Technical Manager was responsible for the certification of Arconic's Reynobond PE products.  Wehrle was also the designated Arconic representative involved in corresponding with CSTB, the entity that conducted the fire tests of Reynobond PE at Arconic's request.  As explained above, CSTB significantly downgraded Reynobond PE, a fact that Arconic concealed from the market and the BBA.



134.   During the Class Period, Wehrle was also responsible for communicating with the BBA about the certification of Arconic's Reynobond PE products.   Arconic concealed from the BBA the test results performed by CSTB, which significantly downgraded these products. Accordingly, the BBA continued to maintain its 2008 rating certification of Reynobond PE, which misleadingly showed that the products were rated Class 0 and Euroclass B:



*Our Ref:*   S1/60286

**BBA**

Bucknalls Lane,
Watford
Herts WD25 9BA
D
E          [redacted]@bba.star.co.uk
W  www.bbacerts.co.uk

15 November 2016

Claude Wehrle
1 rue du Ballon
Merxheim
France
68500

Dear Claude Wehrle,

**Re: Review of Certificate 08/4510 – Reynobond Architecture Wall Cladding Panels – January 2014 to November 2016**

The Review confirmed that the technical specification, manufacturing controls and performance of the product continue to be satisfactory and in the opinion of the BBA the product remains fit for purpose.

Agrément Certificate 08/4510 remains valid but needs to be reissued for the following reasons:

- Change of company name from Alcoa Architectural products to Arconic Architectural Products sas
- Updates to the national Building Regulations
- Updating of reference to Construction (Design and Management) Regulations
- Updating of references to Technical Standards
- Updating of the reference to NHBC Standards
- Removal of the Zurich Building Guarantee Technical Manual 2007
- Inclusion of a new paragraph regarding the manufacturing process
- Updates to the fire section, including reference to the necessary height and boundary restrictions, where appropriate Update of Certificate format
- Re-assessment of impact resistance test data to a current Standard (ETAG 34 –I : 2012 ) and update to impact categories in section 5 as necessary, following the withdrawal of BS 8200
- Change of the name of the product to Reynobond 55, in accordance with Certificate holder's product literature
- Change of the name of the coatings to Duragloss 5000 and PVDF 70/30, in accordance with Certificate holder's product literature
- Other editorial updates as necessary

**Action Required**

The Certificate holder must take up the Reissue Contract currently being prepared by BBA by the 3rd March 2017 for the validity of the Certificate to continue.

**Next Review Date**

Subject to the above Reissue contract being taken up, the next Review date will be 14/01/2020.

Yours sincerely,                                                      Authorised by,

*Valentina Amoroso*                                          *Prayer Nkomo*
Valentina Amoroso                                            Prayer Nkomo
Project Manager                                                Team Manager
Engineering                                                         Engineering

| Product Approval | Installer Approval | Test Services | Management Systems |

The UK Representative in EOTA (European Organisation for Technical Assessments) and in the UEAtc (European Union of Agrément).
UKAS Accredited Calibration Laboratory No. 0133 / Testing Laboratory No. 0357 / Certification Body No. 0113 / Inspection Body No. 4345
British Board of Agrément, a company limited by guarantee, registered in England No 878293. Registered Office: Bucknalls Lane, Garston, Watford, Hertfordshire WD25 9BA.

GTID0000409

ARC00000410_0001

135.   During the Class Period, Arconic continuously misrepresented on its official

website that Reynobond PE achieved a superior Class 0 rating and an Euroclass B rating:

Reynobond . . . composite and aluminum sheet panels are certified in more than 15
countries by certifying bodies such as BBA, CSTB  or ISO.

> Fire certificates for Reynobond Architecture: Great Britain BS476 part 6 & 7: Reynobond PE & FR: Class 0; Great Britain BBA Agreement BBA08/4510, classifying the PE panels as Class 0.

> Behaviour in relation to fire: when tested for reaction to fire, [product] achieved a classification of B-s2 . . . As a consequence . . . the product[s] may be regarded as having a Class 0 surface.

136.    These representations appeared not in brochures, but on the Company's official website.

137.    Throughout the Class Period, Arconic repeatedly emphasized in filings with the SEC the importance to shareholders of the quality of its products, stating that "we deliver [our] products at a quality and efficiency that ensure customer success and shareholder value."

138.    During the Class Period, investors relied on Arconic's false and misleading representations related to the specific certifications of Reynobond PE.

139.    Wehrle, as the Technical Manager responsible for the classification of the Reynobond PE products, approved, reviewed, ratified, furnished information and language for inclusion, recklessly disregarded and/or tolerated Arconic's false representations about the specific classifications and qualities of these products.

**CONFIDENTIAL WITNESSES CONFIRM THAT ARCONIC'S MANAGEMENT KNEW THAT THE COMPANY WAS DEPLOYING UNSAFE SALES TACTICS BY SELLING REYNOBOND PE FOR UNAUTHORIZED USE**

140.    According to a November 21, 2007 article titled *Alcoa adopts Oracle consolidated global database*,  Alcoa adopted a global database system in 2007 in order to ensure that their data was centralized and accessible across the company:

> Aluminium supplier Alcoa has upgraded its multi-terabyte data warehouse to Oracle Database 10g and Oracle Real Application Clustersto improve efficiency.

> Using the system Alcoa's executives are now able to access, manage and integrate global data from a single source to business analytics applications, such as Oracle's Hyperion Essbase, Hyperion Financial Management and Hyperion Planning - all components of Oracle Fusion Middleware.

Alcoa consolidated data from four regional instances of the Oracle E-Business Suite it has deployed globally into a single, global repository, to support its business analytics, enterprise performance management, and master data management initiatives.

With Oracle Real Application Clusters, Alcoa is able to incrementally add server capacity to adapt easily to growing business demands without disruption.

"The clustered database architecture that we have deployed has satisfied our business and performance requirements," said Matthew Schroeder, manager for business information and technologies at Alcoa.

"It also offers us the flexibility we need for future growth. The newly re-architected global data warehouse features, in addition to more powerful processors, improved performance and provides additional capacity for applications and users," he said.

141.     According to a confidential witness ("CW1") with first-hand knowledge of the matters he/she discussed herein, Defendant Kleinfeld was very familiar with Arconic's Reynobond PE panels.  CW1 worked at Arconic as a Marketing Manager and as a Global Marketing Director between 2000 and 2011, including working at the Company's Merxheim, France office, where the Reynobond PE products were manufactured for use in the U.K. and other parts of Europe.  As a marketing manager for Arconic, CW1 oversaw the Company's efforts to market the brand names and product lines integrated into the Company from Reynolds, namely the Reynobond product line, which included both Reynobond and Reynolux panels.  CW1 also worked with the Company's Commercial Director responsible for Reynobond in Merxheim, France, Guy Scheidecker.  Scheidecker developed and implemented the Company's business strategy for Reynobond in the U.K., CW1 said.

142.     On Arconic's website, Scheidecker was quoted at length regarding the benefits of Reynobond, referred to by its brand name, "Reynobond Architecture":

Scheidecker:  Reynobond Architecture is a composite panel consisting of two coil-coated aluminium sheets that are fusion-bonded to both sides of a polyethylene core or – depending on the model – of a highly fire retardant core. This dual chemical and mechanical priming allows for exception, long-lasting resistance to peeling between the sheet and the core.

And even more: Reynobond® Architecture Panels weigh 1.6 times less than comparable pure aluminium panels. And the Reynobond® Architecture Panels offer outstanding mechanical characteristics: They are extremely rigid and possess a very low coef cient of expansion during temperature fluctuations. Then top it off with the simple processing and increased impact resistance as well – all factors that are important in everyday use.

*　　*　　*

Reynobond® Architecture was specially developed for complete façade concepts with the most diverse of fastening methods. You can screw, bolt, rivet, glue or solder it with hot air. And to create ventilated facades, you can use flat, bent or machined Reynobond® Architecture sheets in cassette systems.

*　　*　　*

Reynobond® Architecture is suitable for use in temperature ranges from – 50 °C to + 80 °C. Let's take an example: In Alaska the temperatures in winter easily sink to negative 45 °C, but in summer it can get really hot in this region. For this reason the new Alaska Museum was clad with composite panels from Reynobond® Architecture, because the material can withstand their temperature extremes without a problem. Other parts of the world may not have it quite so extreme, but their temperatures may fluctuate considerably as well. With Reynobond® Architecture you are always on the safe side with temperature fluctuations.

143.    CW1 also served as the liaison between Arconic's North American and European operations.  According to CW1, the European Sales and Marketing Department was made up of about only 12 sales and marketing employees, all reporting directly to Scheidecker.  Marketing Managers Gerard Sonntag and Virginie Leicht were two of those employees.  Another was U.K. Sales Manager Debbie French.  The European sales team was made up of one salesperson in Italy, one salesperson in the U.K., two or three in France and one in Germany, said CW1.  CW1 communicated with Scheidecker on a regular basis, coordinating global marketing efforts with him in Europe.  CW1 said that he/she did not recall hearing any specific marketing plans in the U.K. While "the sales approach would differ for different countries based on what building code testing was needed," CW1 said the "same marketing strategy was pretty much applicable everywhere."

144.    As a Marketing Manager with Arconic, CW1's job was to strategize ways of marketing Alcoa's Reynobond and Reynolux panels to architects and customers, typically subcontractors on construction projects.   CW1 worked with upper management and sales professionals at Arconic along with outside advertising firms to support Reynobond and Reynolux sales.   As a Global Marketing Director, CW1 was involved in product development and competitive market intelligence operations.   CW1's focus across those activities was always the Reynobond product line throughout his employment at Arconic.

145.    According to CW1, Defendant Kleinfeld was very familiar with the Reynobond products.   CW1 explained that Kleinfeld met with CW1 and other senior employees working at the Company's Merxheim, France office sometime in 2007 or 2008.   Kleinfeld was traveling in Basel, Switzerland and decided to visit the Merxheim office to learn more about the Reynobond business, CW1 said.   During the meeting, Craig Belnap (President of Alcoa Architectural Products) and Claude Schmidt ("Schmidt") (General Manager at the Merxheim facility) led a presentation on Reynobond and its products including Reynobond PE, Reynobond FR and Reynolux.  The two, with help from CW1, discussed Reynobond financials and sales and explained their roles within the business group.   Scheidecker also attended the meeting.   CW1 created PowerPoint slides for the presentation.   The slides included pictures of various construction projects with Reynobond PE or FR cladding.

146.    As a result of the meeting, Kleinfeld knew that the PE and FR panels were different and that the FR panels were to be used when the specifications and building codes for a project called for fire resistant panels, CW1 said.

147.    CW1 explained that "everybody knew" that Reynobond PE panels would burn because they could not pass multi-story fire tests.  It was "universally known" throughout the

construction industry that polyethylene panels were not supposed to be used on high rise buildings, CW1 said.

148.    For example, the polyethylene version of Reynobond, Reynobond PE, was only allowed to be used as a cladding material in the U.S. up to 40 feet as required by U.S. building codes, CW1 said.  The only Reynobond product allowed to be used above 40 feet high was the Company's fire-retardant product, Reynobond FR.  That was because Reynobond PE "burns very readily," as footage of the Grenfell Tower burning showed, according to CW1.   Further, Reynobond PE had not passed one of two major fire tests required by U.S. building codes.  Both Reynobond PE and Reynobond FR passed the U.S. "smoke and flame test" (ASTM E 84) but only Reynobond FR passed the U.S. "multi-story fire test" (NFPA 285), CW1 said.

149.    While the ASTM E 84 and NFPA 285 tests are standards for the U.S. specifically, there are equivalent standards in other jurisdictions, according to CW1.  In Canada, for example, construction materials need to pass the S134 multi-story fire test to be used above a certain height.  In Europe, each jurisdiction is different but most have a comparable test and standard for cladding materials like Reynobond.

150.    According to CW1, all the sales managers at Arconic knew what type of materials the Company supplied for its projects.  They accessed and tracked information on the projects for which they sold Reynobond panels in a construction project database.  Senior level executives were briefed on statistics like Reynobond sales, market share and growth, CW1 said.

151.    Arconic salespeople used the construction project database to develop business, CW1 explained.  The database included information on new projects and their specifications as determined by each project's architect in accordance with local construction codes, CW1 said.  The specifications displayed in the database were detailed descriptions of materials to be used

including prescribed wall panels and insulation systems.  A building's cladding material would be specified within the database, CW1 noted.

152.    As CW1 explained, Alcoa's sales team accessed the database to find projects that they could refer to potential customers – subcontractors who worked on the project's construction – with the goal of selling Reynobond panels for the project identified.  Subcontractors in turn used the database's specifications to guide them in their project bids.  It is not uncommon in the construction industry for subcontractors to bid on a project and then deviate from that project's specifications after they have won the bid, according to CW1.  In those instances, Arconic sales employees would learn which Reynobond product was being used for a project when a subcontractor asked for a new quote, usually for a building material that was cheaper than the one specified in the database.  Those quotes were requested and provided via email, CW1 said.

153.    CW1 explained that "[b]ecause you can't sell or market unless you have the testing – that's your ticket to the market – and your building code approval or multistory fire test or the system test."  "I know very well that you can't sell into a market unless you have the 'OK,' so to me it was always an assumption that if we're selling there we have it," CW1 said.

154.    CW1 said that Arconic's top management knew about the fire test results of Reynobond PEs.  CW1 explained that when a Reynobond panel received bad test results, *i.e.*, a panel failed a fire reaction test, it would have been reported to Claude Schmidt, the general manager of Arconic's Merxheim, France plant.  "The GM would be aware of the test results because (it would be discussed) in a meeting," CW1 said.  "If the material passed, (the report) would say it did pass. If it didn't pass, it would come up as an issue."  When asked about it, CW1 said if fire reaction test results from CSTB would negatively impact the demand for a product,

Schmidt would be informed of it as well.  "If it were going to affect directly the marketability of a product in a country, yes," the results would be presented to Schmidt, CW1 said.

155.    CW1 explained that the Technology Department in Merxheim submitted and received results of the fire reaction tests.  Claude Wehrle was the head of the Technology Department.  According to CW1, the Technology Department coordinated the submission of Reynobond panels to CSTB for testing and also received the CSTB reports of the results.  CW1 said those test results also would have been reported to Guy Scheidecker, Marketing and Sales Director at the time.

156.    CW1 noted that Arconic's Reynobond PE panel referred to as the "cassette" system is the same product as the Reynobond PE "riveted" system.    "Those are not different products," CW1 said.  The riveted vs. the cassette system referred to the fact the panels "are attached to the building in different ways."  "Reynobond PE is Reynobond PE is Reynobond PE," he said. "It doesn't matter what the name is after that."

157.    CW1 said that in the U.S., Arconic did not submit Reynobond PE panels for tests that rated its fire resistance because it's well-known the panels would fail such tests.

158.    According to a confidential witness ("CW4") with first-hand knowledge of the matters he/she discussed herein, Arconic's management was aware that the Company had a practice of systematically selling Reynobond PE for application on high-rises.  CW4 was a Sales Manager at Arconic Architectural Products based in France from June 2013 to July 2017.  CW4 reported to Alain Flacon, who was the Commercial and Marketing Director of Arconic Architectural Products.  CW4 sold Reynobond panels, including the polyethylene (PE) kind, in his sales territory of Southern Europe, the Middle East, and Africa.

159.    CW4 visited the Merxheim plant for meetings about four to five days a month. CW4 attended meetings twice a year at the plant during which Schmidt discussed the sales reports and forecasts.  The Reynobond PE made up 75% of the panels made and sold by the Merxheim plant compared to Reynobond FR, which made up 25%.

160.    CW4 explained that the General Manager of the facility where Arconic Architectural Products were made was aware from sales reports that the Reynobond PE panels were being sold for use in high-rise projects, which was the common practice at the Company. CW4 said the Reynobond PE panels were much more commonly purchased and used than more fire-resistant panels because the PE type was less expensive.

161.    Due to the higher popularity of PE panels, the sales reports of Arconic Architectural Products reflected a large majority of the Company's panel sales were for Reynobond PE and only a small percentage were of the more fire resistant Reynobond FR panels, CW4 said.  Claude Schmidt, the General Manager of the Merxheim plant, where all the panels were made, regularly reviewed these AAP sales reports about the Reynobond panels, according to CW4.  Schmidt also reviewed reports about production levels at the plant for each panel type.  Based on the sales and production reports, Schmidt was also aware that the factory was producing and selling a much larger percentage of PE panels compared to FR panels, and that many of Arconic's customers were building high-rises.  Considering the sales and production reports along with the knowledge many of Arconic's customers were building high-rises, Schmidt was aware that Reynobond PE panels were being sold for use on high-rise buildings, CW4 said.'

162.    "These guys (Schmidt and Flacon) are looking into the figures and when you see the Reynobond sales you see the big majority of Reynobond are made with PE," CW4 said.  "A few quantities are made with FR. When you check sales statistics, you see the PE is in the biggest

majority. So, you understand of course…" that PE panels were being sold for use on high-rise buildings.  A majority of those projects in France and Germany, the UK and other parts of the world used to be (the construction of) towers," CW4 said.  Arconic kept an internal database of what AAP panels were sold to what type of building projects.  CW4 explained that during his employment from June 2013 to July 2017, part of his sales job included inputting details about his sales projects into an internal database.  CW4 referred to it as a CRM or a Customer Relations Management software system.  "From all steps of the project. The design step, the architectural level, then the tender (sale) step… and the execution step when we sent the product to the distributor or directly to the cladder or installer."

163.    Based on his personal knowledge of what CRMs include, CW4 said the Grenfell Tower project would have included information about the scope and description of the project, the architect, the general contractor for the project, the façade designer, the cladding installers and if there was one, the distributor.  The CRM details for such a project would also include information about the initial proposals for the type of panels the customer planned to use for the project and the amount needed.  This would later be updated with the final choice for which panels would be used.

164.    The CRM would track the project until the panels were shipped to the customer, CW4 said.  CW4 said his manager Flacon could review the details in the CRM at anytime, and that Flacon regularly reviewed reports from the CRM. CW4 said Flacon was able to see in the CRM that Reynobond PE panels were being sold for use in high-rise buildings.

165.    CW4 said that Schmidt was aware that PE panels were being installed on high-rise buildings based on the reasons described above.

166.    There was general awareness at Arconic Architectural Products that the Reynobond PE panels were being sold for use on high-rise towers throughout the world, explained CW4.  "We were aware about the fact that these kind of panels (the flammable, less expensive versions) were installed on high-rise buildings not only in the UK," CW4 said.

167.    During the Class Period, Schmidt and Flacon approved, reviewed, ratified, furnished information and language for inclusion, recklessly disregarded or tolerated Arconic's false representations related to Arconic's PE products and the Company's risk mitigation and compliance.

168.    Confidential witness 2 ("CW2") is a Managing Director of a U.K. overcladding business that has been involved in removing combustible Reynobond PE cladding from high rise tower blocks in the U.K.  CW2  has worked in the cladding industry for more than 30 years.  CW2 explained that the setup of many contracts is led by manufacturers such as Arconic—described as "system suppliers" who would work very closely with consultants (including architects) to ensure that their product is named on the specification documents for development schemes.  That process happened before any procurement or contractor (e.g., Rydon) coming on board.  System suppliers (i.e., manufacturers) closely watched events in the industry.  As a matter of practice, system suppliers were aware of all events, both regulatory and incident-led (such as fires), as they were asked questions about such events regularly.  As a system supplier, Arconic would have been aware at a number of management levels of the fires reported in the U.K. and worldwide.

169.    CW2 explained that his/her business would refuse to engage with high-rise projects that had flammable cladding and that they would tender instead for a solid aluminium cladding system.  CW2 said that they would win 1 out of 10 bids, often because they would not agree to, or would question the use of, flammable cladding with the consultant or architect.  CW2 stated that

on some schemes, the ultimate client changed their opinion after listening to their advice concerning the use of flammable cladding ACM, but that such comments were not often welcomed by the consultants.

170.     CW2 estimated that Arconic's global market share of ACM is roughly 30% . CW2 said that Arconic and Alcobond were known to be the two major suppliers of U.K. ACM in the market, with relatively similar levels of sales. CW2 estimated that, between the two companies, Arconic and Alcobond had approximately 80% of the U.K. market. Individually, CW2 estimated that Reynobond PE would constitute 30% of the U.K. cladding market. According to Gary Strong, Global Building Standards Director at the Royal Institute of Chartered Surveyors, the number of private high-rise buildings in the U.K. with flammable ACM core was approximately 600. In addition, the U.K. government identified approximately 170 non-private high-rise buildings in the U.K. The 30% estimate means that approximately 230 buildings in the U.K. contain Arconic's Reynobond PE products.

171.     CW2 explained that often, because of the equal rating for many of the products such as the PE and the FR Class O Reynobond, they could be swapped without recourse to planning or documentation, as they had the same rating. That had been an issue when looking to establish which materials were used where.

172.     According to CW2, in terms of business practice, the sale of Reynobond PE was not part of a single sale but formed a core part in a sales strategy to supply the high-rise cladding market. The cost of all the constituent parts of this strategy—including marketing, sales, testing costs, registration of materials and multiple types of product systems for U.K. and global market—meant "there was no way that such plans would not have been used or known at a high level."

173.     According to CW2, one of the reasons Arconic provided Reynobond PE was because the aluminum and the core material stick best when using PE and there is more risk the FR will delaminate.  CW2 also stated that a lack of data within the industry at the government and testing levels meant that they had to rely on tests with materials supplied by manufacturers for their information on performance.   However, CW2 said that the issue was that "only the manufacturer actually knows exactly what materials are being tested.  The testing bodies do not know, they have to trust the manufacturer on their word that what they are testing is what is described."

174.     Confidential witness 3 ("CW3"), an executive of a U.K. manufacturer of engineered facade and roofing systems for the architectural sector, specializing in accredited limited combustibility solutions, said he/she identified at least  three high-rises which were cladded in PE, where his company was involved as a fabricator of other products.

175.     CW3 said that "Before Grenfell I didn't know the core [of many ACM cladding panels] was PE, I am an expert now.   It was generally, however, industry practice to use FR [Fire Resistant version of the ACM] in high-rises.

176.     CW3 remarked that "Reynobond was unique as a manufacturer as they were the only company to have PE ACM classed as "B" rating.   Everybody else had only ever got a "D" rating.   For years everybody in the industry said, 'There is no way their FR material is the same [fire rating] as their PE material.'"

## SECURITIES ACT ALLEGATIONS

## THE PREFERRED IPO

177.     On or about July 11, 2014, Arconic filed with the SEC a Registration Statement on Form S 3, which would later be utilized for the Preferred IPO following an amendment made to it on July 25, 2014.  The Registration Statement was filed pursuant to SEC Rule 415 permitting the

Company to sell up to $5 billion of any combination of its securities (including debt securities, Class B Serial Preferred Stock, Depository Shares, Common Stock, Warrants, Stock Purchase Contracts or Stock Purchase Units), in yet unspecified amounts, on yet undetermined dates.  The Registration Statement expressly incorporated by reference certain past and future filings the Company made with the SEC, stating, in pertinent part, as follows:

**Incorporation by Reference**

The rules of the SEC allow us to incorporate by reference in this prospectus the information in other documents that we file with it, which means that we can disclose important information to you by referring you to those documents.  The information incorporated by reference is considered to be a part of this prospectus, and certain information in documents that we file later with the SEC will automatically update and supersede information contained in documents filed earlier with the SEC or contained in this prospectus.  We incorporate by reference in this prospectus the documents listed below and any future filings that we may make with the SEC under Sections 13(a), 13(c), 14, or 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), on or after the date of this prospectus and before the termination of the offering . . . .

- Our Annual Report on Form 10-K for the year ended December 31, 2013;

- Our Quarterly Reports on Form 10-Q for the quarters ended March 31, 2014 and June 30, 2014; and

- Our Current Reports on Form 8-K filed January 10, 2014 (Item 1.01 and Exhibit 99.1 of Item 9.01), January 21, 2014, January 23, 2014, February 21, 2014, March 18, 2014, April 14, 2014 (Item 8.01), May 8, 2014 (Item 5.07) and June 27, 2014 (Items 1.01 and 3.02 and Exhibits 2.1, 10.1 and 10.2 of Item 9.01).

178.    On July 30, 2014, the SEC declared the Registration Statement effective.  On or about September 18, 2014, Arconic and the Underwriter Defendants priced the Preferred IPO and filed the final Prospectus for the Preferred IPO, which forms part of the Registration Statement (collectively, the "Registration Statement").

179.    The Preferred IPO was successful for the Company and the Underwriter Defendants, who sold 25 million Arconic Depositary Shares, each representing a 1/10th Interest

in a Share of 5.375% Class B Mandatory Convertible Preferred Stock, Series 1, to the public at $50 per share, raising $1.25 billion in gross proceeds for the Company ($1.2125 billion in net proceeds from the Preferred IPO after deducting underwriting discounts, commissions and offering costs).

### The Registration Statement Contained Inaccurate Statements of Material Fact and Omitted Material Information Required to Be Disclosed Therein

180.    The Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and was not prepared in accordance with the rules and regulations governing its preparation.

181.    First, the Registration Statement negligently failed to disclose that Arconic was selling Reynobond PE – a cladding that created a significant risk of catastrophe when used improperly – for unauthorized, unsafe use.    Second, the Registration Statement contained inaccurate statements of material fact about the Company's practices and policies concerning safety and risk management.    Third, the Company failed to identify and disclose known trends, events, demands, commitments, or uncertainties that were reasonably likely to have a material effect on the Company's operating performance.    Finally, the Registration Statement failed to identify and disclose known risks that made an investment in Arconic risky or speculative.

182.    The Registration Statement was negligently prepared because while the Company warned that it could be subject to certain civil or criminal liabilities, including product liability claims, it failed to warn that  at the time of the Preferred IPO, Arconic was selling Reynobond PE for unauthorized and unsafe use on high-rise towers.  This was exacerbated by the fact that, by the time of the Preferred IPO, CSTB testing had downgraded the cladding's safety rating, revealing that the cladding no longer qualified for a Class 0 certificate  Defendants knew that by selling

Reynobond PE for use on these towers, it created a significant risk that the buildings to which it was applied were unsafe, yet the Registration Statement failed to disclose this risk.  Specifically, the 2013 10-K represented stated in pertinent part:

> ***Alcoa may be exposed to significant legal proceedings, investigations or changes in U.S. federal, state or foreign law, regulation or policy.***[34]
>
> Alcoa's results of operations or liquidity in a particular period could be affected by new or increasingly stringent laws, regulatory requirements or interpretations, or outcomes of significant legal proceedings or investigations adverse to Alcoa.  The Company may experience a change in effective tax rates or become subject to unexpected or rising costs associated with business operations or provision of health or welfare benefits to employees due to changes in laws, regulations or policies.  ***The Company is also subject to a variety of legal compliance risks. These risks include, among other things, potential claims relating to product liability, health and safety, environmental matters, intellectual property rights, government contracts, taxes, and compliance with U.S. and foreign export laws, anti-bribery laws, competition laws and sales and trading practices.  Alcoa could be subject to fines, penalties, damages (in certain cases, treble damages), or suspension or debarment from government contracts.***
>
> ***While Alcoa believes it has adopted appropriate risk management and compliance programs to address and reduce these risks, the global and diverse nature of its operations means that these risks will continue to exist, and additional legal proceedings and contingencies may arise from time to time.***  In addition, various factors or developments can lead the Company to change current estimates of liabilities or make such estimates for matters previously not susceptible of reasonable estimates, such as a significant judicial ruling or judgment, a significant settlement, significant regulatory developments or changes in applicable law.  A future adverse ruling or settlement or unfavorable changes in laws, regulations or policies, or other contingencies that the Company cannot predict with certainty could have a material adverse effect on the Company's results of operations or cash flows in a particular period.

183.    The statements referenced above in ¶182 were inaccurate statements of material fact because they failed to disclose the following material facts which existed at the time of the Preferred IPO:

---

[34]  Emphasis in original.

(a)     that Arconic was selling and/or negotiating to sell Reynobond PE for use in construction projects where the product was to be used in a manner that the Company knew was unsafe and presented a fire hazard;

(b)     that Arconic's assurances of effective risk management and compliance programs concealed from investors the immense risk Arconic assumed through its sales and marketing practices; and

(c)     as a result, Defendants' statements about safety, risk management and compliance, and efforts to address and reduce risk were materially false and misleading and/or lacked a reasonable basis.

**Omissions Based On Violations of Items 303 and 503**

184.    Item 2 of Form 10-Q requires SEC registrants to furnish the information called for under Item 303 of Regulation S-K [17 C.F.R. §229.303], *Management's Discussion and Analysis of Financial Condition and Results of Operations* ("MD&A").  Among other things, Item 303 of Regulation S-K required Arconic's Form 10-K for the fiscal year ended December 31, 2013 (the "2013 10-K")—which Arconic filed with the SEC on February 13, 2014 and which was signed and certified pursuant to the Sarbanes Oxley Act of 2002 by the Officer Defendants—to disclose known trends or uncertainties that were reasonably likely to have a material impact on Arconic's revenues or income from continuing operations.

185.    In 1989, the SEC issued interpretative guidance associated with the requirements of Item 303 of Regulation S-K concerning the disclosure of material trends or uncertainties.  In particular, the interpretative guidance specifically states that when an SEC registrant knows of a known uncertainty that is reasonably likely to have a material effect on its future operating results exists, disclosure is required.  The interpretative guidance states, in pertinent part, as follows:

A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

\*      \*      \*

*Events that have already occurred* or are anticipated *often give rise to known uncertainties*.  For example, a registrant may know that a material government contract is about to expire.  The registrant may be uncertain as to whether the contract will be renewed, but nevertheless would be able to assess facts relating to whether it will be renewed.  More particularly, the registrant may know that a competitor has found a way to provide the same service or product at a price less than that charged by the registrant, or may have been advised by the government that the contract may not be renewed.  The registrant also would have factual information relevant to the financial impact of non-renewal upon the registrant.  *In situations such as these, a registrant would have identified a known uncertainty reasonably likely to have material future effects on its financial condition or results of operations, and disclosure would be required*.

186.     In 2003, the SEC issued additional interpretative guidance relating to the requirements of Item 303.  Such guidance states, in pertinent part:

*We believe that management's most important responsibilities include communicating with investors in a clear and straightforward manner.  MD&A is a critical component of that communication*.  The Commission has long sought through its rules, enforcement actions and interpretive processes to elicit MD&A that not only meets technical disclosure requirements but generally is informative and transparent.

187.     Thus, the MD&A disclosure in Arconic's 2013 10-K, which was incorporated by reference in the Registration Statement, contained inaccurate statements of material fact or failed to disclose material facts.  Specifically, the Registration Statement failed to disclose that Arconic was selling Reynobond PE for use in construction projects in a manner that the Company knew was unsafe and presented a fire hazard, and which conflicted with the safety and risk management safeguards that the Company purported to offer.

188.     Additionally, the MD&A disclosure in the 2013 10-K failed to disclose that because Arconic had been knowingly selling its Reynobond PE panels for unapproved and unsafe use, the

Company created the risk that a catastrophe would occur, exposing itself to significant civil, regulatory and/or criminal liability.

189.    The uncertainty associated with these sales practices was reasonably likely to have a material impact on Arconic's profitability, and, therefore, was required to be, but were not, disclosed in the Registration Statement.

190.    Defendants also violated their affirmative disclosure duties imposed by Item 503[35] of Regulation S-K, 17 C.F.R. §229.503(c),  which governs disclosure of risk factors and requires an issuer to "provide under the caption 'Risk Factors' a discussion of the most significant factors that make the [securities] speculative or risky."  Specifically, Item 503 requires the issuer to "[e]xplain how the risk affects the issuer or the securities" and to "[s]et forth each risk factor under a subcaption that adequately describes the risk."  Additionally, the SEC further instructs issuers, in Item 1A to Part I of the General Instructions governing the preparation of an issuer's annual report on Form 10-K, to "[s]et forth, under the caption 'Risk Factors,' where appropriate, the risk factors described in Item 503 of Regulation S-K," codified at 17 C.F.R. §229.503. Item 1A to Part II of the General Instructions governing the preparation of an issuer's quarterly report on Form 10-Q similarly requires the issuer to "[s]et forth any material changes from risk factors as previously disclosed in the registrant's Form 10-K (§249.310) in response to Item 1A. to Part [I] of Form 10-K."

191.    Because Item 1A of Form 10-K requires SEC registrants to furnish the information called for under Item 503 of Regulation S-K.  This required that Arconic's 2013 Form 10-K, which

---

[35] Effective May 2, 2019, the SEC relocated Item 503(c) to Item 105 of Regulation S-K to reflect that the Item applies to periodic reporting, as well as registration statements.  *See* FAST Act Modernization and Simplification of Regulation S-K, 84 Fed. Reg. 12674 (April 2, 2019); *see also* 17 C.F.R. §229.105.

was incorporated by reference in the Registration Statement, disclose the most significant matters that make an investment in Arconic risky.

192.    Defendants violated the affirmative disclosure duties imposed by Item 503 of Regulation S-K by failing to disclose that Arconic was selling its product for unauthorized misuse and that the danger created by the unsafe application of Reynobond PE would potentially expose the Company to significant criminal and/or civil liabilities, thereby making an investment in Arconic risky or speculative.  The uncertainty associated with these sales practices was reasonably likely to have a material impact on Arconic's profitability and, therefore, these practices were required to be, but were not, disclosed in the Registration Statement.  In the Registration Statement, Defendants included a Risk Factors section discussing the most significant factors that make an investment in Arconic speculative or risky.  Defendants, however, failed to disclose that Arconic was selling and/or negotiating to sell Reynobond PE for unsafe and unpermitted installation on high-rise towers, which made an investment in Arconic risky or speculative.

193.    While the 2013 10-K represented that "Alcoa may be exposed to significant legal proceedings [and] investigations" and that the "Company is . . . subject to a variety of legal compliance risks," including "potential claims relating to product liability, health and safety . . . .and compliance with U.S. and foreign export laws . . . and sales and trading practices.  Alcoa could be subject to fines, penalties, damages (in certain cases, treble damages), or suspension or debarment from government contracts," it also represented that the Company ***"believes it has adopted appropriate risk management and compliance programs to address and reduce these risks."***

194.    The 2013 10-K also stated that "Alcoa is subject to a broad range of health, safety and environmental laws and regulations in the jurisdiction in which it operates and may be exposed

to substantial costs and liabilities associated with such laws and regulations."  "Compliance with .

. . health and safety legislation and regulatory requirements may prove to be more limiting and

costly than we anticipate.  Alcoa's results of operations or liquidity in a particular period could be

affected by certain health, safety or environmental matters, including remediation costs and

damages related to certain sites.  Additionally, evolving regulatory standards and expectations can

result in increased litigation and/or increased costs, all of which can have a material and adverse

effect on earnings and cash flows."

195.    The 2013 10-K also included a discussion regarding unexpected fires, stating in

pertinent part as follows:

> Unexpected events may increase Alcoa's cost of doing business or disrupt Alcoa's operations.

> Unexpected events, including fires or explosions at facilities, natural disasters, war or terrorist activities, unplanned outages, supply disruptions, or failure of equipment or processes to meet specifications may increase the cost of doing business or otherwise impact Alcoa's financial performance.

196.    The statements referenced above in ¶¶ 193-95 were inaccurate statements of

material fact because they failed to disclose the following material facts which existed at the time

of the Preferred IPO:

(a)    that Arconic was knowingly selling Reynobond PE for use in construction

projects where the product was to be used in a manner that the Company knew was unsafe and

presented a fire hazard;

(b)    that Arconic's marketing and sales of highly-flammable Reynobond PE

sales for use in high-rise tower projects directly conflicted with the purported strong culture of

safety, ethics and legal compliance that the Company claimed to have and exposed Arconic to

hundreds of millions of dollars in potential civil and criminal liability and reputational harm;

(c)      that Arconic's strong assurances of effective global safety and integrity practices concealed from investors the immense risk Arconic had assumed through its sales and marketing practices;

(d)      that Arconic's risk of an unexpected fire had dramatically increased because it was marketing and selling highly-flammable Reynobond PE panels for use in high-rise tower projects that it knew, but did not disclose, in a manner that the Company knew was unsafe and presented a fire hazard; and

(e)      as a result, Defendants' statements about safety, risk management and compliance, and efforts to address and reduce risk were materially false and misleading and/or lacked a reasonable basis.

### COUNT I

**(For Violation Of §11 Of The Securities Act
Against All Defendants by Plaintiff Sullivan)**

197.    Plaintiff Sullivan repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.  Any allegations of fraud are hereby expressly disclaimed and not incorporated by reference in this Count.

198.    This Cause of Action is asserted by Plaintiff Sullivan, pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

199.    The Registration Statement for the Preferred IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

200.    Defendants are strictly liable to Plaintiff Sullivan and the Class for the misstatements and omissions.

201.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

202.    By reason of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated §11 of the Securities Act.

203.    Plaintiff Sullivan purchased Arconic Preferred Shares traceable to the Preferred IPO.

204.    Plaintiff Sullivan and the Class have sustained damages.  The value of Arconic Preferred Shares has declined substantially subsequent to and due to Defendants' violations.

205.    At the time of their purchases of Arconic Preferred Shares, Plaintiff Sullivan and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed from the time that Plaintiff Sullivan discovered or reasonably could have discovered the facts upon which the initial complaint is based to the time that Plaintiff Sullivan commenced this action.  Less than three years has elapsed between the time that the securities upon which this Cause of Action is brought were offered to the public and the time Plaintiff Sullivan commenced this action.

## COUNT II

### (For Violation of §15 of the Securities Act Against the Company and the Individual Defendants by Plaintiff Sullivan)

206.    Plaintiff Sullivan repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.  Any allegations of fraud are hereby expressly disclaimed and not incorporated by reference in this Count.

207.    This Cause of Action is asserted by Plaintiff Sullivan, pursuant to §15 of the Securities Act, 15 U.S.C. §77o, against the Company and the Individual Defendants.

208.    The Individual Defendants each were control persons of Arconic by virtue of their positions as directors and/or senior officers of Arconic.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Arconic.  The Company controlled the Individual Defendants and all of Arconic's employees.

209.    The Individual Defendants each were culpable participants in the violations of §11 of the Securities Act alleged in the Cause of Action above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the Preferred IPO to be successfully completed.

## ADDITIONAL EXCHANGE ACT ALLEGATIONS

210.    Unbeknownst to investors, it was Arconic's practice to supply cheaper, flammable Reynobond PE for use in high rise buildings despite the fact that this practice was banned.   The Grenfell Tower was not the exception, but the rule.  *See, e.g., supra* at 14-23.

211.    As noted above in ¶105, in a statement to Reuters responding to the June 24, 2017, report, Arconic openly acknowledged that it "had known the panels would be used at Grenfell Tower but that it was not its role to decide what was or was not compliant with local building regulations."

212.    On Monday June 26, 2017, Arconic announced *it was discontinuing the sale of its Reynobond PE core panels worldwide for use in "any high-rise applications regardless of local codes and regulations*."   Arconic cited the purported inconsistency of building codes across the world and issues that had arisen in the wake of the Grenfell Tower tragedy regarding code compliance of cladding systems in the context of buildings' overall designs.  Arconic's statement

also confirmed that its aluminum product, Reynobond PE, was part of the cladding system on the

outside of Grenfell Tower:

> The loss of lives, injuries and destruction following the Grenfell Tower fire are devastating, and our deepest condolences are with everyone affected by this tragedy.  We have offered our full support to the authorities as they conduct their investigations.
>
> While the official inquiry is continuing and all the facts concerning the causes of the fire are not yet known, we want to make sure that certain information is clear:
>
> - Arconic supplied one of our products, Reynobond PE, to our customer, a fabricator, which used the product as one component of the overall cladding system on Grenfell Tower.  The fabricator supplied its portion of the cladding system to the façade installer, who delivered it to the general contractor.  The other parts of the cladding system, including the insulation, were supplied by other parties.  We were not involved in the installation of the system, nor did we have a role in any other aspect of the building's refurbishment or original design.
>
> - While we provided general parameters for potential usage universally, we sold our products with the expectation that they would be used in compliance with the various and different local building codes and regulations.  Current regulations within the United States, Europe and the U.K. permit the use of aluminum composite material in various architectural applications, including in high-rise buildings depending on the cladding system and overall building design.  Our product is one component in the overall cladding system; we don't control the overall system or its compliance.
>
> Nevertheless, in light of this tragedy, ***we have taken the decision to no longer provide this product in any high-rise applications, regardless of local codes and regulations***.

213.    As reported by the Guardian that day, "[t]he company emailed clients on Monday

to tell them it would no longer sell Reynobond PE to buyers planning to use it on tower blocks."

214.    The *Guardian* also reported on June 26, 2017, that the U.K. DCLG had put in place

a "combustibility testing programme" for aluminum composite materials and that in early testing,

60 samples from buildings in 25 areas were classed as combustible, with approximately 540 then-

still yet to be tested.  Over the prior weekend, following the fire, hundreds of Londoners in public

housing structures clad with ACM panels had been forced to evacuate due to safety concerns.

215.    That same day, on June 26, 2017, *Bloomberg* reported that U.K. investigators were

targeting Arconic in their investigations as potentially liable, and that the investment community

was taking note:

> The use of combustible cladding has become a focal point for investigators.  As the U.K. looks to hold someone responsible, Arconic could be subject to significant liabilities, Seaport Global analyst Josh Sullivan said in an interview.
>
> "The political sentiment on the ground in the U.K. is very aggressive right now," he said.  "Whether or not they are ultimately culpable, they are going to be a part of the inquiry process."
>
> While it's too early to determine the possible financial impact, the situation could make it more difficult for Arconic to find a permanent CEO, Cowen & Co. analyst Gautam Khanna said in a note.  David Hess has been serving on an interim basis since April, when Klaus Kleinfeld left the company.

216.    On September 14, 2017, U.K. officials opened a public inquiry into the cause and

spread of the fire (the "Grenfell Tower Inquiry").  British Prime Minister Theresa May appointed

retired jurist Sir Martin Moore-Bick to be chairman of the Grenfell Tower Inquiry.  Moore-Bick

stated that the Grenfell Tower Inquiry "can and will provide answers to the pressing questions as

to how a disaster of this kind could occur in 21st century London."

217.    Following the tragedy at the Grenfell Tower, the British government established a

"Building Safety Programme" with the aim of ensuring that residents of high-rise residential

buildings are safe and feel safe from the risk of fire.  As part of the program, the U.K.'s Ministry

of Housing, Communities & Local Government (the "MHCLG") publishes a monthly bulletin

describing the ongoing work being done to remediate social housing buildings with confirmed

ACM cladding in England.

218.   On February 7, 2018, the *New York Times* reported that three separate investigations could not unearth any evidence that the ACM cladding used in the Grenfell Tower had ever been tested for compliance with U.K. building regulations:

> Cladding systems like that installed at Grenfell Tower and since found on hundreds of buildings were not put through legally required fire safety tests, investigators believe.
>
> Eight months after the fire that killed 71 people, *The Times* understands that three separate investigations have yet to find any record of independent tests on the combination of cladding and insulation materials used at Grenfell Tower or similar materials at 299 other high-rise buildings across England.
>
> To comply with building regulations, external cladding should pass either a large-scale laboratory fire test or a "desktop study", modelling how the materials would behave in fire.
>
> Investigators from the Metropolitan Police, the government's expert panel on fire safety and Dame Judith Hackitt's review into building regulations have been shocked to discover that none of the recognised tests appears to have been carried out here or abroad. A failure to test the materials before using them in housing blocks would point to a failure of the building control and regulation regimes.
>
> "The question that has to be asked is how on earth did this material come to be installed on all of those buildings?" a source with knowledge of the investigations said. "Somehow or other, those materials have got on to 300 buildings without any tests being done or test results being produced."
>
> The buildings that were deemed "at risk" included 160 social housing blocks, 95 private residential blocks, 31 student residences and 13 public buildings, including at least nine hospitals.
>
> *        *        *
>
> *The Times* has previously revealed how £293,000 was saved in the project budget by replacing Reynobond's fire-retardant cladding panels with a cheaper one made by the same manufacturer, but with a combustible polyethylene core. Tests carried out after the fire combined the combustible cladding with flammable, flame-retardant and non-combustible insulation materials. All systems containing the polyethylene core cladding failed the tests.
>
> The latest report from the government's expert panel said that it was not aware of any tests of such combinations meeting fire regulation standards.

219.    The monthly MHCLG bulletin includes a current count of "high-rise buildings that have been confirmed as having ACM cladding that does not meet the limited combustibility requirements set out in [U.K.] building regulations guidance."

220.    A bulletin published by the MHCLG on March 28, 2018 and including data as of March 15, 2018, found that 306 buildings in 65 local authority areas in England had ACM cladding that failed flammability tests conducted by the Building Research Establishment.

221.    The MHCLG bulletin also stated that:

- The total number of residential buildings over 18 metres and public buildings in England on 15 March 2018 where it has been confirmed that Aluminium Composite Material (ACM) cladding is installed or was previously installed was 319. This is an increase of five since the last data release, which was based on data from 16 February 2018.

- Of these 319 buildings, 306 have ACM cladding systems that the expert panel advise are unlikely to meet current Building Regulations guidance and therefore present fire hazards on buildings over 18 metres (an increase of five buildings since 16 February 2018).

- Of these 306 buildings unlikely to meet current Building Regulations guidance:

    o 158 are social housing buildings (managed by either local authorities or housing associations);

    o 134 are private sector residential buildings, including hotels and student accommodation; and

    o 14 are public buildings, including hospitals and schools.

222.    A subsequent June 28, 2018 bulletin found that the total number of high-rise residential buildings and publicly-owned buildings in the U.K. with ACM cladding systems is 470. As explained above, that number has increased.

223.    During the Class Period, Arconic's management recognized its responsibility for conducting the Company's affairs according to the highest standards of personal and corporate conduct.  This responsibility was characterized and reflected in key policy statements issued from

time to time regarding, among other things, conduct of its business activities within the laws of the host countries in which the Company operates and potentially conflicting outside business interests of its employees.   During the Class Period, the Company represented that it maintained a systematic program to assess compliance with these policies.

224.    During the Class Period, the Company also represented that its approach to safety included the following main activities, which it undertook at all times:

- Identifying hazards and assessing the risks associated with our products, services, and operations;

- Developing and implementing operational controls with built-in layers of protection to mitigate effectively the impact of those risks;

- Monitoring and maintaining our hazard recognition, risk assessment, and operational control activities to ensure they are current and effective; and

- Reacting to correct gaps in our protective systems and continuously improving system stability.

225.    The Company further represented to investors that "[t]he safety systems are reviewed at least annually.  Senior management participates in the review process, which is designed to ensure the continued sustainability, adequacy, and effectiveness of the organization's overall safety management system."

226.    The Company also stated that "[Arconic]'s chairman and CEO, who reports to and is a member of the Board of Directors, has ultimate responsibility for economic, environmental, and social topics.  The chief financial officer is responsible for economic topics, and the executive vice president of human resources and environment, health, safety, and sustainability has responsibility for environmental and social topics.  Both report to the chairman and CEO."

227.    The Company also informed investors that Arconic's "Approach to Safety" included an annual review by Arconic's Executive Council, which included the Company's CEO. The Company stated that "[t]he review process is designed to ensure the continued suitability,

adequacy, and effectiveness of the organization's overall enterprise risk management and includes

significant risks for both personnel and process safety."

228.   Arconic also represented that "[w]e track key performance indicators for each

business unit and operating location.  Periodically, we validate their effectiveness in measuring

and monitoring our overall safety performance."

### MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD RELEVANT TO THE EXCHANGE ACT VIOLATIONS

**False and Misleading Statements Made in 2013**

229.   On or about November 20, 2013, the Company made the following representations

regarding its Reynobond ACM products, on its official website:

> [E]ach of our product offerings provide the durability to ensure your project will look pristine for years to come—with minimal maintenance.

> Safe and Compliant.  Reynobond is designed and tested to meet safety and environmental building codes around the world.  It is available with either a polyethylene (PE) core or a fire-resistant (FR) core material . . . .

> Reynobond® Aluminum Composite Material (ACM) is a high-performance wall cladding product from Alcoa Architectural Products, consisting of two sheets of nominal 0.020'' (0.50 mm) aluminum, each permanently bonded to an extruded thermoplastic core.  This is an elegant concept resulting in an extraordinary flat and highly formable material with an excellent strength-to-weight ratio.

> Reynobond is a fully tested product, with building-code approvals throughout the world.  It is available with either a Polyethylene (PE) core or a Fire Resistant (FR) core.

> Reynobond is manufactured to exacting tolerances with state-of-the-art equipment in a continual process.  Alcoa Architectural Products has a reputation for manufacturing products of the highest quality, and Reynobond is no exception.

> Our Reynobond® Aluminum Composite Material delivers consistent . . . strength.

230.   The Company made the same or similar statements to those in ¶ 229 above on or

about December 12, 17, and 27, 2013, on its website.

231.    On or about November 20, 2013, the Company made the following statements with

respect to its development and implementation of operational controls, on its official website:

> Operations and activities that could result in risk or impact are controlled to ensure
> that our environment, health and safety (EHS) policy is followed and that
> management system objectives are achieved.  We develop procedures to cover . . .
> external activities, including contractor and product safety.

232.    On or about November 20, 2013, the Company also represented the following on

its official website:

> The following are the four main activities undertaken in support of our safety
> system: Identifying hazards and assessing the risks associated with our products . .
> . .

*      *      *

> Our global focus and attention on fatality prevention continues with the objection
> of building a system and culture that is more robust in its ability to . . . address
> contractor and contracted services safety.

233.    On information and belief, the Company made the same or similar statements to

those in ¶¶ 231-32 above on or about December 12, 17, and 27, 2013, on its website.

### REASONS WHY THE STATEMENTS MADE IN 2013 WERE FALSE AND MISLEADING

234.    The Arconic Defendants' statements made in 2013, which specifically discuss the

features of the Reynobond ACM products, including Reynobond PE, were false and misleading

because at the time these statements were made, the Arconic Defendants failed to disclose that

Arconic was selling Reynobond PE for use in construction projects, where the product was to be

used in a manner that the Company knew was unsafe and presented a fire hazard.

235.    The Arconic Defendants' statements made in 2013 related to the Company's

adopted procedures to cover contractor and product safety were false and misleading because at

the time these statements were made, (i) Arconic did not employ safety procedures to cover its

contractors and product safety, but instead supplied highly flammable Reynobond PE products in

85

construction projects, where the product was to be used in a manner that the Company knew was unsafe and presented a fire hazard; and (ii) Arconic's assurances of safety practices concealed from investors the immense risk Arconic had assumed through its marketing and sales of highly-flammable Reynobond PE products for use in high-rise tower projects across the U.K. and other countries.

**False and Misleading Statements Made in 2014**

236.    On or about January 9, 2014, Arconic issued a press release announcing its financial results for the quarter and year ended December 31, 2013 ("Q4 2013" and "FY 2013," respectively).  For Q4 2013, the press release reported that Arconic's Engineered Products and Solutions segment had generated third-party sales of $1.4 billion and that "ATOI [after-tax operating income] was a "fourth quarter record" of $168 million, down $24 million sequentially and up $28 million, or 20 percent, year-over-year."

237.    For FY 2013, the press release reported that Arconic's Engineered Products and Solutions segment had generated $5.7 billion in third-party sales and $726 million of ATOI.

238.    On February 13, 2014, Arconic filed its Form 10-K for the fiscal year ended December 31, 2013 with the SEC ("2013 10-K"), which was signed and certified pursuant to the Sarbanes Oxley Act of 2002 by Defendants Kleinfeld, among others.  Concerning sales in Arconic's "Engineered Products and Solutions" segment, which included sale of "integrated aluminum structural systems," the 2013 10-K stated that "[t]hird-party sales for the Engineered Products and Solutions segment improved 4% in 2013 compared with 2012 . . . .," "Third-party sales for this segment increased 3% in 2012 compared with 2011 . . . .," "ATOI [after-tax operating income] for the Engineered Products and Solutions segment rose $114 in 2013 compared with 2012, principally the result of net productivity improvements across all businesses . . . .," and "ATOI for this segment climbed $75 in 2012 compared with 2011 . . . ."

239.    The 2013 10-K also reported sales of architectural aluminum systems of $977 million for full year 2013.

240.    The 2013 10-K also represented that "Alcoa may be exposed to significant legal proceedings [and] investigations" and that the "Company is . . . subject to a variety of legal compliance risks," including "potential claims relating to product liability, health and safety . . . .and compliance with U.S. and foreign export laws . . . and sales and trading practices.  Alcoa could be subject to fines, penalties, damages (in certain cases, treble damages), or suspension or debarment from government contracts."  "Alcoa believes it has adopted appropriate risk management and compliance programs to address and reduce these risks."

241.    The 2013 10-K also stated that "Alcoa is subject to a broad range of health, safety and environmental laws and regulations in the jurisdiction in which it operates and may be exposed to substantial costs and liabilities associated with such laws and regulations."  "Compliance with . . . health and safety legislation and regulatory requirements may prove to be more limiting and costly than we anticipate.  Alcoa's results of operations or liquidity in a particular period could be affected by certain health, safety or environmental matters, including remediation costs and damages related to certain sites.  Additionally, evolving regulatory standards and expectations can result in increased litigation and/or increased costs, all of which can have a material and adverse effect on earnings and cash flows."

242.    The 2013 10-K also included a discussion regarding unexpected fires, stating in pertinent part as follows:

Unexpected events may increase Alcoa's cost of doing business or disrupt Alcoa's operations.

Unexpected events, including fires or explosions at facilities, natural disasters, war or terrorist activities, unplanned outages, supply disruptions, or failure of equipment or

processes to meet specifications may increase the cost of doing business or otherwise impact Alcoa's financial performance.

243.     The Company's 2013 Annual Report sent to investors in early 2014 included a Chairman's Letter signed by Defendant Kleinfeld that emphasized the Company's purported strong commitment to safety values on a global level, stating, in pertinent part:

> We continued to reaffirm Alcoa's Values during 2013. *We launched a global Integrity Champion Network of high potential managers to further embed a values-based culture of integrity and compliance at all levels of the Company*. *Our employees' strong commitment to* our Environment, *Health and Safety Value* resulted in Alcoa's first fatality free year in *the 70 years since the Company began monitoring safety on a global basis*.

244.     The 2013 Annual Report specifically emphasized the Company's purported strong safety values, stating, in pertinent part:

> *Alcoa is a values-based company*. *Our Values—Integrity*, Respect, Innovation, *Excellence and Environment, Health and Safety*—guide our work and help us accomplish our goals the right way. *They also align us with our stakeholders*, from employees, customers and suppliers to investors and the communities in which we operate.

245.     The 2013 Annual Report also specifically highlighted the successes of the Engineered Products and Solutions segment, stating, in pertinent part:

> **ENGINEERED PRODUCTS AND SOLUTIONS**
>
> Our products . . . enable buildings that are . . . safe, . . . .  Engineered Products and Solutions, part of Alcoa's value-add portfolio, performed against targets set in 2010 and generated $970 million incremental revenue from share gains through innovation, while growing adjusted EBITDA margins from 2010 to 2013.

246.     On or about March 7, 2014, the Company made the following statements with respect to its development and implementation of operational controls, on its official website:

> Operations and activities that could result in risk or impact are controlled to ensure that our environment, health and safety (EHS) policy is followed and that management system objectives are achieved.  We develop procedures to cover . . . external activities, including contractor and product safety.

247.     On or about March 7, 2014, the Company also represented the following on its

official website:

> The following are the four main activities undertaken in support of our safety
> system: Identifying hazards and assessing the risks associated with our products . .
> . .

>                     *        *        *

> Our global focus and attention on fatality prevention continues with the objection
> of building a system and culture that is more robust in its ability to . . . address
> contractor and contracted services safety.

248.     On information and belief, the Company made the same or similar statements to

those in ¶¶ 246-47 above on or about January 20, 27, February 8, 9, 14, 22, 27, March 7, 8, 20, 27,

May 6, 16, 20, June 6, 23, 25, 27, 28, July 3, 23, September 22, 27, October 1, 2, 9, 13, 15, 17,

November 18, December 16, 18 and 27, 2014, on its official website.

249.     On or about March 7, 2014, Arconic stated the following concerning "Environment,

Health and Safety" ("EHS") on its official website:

> EHS POLICY

> It is [Arconic]'s policy to operate worldwide in a safe, responsible manner which
> respects the environment and the health of our employees, our customers and the
> communities where we operate. We will not compromise environmental, health or
> safety values for profit or production.  All [Arconic]ans are expected to understand,
> promote and assist in the implementation of this Policy and the accompanying
> Principles.

250.     Under the heading "EHS Principles," Arconic further stated that:

> •      We value human life above all else and manage risks accordingly.

>                     *        *        *

> •      We do not compromise our EHS Value for profit or production.

> •      We comply with all laws and set higher standards for ourselves and
>        our suppliers where unacceptable risks are identified.

>                     *        *        *

- We supply and use safe and reliable products and services.

- We use our knowledge to enhance the safety and well-being of our communities.

251.    On or around March 10, 2014, the Company made the following representations regarding its Reynobond ACM products, on its official website:

> [E]ach of our product offerings provide the durability to ensure your project will look pristine for years to come—with minimal maintenance.

> Safe and Compliant.   Reynobond is designed and tested to meet safety and environmental building codes around the world.   It is available with either a polyethylene (PE) core or a fire-resistant (FR) core material . . . .

> Reynobond® Aluminum Composite Material (ACM) is a high-performance wall cladding product from Alcoa Architectural Products, consisting of two sheets of nominal 0.020'' (0.50 mm) aluminum, each permanently bonded to an extruded thermoplastic core.  This is an elegant concept resulting in an extraordinary flat and highly formable material with an excellent strength-to-weight ratio.

> Reynobond is a fully tested product, with building-code approvals throughout the world.  It is available with either a Polyethylene (PE) core or a Fire Resistant (FR) core.

> Reynobond is manufactured to exacting tolerances with state-of-the-art equipment in a continual process.   Alcoa Architectural Products has a reputation for manufacturing products of the highest quality, and Reynobond is no exception.

> Our Reynobond® Aluminum Composite Material delivers consistent . . . strength.

252.    The Company made the same or similar statements to those in ¶ 251 above on or about January 20, 27, February 8, 9, 14, 22, 27, March 7, 8, 20, 27, May 6, 16, 20, June 6, 23, 25, 27, 28, July 3, 23, September 22, 27, October 1, 2, 9, 13, 15, 17, November 18, December 16, 18 and 27, 2014, on its official website.

253.    On information and belief, on or about March 25, 2014, Arconic made the following specific statements on its official website directed to investors about the documentation and certification of its Reynobond PE products:

> Reynobond . . . composite and aluminum sheet panels are certified in more than 15 countries by certifying bodies such as BBA, CSTB  or ISO.

Fire certificates for Reynobond Architecture: Great Britain BS476 part 6 & 7: Reynobond PE & FR: Class 0; Great Britain BBA Agreement BBA08/4510, classifying the PE panels as Class 0.

Behaviour in relation to fire: when tested for reaction to fire, [product] achieved a classification of B-s2 . . . As a consequence . . . the product[s] may be regarded as having a Class 0 surface.

254.    On information and belief, the Company made similar statements to those in the paragraph above on or about April 25, May 25, June 25, July 25, August 25, September 25, October 25, November 25, and December 25, 2014.

255.    Throughout the Class Period, Arconic repeatedly emphasized in filings with the SEC the importance to shareholders of the quality of its products, stating that "we deliver [our] products at a quality and efficiency that ensure customer success and shareholder value."

256.    On or about April 8, 2014, Arconic issued a press release announcing its financial results for the quarter ended March 31, 2014 ("Q1 2014").  For Q1 2014, the press release reported that Arconic's Engineered Products and Solutions segment had generated third-party sales of $1.4 billion and that "ATOI was a first quarter record of $189 million, up $21 million, or 13 percent, sequentially and up $16 million, or 9 percent, year-over-year."

257.    On or about April 24, 2014, Arconic filed its Form 10-Q for the quarter ended March 31, 2014 with the SEC ("Q1 2014 10-Q").  The Q1 2014 10-Q was signed on behalf of Arconic by its CFO and its Controller.

258.    Also, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Defendant Kleinfeld certified that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

259.     The Q1 2014 10-Q set forth financial results substantially similar to those described above regarding Arconic's April 9, 2014 press release.

260.     On or about May 2, 2014, Arconic held an annual shareholders meeting, in which Defendant Kleinfeld participated.   At the meeting, Kleinfeld stated the following about the Company's safety record:

> So let's first start with our most important thing, safety. And as you can see here, this is our safety track record.  And we already are know [sic] not only in our industry, but beyond our industry, to have a very, very, very good safety record.

261.     On or about May 13, 2014, Arconic posted to the Sustainability section of its official website a "Chairman & CEO Statement" attributed to Defendant Kleinfeld.   In the Chairman & CEO Statement, Defendant Kleinfeld stated that ***"[b]y reinforcing that nothing is more valuable than human life, [Arconic] has progressively improved its safety performance over the years*."**

262.     On or about July 8, 2014, Arconic issued a press release announcing its financial results for the quarter ended June 30, 2014 ("Q2 2014").  For Q2 2014, the press release reported that Arconic's Engineered Products and Solutions segment had generated third-party sales of $1.5 billion, and that "ATOI was a quarterly record of $204 million, up $15 million, or 8 percent, sequentially and up $11 million, or 6 percent, year-over-year."

263.     On or about July 24, 2014, Arconic filed its Form 10-Q for the quarter ended June 30, 2014 with the SEC ("Q2 2014 10-Q").  The Q2 2014 10-Q was signed on behalf of Arconic by its CFO and its Controller.  Also, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Defendant Kleinfeld certified that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

264.    The Q2 2014 10-Q set forth figures substantially similar to those described above regarding Arconic's July 8, 2014 press release.

265.    On or about October 8, 2014, Arconic issued a press release announcing its financial results for the quarter ended September 30, 2014 ("Q3 2014").  For Q3 2014, the press release reported that Arconic's Engineered Products and Solutions segment had generated third-party sales of $1.495 billion, and that "ATOI was a quarterly record of $209 million, up $5 million, or 2 percent, sequentially and up $17 million, or 9 percent, year-over-year."  The press release also stated that "EPS delivered its eighteenth consecutive quarter of year-over-year ATOI improvement."

266.    On or about October 23, 2014, Arconic filed its Form 10-Q for the quarter ended September 30, 2014 with the SEC ("Q3 2014 10-Q").  The Q3 2014 10-Q was signed on behalf of Arconic by its CFO and its Controller.  Also, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Defendant Kleinfeld certified that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

267.    The Q3 2014 10-Q set forth figures substantially similar to those described above regarding Arconic's October 8, 2014 press release.

**REASONS WHY THE STATEMENTS MADE IN 2014 WERE FALSE AND MISLEADING**

268.    The Arconic Defendants' statements made in 2014, which specifically discuss the features of the Reynobond ACM products, including Reynobond PE, were false and misleading because at the time these statements were made, the Arconic Defendants failed to disclose that

Arconic was selling Reynobond PE for use in construction projects, where the product was to be used in a manner that the Company knew was unsafe and presented a fire hazard.

269.    The Arconic Defendants' statements made in 2014 related to the Company's commitment to safety, its touted safety performance, its adopted procedures to cover contractor and product safety, and its assurances that the Company supplies and uses safe and reliable products and services were false and misleading because at the time these statements were made, (i) Arconic did not employ safety procedures to cover its contractors and product safety, but instead supplied highly flammable Reynobond PE products in construction projects, where the product was to be used in a manner that the Company knew was unsafe and presented a fire hazard; and (ii) Arconic's strong assurances of safety practices concealed from investors the immense risk Arconic had assumed through its marketing and sales of highly-flammable Reynobond PE products for use in high-rise tower projects across the U.K. and other countries.

270.    The Arconic Defendants' statements made in 2014 representing that Arconic has adopted appropriate risk management and compliance programs that address and reduce the risks associated with legal compliance risks related to product liability, safety, or noncompliance with US and foreign sale sales and trading practices, and their statements that Arconic complies with all laws (including safety laws) and sets high standards for suppliers where unacceptable risk are identified were false and misleading because, at the time these statements were made, Arconic was selling Reynobond PE for use in construction projects, where the product was to be used in a manner that the Company knew was non-compliant, unsafe and presented a fire hazard, exposing Arconic to hundreds of millions of dollars in potential civil and criminal liability.

271.    The Arconic Defendants' statements made in 2014 concerning sales metrics (*i.e.*, that the Company made millions of dollars in revenues and profits from, among other products,

sales of Reynobond PE products, and that its sales were increasing) were false and misleading because the Arconic Defendants failed to disclose that Reynobond PE sales proceeds were the result of misleading and illicit marketing and sales practices, and subjected the Company to significant civil, regulatory, and criminal liability.

272.    The Arconic Defendants' statements made in 2014 regarding unexpected fires were false and misleading when made because they failed to disclose that Arconic's risk of an "unexpected fire" had dramatically increased because it was marketing and selling highly flammable Reynobond PE panels for use in high-rise buildings in a manner that was unsafe and presented a fire hazard.

273.    The Arconic Defendants' statements made in 2014 touting the safety classification of the Reynobond PE products as Class B, thus meeting a Class 0 surface, were false and misleading when made because tests commissioned by Arconic and hidden from the public and the BBA showed that Reynobond PE's classification was reduced to C and E, rendering such products entirely unsafe for use in high rise buildings.  The products did not meet a Class 0 classification.

**False and Misleading Statements Made in 2015**

274.    On or about January 12, 2015, Arconic issued a press release announcing its financial results for the fourth fiscal quarter and year ended December 31, 2014 ("Q4 2014" and "FY 2014," respectively).  For Q4 2014, the press release reported that Arconic's Engineered Products and Solutions segment had generated third-party sales of $1.566 billion, and ATOI of $165 million, which was "its 19th consecutive quarter of year-over-year after-tax operating income growth, excluding Firth Rixson."

275.    For FY 2014, the press release reported that Arconic's Engineered Products and Solutions segment had generated $6.006 billion in third-party sales and $767 million of ATOI.

276.     On February 19, 2015, Arconic filed its Form 10-K for the fiscal year ended December 31, 2014 with the SEC ("2014 10-K"), which was signed and certified pursuant to the Sarbanes Oxley Act of 2002 by Defendant Kleinfeld.  Concerning sales in Arconic's "Engineered Products and Solutions" segment, which included sale of "integrated aluminum structural systems," the 2014 10-K stated that "[t]hird-party sales for the Engineered Products and Solutions segment increased 5% in 2014 compared with 2013, primarily due to higher volumes . . . ." "Third-party sales for this segment increased 4% in 2013 compared with 2012 . . . .," " "ATOI [after-tax operating income] for the Engineered Products and Solutions segment climbed $41 in 2014 compared with 2013, mainly due to net productivity improvements across all businesses . . . .," and "ATOI for this segment climbed $114 in 2013 compared with 2012 . . . ."

277.     The 2014 10-K also reported sales of architectural aluminum systems of $1,002 million for full year 2014.

278.     The 2014 10-K also represented that "Alcoa may be subject to significant legal proceedings [and] investigations" and that the "Company is . . . subject to a variety of legal compliance risks," including "potential claims relating to product liability, health and safety . . . .and compliance with U.S. and foreign export laws . . . and sales and trading practices.  Alcoa could be subject to fines, penalties, damages (in certain cases, treble damages), or suspension or debarment from government contracts."   "Alcoa believes it has adopted appropriate risk management and compliance programs to address and reduce these risks."

279.     The 2014 10-K also stated that "Alcoa is subject to a broad range of health, safety and environmental laws and regulations in the jurisdiction in which it operates and may be exposed to substantial costs and liabilities associated with such laws and regulations."  "Compliance with . . . health and safety legislation and regulatory requirements may prove to be more limiting and

costly than we anticipate.  Alcoa's results of operations or liquidity in a particular period could be affected by certain health, safety or environmental matters, including remediation costs and damages related to certain sites.  Additionally, evolving regulatory standards and expectations can result in increased litigation and/or increased costs, all of which can have a material and adverse effect on earnings and cash flows."

280.    The 2014 10-K also included a discussion regarding unexpected fires, stating in pertinent part as follows:

> Unexpected events may increase Alcoa's cost of doing business or disrupt Alcoa's operations.
>
> Unexpected events, including fires or explosions at facilities, natural disasters, war or terrorist activities, unplanned outages, supply disruptions, or failure of equipment or processes to meet specifications may increase the cost of doing business or otherwise impact Alcoa's financial performance.

281.    The Company's 2014 Annual Report sent to investors in early 2015 included a Chairman's Letter signed by Defendant Kleinfeld that emphasized that Arconic's "businesses benefit from a set of Alcoa Values that have endured the test of time—Integrity; Respect; Environment, Health and Safety; Innovation; and Excellence."

282.    The Chairman's Letter lauded the Company's purported strong commitment to safety values on a global level, stating, in pertinent part:

283.    Further expounding on the Company's purported "Values," the 2014 Annual Report emphasized the Company's strong commitments to safety, ethics and compliance in all of its product offerings, stating, in pertinent part:

> ***Our Alcoa Values – Integrity, Respect, Innovation, Excellence and Environment, Health and Safety – bring out the best in our employees and our Company. As Alcoa transforms, our Values serve as a bright beacon, continuing to guide how we work with our stakeholders and communities***.
>
> ***Safety***

*Our world-class safety culture values human life above all else, seeks to manage risk accordingly* . . . .

Ethics and Compliance

. . . *The Ethics and Compliance Program continues to focus on* anti-corruption, trade compliance and *adherence with all relevant U.S. and national laws and regulations*.

284.    The 2014 Annual Report also specifically highlighted the successes of the

Engineered Products and Solutions segment, stating, in pertinent part:

**ENGINEERED PRODUCTS AND SOLUTIONS**

2014 was the best year ever for our innovative, multi-material Engineered Products and Solutions (EPS) segment.  It generated $6.0 billion in third-party revenues and $767 million in after-tax operating income (ATOI) with an adjusted EBITDA margin of 21.9%.  By engineering proprietary *products that are highly valuable to customers across* its aerospace, commercial transportation, *building and construction*, industrial gas turbine, and oil and gas end markets, *EPS drove strong share gains across all of its businesses.  The segment signed a number of valuable contracts throughout the year* . . . .

285.    On or around February 5, 2015, the Company made the following representations

regarding its Reynobond ACM products, on its official website:

[E]ach of our product offerings provide the durability to ensure your project will look pristine for years to come—with minimal maintenance.

Safe and Compliant.   Reynobond is designed and tested to meet safety and environmental building codes around the world.   It is available with either a polyethylene (PE) core or a fire-resistant (FR) core material . . . .

Reynobond® Aluminum Composite Material (ACM) is a high-performance wall cladding product from Alcoa Architectural Products, consisting of two sheets of nominal 0.020'' (0.50 mm) aluminum, each permanently bonded to an extruded thermoplastic core.  This is an elegant concept resulting in an extraordinary flat and highly formable material with an excellent strength-to-weight ratio.

Reynobond is a fully tested product, with building-code approvals throughout the world.  It is available with either a Polyethylene (PE) core or a Fire Resistant (FR) core.

Reynobond is manufactured to exacting tolerances with state-of-the-art equipment in a continual process.   Alcoa Architectural Products has a reputation for manufacturing products of the highest quality, and Reynobond is no exception.

Our Reynobond® Aluminum Composite Material delivers consistent . . . strength.

286.     The Company made the same or similar statements to those in ¶ 285 above on or about February 6, 7, 25, 28, March 14, 15, 19, 29, April 2, 5, 11, 18, May 2, 17, 19, 22, June 21, 27, July 2, 6, 7, 9, 10, 11, August 1, 7, 11, 13, September 1, 5, 10, 20, 27, October 1, 8, 9, November 3, 13 and December 16, 2015, on its official website.

287.     On or about February 5, 2015, the Company made the following statements with respect to its development and implementation of operational controls on its official website:

> Operations and activities that could result in risk or impact are controlled to ensure that our environment, health and safety (EHS) policy is followed and that management system objectives are achieved.  We develop procedures to cover . . . external activities, including contractor and product safety.

288.     On or about February 5, 2015, the Company also represented the following on its official website:

> The following are the four main activities undertaken in support of our safety system: Identifying hazards and assessing the risks associated with our products . . . .

*     *     *

> Our global focus and attention on fatality prevention continues with the objection of building a system and culture that is more robust in its ability to . . . address contractor and contracted services safety.

289.     On information and belief, the Company made the same or similar statements to those in ¶¶ 287-88 above on or about February 6, 7, 25, 28, March 14, 15, 19, 29, April 2, 5, 11, 18, May 2, 17, 19, 22, June 21, 27, July 2, 6, 7, 9, 10, 11, August 1, 7, 11, 13, September 1, 5, 10, 20, 27, October 1, 8, 9, November 3, 13 and December 16, 2015, on its official website.

290.     On information and belief, on or about March 25, 2015, Arconic made the following specific statements on its official website directed to investors about the documentation and certification of its Reynobond PE products:

99

Reynobond . . . composite and aluminum sheet panels are certified in more than 15 countries by certifying bodies such as BBA, CSTB  or ISO.

Fire certificates for Reynobond Architecture: Great Britain BS476 part 6 & 7: Reynobond PE & FR: Class 0; Great Britain BBA Agreement BBA08/4510, classifying the PE panels as Class 0.

Behaviour in relation to fire: when tested for reaction to fire, [product] achieved a classification of B-s2 . . . As a consequence . . . the product[s] may be regarded as having a Class 0 surface.

291.    On information and belief, the Company made similar statements to those in the paragraph above on or about April 25, May 25, June 25, July 25, August 25, September 25, October 25, November 25, and December 25, 2015.

292.    On or about April 8, 2015, Arconic issued a press release announcing its financial results for the quarter ended March 31, 2014 ("Q1 2015").  For Q1 2015, the press release reported that Arconic's Engineered Products and Solutions segment had generated third-party sales of $1.689 billion, and that "After-tax operating income (ATOI) was a first quarter record of $191 million, up $2 million, or 1 percent, year-over-year, and up $26 million, or 16 percent, sequentially."

293.    On or about April 23, 2015, Arconic filed its Form 10-Q for the quarter ended March 31, 2014 with the SEC ("Q1 2015 10-Q").  The Q1 2015 10-Q was signed on behalf of Arconic by its CFO and its Controller.  Also, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Defendant Kleinfeld certified that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

294.    The Q1 2015 10-Q set forth financial results substantially similar to those described above regarding Arconic's April 8, 2015 press release.

295.    On or about May 1, 2015, Arconic held an annual shareholders meeting, where Defendant Kleinfeld participated.  On the call, Kleinfeld stated the following about the Company's steps to guarantee safety:

> But as is customary and as it reflects our values, *we always start with safety, safety first*.  So on the left hand side, here you see the safety statistics and as you see, I mean, we have achieved a lot in the last year, and this is pretty amazing, I mean, many see us as a benchmark in not only in our industry but also in other industries. And if you look at those numbers here, I mean it is -- I'm always wondering how much further can we go down here but every year, we are able to get the safety one step further.

*    *    *

> *. . . . [w]e have a very strong as you know, safety culture and we have also a very strong culture and reminding people on the risk. But we have created new tools and used this to basically shake the organization up to say, look, I mean we cannot afford to have anything routine in there because the moment people don't think, something terrible might happen*.

> *So we have introduced new tools to basically, recognize hazards, fix it -- find it, fix it and share it, program, we have created a -- we have this human performance certification process that every facility has to go through and almost all have gone through that in different rates*.

296.    On or about July 8, 2015, Arconic issued a press release announcing its financial results for the second fiscal quarter ended June 30, 2015 ("Q2 2015").  For Q2 2015, the press release reported that Arconic's Engineered Products and Solutions segment had generated sales of $1.733 billion, and that "[a]fter-tax operating income (ATOI) was a record $210 million, up $8 million, or 4 percent, year-over-year from $202 million (revised from $204 million*), and up $16 million, or 8 percent, from $194 million (revised from $191 million*) sequentially."

297.    On or about July 22, 2015, Arconic filed its Form 10-Q for the quarter ended June 30, 2015 with the SEC ("Q2 2015 10-Q").  The Q2 2015 10-Q was signed on behalf of Arconic by its CFO and its Controller.  Also, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Defendant Kleinfeld certified that "[b]ased on my knowledge, this report does not contain any

untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

298.    The Q2 2015 10-Q set forth figures substantially similar to those described above regarding Arconic's July 8, 2015 press release.

299.    On or about September 8, 2015, Arconic stated the following concerning "Environment, Health and Safety" ("EHS") on its official website:

EHS POLICY

It is [Arconic]'s policy to operate worldwide in a safe, responsible manner which respects the environment and the health of our employees, our customers and the communities where we operate.  We will not compromise environmental, health or safety values for profit or production.  All [Arconic]ans are expected to understand, promote and assist in the implementation of this Policy and the accompanying Principles.

300.    Under the heading "EHS PRINCIPLES," Arconic further stated that:

- "We value human life above all else and manage risks accordingly."

- We do not compromise our EHS Value for profit or production.

- We comply with all laws and set higher standards for ourselves and our suppliers where unacceptable risks are identified.

- We supply and use safe and reliable products and services.

- We are all accountable for conforming with and deploying our EHS Value and Principles.

301.    On or about October 8, 2015, Arconic issued a press release announcing its financial results for the third fiscal quarter ended September 30, 2015 ("Q3 2015").  For Q3 2015, the press release reported that Arconic's Transportation and Construction Solutions segment (separated as of Q3 2015 from Engineered Products and Solutions as a reportable segment, and

which encompassed the business unit that made Reynobond) had generated third-party sales of $475 million, and ATOI of $44 million.

302.     On or about October 23, 2015, Arconic filed its Form 10-Q dated October 22, 2015 for the quarter ended September 30, 2015 with the SEC ("Q3 2015 10-Q").  The Q3 2015 10-Q was signed on behalf of Arconic by its CFO and its Controller.  Also, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Defendant Kleinfeld certified that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

303.     The Q3 2015 10-Q set forth figures substantially similar to those described above regarding Arconic's October 8, 2015 press release.

### REASONS WHY THE STATEMENTS MADE IN 2015 WERE FALSE AND MISLEADING

304.     The Arconic Defendants' statements made in 2015, which specifically discuss the features of the Reynobond ACM products, including Reynobond PE, were false and misleading because at the time these statements were made, the Arconic Defendants failed to disclose that Arconic was selling Reynobond PE for use in construction projects, where the product was to be used in a manner that the Company knew was unsafe and presented a fire hazard.

305.     The Arconic Defendants' statements made in 2015 related to related to the Company's commitment to safety, its touted safety performance, its adopted procedures to cover contractor and product safety, and its assurances that the Company supplies and uses safe and reliable products and services were false and misleading because at the time these statements were made, (i) Arconic did not employ safety procedures to cover its contractors and product safety, but instead supplied highly flammable Reynobond PE products in construction projects, where the

product was to be used in a manner that the Company knew was unsafe and presented a fire hazard; and (ii) Arconic's strong assurances of safety practices concealed from investors the immense risk Arconic had assumed through its marketing and sales of highly-flammable Reynobond PE sales for use in high-rise tower projects across the U.K. and other countries.

306.    The Arconic Defendants' statements made in 2015 representing that Arconic has adopted appropriate risk management and compliance programs that address and reduce the risks associated with legal compliance risks related to product liability, safety, or noncompliance with US and foreign sale sales and trading practices, and their statements that Arconic complies with all laws (including safety laws) and sets high standards for suppliers where unacceptable risk are identified were false and misleading because, at the time these statements were made, Arconic was selling Reynobond PE for use in construction projects, where the product was to be used in a manner that the Company knew was non-compliant, unsafe and presented a fire hazard, exposing Arconic to hundreds of millions of dollars in potential civil and criminal liability.

307.    The Arconic Defendants' statements made in 2015 concerning sales metrics (*i.e.*, that the Company made millions of dollars in revenues and profits from, among other products, sales of Reynobond PE products, and that its sales were increasing) were false and misleading because the Arconic Defendants failed to disclose that Reynobond PE sales proceeds were the result of misleading and illicit marketing and sales practices, and subjected the Company to significant civil, regulatory, and criminal liability.

308.    The Arconic Defendants' statements made in 2015 regarding unexpected fires were false and misleading when made because they failed to disclose that Arconic's risk of an "unexpected fire" had dramatically increased because it was marketing and selling highly

flammable Reynobond PE panels for use in high-rise buildings in a manner that was unsafe and presented a fire hazard.

309.     The Arconic Defendants' statements made in 2014 touting the safety classification of the Reynobond PE products as Class B, thus meeting a Class 0 surface, were false and misleading when made because tests commissioned by Arconic and hidden from the public and the BBA showed that Reynobond PE's classification was reduced to C and E, rendering such products entirely unsafe for use in high rise buildings.  The products did not meet a Class 0 classification.

**False and Misleading Statements Made in 2016**

310.     On or about January 9, 2016, the Company made the following representations regarding its Reynobond ACM products on its official website:

> [E]ach of our product offerings provide the durability to ensure your project will look pristine for years to come—with minimal maintenance.

> Safe and Compliant.  Reynobond is designed and tested to meet safety and environmental building codes around the world.  It is available with either a polyethylene (PE) core or a fire-resistant (FR) core material . . . .

> Reynobond® Aluminum Composite Material (ACM) is a high-performance wall cladding product from Alcoa Architectural Products, consisting of two sheets of nominal 0.020'' (0.50 mm) aluminum, each permanently bonded to an extruded thermoplastic core.  This is an elegant concept resulting in an extraordinary flat and highly formable material with an excellent strength-to-weight ratio.

> Reynobond is a fully tested product, with building-code approvals throughout the world.  It is available with either a Polyethylene (PE) core or a Fire Resistant (FR) core.

> Reynobond is manufactured to exacting tolerances with state-of-the-art equipment in a continual process.  Alcoa Architectural Products has a reputation for manufacturing products of the highest quality, and Reynobond is no exception.

> Our Reynobond® Aluminum Composite Material delivers consistent . . . strength.

311.    The Company made the same or similar statements to those in ¶ 310 above on or about January 10, 12, 13, 25, 27, 29, February 4, 5, 20, 29, March 1, 3, 4, 8, 9, 19, 13, 15, 18, 19, 20, 24, April 10, 11, 13, 19, May 3, 10, 14, 29, June 3, 17, 28, July 3, 29, August 3, 22, 31, September 3, 4, 9, 10, 12, 14, 17 24, 30, October 1, 2, 3, 8, 15, 16, 20, 22, 23, 29, November 1, 3 and 5, 2016, on its official website.

312.    On or about January 9, 2016, the Company made the following statements with respect to its development and implementation of operational controls on its official website:

> Operations and activities that could result in risk or impact are controlled to ensure that our environment, health and safety (EHS) policy is followed and that management system objectives are achieved.  We develop procedures to cover . . . external activities, including contractor and product safety.

313.    On or about January 9, 2016, the Company also represented the following on its official website:

> The following are the four main activities undertaken in support of our safety system: Identifying hazards and assessing the risks associated with our products . . . .

> *     *     *

> Our global focus and attention on fatality prevention continues with the objection of building a system and culture that is more robust in its ability to . . . address contractor and contracted services safety.

314.    On information and belief, the Company made the same or similar statements to those in ¶¶ 312-13 above on or about January 10, 12, 13, 25, 27, 29, February 4, 5, 20, 29, March 1, 3, 4, 8, 9, 19, 13, 15, 18, 19, 20, 24, April 10, 11, 13, 19, May 3, 10, 14, 29, June 3, 17, 28, July 3, 29, August 3, 22, 31, September 3, 4, 9, 10, 12, 14, 17 24, 30, October 1, 2, 3, 8, 15, 16, 20, 22, 23, 29, November 1, 3 and 5, 2016, on its official website.

315.    On or about January 11, 2016, Arconic issued a press release announcing its financial results for the quarter and year ended December 31, 2015 ("Q4 2015" and "FY 2015,"

respectively).   For Q4 2015, the press release reported that Arconic's Transportation and Construction Solutions segment had generated third-party sales of $444 million, and ATOI of $40 million.

316.   For FY 2015, the press release reported that Arconic's Transportation and Construction Solutions segment had generated $1.882 billion in third-party sales and $166 million of ATOI.

317.   On February 19, 2016, Arconic filed its Form 10-K for the fiscal year ended December 31, 2015 with the SEC ("2015 10-K"), which was signed and certified pursuant to the Sarbanes Oxley Act of 2002 by Defendant Kleinfeld.   Concerning sales in Arconic's new "Transportation and Construction Solutions" segment, which included sale of "integrated aluminum structural systems," the 2015 10-K stated that "[t]hird-party sales for the Transportation and Construction Solutions segment decreased 7% in 2015 compared with 2014, primarily driven by unfavorable foreign currency movements . . ." "ATOI [after-tax operating income] for the Transportation and Construction Solutions segment declined $14 in 2015 compared with 2014, mainly due to higher costs, net unfavorable foreign currency movements, primarily related to a weaker euro and Brazilian real, and unfavorable price/product mix. . . . ."

318.   The 2015 10-K also reported sales of architectural aluminum systems of $951 million for full year 2015.

319.   The 2015 10-K also represented that "Alcoa may be exposed to significant legal proceedings [and] investigations" and that the "Company is . . . subject to a variety of legal compliance risks," including "potential claims relating to product liability, health and safety . . . .and compliance with U.S. and foreign export laws . . . and sales and trading practices.   Alcoa could be subject to fines, penalties, damages (in certain cases, treble damages), or suspension or

debarment from government contracts."   "Alcoa believes it has adopted appropriate risk management and compliance programs to address and reduce these risks."

320.    The 2015 10-K also stated that "Alcoa is subject to a broad range of health, safety and environmental laws and regulations in the jurisdiction in which it operates and may be exposed to substantial costs and liabilities associated with such laws and regulations."   "Compliance with . . . health and safety legislation and regulatory requirements may prove to be more limiting and costly than we anticipate.  Alcoa's results of operations or liquidity in a particular period could be affected by certain health, safety or environmental matters, including remediation costs and damages related to certain sites.  Additionally, evolving regulatory standards and expectations can result in increased litigation and/or increased costs, all of which can have a material and adverse effect on earnings and cash flows."

321.    The 2015 10-K also included a discussion regarding unexpected fires, stating in pertinent part as follows:

> Unexpected events may increase Alcoa's cost of doing business or disrupt Alcoa's operations.

> Unexpected events, including fires or explosions at facilities, natural disasters, war or terrorist activities, unplanned outages, supply disruptions, or failure of equipment or processes to meet specifications may increase the cost of doing business or otherwise impact Alcoa's financial performance.

322.    Elsewhere the 2015 Annual Report highlighted the financial results achieved in the "Construction Solutions" segment that sold the Reynobond panels, stating that it had "reported ATOI [after-tax operating income] of $166 million in 2015. It also delivered a solid 2015 adjusted EBITDA [earnings before interests, taxes, depreciation and amortization] margin of 14.4 percent."

323.    On or about March 2, 2016, Arconic stated the following concerning "Environment, Health and Safety" ("EHS") on its official website:

EHS POLICY

It is [Arconic]'s policy to operate worldwide in a safe, responsible manner which respects the environment and the health of our employees, our customers and the communities where we operate. We will not compromise environmental, health or safety values for profit or production.  All [Arconic]ans are expected to understand, promote and assist in the implementation of this Policy and the accompanying Principles.

324.    Under the heading "EHS Principles," Arconic further stated that:

- We value human life above all else and manage risks accordingly.

*   *   *

- We do not compromise our EHS Value for profit or production.

▪ We comply with all laws and set higher standards for ourselves and our suppliers where unacceptable risks are identified.

*   *   *

- We supply and use safe and reliable products and services.

- We use our knowledge to enhance the safety and well-being of our communities.

325.    The statements made on March 2, 2016 above were also made by Arconic on its official website on October 27, 2016.

326.    On information and belief, on or about March 25, 2016, Arconic made the following specific statements on its official website directed to investors about the documentation and certification of its Reynobond PE products:

Reynobond . . . composite and aluminum sheet panels are certified in more than 15 countries by certifying bodies such as BBA, CSTB  or ISO.

Fire certificates for Reynobond Architecture: Great Britain BS476 part 6 & 7: Reynobond PE & FR: Class 0; Great Britain BBA Agreement BBA08/4510, classifying the PE panels as Class 0.

Behaviour in relation to fire: when tested for reaction to fire, [product] achieved a classification of B-s2 . . . As a consequence . . . the product[s] may be regarded as having a Class 0 surface.

327.    On information and belief, the Company made similar statements to those in the paragraph above on or about April 25, May 25, June 25, July 25, August 25, September 25, October 25, November 25, and December 25, 2016.

328.    On or about April 11, 2016, Arconic issued a press release announcing its financial results for the quarter ended March 31, 2016 ("Q1 2016").  For Q1 2016, the press release reported that Arconic's Transportation and Construction Solutions segment had generated third-party sales of $429 million, and ATOI of $39 million.

329.    On or about May 5, 2016, Arconic filed its Form 10-Q for the quarter ended March 31, 2014 with the SEC ("Q1 2016 10-Q").  The Q1 2016 10-Q was signed on behalf of Arconic by its CFO and its Controller.  Also, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Defendant Kleinfeld certified that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

330.    The Q1 2016 10-Q set forth financial results substantially similar to those described above regarding Arconic's April 11, 2016 press release.

331.    On or about May 6, 2016, Arconic held an annual shareholders meeting, in which Defendant Kleinfeld participated.  At the shareholders meeting, Kleinfeld stated the following about the Company's emphasis on safety:

> And let me go through starting with Safety. So as those that are longer shareholders know, we take safety very, very seriously and we have made great progress, as you can see on the left hand side. And really are setting benchmarks for others.

332.    On or about May 13, 2016, Arconic posted its 2015 Sustainability Report to its official website and posted a link to the report on Arconic's official Twitter account.

333.    The 2015 Sustainability Report featured a "Chief Executive Officer Statement" attributed to Defendant Kleinfeld that represented the following about Arconic:

> We create thermally efficient architectural aluminum systems that help improve building energy-efficiency by up to 50%. ***Our state-of-the-art framing and wall systems are also hurricane and blast-resistant, making buildings more resilient and increasing occupant safety***.

334.    The 2015 Sustainability Report also stated that "Many of our top leaders and employees around the world are involved in the writing of individual sections of our sustainability report, or they provide significant input and feedback," and that "the draft report is provided to the Public Issues Committee of the Alcoa Board of Directors and our Executive Council for review."

335.    Kleinfeld served on Arconic's Executive Council at the time that the 2015 Sustainability Report was posted to Arconic's website and had served on the Executive Council from the beginning of the Class Period.

336.    Regarding Arconic's "Building and Construction" business unit, whose "recent innovations include Reynobond NC Double Sheet aluminum composite material panels," the 2015 Sustainability Report stated the following:

> • We also have developed state-of-the-art framing and wall systems that are hurricane- and blast-resistant and have been tested to industry standards and state mandates. ***These systems are designed to minimize vulnerabilities and provide increased security to protect occupants against damage and devastation***.
>
> • Architectural aluminum systems that use advanced thermal technologies can provide superior thermal performance ***without compromising on structural performance***.

337.    Additionally, the 2015 Sustainability Report described "Health and Safety" as one of eight "Material Aspects" of its business.

338.    Regarding Health and Safety at Arconic, the 2015 Sustainability Report represented that:

- Arconic was "Committed to Truth in Reporting" and to that end had "a rigorous internal audit process that evaluates our locations on five areas: environmental; health and safety; operational excellence; financial and business processes; and information technology.

- As part of its stated commitment to "Truth in Reporting," Arconic maintained "Health and Safety Committees: Each location has various task, department, ad hoc, and other committees to develop and implement health and safety programs based on the location's strategic health and safety plan. These leadership groups include a cross-section of personnel from the facility."

- "We were the first aluminum company to receive Cradle to Cradle Certification, which is a multi-attribute eco-label that assesses a product's safety to humans and potential impact on the natural environment."

339.    Concerning "Customer Health/Product Safety," the 2015 Sustainability Report represented that Arconic's "efforts to ensure customer health and product safety" included "Challenging misguided/bad science with best available scientific research" and "Engaging regulators as appropriate."

340.    The 2015 Sustainability Report further stated that:

[Arconic has] a Product Safety Standard to identify what is required for product safety management systems developed by our businesses. The standard includes requirements for raw material sources, production practices, chemical composition of our products, and **communication of risks associated with use or abuse of these products**.

We also provide safety data sheets and other documents that communicate information on the proper use, reuse, and/ or disposal of our products. **These sheets include the potential health risks associated with use and misuse of these products and the precautionary measures that can be used to reduce or eliminate these risks**.

341.    On or about July 11, 2016, Arconic issued a press release announcing its financial results for the second fiscal quarter ended June 30, 2016 ("Q2 2016"). For Q2 2016, the press release reported that Arconic's Transportation and Construction Solutions segment had generated third-party sales of $467 million, and ATOI of $46 million.

342.     On or about July 29, 2016, Arconic filed its Form 10-Q for the quarter ended June 30, 2016 with the SEC ("Q2 2016 10-Q").  The Q2 2016 10-Q was signed on behalf of Arconic by its CFO and its Controller.  Also, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Defendant Kleinfeld certified that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

343.     The Q2 2016 10-Q set forth financial results substantially similar to those described above regarding Arconic's July 11, 2016 press release.

344.     On or about November 9, 2016, Arconic filed its Form 10-Q for the quarter ended September 30, 2016 with the SEC ("Q3 2016 10-Q").  The Q3 2016 10-Q was signed on behalf of Arconic by its CFO and its Controller.  Also, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Defendant Kleinfeld certified that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

345.     The Q3 2016 10-Q reported that, for Q3 2016, Arconic's Transportation and Construction Solutions segment had generated third-party sales of $475 million, and ATOI of $44 million.

346.     On or about November 12, 2016, the Company made the following representations on its official website regarding the use of its architectural products in buildings:

Fire is a key issue when it comes to buildings.

When conceiving a building, it is crucial to choose the adapted products in order to avoid the fire to spread to the whole building.  Especially when it comes to facades and roofs, the fire can spread extremely rapidly.

Important to take the "fire characteristic" into account when starting the construction or refurbishment of a building in order to protect the people and assets while limiting fire propagation.  It is especially crucial for public establishments such as hospitals, schools, offices, etc.

Buildings are also classified according to their height and destination (public buildings, industrial building, housings…): it will also define which materials are safer to use.  Another important rule when it comes to the height of buildings concerns the accessibility of the fire brigade to the fire in the building: as soon as the building is higher than the firefighters' ladders, it has to be conceived with an incombustible material.



As soon as the building is higher than the firefighters' ladders, it has to be conceived with an incombustible material.

347.    The Company made the same or substantially similar statements to those in ¶ 346 above on its official website on or about November 20, 21, 24-27, December 2-4, 7, 9, 17, 24, and 31, 2016, as well as, March 8, 2017, May 18, 2017 and June 18, 2017.

### REASONS WHY THE STATEMENTS MADE IN 2016 WERE FALSE AND MISLEADING

348.    The Arconic Defendants' statements made in 2016, which specifically discuss the features of the Reynobond ACM products, including Reynobond PE, were false and misleading because at the time these statements were made, the Arconic Defendants failed to disclose that Arconic was selling Reynobond PE for use in construction projects, where the product was to be used in a manner that the Company knew was unsafe and presented a fire hazard.

114

349.    The Arconic Defendants' statements made in 2016 related to the Company's commitment to safety, its touted safety performance, its adopted procedures to cover contractor and product safety, and its assurances that the Company supplies and uses safe and reliable products and services were false and misleading because at the time these statements were made, (i) Arconic did not employ safety procedures to cover its contractors and product safety, but instead supplied highly flammable Reynobond PE products in construction projects, where the product was to be used in a manner that the Company knew was unsafe and presented a fire hazard; and (ii) Arconic's strong assurances of safety practices concealed from investors the immense risk Arconic had assumed through its marketing and sales of highly-flammable Reynobond PE sales for use in high-rise tower projects across the U.K. and other countries.

350.    The Arconic Defendants' statements made in 2016 representing that Arconic has adopted appropriate risk management and compliance programs that address and reduce the risks associated with legal compliance risks related to product liability, safety, or noncompliance with US and foreign sale sales and trading practices, and their statements that Arconic complies with all laws (including safety laws) and sets high standards for suppliers where unacceptable risk are identified, were false and misleading because, at the time these statements were made, Arconic was selling Reynobond PE for use in construction projects, where the product was to be used in a manner that the Company knew was non-compliant, unsafe and presented a fire hazard, exposing Arconic to hundreds of millions of dollars in potential civil and criminal liability.

351.    The Arconic Defendants' statements made in 2016 concerning sales metrics (*i.e.*, that the Company made millions of dollars in revenues and profits from, among other products, sales of Reynobond PE products) were false and misleading because the Arconic Defendants failed to disclose that Reynobond PE sales proceeds were the result of misleading and illicit marketing

and sales practices, and subjected the Company to significant civil, regulatory, and criminal liability.

352.    The Arconic Defendants' statements made in 2016 concerning the use of its architectural products in buildings, including the representations related to the fact that "fire is a key issue when it comes to buildings," were false and misleading because, at the time these statements were made, the Arconic Defendants failed to disclose that Arconic was selling Reynobond PE for use in construction projects, where the product was to be used in a manner that the Company knew was unsafe and presented a fire hazard, directly contradicting the Company's representations.

353.    The Arconic Defendants' statements made in 2016 regarding unexpected fires were false and misleading when made because they failed to disclose that Arconic's risk of an "unexpected fire" had dramatically increased because it was marketing and selling highly flammable Reynobond PE panels for use in high-rise buildings in a manner that was unsafe and presented a fire hazard.

354.    The Arconic Defendants' statements made in 2014 touting the safety classification of the Reynobond PE products as Class B, thus meeting a Class 0 surface, were false and misleading when made because tests commissioned by Arconic and hidden from the public and the BBA showed that Reynobond PE's classification was reduced to C and E, rendering such products entirely unsafe for use in high rise buildings.  The products did not meet a Class 0 classification.

**False and Misleading Statements Made in 2017**

355.    On or about January 31, 2017, Arconic issued a press release announcing its financial results for the fourth fiscal quarter and full year ended December 31, 2016 ("Q4 2016" and "FY 2016," respectively).    For Q4 2016, the press release reported that Arconic's

Transportation and Construction Solutions segment had generated third-party sales of $456 million, and "record fourth quarter ATOI of $44 million, up $4 million, or 10 percent, year over year."

356.    For FY 2016, the press release reported that Arconic's Transportation and Construction Solutions segment had generated $1.802 billion in third-party sales and $176 million of ATOI.

357.    On February 28, 2017, Arconic filed its Form 10-K for the fiscal year ended December 31, 2016 with the SEC ("2016 10-K"), which was signed and certified pursuant to the Sarbanes Oxley Act of 2002 by Defendant Kleinfeld.   Concerning sales in Arconic's new "Transportation and Construction Solutions" segment, which included sale of "integrated aluminum structural systems," the 2016 10-K stated that "[t]hird-party sales for the Transportation and Construction Solutions segment decreased 4% in 2016 compared with 2015, primarily driven by lower demand from the North American commercial transportation end market, which was partially offset by rising demand from the building and construction end market. . . ."  "ATOI [after-tax operating income] for the Transportation and Construction Solutions segment increased $10, or 6%, in 2016 compared with 2015, principally driven by net productivity improvements across all businesses and growth in the building and construction segment . . . ."

358.    The 2016 10-K also reported sales of architectural aluminum systems of $1,010 million for full year 2016.

359.    The 2016 10-K also represented that "Alcoa may be exposed to significant legal proceedings [and] investigations" and that the "Company is . . . subject to a variety of legal compliance risks," including "potential claims relating to product liability, health and safety . . . .and compliance with U.S. and foreign export laws . . . and sales and trading practices.  Alcoa

could be subject to fines, penalties, damages (in certain cases, treble damages), or suspension or debarment from government contracts." "Alcoa believes it has adopted appropriate risk management and compliance programs to address and reduce these risks."

360.    The 2016 10-K also stated that "Alcoa is subject to a broad range of health, safety and environmental laws and regulations in the jurisdiction in which it operates and may be exposed to substantial costs and liabilities associated with such laws and regulations." "Compliance with . . . health and safety legislation and regulatory requirements may prove to be more limiting and costly than we anticipate. Alcoa's results of operations or liquidity in a particular period could be affected by certain health, safety or environmental matters, including remediation costs and damages related to certain sites. Additionally, evolving regulatory standards and expectations can result in increased litigation and/or increased costs, all of which can have a material and adverse effect on earnings and cash flows."

361.    The 2016 10-K also included a discussion regarding unexpected fires, stating in pertinent part as follows:

Unexpected events may increase Alcoa'''s operations.

Unexpected events, including fires or explosions at facilities, natural disasters, war or terrorist activities, unplanned outages, supply disruptions, or failure of equipment or processes to meet specifications may increase the cost of doing business or otherwise impact Alcoa''

362.    The cover of the 2016 Annual Report emphasized that [w]orking in close partnership with our customers, we solve complex engineering challenges to transform the way we . . . build . . . ," and that "[t]hrough the ingenuity of our people and cutting-edge, advanced manufacturing techniques, *we deliver these products at a quality and efficiency that ensure customer success and shareholder value*."

363.    Arconic's 2016 Annual Highlights Report sent to investors in early 2017 lauded the financial performance in its new Transportation and Construction Solutions segment, stating that it had "recorded revenue of $1.8 billion in 2016, down four percent year over year, ATOI of $176 million, up six percent year over year, adjusted EBITDA of $291 million, up seven percent year over year, and an adjusted EBITDA margin of 16.1 percent."  It further highlighted that Arconic was deriving 10% of its sales from the building and construction industries, and a full 6% of its revenues from the U.K., the only other country than the U.S. whose sales were so significant to Arconic that they were individually broken-out:



364.    In a section entitled "Living Our Values," the 2016 Annual Highlights Report emphasized that Arconic "excel[s] as high-performance teams – safely, with respect and integrity." The section next emphasized "Safety", representing that ***"[n]othing matters more than human life***," and that this had "long been a guiding principle at Arconic, and ***safety [was] one of [its] most cherished values***."

365.    The Company also represented the following with respect to its Ethics and Compliance Program:

Our Ethics and Compliance Program drives a global culture of . . . ***compliance, prevention and risk identification and mitigation*** . . . .

366.    On or about March 25, 2017, Arconic made the following specific statements on its official website directed to investors about the documentation and certification of its Reynobond PE products:

Reynobond . . . composite and aluminum sheet panels are certified in more than 15 countries by certifying bodies such as BBA, CSTB  or ISO.

Fire certificates for Reynobond Architecture: Great Britain BS476 part 6 & 7: Reynobond PE & FR: Class 0; Great Britain BBA Agreement BBA08/4510, classifying the PE panels as Class 0.

Behaviour in relation to fire: when tested for reaction to fire, [product] achieved a classification of B-s2 . . . As a consequence . . . the product[s] may be regarded as having a Class 0 surface.

367.    On information and belief, the Company made similar statements to those in the paragraph above on or about April 25 and May 25, 2017.

368.    On or about April 25, 2017, Arconic issued a press release announcing its financial results for the first fiscal quarter ended March 31, 2017 ("Q1 2017").  For Q1 2017, the press release reported that Arconic's Transportation and Construction Solutions segment had generated third-party sales of $449 million and adjusted earnings before interest, tax, depreciation and amortization ("Adjusted EBITDA," which in Q1 2017 replaced ATOI as Arconic's primary measure of segment performance) of $72 million.

369.    On or about May 2, 2017, Arconic filed its Form 10-Q for the quarter ended March 31, 2017 with the SEC ("Q1 2017 10-Q").  The Q1 2017 10-Q was signed on behalf of Arconic by its CFO and its Controller.  Also, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Arconic's Interim Chief Executive Officer David Hess certified that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact

necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

370.    The Q1 2017 10-Q set forth financial results substantially similar to those described above regarding Arconic's April 25, 2017 press release.

## REASONS WHY THE STATEMENTS MADE IN 2017 WERE FALSE AND MISLEADING

371.    The Arconic Defendants' statements made in 2017, which specifically discuss the features of the Reynobond ACM products, including Reynobond PE, were false and misleading because at the time these statements were made, the Arconic Defendants failed to disclose that Arconic was selling Reynobond PE for use in construction projects, where the product was to be used in a manner that the Company knew was unsafe and presented a fire hazard.

372.    The Arconic Defendants' statements made in 2017 related to the Company's procedures and practices concerning safety, compliance, risk identification and mitigation were false and misleading because at the time these statements were made, (i) Arconic did not employ safety procedures to cover its contractors and product safety, but instead supplied highly flammable Reynobond PE products in construction projects, where the product was to be used in a manner that the Company knew was unsafe and presented a fire hazard; and (ii ) Arconic's assurances of safety practices concealed from investors the immense risk Arconic had assumed through its marketing and sales of highly-flammable Reynobond PE sales for use in high-rise tower projects across the U.K. and other countries.

373.    The Arconic Defendants' statements made in 2017 representing that Arconic has adopted appropriate risk management and compliance programs that address and reduce the risks associated with legal compliance risks related to product liability, safety, or noncompliance with US and foreign sale sales and trading practices were false and misleading because, at the time these

statements were made, Arconic was selling Reynobond PE for use in construction projects, where the product was to be used in a manner that the Company knew was non-compliant, unsafe and presented a fire hazard, exposing Arconic to hundreds of millions of dollars in potential civil and criminal liability.

374.    The Arconic Defendants' statements made in 2017 concerning sales metrics (*i.e.*, that the Company made millions of dollars in revenues and profits from, among other products, sales of Reynobond PE products) were false and misleading because the Arconic Defendants failed to disclose that Reynobond PE sales proceeds were the result of misleading and illicit marketing and sales practices, and subjected the Company to significant civil, regulatory, and criminal liability.

375.    The Arconic Defendants' statements made in 2017 concerning the use of its architectural products in buildings, including the representations related to the fact that "fire is a key issue when it comes to buildings," were false and misleading because, at the time these statements were made, the Arconic Defendants failed to disclose that Arconic was selling Reynobond PE for use in construction projects, where the product was to be used in a manner that the Company knew was unsafe and presented a fire hazard, directly contradicting the Company's representations.

376.    The Arconic Defendants' statements made in 2017 regarding unexpected fires were false and misleading when made because they failed to disclose that Arconic's risk of an "unexpected fire" had dramatically increased because it was marketing and selling highly flammable Reynobond PE panels for use in high-rise buildings in a manner that was unsafe and presented a fire hazard.

377.    The Arconic Defendants' statements made in 2017 touting the safety classification of the Reynobond PE products as Class B, thus meeting a Class 0 surface, were false and misleading when made because tests commissioned by Arconic and hidden from the public and the BBA showed that Reynobond PE's classification was reduced to C and E, rendering such products entirely unsafe for use in high rise buildings.   The products did not meet a Class 0 classification.

## THE TRUTH EMERGES

378.    During the Class Period, the Arconic Defendants made false and misleading statements and engaged in a scheme to deceive the market as detailed herein. The Arconic Defendants undertook a course of conduct which artificially inflated the price of Arconic securities by misrepresenting the Company's business, prospects, and attention to safety. When the Arconic Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Arconic securities fell precipitously as artificial inflation came out of the price.   As a result of their purchases of Arconic securities during the Class Period and the revelation of the Arconic Defendants' conduct, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, incurred damages, under the federal securities laws.

379.    On Saturday, June 24, 2017, news sources revealed that Arconic had knowingly supplied Reynobond PE for use on Grenfell Tower, despite warnings Arconic issued against use of this flammable product above a height which the Grenfell Tower far exceeded.  Reuters reported that internal emails from Arconic employees revealed that "Arconic knowingly supplied flammable panels for use in tower…".[36]  In its response regarding this disclosure, as quoted in the

---

[36] *Reuters*, "REFILE:Arconic knowingly supplied flammable panels for use in tower- - emails" (Refiles to amend editing credit; no changes to story text), June 24, 2017, 8:05 am; original time stamp 7:12 am ET.

*Reuters* article, Arconic admitted it had known its product would be used on Grenfell Tower, but denied responsibility for its use there on the grounds that its role was not "to decide what was or was not compliant with local building regulations." There is no indication in the Reuters article that Arconic addressed the fundamental issue of why, regardless of local building regulations, Arconic sold Reynobond PE for use on Grenfell Tower when it knew the danger of using this flammable product on a high-rise residential building.

> Six emails sent by and to an Arconic Inc sales manager raise questions about why the company supplied combustible cladding to a distributor for use at Grenfell Tower, despite publicly warning such panels were a fire risk for tall buildings.
>
> The emails, dating from 2014 and seen by Reuters, were between Deborah French, Arconic's UK sales manager, and executives at the contractors involved in the bidding process for the refurbishment contract at Grenfell Tower in London, where 79 people died in a blaze last week.
>
> When asked about the emails, Arconic said in a statement that it had known the panels would be used at Grenfell Tower but that it was not its role to decide what was or was not compliant with local building regulations. The company manufactures three main types of Reynobond panel -- one with a polyethylene (PE) core, one with a fire retardant core and another with a non-combustible core, according to its website.
>
> Diagrams in a 2016 Arconic brochure for its Reynobond panels describe how PE core panels are suitable up to 10 metres in height. Panels with a fire resistant core -- the FR model -- can be used up to 30 metres, while above that height, panels with the non-combustible core -- the A2 model -- should be used, the brochure says.
>
> Grenfell Tower is more than 60 metres tall.
>
> The brochure also issued a blunt warning that cladding can be a fire risk.
>
> "When conceiving a building, it is crucial to choose the adapted products in order to avoid the fire to spread to the whole building. Especially when it comes to facades and roofs, the fire can spread extremely rapidly," the brochure said.
>
> "As soon as the building is higher than the fire fighters' ladders, it has to be conceived with an incombustible material." Nonetheless, between May and July 2014, French, who was based at Arconic's factory in Merxheim, France, responded to requests from the companies involved in refurbishing Grenfell Tower on the availability of samples of five different types of Reynobond aluminium-covered

panels, all of which were only available in the combustible PE and FR versions, according to Arconic brochures.

In the end, Arconic said on Friday, the company provided PE panels. "While we publish general usage guidelines, regulations and codes vary by country and need to be determined by the local building code experts," the company said in an emailed statement in response to the Reuters enquiry……

Arconic would not state whether it knew the height of the Grenfell Tower, but the context of the discussion in the emails obtained by Reuters was said to be that of high-rise projects. Reuters' reporting also indicated Arconic must have known the building was a high-rise because, as Reuters observed, Arconic knew the quantity and coverage of the panels it sold for this project. Arconic was said by a source from another contractor on the project to have had "full involvement" in the bidding process for the tower's exterior coverage.

French did not respond to requests for comment.

Arconic, which was known as Alcoa Inc until 2016, declined to say if it knew how tall the tower was and the emails seen by Reuters do not specifically refer to its height. They do, however, refer to "Grenfell Tower" and mention other high rise projects where panelling has been used when discussing the appearance that was being sought for Grenfell Tower.

Arconic also knew the quantity of panels being supplied and thus the total exterior coverage. A source at one of the companies involved in the process said Arconic had "full involvement" throughout the contract bidding process……

In the emails, French and representatives of Harley, Omnis and Rydon also discuss the choice of panel models and colours and how they were inching towards securing the contract with the local authority, the Royal Borough of Kensington and Chelsea (RBKC)….

380.    Also on June 24, 2017, *The New York Times* published a critical article which also confirmed Arconic's awareness of the risk in selling flammable Reynobond PE as cladding covering high-rise buildings. *The New York Times* explicitly contrasted Arconic's "opaque"

125

marketing of flammable cladding in the U.K., where it had sold flammable facades for years, with

Arconic's cautionary sales pitch elsewhere in Europe:[37]

> The incineration of Grenfell Tower on June 14, the deadliest fire in Britain in more than a century, is now a national tragedy. The London Police on Friday blamed flammable materials used in the façade for the spread of the blaze and said the investigation could bring charges of manslaughter....

> Promising to cut "red tape," business-friendly politicians evidently judged that cost concerns outweighed the risks of allowing flammable materials to be used in facades. Builders in Britain were allowed to wrap residential apartment towers – perhaps several hundred of them – from top to bottom in highly flammable materials, a practice forbidden in the United States and many European countries. And companies did not hesitate to supply the British market.....

> Arconic has marketed the flammable facades in Britain for years, even as it has adjusted its pitch elsewhere. In other European countries, Arconic's sales materials explicitly instructed that "as soon as the building is higher than the firefighters' ladders, it has to be conceived with an incombustible material." An Arconic website for British customers said only that such use "depends on local building codes"....

> Fire safety experts said the blaze at Grenfell Tower was a catastrophe that could have been avoided, if warnings had been heeded....

> Flames in an ordinary fire burst out of windows, moving from the inside out. Grenfell Tower burned in reverse, moving inward from the building's exterior. The flames quickly tore upward in streaks through the façade, filling apartments with toxic black smoke. Torrents of orange and red branched out of the first streaks and shot upward. The flames encased the building in a cylinder of fire.....

> ....by 1998, regulators in the United States – where deaths from fires are historically more common than in Britain or Western Europe – began requiring real-world simulations to test any materials to be used in buildings taller than a firefighter's two-story ladder. "The U.S. codes say you have to test your assembly exactly the way you install it in a building," said Robert Solomon, an engineer at the National Fire Protection Association, which is funded in part by insurance companies and drafts model codes followed in the United States and around the world.

> No aluminum cladding made with pure polyethylene – the type used at Grenfell Tower – has ever passed the test, experts in the United States say. The aluminum sandwiching always failed in the heat of a fire, exposing the flammable filling. And the air gap between the cladding and the insulation could act as a chimney,

---

[37] *The New York Times*, "Why Grenfell Tower Burned: Regulators Put Cost Before Safety," June 24, 2017.

intensifying the fire and sucking flames up the side of a building. Attempts to install nonflammable barriers at vertical and horizontal intervals were ineffective in practice.

As a result, American building codes have effectively banned flammable cladding in high-rises for nearly two decades….

And partly because of the influence of American architects, many territories around the world follow the American example. But not Britain…..

*The New York Times* article summarized the history of major fires involving cladding on high-rise buildings, including fires at high-rise buildings with the same type of cladding as had been installed on the Grenfell Tower:

In 2014, the Fire Protection Research Foundation, an organization in the United States, counted 20 major high-rise fires involving cladding. In at least a half-dozen – in France, Dubai, South Korea, the United States and elsewhere – the same type of panels installed at Grenfell tower caught fire. A 2014 fire in Melbourne, Australia, resulted in multiple investigations into the dangers of combustible cladding. Another fire broke out in Dubai, around a 60-story skyscraper, on New Year's Eve of 2015, and yet another, around a 70-story skyscraper there, this April.

*The Times* contrasted Arconic's "opaque" marketing of flammable cladding in Britain with its more forthcoming description of fire hazard in Arconic marketing material targeted at customers elsewhere in Europe. To those customers, Arconic acknowledged that "[f]ire is a key issue when it comes to buildings . . . [e]specially when it comes to facades and roofs …."

The cladding itself was produced by Arconic, an industry titan….Arconic sells a flammable polyethylene version of its Reynobond cladding and a more expensive, fire-resistant version.

In a brochure aimed at customers in other European countries, the company cautions that the polyethylene Reynobond should not be used in buildings taller than 10 meters, or about 33 feet, consistent with regulations in the United States and elsewhere. "Fire is a key issue when it comes to buildings," the brochure explains. "Especially when it comes to facades and roofs, the fire can spread extremely rapidly."

A diagram shows flames leaping up the side of a building. "As soon as the building is higher than the firefighters' ladders, it has to be conceived with an incombustible material," a caption says.

But the marketing materials on Arconic's British website are opaque on the issue.

"Q: When do I need Fire Retardant (FR) versus Polythylene (PR) Reynobond? The answer to this, in part, depends on local building codes. Please contact your Area Sales Manager for more information," reads a question-and-answer section.

As quoted in the article, Arconic attempted to deflect responsibility for safety in use of its cladding products from itself to local building codes and their local interpreters.

Asked about its varying product guidelines, the company added, "While we publish general usage guidelines, regulations and codes vary by country and need to be determined by the local building code experts."

381.   News releases over the weekend tracked the growing realization of the severity of the problem of flammable cladding on high-rises across the U.K.   Ongoing tests of cladding installed on U.K. high-rises resulted in a growing number of high-rise residential buildings found to have flammable cladding.

All 60 council and social housing blocks that have so far undergone mandatory checks have failed combustibility tests, the government said on Sunday evening.[38]

382.   On Monday June 26, 2017, Arconic effectively conceded the unfitness of this cladding product for Grenfell Tower and for high-rise projects generally. According to The Guardian, Arconic sent an email to clients notifying them that it would no longer sell Reynobond PE for use in high-rise buildings. Arconic attributed this decision to "inconsistency of building codes across the world":[39]

The company that manufactures an element of the cladding believed to have contributed to the rapid spread of fire through Grenfell Tower has pulled the material from sale around the world.

---

[38] *The Financial Times*, "UK social housing: Insurers warned of tower fire risk in month before Grenfell," June 25, 2017.

[39] *The Guardian*, "Grenfell Tower: cladding material linked to fire pulled from sale worldwide," June 26, 2017, 11:11 EDT.

Arconic said on Monday that it was discontinuing Reynobond PE, panels that are combined with insulation to form cladding that was revealed as flammable in the wake of the blaze that killed at least 79 people in west London.

The firm said it had stopped global sales of the material for tall buildings over concerns about the "inconsistency of building codes across the world."

The manufacturer said in a statement: "Arconic is discontinuing global sales of Reynobond PE for use in high-rise applications. We believe this is the right decision because of the inconsistency of building codes across the world and issues that have arisen in the wake of the Grenfell Tower tragedy regarding code compliance of cladding systems in the context of buildings' overall designs. We will continue to fully support the authorities as they investigate this tragedy."

The company emailed clients on Monday to tell them it would no longer sell Reynobond PE to buyers planning to use it on tower blocks. It said this would apply globally due to the difficulty of being sure that its material would be used in a way compliant with building regulations in multiple countries.

*The Guardian* observed that Arconic's decision to cease sales of Reynobond PE as cladding for skyscrapers, followed Reuters' revelation that the Company had been aware in 2014 that Reynobond PE would be installed on Grenfell Tower despite Arconic's own warning about its use on high-rise projects.

…..The decision to stop selling Reynobond PE for use in skyscraper cladding comes after it emerged that the company knew that the less fire-resistant version, Reynobond PE, would be used on Grenfell Tower, despite its own guidelines warning that it was unsuitable for buildings above 10m tall. Emails obtained by Reuters showed Arconic was involved in discussions about the use of cladding on the building during 2014.[40]

383.    Analysts expressed concern over the impact on Arconic of the weekend's revelations.  For example, in a June 26, 2017 report from Cowen, Inc., entitled "Cladding Overhang May Linger," an analyst wrote:

ARNC's role in the Grenfell Tower fire raises questions about the firm's broader exposure and makes its quest to hire a high quality CEO harder.

Grenfell Tower Fire Raises Many Questions - Reuters reported that in 2014-15, RNC knowingly supplied flammable cladding that was used in UK's Grenfell

---

[40] *Id.*

129

Tower. Tragically, 79 people were killed when the building caught fire. Besides the obvious question of ARNC's financial liability (which we don't have a way to ballpark yet), this incident raises other important questions: how many other structures may have ARNC's flammable cladding in inappropriate areas, and what internal safeguards/firewalls does ARNC have in place to diligence that products are used in the intended (i.e. safe) way? We have asked ARNC's IR team about these questions and are awaiting a response.

Doesn't Help With CEO Search - ARNC's search for a permanent, operating focused CEO is made harder by this incident (public relations fallout may linger).[41]

384.    Similarly, in a Deutsche Bank report from June 26, 2017 entitled "TCS segment panels linked to Grenfell Tower fire," an analyst wrote

Combustible cladding supplied to Grenfell Tower

Reuters reports state Arconic knowingly provide *[sic]* non-fire rated materials for Grenfell Tower, but did provide warnings as to their appropriate installation use. Responsibility for the Grenfell Tower fire which claimed the lives of 79 people has been linked to a faulty electrical appliance and is believed to have spread quickly due to the new exterior cladding installed in 2014……

Stock down 10% in early-morning trading, shedding ~$1bn of market cap

Arconic's 2016 annual revenue from its Transportation & Construction Solutions (TCS) segment was $1.8bn (15% of company total) and EBITDA contribution was $291m (19%). Architectural Systems accounted for $1bn of revenue and an undisclosed amount of EBITDA. The $1bn selloff appears to represent more-than-half the entire value of the TCS business.[42]

Arconic shares fall as much as 11% in the biggest decline since going public in November, after Reuters reported that jet- and auto-parts maker the [sic] knowingly supplied flammable panels used on London's Grenfell Tower where 79 people died in a fire earlier this month. Although Arconic said it would stop selling the panels for use in high rises, analysts say the bigger concern than lost revenue is the fire-related investigation and possible product liability, While it is difficult to put a figure on the expected liabilities at this point, Seaport analyst Josh Sullivan noted it was a historic case that is likely to have a "historic settlement as well."[43]

---

[41] Cowen, "Cladding Overhang May Linger," June 26, 2017.

[42] Deutsche Bank, "TCS segment panels linked to Grenfell Tower fire," June 26, 2017.

[43] *Bloomberg First Word*, "Arconic London Fire Liability Threatens the Shares: Street Wrap," June 26, 2017, 14:57 ET.

385.     Late in the trading day on June 26, Chris Olin, a representative of institutional asset manager Longbow Research, was interviewed by CNBC about the effect of Arconic's liability in the Grenfell Tower fire. Mr. Olin stated that although the cladding business was perhaps 2-3% of Arconic's annual revenue, "what we are waiting to see is how the liabilities do play out." A CNBC anchor asked directly "Why would the Company sell a product it knew shouldn't be used in buildings over 10 meters in height?" Mr. Olin replied "That I cannot answer for you right now . . . that's what's going to keep investors away from this story at least for the near term..…it's something that's going to be a risk for, for the foreseeable future."[44]

386.     The revelations about Arconic's decision to sell Reynobond PE for Grenfell Tower with full knowledge of the danger posed for a high-rise building by this flammable product, and contrary to Arconic's own warnings, caused sharp declines in price of Arconic common and preferred stock. By market close on Monday, June 26, 2017, the price of Arconic common stock had fallen 5.99% to $24.01 from its closing price of $25.54 on Friday, June 23, 2017. Also on June 26, 2017, the price of Arconic preferred stock fell 6.08% to $37.72, from $40.16 at close on June 23, 2017.

387.     In its June 26, 2017 press release issued after market close, Arconic again attempted to distance itself from responsibility for the Grenfell Tower fire. Arconic pointed to other contributors to the Grenfell Tower's cladding system, as well as to building codes and regulations or violation thereof, minimizing the role Arconic played in the tragic fire as manufacturer and supplier of Reynobond PE.

---

[44] CNBC, "Investors will stay away from Arconic because of bad PR: Longbow Research," June 26, 2017, 3:37 pm ET, accessed April 4, 2018. https://www.cnbc.com/video/2017/06/26/investors-will-stay-away-from-arconic-because-of-bad-pr-longbow-research.html.

- Arconic supplied one of our products, Reynobond PE, to our customer, a fabricator, which used the product as one component of the overall cladding system on Grenfell Tower. The fabricator supplied its portion of the cladding system to the façade installer, who delivered it to the general contractor. The other parts of the cladding system, including the insulation, were supplied by other parties. We were not involved in the installation of the system, nor did we have a role in any other aspect of the building's refurbishment or original design.

- While we provided general parameters for potential usage universally, we sold our products with the expectation that they would be used in compliance with the various and different local building codes and regulations. Current regulations within the United States, Europe and the U.K. permit the use of aluminum composite material in various architectural applications, including in high-rise buildings depending on the cladding system and overall building design. Our product is one component in the overall cladding system; we don't control the overall system or its compliance.

- Nevertheless, in light of this tragedy, we have taken the decision to no longer provide this product in any high-rise applications, regardless of local codes and regulations.[45]

388. Market discussion and analysis of disclosures about Arconic's conduct in knowingly providing a flammable cladding product for use on Grenfell Tower, and its marketing and sales practices, continued on June 27, 2017. In addition, news on June 27, 2017, indicated that law enforcement and regulatory investigation of past application of flammable cladding to high-rise buildings in the U.K., would intensify. In a Cabinet meeting on June 27, U.K. Prime Minister Theresa May called for a major national investigation specifically into use of cladding on high-rise structures, in addition to the previously announced investigation into the Grenfell Tower fire. Prime Minister May's call to the Cabinet and the public came after discovery that flammable cladding had been applied in all 95 samples amounting to 100% of the U.K. high-rises investigated

---

[45] Business Wire, "Arconic Issues Statement on Reynobond PE," June 26, 2017, 5:47 pm EDT.

to date following the Grenfell Tower fire.  This was a further materialization of the risk that the liability of Arconic as manufacturer and seller of flammable cladding, extended beyond liability in the Grenfell Tower fire.

> Prime Minister Theresa May has said there must be a "major national investigation" into the use of potentially flammable cladding on high-rise towers across the country over a period of decades.

> Mrs. May's call came as Cabinet was informed 95 samples of cladding from tower blocks in 32 English local authority areas have failed fire safety tests – amounting to 100 per cent of all samples submitted by councils in the wake of the Grenfell Tower tragedy.

> The PM's official spokesman said the national investigation could be conducted as a second phase of the public inquiry already announced into the west London blaze, which claimed the lives of at least 79 people earlier this month.[46]

389.    On June 27, 2017, prices of Arconic common and preferred stock fell again as a result of the above revelations. Arconic common stock closed on June 27 at $21.84, down 9.04% from its closing price of $24.01 on June 26, 2017.  Arconic preferred stock closed on June 27 at $34.55, down 8.40% from its closing price of $37.72 on June 26, 2017.

## PRESUMPTION OF RELIANCE

390.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- the Arconic Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Arconic securities traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts; and

---

[46] *The Telegraph*, "Grenfell fire: Theresa May pledges 'major national investigation' into cladding on high-rise buildings," June 27, 2017, 1:17 pm GMT (9:17 am ET).

- the misrepresentations and omissions alleged would tend to induce a  reasonable investor to misjudge the value of the Company's securities.

391.   Plaintiffs and members of the Class purchased, acquired and/or sold Arconic securities between the time the Arconic Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

392.   Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

393.   Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as the Arconic Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT III

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants Arconic and Kleinfeld by Plaintiff Ironworkers, and by Plaintiff Sullivan With Respect to the Defined "Preferred Shares" Only)**

394.   This Cause of Action is asserted by Plaintiff Ironworkers on behalf of purchasers of all Arconic securities except the Preferred Shares defined above in connection with the 2014 Preferred IPO, which are brought by Plaintiff Sullivan.

395.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

396.   This Count is asserted against the Arconic Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

397.    During the Class Period, the Arconic Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Arconic securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Arconic securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, the Arconic Defendants, and each of them, took the actions set forth herein.

398.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Arconic Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Arconic securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Arconic's finances and business prospects.

399.    By virtue of their positions at Arconic, the Arconic Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative,

the Arconic Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Arconic Defendants. Said acts and omissions of the Arconic Defendants were committed willfully or with reckless disregard for the truth. In addition, each Arconic Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

400. Information showing that the Arconic Defendants acted knowingly or with reckless disregard for the truth is peculiarly within the Arconic Defendants' knowledge and control. As the CEO of Arconic, Defendant Kleinfeld had knowledge of the details of Arconic's internal affairs.

401. Defendant Kleinfeld is liable both directly and indirectly for the wrongs complained of herein. Because of his position of control and authority, Defendant Kleinfeld was able to and did, directly or indirectly, control the content of the statements of Arconic. As officer and/or director of a publicly-held company, Defendant Kleinfeld had a duty to disseminate timely, accurate, and truthful information with respect to Arconic's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Arconic securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Arconic's business, operational and compliance processes and procedures, which were concealed by the Arconic Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Arconic securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by the Arconic Defendants, and were damaged thereby.

402.    During the Class Period, Arconic securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Arconic Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Arconic securities at prices artificially inflated by the Arconic Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Arconic securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class.  The market price of Arconic securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

403.    By reason of the conduct alleged herein, the Arconic Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

404.    As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

**COUNT IV**

**(Violations of Section 20(a) of the Exchange Act Against Defendant Kleinfeld by Plaintiff Ironworkers, and by Plaintiff Sullivan With Respect to the Defined "Preferred Shares" Only)**

405.    This Cause of Action is asserted by Plaintiff Ironworkers on behalf of purchasers of all Arconic securities except the Preferred Shares defined below in connection with the 2014 Preferred IPO, which are brought by Plaintiff Sullivan.

406.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

407.    During the Class Period, Defendant Kleinfeld participated in the operation and management of Arconic, and conducted and participated, directly and indirectly, in the conduct of Arconic's business affairs.  Because of his senior position, he knew the adverse non-public information about Arconic's misstatement of income and expenses and false financial statements.

408.    As officer and/or director of a publicly owned company, Defendant Kleinfeld had a duty to disseminate accurate and truthful information with respect to Arconic's financial condition and results of operations, and to correct promptly any public statements issued by Arconic which had become materially false or misleading.

409.    Because of his position of control and authority as senior officer, Defendant Kleinfeld was able to, and did, control the contents of the various reports, press releases and public filings which Arconic disseminated in the marketplace during the Class Period concerning Arconic's results of operations.  Throughout the Class Period, Defendant Kleinfeld exercised his power and authority to cause Arconic to engage in the wrongful acts complained of herein. Defendant Kleinfeld therefore, was a "controlling person" of Arconic within the meaning of Section 20(a) of the Exchange Act.  In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of Arconic securities.

410.    Defendant Kleinfeld, therefore, acted as a controlling person of Arconic.  By reason of his senior management position and/or being a director of Arconic, Defendant Kleinfeld had the

power to direct the actions of, and exercised the same to cause, Arconic to engage in the unlawful acts and conduct complained of herein.  Defendant Kleinfeld exercised control over the general operations of Arconic and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

411.    By reason of the above conduct, Defendant Kleinfeld is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Arconic.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the respective Class representatives;

B.    Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: July 23, 2019

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman (Pro Hac Vice)
(New York Bar No. 4161352)
Emma Gilmore
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
        egilmore@pomlaw.com


POMERANTZ LLP
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:   (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Lead Counsel for Lead Plaintiff Ironworkers for
All Shares Other Than the Defined Preferred
Shares*


ROBBINS GELLER RUDMAN
   & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
LINDSAY LA MARCA
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
llamarca@rgrdlaw.com

*Lead Counsel for Lead Plaintiff of the Defined
Preferred Shares*

LAW OFFICES OF CURTIS V. TRINKO, LLP
CURTIS V. TRINKO
16 West 46th Street, 7th Floor
New York, NY  10036
Telephone: 212/490-9550
212/986-0158 (fax)
ctrinko@trinko.com

*Lead Counsel for Lead Plaintiff of the Preferred Shares*


LAW OFFICE OF ALFRED G. YATES, JR., P.C.
ALFRED G. YATES, JR. (PA17419)
GERALD L. RUTLEDGE (PA62027)
300 Mt. Lebanon Boulevard, Suite 206-B
Pittsburgh, PA 15234-1507
Telephone: (412) 391-5164
412/471-1033 (fax)
yateslaw@aol.com

*Local Counsel for Lead Plaintiff Ironworkers for All Securities Other Than the Preferred IPO Shares*

LAW OFFICE OF ALFRED G. YATES, JR.,
P.C.
ALFRED G. YATES, JR. (PA17419)
GERALD L. RUTLEDGE (PA62027)
300 Mt. Lebanon Boulevard, Suite 206-B
Pittsburgh, PA 15234-1507
Telephone: (412) 391-5164
412/471-1033 (fax)
yateslaw@aol.com

*Local Counsel*

LAW OFFICES OF CURTIS V. TRINKO, LLP
CURTIS V. TRINKO
39 Sintski Drive West
Port Washington, NY  11050
Telephone: 212/490-9550
212/986-0158 (fax)
ctrinko@trinko.com

*Additional Local Counsel*