## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MARTIN HOWARD,             )
                                 )
            Plaintiff,        )    2:17-cv-1057
                                 )
               v.           )
                                 )
ARCONIC INC., ET AL.,      )
                                 )
            Defendants.   )
                                 )

## OPINION

**Mark R. Hornak, Chief United States District Judge**

This Court previously granted Defendants' motion to dismiss Plaintiffs' First Amended Complaint and dismissed the First Amended Complaint in its entirety and without prejudice with leave to amend. (ECF Nos. 106, 107.) Plaintiffs seized the opportunity to amend and filed a Second Amended Complaint, which Defendants have again moved to dismiss in its entirety.

Because the Court concludes that the Second Amended Complaint cures some, but not all, of the "three related and fundamental flaws" that were fatal to the First Amended Complaint (*see* ECF No. 106, at 10), the Court will deny in part, and grant in part, Defendants' pending Motion to Dismiss at ECF No. 111. In sum, the claims against Mr. Kleinfeld at Counts III and IV and the claims against the Individual Defendants and Arconic at Count II will be dismissed with prejudice. The claims against Arconic at Count III and against all Defendants at Count I survive Defendants' motion to dismiss, but only to the extent described below.

### I.      BACKGROUND

The Court previously discussed the events prompting the filing of this lawsuit, as alleged in the First Amended Complaint ("FAC") at ECF No. 61. (*See* ECF No. 106, at 2–8.) The Court

need not repeat this factual history, most of which is re-pleaded in the Second Amended Complaint ("SAC") at ECF No. 108, and which is, at this point, familiar to all parties and to the Court.[1]

But here is a brief recap: Arconic, Inc. is a global company engaged in "the engineering and manufacturing of aluminum and other lightweight metals." (SAC ¶ 18.) Arconic manufactured and sold an aluminum composite product called Reynobond PE, which is applied as an exterior wall cladding. (*Id.* ¶ 2.) In 2017, a fire broke out at the Grenfell Tower in London, England, leading to the death of 71 people and injuries to more than 70 others. (*Id.* ¶ 5.) The Grenfell Tower's exterior cladding system included Reynobond PE, and it was reported that the Reynobond PE contributed to the fire's rapid spread. (*Id.* ¶¶ 5–8.) Plaintiffs filed a federal securities class action against Defendants, alleging claims under the Securities Exchange Act of 1934 and the Securities Act of 1933. (*Id.* ¶¶ 3–4.) Besides Arconic, Defendants include Klaus Kleinfeld, the Company's former Chief Executive Officer and Chairman of its Board of Directors; current and former officers and directors of Arconic who signed the Registration for the Preferred Offering (those individuals, together with Kleinfeld, the "Individual Defendants"); and investment banking firms that acted as underwriters for the Preferred Offering (together, the "Underwriter Defendants"). (*Id.* ¶¶ 19–25.)

In April 2018, Plaintiffs filed the FAC. (ECF No. 61.) Defendants moved to dismiss the FAC. (ECF No. 71.) After full briefing and oral argument, this Court issued an 82-page Opinion, dismissing the FAC without prejudice and giving Plaintiffs the chance to file another amended Complaint to the extent that doing so would not be futile. (ECF Nos. 106, 107.) Plaintiffs filed the SAC, and Defendants again moved to dismiss. (ECF Nos. 108, 111.) The matter is now fully briefed, including supplemental briefing on relevant legal developments in the Third Circuit. (ECF Nos. 112, 115, 118, 126, 128, 129.)

---

[1] Likewise, throughout this Opinion, the Court refrains from explaining the SAC's allegations if they also appeared in the FAC.

This Court dismissed Plaintiffs' FAC centrally based on "three related and fundamental flaws": (1) that Plaintiffs did not "adequately and plausibly allege[] that Reynobond PE was being or had been sold for inappropriate end uses other than on the Grenfell Tower"; (2) that Plaintiffs failed to "adequately and plausibly allege that Kleinfeld or any other Arconic executive knew that Reynobond PE was allegedly being sold for improper end uses"; and (3) that "as pleaded, the [FAC did] not plausibly show that a failure to inform investors of this single sale to an end user who wound up using the product unsafely provides a basis for a securities law claim." (ECF No. 106, at 8–11.) These factual gaps caused the Court to conclude that the FAC did not sufficiently allege the requisite levels of materiality and scienter sufficient to support the securities law claims that Plaintiffs sought to advance.

In the SAC, Plaintiffs put forth new allegations that cure some but not all of these flaws. The new allegations fall into two main categories: (1) Plaintiffs allege that Arconic regularly sold Reynobond PE for use on high-rise buildings around the world and tracked the specifications for each construction project to which it supplied Reynobond PE panels; and (2) Plaintiffs allege with more specificity that Arconic managers tasked with certifying Reynobond products knew and concealed the fact that Reynobond PE failed to meet safety standards necessary for the cladding to meet government guidelines.

A. **The Alleged Regular Practice of Selling Reynobond PE for Use in High-Rise Buildings**

Plaintiffs allege that, on top of the sale of Reynobond PE for use in the Grenfell Tower, Arconic sold Reynobond PE for use in many other high-rise buildings, including: multiple high-rise student housing buildings in Newcastle and Nottingham, England; a high-rise student resident hall in Edinburgh, Scotland; multiple high-rise housing buildings in Camden, England; 14 high-rise blocks around the United Kingdom; Clements Court tower in London, England; Castlemain

Tower in London, England; Horatia House in Portsmouth, England; the 32-story Marriott Waterfront Hotel in Baltimore, Maryland; a 24-meter building that houses the office of the Chancellor of the California State University System in Long Beach, California; a 26-meter terminal at the Dallas/Fort Worth International Airport; a 20-meter clinic of the University of Texas Southwestern Medical Center; the 52-meter Cleveland Browns stadium; River East Center's hotel and condominium building; and the Gordon B. Isnor Manor in Halifax, Canada. (*Id.* ¶¶ 49, 51–57, 60, 63, 69, 73–78.) Plaintiffs allege that approximately 230 high-rises in the U.K. are clad with Reynobond PE. (*Id.* ¶ 170.) Plaintiffs also allege that these sales were occurring as early as 2006. (*Id.* ¶ 56.)

According to a confidential witness, certain members of Arconic's management knew that Arconic had a practice of systematically selling Reynobond PE for use in high-rise buildings. (*Id.* ¶ 158.) Plaintiffs also allege that Mr. Claude Schmidt, the general manager of the French facility where the Reynobond PE products were manufactured for use in the U.K. and parts of Europe, knew from sales and production reports and an internal tracking database that the Reynobond PE panels were regularly being sold for use in high-rise projects. (*Id.* ¶¶ 160–65.)

**B. <u>Alleged Concealment of a Failure to Meet Safety Standards</u>**

The SAC also pleads in more detail facts that Plaintiffs say show that Arconic concealed downgraded safety reports about the Reynobond PE product. Here is what the SAC alleges in those regards.

Plaintiffs cite an expert report prepared in connection with the Grenfell Tower investigation in the U.K. that revealed Reynobond PE received downgraded safety ratings. (*Id.* ¶ 120.) The expert report allegedly shows that Arconic hid the downgraded ratings from the contractor and architects of the Grenfell Tower refurbishment, and from the British Board of Agrément ("BBA"),

the entity that certifies buildings under the U.K. building regulations. (*Id.* ¶¶ 120–31.) In 2008, Reynobond PE had been certified as Class 0 under the U.K. building regulations, which meant that the product had the highest rating for preventing the spread of flames and heat. (*Id.* ¶¶ 116–18, 120–21.) But, from October 2011 through 2015, the Scientific and Technical Centre for Building ("CSTB"), which uses the Euroclass standard to classify building products based on their level of combustibility and their fire resistances, had rated Reynobond PE as Euroclass E on its scale of A1 to F, with A1 being the highest fire rating and F being the lowest. (*Id.* ¶¶ 111, 120.) The Euroclass E ratings made the Reynobond PE product ineligible for a Class 0 rating, yet Plaintiffs say that Arconic knowingly continued to claim that Reynobond PE had a Class 0 rating and continued to rely on a factually incorrect safety certification. (*Id.* ¶¶ 115–16, 118–21, 131.)

According to a confidential witness, two members of what Plaintiffs contend were among Arconic's top management knew about these Reynobond PE fire test results. (*Id.* ¶ 154.) Mr. Claude Wehrle, Arconic's Technical Manager at the French facility, was responsible for the certification of Arconic's Reynobond PE products. (*Id.* ¶ 133.) Plaintiffs allege that although Mr. Wehrle's direct employer was an Arconic subsidiary, he nonetheless was the designated Arconic representative involved in corresponding with the CSTB and was also responsible for communicating with the BBA about the certification of Arconic's Reynobond PE products. (*Id.* ¶¶ 133–34.) Under his direction, the Technology Department of the French facility submitted and received results of the fire tests and coordinated the submission of Reynobond PE panels for testing. (*Id.* ¶¶ 154–55.) In addition, when a Reynobond PE panel received poor test results, the Department reported the results to Mr. Schmidt. (*Id.* ¶ 154.)

Plaintiffs allege that Arconic concealed from the BBA the test results performed by the CSTB. (*Id.* ¶ 134.) Despite Arconic's contractual obligation to inform BBA that it had received a

Euroclass E rating, the BBA never received that information. (*Id.* ¶¶ 117–18, 127.) The BBA continued to maintain its 2008 rating certification of Reynobond PE, which showed that the PE products were rated Class 0 and Euroclass B. (*Id.* ¶ 134.) Arconic also allegedly misrepresented on its website that Reynobond PE had a Class 0 rating. (*Id.* ¶ 135.) According to the SAC, the Arconic website stated the following:

- "Reynobond . . . composite and aluminum sheet panels are certified in more than 15 countries by certifying bodies such as BBA, CSTB or ISO."

- "Fire certificates for Reynobond Architecture: Great Britain BS476 part 6 & 7: Reynobond PE & FR: Class 0; Great Britain BBA Agreement BBA08/4510, classifying the PE panels as Class 0."

- "Behaviour in relation to fire: when tested for reaction to fire, [product] achieved a classification of B-s2 . . . As a consequence . . . the product[s] may be regarded as having a Class 0 surface." (*See, e.g.*, *id.*)

## II.    STANDARD OF REVIEW

In considering a motion to dismiss pursuant to Rule 12(b)(6), the Court is to "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (citation omitted). Ordinarily, to survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). And as noted below, provisions of

applicable federal securities statutes set the more particularized substantive context in which some of these assessments are required to be made.

## III.    <u>DISCUSSION</u>

In the SAC, as in the FAC, Plaintiffs allege that Arconic and Mr. Kleinfeld violated § 10(b) of the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder (Count III), that all Defendants violated § 11 of the Securities Act of 1933 and the rules and regulations promulgated thereunder (Count I), that Mr. Kleinfeld violated § 20(a) of the Exchange Act (Count IV), and that Arconic and the Individual Defendants violated § 15 of the Securities Act (Count II).

### A.   <u>Count III: Section 10(b) of the Exchange Act</u>

Section 10(b) of the Exchange Act makes it unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations" prescribed by the SEC. 15 U.S.C. § 78j(b). To implement § 10(b), the SEC promulgated Rule 10b-5, which makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b).

The Supreme Court has implied a private cause of action from the text and purpose of § 10(b) available to investors who have been injured by its violation. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 318 (2007). To state a securities fraud claim under § 10(b), a plaintiff must allege the following elements: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance on the misrepresentation or omission; (5) economic loss; and (6) loss

causation. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005); *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014).

In addition to pleading the foregoing elements, the Private Securities Litigation Reform Act ("PSLRA") imposes two distinct, heightened pleading requirements that must be satisfied for a complaint alleging § 10(b) claims to survive a motion to dismiss. *See Inst'l Inv'rs Group v. Avaya, Inc.*, 564 F.3d 242, 252–53 (3d Cir. 2009). First, the PSLRA requires that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Second, the complaint must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A). That state of mind is "scienter," which is defined as a "mental state embracing intent to deceive, manipulate, or defraud" and it requires knowledge or recklessness. *Avaya*, 564 F.3d at 252 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976)). Both provisions require that facts be pleaded with particularity. This standard "requires plaintiffs to plead the who, what, when, where and how: the first paragraph of any newspaper story." *Id.* at 253 (quoting *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir. 1999)).

The Supreme Court has prescribed a three-step process for considering a motion to dismiss in a § 10(b) case. *See Tellabs*, 551 U.S. at 322–23. First, as with any motion to dismiss, the court must "accept all factual allegations in the complaint as true." *Id.* at 322. Second, the court must "consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the

complaint by reference, and matters of which a court may take judicial notice." *Id.* On this point, the inquiry is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323. Third, "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Id.*

Plaintiffs assert in Count III of the SAC that Arconic and Mr. Kleinfeld violated § 10(b) of the Exchange Act and Rule 10b-5 by making false statements of material fact and/or by failing to state, and thereby omitting, material facts, which deceived the investing public, artificially inflated Arconic's securities' prices, and caused Plaintiffs and members of the Class to purchase Arconic's securities at artificially inflated prices. In the SAC, Plaintiffs essentially recycle some of the § 10(b) claims that they alleged in the FAC: (1) statements in risk disclosures; (2) statements about Arconic's values, commitment to safety, and the safety of Arconic products; and (3) statements about Reynobond PE in product brochures posted on Arconic's website.[2] The SAC also alleges that three newly alleged statements that appeared on Arconic's website are actionable under § 10(b).

Defendants contend that Plaintiffs' § 10(b) claims must be dismissed because: (1) the Court already concluded that most statements in the SAC are not actionable and none of the new allegations affect these rulings; (2) Plaintiffs fail to adequately allege that the new statements in the SAC: (i) were materially misleading, (ii) were made "in connection with" the purchase or sale of securities, or (iii) were the proximate cause of the decline in the security's value (in other words,

---

[2] Plaintiffs are no longer pursuing their § 10(b) claims with respect to Defendants' representations in financial disclosures. (ECF No. 115, at 13 n.4.)

a failure to adequately plead loss causation); and (3) Plaintiffs again fail to raise a strong inference of scienter as to Arconic or Mr. Kleinfeld.

The Court must essentially decide whether the SAC's new allegations affect the Court's prior § 10(b) rulings, and whether the newly alleged misleading statements are actionable. The Court will first address Defendants' arguments about each group of alleged misleading statements.[3] The Court will then turn to the issue of scienter, which pertains to all § 10(b) claims.

### 1. Risk Disclosures

The Court previously concluded that the identified risk disclosures were not actionable because they were not materially false or misleading, and they were protected by the PSLRA safe harbor and the common-law bespeaks caution doctrine. (ECF No. 106, at 39–48.) Now the Court concludes that the amplified allegations of the SAC transform the context in which these statements were made. In light of the new context, Plaintiffs plausibly allege that the statements were materially false or misleading. However, all but one statement within the risk disclosures remain protected by the PSLRA safe harbor or "bespeaks caution" doctrine and are therefore not actionable here.

#### i.    *Material misrepresentation or omission*

The first element of a § 10(b) securities fraud claim is a material misrepresentation or omission. Under the PSLRA's heightened pleading standard, a plaintiff first must specify each allegedly misleading statement, why the statement was misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity. 15 U.S.C. § 78u–4(b)(1). To prevail on a § 10(b) claim, a plaintiff must show that the defendant made a misleading statement or omission as to a material fact. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38

---

[3] The challenged statements that survive the motion to dismiss in whole or in part are reproduced in Appendix A to this Opinion.

(2011) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)). A misrepresentation or omission "is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). The Supreme Court has held that to satisfy the materiality requirement "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc.*, 485 U.S. at 231–32 (quoting *TSC Indus.*, 426 U.S. at 449).

The Third Circuit has held that the question of materiality "typically presents a mixed question of law and fact," which has traditionally been viewed as appropriate for the trier of fact. *Semerenko v. Cendant Corp.*, 223 F.3d 165, 178 (3d Cir. 2000). But "complaints alleging securities fraud often contain claims of omissions or misstatements that are obviously so unimportant that courts can rule them immaterial as a matter of law at the pleading stage." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). The Court determines materiality as of the date of the alleged misstatement or omission, not with the benefit of hindsight. *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002).

Plaintiffs argue that the risk disclosures were materially false or misleading in light of the allegations of the SAC. The risk disclosures made representations about Arconic's exposure to legal proceedings and investigations; Arconic's compliance with health and safety legislation and regulations; and the impact of unexpected events on Arconic's cost of doing business. (*See, e.g.*, SAC ¶¶ 240–42.) Plaintiffs contend that these statements were materially false or misleading because Arconic failed to disclose what Plaintiffs contend was Arconic's regular practice of selling Reynobond PE in a manner that was unsafe, was not legally compliant, and presented a fire hazard.

(ECF No. 115, at 22; *see, e.g.*, SAC ¶ 270.) Defendants contend that none of the new allegations have any impact on the Court's earlier rulings on risk disclosures. (ECF No. 118, at 8.)

Despite Defendants' assertions otherwise, the new allegations throughout the SAC have a "plausible impact" on the Court's prior reasoning. (*See* ECF No. 112, at 13.) In its prior Opinion, the Court emphasized Plaintiffs' failure to adequately allege that Reynobond PE had been sold for inappropriate end uses other than on the Grenfell Tower. Indeed, the Court expressly viewed the risk disclosures in the context of the one sale of Reynobond PE to the Grenfell Tower, concluding that the single sale was "too far removed from Arconic's company-wide risk disclosure to be actionable." (ECF No. 106, at 41 ("It would appear that these disclosures were designed to deal with just such a situation as a sale of a product that no longer complied with local regulations.").) And when discussing the alleged falsity of the risk disclosures, the Court repeatedly referred to "*a sale*" of Reynobond PE for "*an* inappropriate use." (*See, e.g.*, *id.* at 42 (emphasis added).) The Court stated that such a sale, "without more," could not render insufficient Arconic's risk management and compliance programs. (*See id.* at 41.)

The new allegations in the SAC sufficiently offer "more." The new allegations plausibly allege not just a single sale of Reynobond PE that resulted in an inappropriate use by one end user, but instead assert a regular and systematic practice of such sales, leading to many dozens of sales over multiple years. The SAC now alleges with specificity that Arconic regularly sold Reynobond PE for use in high-rise buildings, approximating that 230 high-rise buildings in the U.K. are clad with Reynobond PE and also identifying its use in specific high-rises around the world. (*See, e.g.*, ¶¶ 49, 51, 54, 73, 170.)

In light of the new allegations, the Court concludes that Plaintiffs adequately plead that the risk disclosures were materially false or misleading. In *Meyer v. Jinkosolar Holdings Company*,

the Second Circuit concluded that statements warning about potential environmental risks were misleading because they failed to disclose violations of environmental regulations that had already occurred and were ongoing. 761 F.3d 245, 251–52 (2d Cir. 2014) ("A generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability." (citing *Rombach v. Chang,* 355 F.3d 164, 173 (2d Cir. 2004))). Similarly, here, statements warning about potential compliance issues and safety risks could plausibly be found to have been misleading because they failed to disclose an allegedly ongoing and systematic sales practice of a sufficient magnitude that increased the likelihood of that risk materializing in a serious way. For example, Arconic was allegedly already selling the Reynobond PE product for non-compliant use, and doing so on a regular basis, when Arconic issued statements about its regulatory compliance.

Defendants' arguments do not persuade the Court otherwise. For example, Defendants emphasize that the risk disclosures in this case are more generic than the actionable statements in *Meyer*. (*See* ECF No. 118, at 8 n.3.) This is true and something the Court noted in its earlier Opinion. The Court then explained that, unlike the detailed disclosures in *Meyer*, "the broad disclosures here could not mislead investors into thinking that Arconic would never face any product-safety risks or that it had completely eliminated such risks." (ECF No. 106, at 43.) But the Court conducted its prior analysis of the disclosure statements given the allegations set forth in the FAC. In the context of the SAC, the disclosure statements could plausibly be found to be insufficient when considering Plaintiffs' plausible allegations that Arconic failed to disclose the allegedly extensive ongoing Company sales practice of Reynobond PE for use in high-rise buildings. Likewise, Defendants cite the Court's previous observation that Plaintiffs' "theory would impose securities liability any time a company spoke on its compliance programs and then

had any sort of compliance gap or issue." (*See id.* at 42.) But Defendants again ignore the crux of the SAC's new allegations. Unlike the FAC, the SAC does not allege a "compliance gap." Instead, the SAC alleges a concerted sales effort that allegedly did not align in a significant and material way with Arconic's representations in the risk disclosures. The alleged omissions are no longer too attenuated from the risk disclosures.

Defendants also advance an argument about the § 11 claims that is applicable to the § 10(b) claims and thus worth discussing here. They say that the statement that Arconic "believes it has adopted appropriate risk management and compliance programs to address and reduce" certain risks is a non-actionable opinion. (ECF No. 112, at 36.) Most courts recognize that analyses of opinion statements are similar under both § 11 and § 10(b). *See, e.g.*, *Hall v. Johnson & Johnson*, No. 18-1833, 2019 WL 7207491, at *12 (D.N.J. Dec. 27, 2019).

To adequately allege that an opinion statement is false or misleading, a plaintiff must plead facts that, if true, would be sufficient to show that the opinion statement "constitutes a factual misstatement" or is rendered misleading by the omission of material facts about the "inquiry into or knowledge concerning" the statement, if those facts "conflict with what a reasonable investor would take from the statement itself." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 182, 189 (2015) (discussing opinion statements in the context of § 11 claims).[4] "[A] reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion— or, otherwise put, about the speaker's basis for holding that view. And if the real facts are

---

[4] Although *Omnicare* examined claims under Section 11, the Supreme Court clarified that these principles are "not unique to § 11." *Omnicare*, 575 U.S. at 191. The Third Circuit has not considered whether *Omnicare* applies to claims brought under the Exchange Act. *See Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701, 717 n.16 (3d Cir. 2020), *cert. denied*, 141 S. Ct. 1284 (2021). But, as referenced above, most courts have applied *Omnicare*'s analysis of opinion statements to alleged misleading opinions under § 10(b). *See, e.g.*, *Hall*, 2019 WL 7207491, at *12; *In re Lehman Bros. Sec. & Erisa Litig.*, 131 F. Supp. 3d 241, 251 (S.D.N.Y. 2015).

otherwise, but not provided, the opinion statement will mislead its audience." *Id.* at 188. As such, an investor "cannot state a claim by alleging only that an opinion was wrong; the complaint must as well call into question the issuer's basis for offering the opinion." *Id.* at 194.

Here, Plaintiffs "identify particular (and material) facts" whose omission plausibly makes the opinion statement at issue misleading to a reasonable investor "reading the statement fairly and in context." *See id.* The Court previously concluded that this specific statement was a non-actionable opinion statement in part because "one sale" of Reynobond PE resulting in inappropriate use did not contradict Arconic's basis for a general opinion about its global risk management programs. (*See* ECF No. 106, at 44.) But the Court recognized that "such a belief does not provide a company *carte blanche*" to assert *any* opinion. (*See id.*) Under the circumstances alleged in the SAC, a reasonable investor could plausibly understand the statement to convey misleading facts about how Arconic formed its belief that it had adopted appropriate risk management and compliance programs. A reasonable investor could plausibly take from this risk disclosure statement that Arconic had a reasonable basis for its belief that it had implemented appropriate risk management and compliance programs, an understanding that conflicts with Arconic's alleged sales practice of actively and broadly placing into the marketplace a flammable product for improper use in situations where the risk of any loss being catastrophic was significant, were a loss to occur. In other words, in making the statement, Defendants conveyed to investors that there was a reasonable basis for their belief about the adequacy of the compliance/risk management programs. But the substantial number of sales now pled in the SAC could plausibly call into question the reasonableness of that belief. The SAC's allegations now render this particular statement materially misleading even if it were classified as being an "opinion."

## ii.  *PSLRA safe harbor and the "bespeaks caution" doctrine*

In its prior Opinion, the Court further concluded that the risk disclosures fell within the PSLRA safe harbor and were protected by the "bespeaks caution" doctrine because they were plainly forward-looking and were accompanied by sufficient cautionary language. (ECF No. 106, at 44–48.) The PSLRA safe harbor "immunizes from liability any forward-looking statement, provided that: the statement is identified as such and accompanied by meaningful cautionary language; or is immaterial; or the plaintiff fails to show the statement was made with actual knowledge of its falsehood." *Avaya*, 564 F.3d at 254 (citing 15 U.S.C. § 78u–5(c)). The cautionary language must be "'extensive yet specific' to prevent a reasonable investor from relying on specific projections." *Semerenko*, 223 F.3d at 182 (quoting *In re Trump Casino Sec. Litig.*, 7 F.3d 357, 369 (3d Cir. 1993)).

The judicially adopted bespeaks caution doctrine, which overlaps with, but is not supplanted by, the PSLRA safe harbor, provides that when:

> [F]orecasts, opinions or projections are accompanied by meaningful cautionary statements, the forward-looking statements will not form the basis for a securities fraud claim if those statements did not affect the 'total mix' of information . . . provided investors. In other words, cautionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law.

*In re Trump*, 7 F.3d at 371. The doctrine is a "shorthand for the well-established principle that a statement or omission must be considered in context, so that accompanying statements may render it immaterial as a matter of law." *Id.* at 363. Yet the doctrine does not automatically render all disclaimers not actionable. A "vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation." *Id.* at 371. To be protected under the doctrine, "the cautionary statements must be substantive and

tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge." *Id.* at 371–72.

To determine whether the safe harbor applies, the Court first must decide if the challenged statements meet the definition of "forward-looking," as the provision only applies to forward-looking statements. The Court previously concluded that the risk disclosure statements were "plainly forward-looking." (ECF No. 106, at 45.)

In the § 10(b) section of their response brief, Plaintiffs only appear to argue that the cautionary language was insufficient, not that the statements were not forward-looking. (ECF No. 115, at 22–23.) But in discussing the alleged § 11 violation, Plaintiffs do argue that the risk disclosure statements are not entitled to the PLSRA safe harbor because the risks about which Arconic was allegedly cautioning investors were not simply ones that could possibly transpire, but instead were ones that had already existed and had transpired for years. (*Id.* at 32.)[5] After all, the SAC alleges that Arconic sold Reynobond PE for use in high-rises before the Preferred IPO, even as early as 2006. (*See, e.g.*, SAC ¶ 56.) As such, and because a "mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present," Plaintiffs contend that the safe harbor provision does not apply. (ECF No. 115, at 22–23 (quoting *Avaya*, 564 F.3d at 255).)

But what really matters is the language of the statements and the context in which they arise. *See Avaya*, 564 F.3d at 255–56. The risk disclosures at issue here appeared in the "Risk Factors" section of Arconic's 10-K reports. Courts have often found that risk disclosures of this kind are forward-looking or are otherwise not actionable by themselves. *See, e.g.*, *Indiana Pub.*

---

[5] The safe harbor that applies to statements covered by the Securities Act and the safe harbor that applies to statements covered by the Exchange Act are "identical in all significant respects." *See W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 654 (N.D. Ill. 2020) (citing *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 729 (7th Cir. 2004), *as amended* (Sept. 3, 2004)).

*Retirement System, et. al. v. Pluralsight, Inc.*, No. 19-128, 2021 WL 1222290, at *13–14 (D. Utah Mar. 31, 2021) (collecting cases); *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 360 (S.D.N.Y. 2008). The Sixth Circuit explained that "[r]isk disclosures like the ones accompanying 10–Qs and other SEC filings are inherently *prospective* in nature" because they "warn an investor of what harms *may* come to their investment" and "are not meant to educate investors on what harms are currently affecting the company." *Bondali v. YumA Brands, Inc.*, 620 F. App'x 483, 491 (6th Cir. 2015). "[A] reasonable investor would be unlikely to infer anything regarding the current state of a corporation's compliance, safety, or other operations from a statement intended to educate the investor on future harms." *Id.* The court recognized, however, that "there may be circumstances under which a risk disclosure might support Section 10(b) liability." *Id.*

For the reasons outlined in the Court's prior Opinion, most of the identified risk disclosure statements warn investors about future harms. The Court stated that the risk disclosures "project possible consequences should a risk related to safety, product liability, unexpected events, or other contingencies materialize." (ECF No. 106, at 45.) The Court also highlighted that the 2013 10-K explicitly defined "Forward-Looking Statements" as including all expectations and assumptions other than statements of historical fact. (*See* 2013 10-K, at 4.) These observations generally remain true under the SAC, and as a result, most of the risk disclosures are forward-looking. For example, the risk disclosure statements that refer to unexpected events that "may increase" Arconic's cost of doing business warn investors about possible changes that may occur in the future. (*See* SAC ¶¶ 242, 280, 321, 361); *see also* 15 U.S.C. § 78u–5(i)(1)(B) (defining forward-looking statement in part as a statement about future operations). Similarly, the following statements are forward-looking: statements that Arconic "may be exposed" to legal proceedings and "could be subject to" fines and penalties; statements that compliance with legislation and regulatory requirements "may

prove to be" more costly; statements that operations results "could be affected" by other matters; and statements that evolving regulatory standards "can result in increased litigation." (*See* parts of SAC ¶¶ 240, 241, 278, 279, 319, 320, 359, 360.)

That leaves only three challenged risk disclosure statements for further consideration:

(1) The "Company is . . . subject to a variety of legal compliance risks. These risks include, among other things, potential claims relating to product liability, health and safety . . . and compliance with U.S. and foreign export laws . . . and sales and trading practices.";

(2) "[Arconic] is subject to a broad range of health, safety and environmental laws and regulations in the jurisdiction in which it operates and may be exposed to substantial costs and liabilities associated with such laws and regulations."; and

(3) "[Arconic] believes it has adopted appropriate risk management and compliance programs to address and reduce these risks."

The first two statements include present-tense language about the legal risks facing Arconic (e.g., "is subject to . . ."). As Plaintiffs note, the safe harbor provision does not apply to a "'mixed present/future statement . . . with respect to the part of the statement that refers to the present.'" *Avaya*, 564 F.3d at 255. However, parts of a forward-looking statement can only be actionable when they include "discernable references to the present" that can "meaningfully be distinguished from the future projection of which they are a part." *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 280 (3d Cir. 2010) (quoting *Avaya*, 564 F.3d at 255). Here, the first two statements refer to future risk ("risks [of] potential claims" and "may be exposed"), and the present-tense aspect of the statement ("[Arconic] is subject to . . .") cannot be separated from these forward-looking warnings. These two statements are therefore considered to be forward-looking.

19

The third statement, however, presents a different story. The statement identified in the SAC is not forward-looking, nor is it even expressly in the present tense. But the Court recognizes that it "must examine allegedly misleading statements in context." *In re Amarin Corp. PLC Sec. Litig.*, No. 13-6663, 2016 WL 1644623, at *8 (D.N.J. Apr. 26, 2016), *aff'd*, 689 F. App'x 124 (3d Cir. 2017). The full statement in the 10-K is: "While [Arconic] believes it has adopted appropriate risk management and compliance programs to address and reduce these risks, the global and diverse nature of its operations means that these risks will continue to exist, and additional legal proceedings and contingencies may arise from time to time." The first part of the statement refers to Arconic's belief at the time it was issued, and the core of that statement discusses Arconic's past adoption of risk management and compliance programs, albeit ones that arguably would have also existed at the time the statement was being made. But if such a statement were considered forward-looking, companies would be free to turn statements of historical fact into forward-looking statements merely by reframing the statement solely as one expressing a current belief. To the extent the rest of the statement references the future, the initial assertion that the Company believes it adopted risk management and compliance programs is meaningfully distinguishable from that future aspect. As a result, the third statement identified above is not forward looking. (*See* SAC ¶¶ 240, 278, 319, 359.) This means that it is not protected by the PSLRA safe harbor or the bespeaks caution doctrine, which only apply to forward-looking statements.

But, as discussed, the rest of the statements in the risk disclosures are forward-looking. And under the PSLRA safe harbor, Defendants will not be liable for such forward-looking statements if they were accompanied by meaningful cautionary language or if Plaintiffs failed to show they were made with actual knowledge of falsity.

As for the adequacy of the accompanying cautionary language, the Court's prior conclusion no longer holds up as previously stated and must now be viewed in the context of the SAC's allegations. Integral to the Court's prior conclusion on this issue was that the FAC did not plausibly allege "with requisite specificity that any sales occurred other than the Grenfell Tower sale" or that "Arconic was selling Reynobond PE for high-rise uses 'for years.'" (*See id.* at 46.) This mattered to the Court because "no amount of general cautionary language can protect a company from failure to disclose . . . a risk that has already occurred." (*See id.* (citing *Lin v. Interactive Brokers Grp., Inc.*, 574 F. Supp. 2d 408, 417 (S.D.N.Y. 2008).) Because the SAC now plausibly alleges that Arconic had a years-long practice of selling Reynobond PE for use in high-rise buildings contrary to its approved and tested uses, Plaintiffs plausibly allege that the cautionary language is no longer sufficient to warrant protection under the safe-harbor provision or the bespeaks caution doctrine. The risk-related statements as pleaded in the SAC did not "sufficiently address[] the actual hazards Arconic faced." (*See* ECF No. 106, at 47.) The SAC thus plausibly alleges that the statements lacked meaningful cautionary language.

Even still, the safe harbor will still apply to the forward-looking statements if Plaintiffs failed to adequately allege that the statements were made with actual knowledge of their falsehood. *See Avaya*, 564 F.3d at 259 ("Since this provision specifies an 'actual knowledge' standard, the scienter requirement for forward-looking statements is stricter than that for statements of current fact. Whereas liability for the latter requires a showing of either knowing falsity or recklessness, liability for the former attaches only upon proof of knowing falsity.") As described in Section III.B.2, *infra*, the Court concludes that Plaintiffs have not sufficiently pled a strong inference that Defendants acted with actual knowledge of the falsity of those statements. This pleading failure is dispositive on the question of whether the safe harbor applies to the forward-looking statements

within the risk disclosures. *See id.* The Court must therefore dismiss Plaintiffs' § 10(b) claims relating to the forward-looking risk disclosures.[6]

In sum, the SAC transforms Plaintiffs' allegations about the risk disclosure statements—but not enough for the claims based on all risk disclosure statements to survive. The SAC adequately alleges the material misrepresentation element of the § 10(b) claim, but the PSLRA safe harbor protects the forward-looking risk disclosure statements. However, the Court concludes that one plausibly materially misleading risk disclosure statement is not forward looking, and so the PSLRA safe harbor and bespeaks caution doctrine do not apply to that statement. That statement is as follows: "[Arconic] believes it has adopted appropriate risk management and compliance programs to address and reduce these risks." (*See* SAC ¶¶ 240, 278, 319, 359.)

## 2. Values-Based and Safety Statements

Plaintiffs also allege that Arconic made materially misleading statements about the safety of its products, its commitment to safety and development of safety procedures, its values and ethics, and its compliance programs. The Court previously concluded that such statements were not false or misleading, and that some statements were non-actionable puffery. (ECF No. 106, at 30–37, 48–51.) Plaintiffs argue that in light of the SAC's new allegations that Arconic regularly supplied Reynobond PE for use in high-rises, statements concerning safety and compliance with laws and regulations are now actionable. (ECF No. 115, at 23.) Defendants again contend that the SAC should not change the Court's prior decision. (ECF No. 112, at 11–13.) The Court now concludes that Plaintiffs plausibly allege that certain values-based/safety statements were materially false or misleading.

---

[6] To be clear, the actual knowledge requirement only comes into play when considering the PSLRA safe harbor or bespeaks caution doctrine which only apply to forward-looking statements. Thus, the actual knowledge standard is not required for non-forward-looking statements, such as the one identified above.

Like with the risk disclosure statements, the Court's prior Opinion about the values-based and safety statements focused on the single sale of Reynobond PE for use in the Grenfell Tower and the alleged unsafe use by one end user. The Court distinguished the allegations about safety practices here from the allegations in *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272 (3d Cir. 1992), "where incompetent management practices were plainly at odds with statements touting management's prowess." (ECF No. 106, at 32.) In *Shapiro*, the Third Circuit explained that if a defendant characterizes a practice as "'adequate' or 'solid' even though it knows [it is] inadequate or unstable, it exposes itself to possible liability for securities fraud. By addressing the quality of a particular management practice, a defendant declares the subject of its representation to be material to the reasonable shareholder" and must speak truthfully. 964 F.2d at 282. In assessing the FAC, the Court determined that, unlike in *Shapiro*, there was "no nexus between Arconic's averred commitment to safety and ethics and alleged unsafe end use of one of its products." (ECF No. 106, at 32.) The Court stated that it was "not reasonable to interpret Arconic's general values statements as a covenant that each of its products would be safe in any use made by an end user." (*Id.* at 33.)

The SAC's allegations impact the Court's analysis. As explained above, the SAC now plausibly pleads far more than "one sale" of Reynobond PE for an improper use. The SAC's allegations are more like those outlined in *Shapiro*, because Plaintiffs now allege that Arconic's representations contradicted its own sales practices, as opposed to one isolated improper use by an end user. The SAC also alleges that Arconic concealed Reynobond PE's downgraded certifications from the Grenfell Tower contractors, the BBA, and the public. (*See, e.g.*, SAC ¶¶ 129–34.) The SAC adequately pleads that, by making affirmative representations about product safety and fire safety certifications, Arconic exposed itself to potential liability on the matter. It would be

reasonable for an investor to interpret Arconic's statements as representing that Arconic sought to comply with—rather than ignore or mislead—regulatory bodies, and to employ sales practices for its products that were attentive to relevant safety standards—rather than being dismissive of them. As a result, Plaintiffs plausibly allege that some of the alleged statements in the SAC about Arconic's product safety and safety policies are materially false or misleading.[7]

However, some of the problems that plagued the FAC still remain in the SAC with respect to certain types of these statements. First, some of the alleged statements "relate to [Arconic's] own workplace safety, not product safety." (ECF No. 106, at 34.) The new allegations in the SAC do not render Arconic's statements about its own workplace safety false or misleading. The same is true for statements about contractor safety. As one example of a workplace safety statement, Arconic allegedly stated, "By reinforcing that nothing is more valuable than human life, [Arconic] has progressively improved its safety performance over the years." (SAC ¶ 261.) Read in context, this statement refers to the safety of Arconic's employees. For this reason, the alleged misrepresentations about workplace safety within SAC ¶¶ 232, 243, 247, 260, 261, 283, 288, 295, 313, 331, 338, and 364 are not actionable and claims based on them will be dismissed.[8]

---

[7] The Court notes that the SAC abandons some of the alleged false or misleading values/safety statements that were pleaded in the FAC.

[8] Likewise, other statements placed at issue here are not plausibly false or misleading. For example, SAC ¶ 334 is not actionable because it is about the writing of Arconic's sustainability report and is not false or misleading. Likewise, SAC ¶ 284 is not false or misleading either. And part of SAC ¶ 333 is not actionable because it is about advanced thermal technologies and is not contradicted by any of the SAC's allegations. ("We create thermally efficient architectural aluminum systems that help improve building energy-efficiency by up to 50%.") The Court notes that this statement is different from the statement in ¶ 336, which also refers to thermal technologies. The statement in ¶ 336 is: "Architectural aluminum systems that use advanced thermal technologies can provide superior thermal performance **without compromising on structural performance**" (emphasis added). Because the latter half of the sentence refers to the structural performance of Arconic's aluminum systems, an issue that Plaintiffs plausibly plead that Defendants put "in play," the statement in ¶ 336 is actionable, but the thermal-technology statement in ¶ 333 is not. Finally, in addition to referring to workplace safety, SAC ¶ 338 mentions a certification that "assesses a product's safety to humans." But the SAC's allegations do not render such statement materially misleading.

Second, some of the allegations about values and safety statements are not actionable because they are immaterial puffery. "It is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are 'too general to cause a reasonable investor to rely upon them.'" *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) (citation omitted). The distinguishing feature of puffery is its use of broad generalities, not simply its use of talismanic aspirational language. *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 298 n.5 (S.D.N.Y. 2019). Puffery statements do not violate the securities laws because they lack an underlying factual basis and fail to meet Rule 10b–5's materiality requirement. *In re Newell Brands, Inc. Sec. Litig.*, 837 F. App'x 869, 874 (3d Cir. 2020) (citing *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 872 (3d Cir. 2000)).

Despite the new allegations in the SAC, certain allegedly misleading statements remain non-actionable puffery. The statements that refer to Arconic's Environmental, Health, and Safety Policy and Principles are puffery because they are generalized and are "plainly aspirational goals." (*See* ECF No. 106, at 36); *see also Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) (describing statements in a Code of Ethics and Principles of Conduct as a "textbook example" of puffery); *cf. Allegheny Cty. Employees' Ret. Sys. v. Energy Transfer LP*, No. 20-200, 2021 WL 1264027, at *16 (E.D. Pa. Apr. 6, 2021) (discussing corporate codes of conducts and explaining that statements that address "concrete steps" a company is taking have been found actionable). The same goes for statements in Arconic's annual reports generally touting the Company's values and the existence of an ethics and compliance program. A reasonable investor would not rely on such generalized

statements of optimism.[9] As a result, the claims based on the alleged misrepresentations at SAC ¶¶ 244, 249, 250, 255, 281, 283, 299, 300, 323, 324, 337, and 365 will be dismissed.

Nonetheless, the new context provided by the SAC gives vitality to claims based on some of the other safety statements, plausibly removing them from the puffery realm. Beyond the generalized principles and values statements, Plaintiffs also allege that Arconic made misrepresentations about specific aspects of its safety policies. For example, Arconic allegedly stated that it was developing "procedures to cover . . . external activities, including product safety"; that its products enabled buildings that are safe; and that its wall systems increased occupant safety and were designed to provide increased security to protect occupants against damage and devastation. (*See, e.g.*, SAC ¶¶ 231, 245, 333, 336; *see also id.* ¶¶ 339, 340, 362.)[10] Arconic also allegedly represented that a "main activit[y] undertaken in support of [its] safety system" was "[i]dentifying hazards and assessing the risks associated with [its] products." (*See* SAC ¶¶ 232, 247, 288, 313.) These statements are far more specific, and it would be plausibly reasonable for an investor to rely on them. *See Martin v. GNC Holdings, Inc.*, No. 15-01522, 2017 WL 3974002, at *10 & n.14 (W.D. Pa. Sept. 8, 2017), *aff'd*, 757 F. App'x 151 (3d Cir. 2018); *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 79 & n.4 (S.D.N.Y. 2017). The SAC renders such statements plausibly misleading because by placing the Company's product safety "in play," Defendants were also required to disclose certain facts contradicting those representations, such as its alleged regular practice of selling the PE product for unsafe use. *See Shapiro*, 964 F.2d at 282.

---

[9] Some alleged misrepresentations that appear in Arconic's "Environment, Health, and Safety" Policy and Principles emphasize Arconic's commitment to supplying safe products, valuing human life above all else, and not compromising on safety values. (*See, e.g.*, SAC ¶¶ 249, 250.) Though the Court concludes that there is no basis for a claim as to these statements, the Court notes that it does not resolve here whether they may or may not be otherwise admissible at a trial for an otherwise relevant purpose.

[10] Only parts of the identified statements are plausibly materially misleading; Appendix A to this Opinion sets forth the specific aspects of the challenged statements that survive the motion to dismiss the § 10(b) claims.

The Court concludes that at least parts of the following values/safety statements could be plausibly found to be materially false or misleading: SAC ¶¶ 231, 232, 245, 246, 247, 287, 288, 312, 313, 333, 336, 339, 340, and 362. Appendix A to this Opinion sets out the specific values/safety statements that the Court concludes are plausibly materially misleading (and ultimately plausibly actionable).

### 3. Brochure and Online Statements

Finally, Plaintiffs allege that Defendants misrepresented Arconic's products in statements in brochures on Arconic's website ("brochure statements") and in other statements also posted on Arconic's website ("online statements"). The brochure statements were pleaded in the FAC, but the online statements are new to the SAC. The online statements are as follows:

(1) "Reynobond . . . composite and aluminum sheet panels are certified in more than 15 countries by certifying bodies such as BBA, CSTB or ISO."

(2) "Fire certificates for Reynobond Architecture: Great Britain BS476 part 6 & 7: Reynobond PE & FR: Class 0; Great Britain BBA Agreement BBA08/4510, classifying the PE panels as Class 0."

(3) "Behaviour in relation to fire: when tested for reaction to fire, [product] achieved a classification of B-s2 . . . As a consequence . . . the product[s] may be regarded as having a Class 0 surface." (SAC ¶¶ 253, 290, 326, 366.)

Defendants argue that: (1) that neither the brochure statements nor the online statements were made "in connection with" the sale of securities; (2) that neither the brochure statements nor the online statements were materially false or misleading; and (3) that Plaintiffs failed to allege loss causation with respect to the online statements.[11]

---

[11] Defendants did not raise a loss causation argument in their motion to dismiss the FAC. (ECF No. 106, at 14 n.2.)

For the following reasons, the Court concludes that parts of the online statements and brochure statements are plausibly actionable.

### i. *"In connection with" element*

Rule 10b-5's "in connection with" requirement is satisfied if a statement "is material to a decision by one or more individuals . . . to buy or sell" a security. *Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 387 (2014) (interpreting the identical language of the Securities Litigation Uniform Standards Act of 1998). More specifically, it is met "where material misrepresentations are 'disseminated to the public in a medium upon which a reasonable investor would rely.'" *Rowinski v. Salomon Smith Barney Inc.*, 398 F.3d 294, 301 (quoting *Semerenko*, 223 F.3d at 176).

The Supreme Court has outlined some broad parameters for evaluating the "in connection with" requirement. First, Rule 10b-5 must be "flexibly" construed to "effectuate its remedial purposes." *SEC v. Zandford*, 535 U.S. 813, 819 (2002). Second, although Rule 10b-5 protects the integrity of the securities markets, its remedial purposes are not limited to that goal. *Id.* at 821–22. The "in connection with" requirement can therefore be met even if a "transaction is not conducted through a securities exchange or an organized over-the-counter market." *Superintendent of Ins. of State of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 10 (1971). Third, the fraud can be "in connection with" the purchase or sale of securities even if an identifiable purchaser or seller is not the individual who is deceived. *United States v. O'Hagan*, 521 U.S. 642, 658 (1997).

In its assessment of the FAC, the Court concluded that the brochure statements did not appear in a medium upon which a reasonable investor would rely. Plaintiffs now offer what is essentially a piggybacking theory: they argue that the online statements meet the "in connection" element, and so too do the brochure statements (as they also appeared on the Company's website). At its core, Plaintiffs' argument echoes their original one, that statements on Defendants' website

were part of the "total mix" of information relied upon by investors, under a fraud-on-the-market theory. They argue that "[i]nvestors rely on statements made on websites and brochures as market information, particularly as it relates to compliance and legal issues that have the potential to significantly increase a company's risk of liability." (ECF No. 115, at 18.)

Defendants counter that the online statements and the brochure statements were not made "in connection with" the purchase or sale of securities because they were not directed at investors and the online statements were too technical for a reasonable investor to rely upon. In addition, because the third online statement was limited in scope and referred only to "one minor product of a foreign subsidiary in a foreign market," Defendants say that no reasonable investor would have looked to it. (*See* ECF No. 118, at 11.)

Though the Court considers this a particularly close question, the Court concludes that the SAC drives a plausible inference that the online statements and brochure statements were alleged misrepresentations upon which reasonable investors would rely. Thus, Plaintiffs have adequately shown that the online statements and brochure statements were made "in connection with" the purchase or sale of a security. The Court will first discuss the online statements and then turn to the brochure statements.

The Court first notes that Plaintiffs need not allege that Defendants were directing the online statements specifically to investors in particular. Even if the alleged misrepresentations were not "made for the purpose or the object of influencing the investment decisions of market participants," they still meet the "in connection with" requirement so long as they were shared with the public in a medium upon which a reasonable investor would rely and were material when disseminated. *See Semerenko*, 223 F.3d at 176–77 (explaining that plaintiffs are "not required to establish that the defendants actually envisioned that members of the Class would rely upon the

alleged misrepresentations when making their investment decisions"). Moreover, as Plaintiffs note, "Defendants' statements that the website was not designed to communicate with investors ignores the everyday practice of all research, which begins with checking a company's website." (ECF No. 115, at 17 n.7 (highlighting that a company search on Bloomberg directs visitors to that company's website).) And it is certainly plausible that any rational seller of securities would operate on the belief that investors would visit the Company's website. In fact, an Arconic annual report directed shareholders to its website—not just to access SEC filings and quarterly earnings reports, but also to view "other Company news." (*See, e.g.*, ECF No. 72-13, at 6.) Likewise, shareholders were referred to the Company website in shareholder/analyst calls.[12] (*See* ECF No. 72-11, at 7; ECF No. 72-14, at 7.)

Statements on websites can be made "in connection with" the sale or purchase of securities. *See S.E.C. v. StratoComm Corp.*, 2 F. Supp. 3d 240, 258 (N.D.N.Y. 2014) (explaining that materially false or misleading "website representations" satisfy the "in connection with" requirement), *aff'd sub nom. Sec. & Exch. Comm'n v. StratoComm Corp.*, 652 F. App'x 35 (2d Cir. 2016); *SEC v. Stinson*, No. 10-3130, 2011 WL 2462038, at *5 (E.D. Pa. June 20, 2011) (concluding that the "in connection element" was satisfied because the defendants communicated material misstatements in direct email solicitations, a webinar, and various websites); *Last Atlantis Cap. LLC v. AGS Specialist Partners*, 749 F. Supp. 2d 828, 834 (N.D. Ill. 2010) (explaining that it is "reasonable for companies maintaining websites to anticipate that current or potential investors might read and rely on website statements" and noting that other "courts have analyzed companies' statements on public websites as potentially fraudulent"), *order clarified sub nom. Last Atlantis v.*

---

[12] The annual reports and shareholder calls were incorporated by reference in the SAC, so the Court may therefore consider them. *See Winer Fam. Tr. v. Queen*, 503 F.3d 319, 327 (3d Cir. 2007); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

*AGS Specialist Partners*, No. 04-397, 2011 WL 223798 (N.D. Ill. Jan. 21, 2011). Accepting Plaintiffs' allegations as true and viewing them in the light most favorable to Plaintiffs, the Court cannot say that a reasonable investor would not plausibly rely on the statements posted on Arconic's official website, or more precisely that here, such would be excluded from consideration as a definitional matter.

And in the Court's view, the online statements are not too technical to satisfy the "in connection with" element. Indeed, "the market can absorb technical . . . information." *See In re Carter-Wallace, Inc. Sec. Litig.*, 150 F.3d 153, 156 (2d Cir. 1998). The second and third online statements promote Reynobond products as having a Class 0 certification. Such technical information about Arconic's safety certifications may be of "enormous importance" to reasonable investors. *See id.* Arconic is a global provider of aluminum and lightweight metals for various markets including building and construction. (*See* SAC ¶¶ 2, 18.) Information about the safety, including the fire safety, of such products would seem to plainly bear on the financial prospects of the Company.

As for the brochure statements, the Court concludes, for similar reasons, that they too now meet the "in connection with" element. The Court previously determined that the customer-facing nature of the brochure statements, in the context of the FAC, precluded Rule 10b-5 liability. But now, with the SAC's new allegations about the online statements, Plaintiffs plead a greater overall online presence regarding Arconic's alleged misrepresentation of Reynobond PE products. The SAC thus changes the full picture of the brochure statements. Arconic allegedly emphasized in SEC filings that the Company delivered its products "at a quality . . . that ensure[d] customer success and shareholder value." (SAC ¶ 255.) While such statement is not actionable standing alone, it is plausible that a shareholder would visit Arconic's official website to learn more about

the "quality" of Arconic's consumer products that Arconic itself promoted as being important to shareholder value. Moreover, as discussed below, some of the brochure statements could now be plausibly found to be material and of importance to the investing public, given the extensive allegations about the magnitude of the overall Reynobond PE sales practice. The broader sales scheme alleged in the SAC puts the public dissemination of the information in the brochure statements into a new light. On the facts alleged in the SAC, the Court cannot say as a matter of law that a reasonable investor would not rely upon the brochure statements when making investment decisions.

### ii.      *Material omission or representation*

The parties next debate whether the SAC plausibly alleges that the online statements and the brochure statements are materially misleading. The Court finds most of Defendants' arguments unpersuasive at this stage of litigation and concludes that parts of the online statements and brochure statements are plausibly pled as being materially misleading. The Court will again begin with an analysis of the online statements.

According to the allegations in the SAC, the online statements touted inaccurate safety classifications of Reynobond PE products. In context, the second and third online statements promoted a BBA certification claiming that Reynobond PE was classified as Class 0, the highest possible fire safety rating under the U.K. building regulations. (*See* SAC ¶¶ 116, 120–21.) But the SAC alleges that, contrary to Arconic's representations, Reynobond PE did not meet the Class 0 classification when the online statements were made on the Arconic official website between 2014 and 2017. Because the Reynobond PE product had allegedly been downgraded from Euroclass B to Euroclass C and E, the product could no longer meet the Class 0 certification. In objecting to the falsity of these statements, Defendants inappropriately introduce (mostly through footnotes) a

debate about the technical standards of safety testing.[13] (*See* ECF No. 112, at 14–17 nn.6–7; ECF No. 118, at 10 nn.8–9.) But the Court need not wade through and evaluate the nuances of such technical arguments at this stage. The Court treats as it must the allegations in the SAC as true and views those allegations in the light most favorable to Plaintiffs. The SAC sufficiently alleges that the second and third online statements were false or misleading. And viewed in the context of the SAC's allegations that Arconic was regularly selling Reynobond PE for unsafe use, these statements could also be found to be material to investors. That Arconic was showcasing allegedly false safety certifications and concealing Reynobond PE's downgraded test results plausibly could be viewed as important to a reasonable shareholder.

That leaves the first online statement, which Plaintiffs concede they added "simply for context." (ECF No. 115, at 15.) The first online statement is as follows: "Reynobond . . . composite and aluminum sheet panels are certified in more than 15 countries by certifying bodies such as BBA, CSTB or ISO." The SAC does not render this statement false or misleading. Unlike the second and third statements, it does not refer to Reynobond PE, either specifically (second statement) or when considered in context (third statement). The SAC does not allege that Arconic concealed downgraded certifications for all Reynobond panels. Nor are there allegations in the SAC that would make the rest of the statement false or misleading. The first online statement is therefore not actionable.

Plaintiffs also plausibly plead that the brochure statements about Reynobond products are materially misleading. The Court previously held otherwise, but the SAC again changes the game.

---

[13] Defendants also argue that the end of the second statement as alleged in the SAC — "classifying the PE panels as Class 0" — does not appear in the document that Defendants identified as containing the second statement. (*See* ECF No. 112, at 15 n.7 (citing ECF No. 112-8).) But notwithstanding that assertion by Defendants, the document that Defendants cite shows the PE product classified as Class 0. Defendants argue that Plaintiffs' allegation collapses because this Class 0 rating refers to British Standard 476, and not the BBA. (*See id.*; ECF No. 118, at 10.) But as explained above, such a technical argument is inappropriate for resolution here and now. The SAC's allegations, as a whole, render the second statement plausibly capable of being materially false or misleading.

The brochure statements claimed that the Reynobond products were "fully tested," "[s]afe and [c]ompliant," and "designed and tested to meet safety . . . building codes around the world." (SAC ¶¶ 229, 251, 285, 310.) The Court's previous conclusion that these statements were not materially false or misleading rested primarily on the Court's conclusion that Reynobond PE's use in the Grenfell Tower's cladding did not contradict the brochure statements. (ECF No. 106, at 26.) But Plaintiffs now plausibly allege that Arconic was regularly supplying Reynobond PE for unsafe use in high-rise buildings at the time the brochure statements were made. More than that, the SAC alleges that the Reynobond PE product had received downgraded fire safety ratings that were also concealed by managers at the French facility. Viewed together, it is plausible that the brochure statements about Reynobond products could have given the false or misleading impression that Arconic was selling Reynobond PE only for safe uses.

The brochure statement about general fire safety, however, is not materially misleading. (*See, e.g.*, SAC ¶ 346.) That statement explains that fire is a "key issue when it comes to buildings," further elaborating that building heights help define which building materials are safer to use. (*See id.*) The SAC avers that this statement is materially false or misleading because, at the time the statement was made, Defendants "failed to disclose that Arconic was selling Reynobond PE for use in construction projects, where the product was to be used in a manner that the Company knew was unsafe and presented a fire hazard, directly contradicting the Company's representations." (SAC ¶ 352.) But any alleged omissions about Arconic's sales practices do not render such a general and truthful statement about fire safety misleading. Nothing in the SAC indicates that this statement is false or misleading.

In sum, Plaintiffs adequately allege that the second and third online statements and the brochure statements about Reynobond products are materially false or misleading. (*See* SAC ¶¶

34

229, 251, 253, 285, 290, 310, 326, 366.) Appendix A to this Opinion sets out the specific online and brochure statements that the Court concludes are materially misleading (and ultimately plausibly actionable).

### iii. *Loss causation*

To prevail on a § 10(b) claim, the plaintiff must also prove "loss causation." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 807 (2011). Loss causation is defined as "a causal connection between the material misrepresentation and the loss." *See Dura Pharms., Inc., v. Broudo*, 544 U.S. 336, 342 (2005). The plaintiff must plead that "the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss." *Id.* at 346. "[T]he plaintiff must show that the revelation of that misrepresentation or omission was a substantial factor in causing a decline in the security's price, thus creating an actual economic loss for the plaintiff." *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 425–26 (3d Cir. 2007). The Third Circuit takes a "practical approach [to loss causation], in effect applying general causation principles." *Id.* at 426 (citing *EP MedSystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 884 (3d Cir. 2000)). "[L]oss causation is a fact intensive inquiry which is best resolved by the trier of fact." *In re Wilmington Tr. Sec. Litig.*, 29 F. Supp. 3d 432, 450 (D. Del. 2014) (citing *EP Medsystems,* 235 F.3d at 884).

In accordance with these standards, Plaintiffs have adequately alleged loss causation as to the online statements under a "materialization of a concealed risk" theory. Plaintiffs seek to plead loss causation by alleging that a corrective disclosure of a previously undisclosed truth and that a materialization of a concealed risk caused the decline in the stock price. (*See* ECF No. 115, at 21; *see In re Wilmington Tr. Sec. Litig.*, 29 F. Supp. 3d at 450.) Defendants first argue that because the 2017 corrective disclosures did not correct statements about the false or misleading nature of

the safety ratings, it cannot be said that disclosure of such facts caused any losses. (ECF No. 112, at 19.) On this much, the Court agrees. The online statements are allegedly misleading because they allegedly concealed from the market the downgraded Euroclass certifications and were allegedly false as to the BBA Class 0 rating. But the corrective disclosures did not reveal the falsity or misleading nature of these misrepresentations, nor suggest that the published safety certifications were inaccurate or outdated. True, "there is no requirement that the disclosure mirror the earlier misrepresentation." *In re Urb. Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 655 (E.D. Pa. 2015). But the disclosure must still "reveal at least part of the falsity of the alleged misrepresentation." *In re DVI, Inc. Sec. Litig.*, No. 03-05336, 2010 WL 3522090, at *6 (E.D. Pa. Sept. 3, 2010). The SAC does not allege as much. The disclosures had nothing to do with the safety certifications of Reynobond PE. The corrective disclosures thus did not reveal information about the allegedly misleading online statements that could have caused the loss of which Plaintiffs complain.

But Plaintiffs' other loss causation theory fares better. Under the materialization of the risk theory, Plaintiffs can prove loss causation by showing an event that reveals that an earlier statement was false, or in other words, by showing the materialization of a risk that was misrepresented by the Company.[14] Under this theory, "where some or all of the risk is concealed by the defendant's misrepresentation or omission, courts have found loss causation sufficiently pled." *In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 534 (S.D.N.Y. 2010) (citation omitted). The SAC

---

[14] Defendants note that the Third Circuit has not adopted the materialization of the risk theory. (ECF No. 118, at 13.) But district courts in this Circuit have applied it. *See, e.g., In re Urb. Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 656–57 (E.D. Pa. 2015). And the Third Circuit has discussed the theory without rejecting it. *See McCabe v. Ernst & Young, LLP.*, 494 F.3d 418, 428–29 (3d Cir. 2007); *see also In re DVI, Inc. Sec. Litig.*, No. 03-05336, 2010 WL 3522090, at *7 & n.12 (E.D. Pa. Sept. 3, 2010) ("Although the Third Circuit has not adopted the . . . materialization of the risk approach, it has in dicta discussed this standard and has not rejected it." (citing cases)). Other circuits have adopted or recognized the theory too. *See, e.g., In re Vivendi Universal, S.A., Sec. Litig.*, 838 F.3d 223, 260–61 (2d Cir. 2016); *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 385 (6th Cir. 2016) (noting "the clear weight of persuasive authority" that supported application of the materialization of the risk theory).

alleges that the downgraded certifications were hidden from investors, the public, a regulatory body, and the parties involved in the Grenfell Tower refurbishment. The hazardous nature of using Reynobond PE in high-rise buildings was likewise allegedly concealed. The SAC adequately pleads that the risks concealed by the misleading fire safety ratings—such as a devastating fire accelerated by Reynobond PE, and Arconic's accompanying civil and criminal liability—subsequently materialized and did so to Plaintiffs' detriment. (*See, e.g.*, SAC ¶¶ 386, 388.) Because Plaintiffs have adequately alleged facts that would trigger the materialization of risk theory, the Court concludes that the SAC sufficiently pleads the loss causation element.

### 4. Scienter

Plaintiffs' last hurdle to advancing the otherwise actionable parts of their Exchange Act claims is "scienter." Scienter is a "mental state embracing intent to deceive, manipulate, or defraud" and "requires a knowing or reckless state of mind." *Avaya*, 564 F.3d at 252 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976)). Recklessness involves "not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* at 267 n.42 (quoting *Advanta*, 180 F.3d at 535 (internal quotation marks omitted)). The PSLRA requires that a plaintiff plead scienter with particularity. *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276 (3d Cir. 2006). The particularity requirement is satisfied by a complaint that pleads "facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A).

As the Supreme Court explained in *Tellabs*, "[t]he inference that the defendant acted with scienter need not be irrefutable . . . or even 'the most plausible of competing inferences,'" but a

complaint adequately pleads a strong inference of scienter "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." 551 U.S. at 324 (quoting *Fidel v. Farley*, 392 F.3d 220, 227 (6th Cir. 2004)). A plaintiff need not come forward with "smoking-gun" evidence to plead scienter. *Id.* Rather, the Court "analyze[s] the complaint holistically to determine whether its allegations, 'taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" *In re Hertz Global Holdings Inc.*, 905 F.3d 106, 114 (3d Cir. 2018) (quoting *Tellabs*, 551 U.S. at 323).

The FAC failed to adequately plead the scienter of Mr. Kleinfeld or Arconic. The SAC attempts to cure this deficiency, at least with respect to Arconic, through new allegations that managers in the facility where Reynobond PE products were manufactured knew about the downgraded safety certifications and Arconic's alleged regular sales practice of selling Reynobond PE for use in high-rises. The SAC is silent as to new scienter allegations regarding Mr. Kleinfeld.

For the reasons below, the Court concludes that the SAC fails to adequately plead the scienter of Mr. Kleinfeld, but now adequately pleads the scienter of Arconic through a theory of corporate scienter.

### i. *Scienter of Mr. Kleinfeld*

The SAC's allegations about Mr. Kleinfeld's scienter mirror those presented in the FAC. Plaintiffs admit as much by not responding to Defendants' arguments on this issue. Instead, Plaintiffs merely state in a footnote that "Plaintiffs submit that the scienter allegations with respect to Defendant Kleinfeld raised in the FAC and Plaintiffs' opposition to the prior motion to dismiss were sufficient and are hereby incorporated by reference." (ECF No. 115, at 29 n.14.)

The Court's prior Opinion explained in detail why the FAC failed to adequately plead Mr. Kleinfeld's scienter. (ECF No. 106, at 52–60.) Plaintiffs do not advance any argument about scienter relative to Mr. Kleinfeld based on the new allegations in the SAC. In the Court's view, the SAC adds nothing to change the Court's conclusion or reasoning on this question. Thus, for the same reasons the Court previously outlined, the Court concludes that Plaintiffs have failed to plead facts in the SAC which, viewed together, would support a strong inference that Mr. Kleinfeld acted with scienter. The failure to plead the scienter of Mr. Kleinfeld is fatal to the Exchange Act claims against him and those claims will be dismissed.

### ii.    *Scienter of Arconic*

As for Arconic, Plaintiffs allege a "corporate scienter" theory. A corporate scienter theory permits a plaintiff "to plead an inference of scienter against a corporate defendant without raising the same inferences required to attribute scienter to an individual defendant." *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 246 (3d Cir. 2013). Under this theory, where a defendant is a corporation, a plaintiff must plead facts that give rise to "a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). "Ascribing a state of mind to a corporate entity is a difficult and sometimes confusing task." *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020).

Plaintiffs argue that the SAC pleads specific scienter on the part of Claude Wehrle, the Technical Manager of the French facility, and Claude Schmidt, the General Manager of the French facility. Plaintiffs also argue that the scienter of Mr. Wehrle and Mr. Schmidt is properly imputed to Arconic. Defendants respond that the Third Circuit has not yet adopted the corporate scienter approach; that the SAC does not adequately plead the specific scienter of Mr. Wehrle and Mr.

Schmidt; and that regardless, knowledge of foreign subsidiary employees cannot be imputed to Arconic's senior management.

There remains a circuit split about the corporate scienter doctrine. *Compare Teamsters*, 531 F.3d at 195–97 (adopting a corporate scienter approach in which the scienter of a corporate defendant may be established through a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter), *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) (same), *and City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 668 (6th Cir. 2005) (same),[15] *with Southland Sec. Corp. v. INSpire Ins. Sols. Inc.*, 365 F.3d 353, 365 (5th Cir. 2004) (concluding that scienter may be imputed to a corporation only by looking at "the state of mind of the individual corporate official or officials who make or issue the statement . . . rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment") *and Phillips v. Sci.-Atlanta, Inc.*, 374 F.3d 1015, 1018 (11th Cir. 2004) (noting in dictum that "the most plausible reading" of the PSLRA is that a plaintiff "must allege facts sufficiently demonstrating each defendant's state of mind regarding his or her alleged violations").[16]

The Third Circuit has not definitively weighed in on this question, stating that it "neither ha[s] accepted nor rejected the doctrine of corporate scienter in securities fraud actions." *Rahman*, 736 F.3d at 246. Yet it has suggested that it may be possible to plead scienter against a corporate defendant without pleading scienter against an individual defendant. *See id.*; *In re Hertz Global*

---

[15] *See also In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063 (9th Cir. 2014) (observing that the corporate scienter theory might be appropriate in some cases); *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 743–44 (9th Cir. 2008) (same).

[16] For a more in-depth discussion about the circuit split and the nuances of the various corporate scienter approaches, see *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, No. 16-6509, 2020 WL 3026564, at *24–32 (D.N.J. June 5, 2020), *motion to certify appeal denied*, No. 16-6509, 2021 WL 1016111 (D.N.J. Mar. 17, 2021); *see also In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 474–77 (6th Cir. 2014) (discussing the merits of the different corporate scienter approaches and adopting a "middle ground" approach).

*Holdings Inc.*, 905 F.3d 106, 121 n.6 (3d Cir. 2018); *City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, 442 F. App'x 672, 676 (3d Cir. 2011). In addition, district courts in this Circuit have applied the corporate scienter principle. *See In re Cognizant Tech. Sols. Corp. Sec. Litig.*, No. 16-6509, 2020 WL 3026564, at *29 (D.N.J. June 5, 2020), *motion to certify appeal denied*, No. 16-6509, 2021 WL 1016111 (D.N.J. Mar. 17, 2021) (analyzing corporate defendant's scienter under various corporate scienter approaches); *Sun v. Han*, No. 15-703, 2015 WL 9304542, at *12 (D.N.J. Dec. 21, 2015); *see also In re Merck & Co., Sec. Derivative & "ERISA" Litig.*, Nos. 05-1151, 05-2367, 2013 WL 396117, at *15 (D.N.J. Jan. 30, 2013) (recognizing that the Third Circuit has not definitively embraced or rejected the theory of corporate scienter). The Court will proceed by analyzing the SAC to determine whether this is an appropriate case in which to apply this analytical approach if it were available.

### a. Scienter of Mr. Wehrle and Mr. Schmidt

To begin, the Court finds that the SAC adequately pleads scienter on the part of Mr. Wehrle and Mr. Schmidt. The SAC alleges that Mr. Wehrle acted with scienter because he, as the person responsible for the certification of Arconic's Reynobond PE products, knew that Reynobond PE failed to meet fire safety standards and failed to disclose this information to the BBA. (SAC ¶¶ 133, 134, 139.) The SAC alleges that Mr. Schmidt acted with scienter because he knew that the Reynobond PE product failed safety tests and that it was regularly and arguably extensively being sold for use on high-rises. (*Id.* ¶¶ 154, 161, 162, 165.)

Part of the SAC's scienter allegations stem from statements from confidential witnesses. "[W]here plaintiffs rely on confidential personal sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false. Moreover, even if personal sources must be identified, there is

no requirement that they be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Rahman*, 736 F.3d at 244 (quoting *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 146 (3d Cir. 2004)). In *Avaya*, the Third Circuit explained that when dealing with confidential witnesses, courts should assess the "detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." *Avaya*, 564 F.3d at 261 (quoting *Chubb*, 394 F.3d at 147).

The statements of the confidential witnesses are pleaded with sufficient particularity here. Plaintiffs' scienter allegations are supported in particular by statements from two confidential witnesses ("CW1" and "CW4"). According to CW1, a Marketing Manager and Director between 2000 and 2011, Mr. Wehrle's Technology Department coordinated the submission of Reynobond PE panels to the CSTB for testing and also received the CSTB reports of the results. (SAC ¶¶ 141, 155.) Additionally, CW1 stated that poor fire safety results of Reynobond PE were reported to Mr. Schmidt as the General Manager of the facility. (*Id.* ¶ 154.) And according to CW4, a sales manager in the French facility, Mr. Schmidt knew that Reynobond PE panels were regularly being sold for use in high-rises based on information Mr. Schmidt learned from sales and production reports. (*Id.* ¶¶ 159–61.) CW4 allegedly knew this because they attended meetings with Mr. Schmidt during which Mr. Schmidt discussed these sales reports. (*Id.* ¶ 159.) CW4 also reported, based on personal knowledge and use of the system, that Arconic kept an internal database called the Customer Relations Management ("CRM") software system that tracked what panels were sold to what type of buildings. (*Id.* ¶ 162.) CW4 said that Mr. Schmidt and other employees knew about Arconic's sales of Reynobond PE for use in high-rises based on CRM reports. (*Id.* ¶¶ 164–65.)

Defendants do not ask the Court to discount the statements of the confidential witnesses, and the Court finds no reason to do so for these purposes, particularly given other corroborating allegations in the SAC about the non-compliance with fire safety standards and the sale of Reynobond PE for use in many high-rises beyond the Grenfell Tower.

The allegations in the SAC, including the statements from CW1 and CW4, support a plausible inference that Mr. Schmidt and Mr. Wehrle knew, and failed to disclose to customers or the public, that Reynobond PE's safety certifications had been downgraded, and that Mr. Schmidt knew that the downgraded Reynobond PE panels were regularly being sold for use in high-rises. Defendants essentially acknowledge this, and instead argue that the SAC does not adequately allege that the managers knew such use was *inappropriate* because compliance with building regulations depended on the overall cladding system, not the individual components. (ECF No. 112, at 26.) This argument fails at this stage of the proceedings. According to the SAC, Mr. Schmidt knew about the common sales practice and the concealed downgraded fire safety ratings. Mr. Wehrle allegedly concealed from the BBA the downgraded test results performed by the CSTB, while at the same time Arconic continued to use an outdated BBA certification heralding a then-false Class 0 safety rating. Viewed collectively, the SAC supports a strong inference that Mr. Schmidt not only knew that Arconic was regularly selling Reynobond PE for use in high-rises, but also that he knew, or at least recklessly disregarded, that this "common practice" was improper.

In evaluating the allegations collectively, the Court concludes that Plaintiffs sufficiently plead scienter of Mr. Wehrle and Mr. Schmidt. *See Avaya,* 564 F.3d at 273 ("[I]nference is not arithmetic. The inferential significance of any single allegation can be determined only by reference to all other allegations.").

*b. Imputing scienter to Arconic*

The Court also concludes that the scienter of Mr. Wehrle and Mr. Schmidt can plausibly be properly imputed to Arconic. "In determining whether to impute an employee's scienter to the corporation, courts have considered the employee's role and rank within the company, as well as the employee's relationship to those who ultimately proffered the materially false information that defrauded investors." *Thomas v. Shiloh Indus., Inc.*, No. 15-7449, 2017 WL 2937620, at *3 (S.D.N.Y. July 7, 2017). Defendants make much of the fact that Mr. Wehrle and Mr. Schmidt work for a foreign subsidiary of Arconic. To be sure, the "mere existence of a parent-subsidiary or affiliate relationship is not on its own sufficient to impute the scienter of the subsidiary to the parent or affiliate." *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 301–02 (S.D.N.Y. 2019) (citing *Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 317 (S.D.N.Y. 2011)). That employees at a subsidiary "were allegedly knowledgeable about the fraud does not mean that the parent company's executives . . . were aware." *Christian v. BT Grp. PLC*, No. 17-497, 2018 WL 3647213, at *8 (D.N.J. Aug. 1, 2018).

But the scienter of an officer of a subsidiary may be imputed to the subsidiary's parent corporation if the plaintiff adequately alleges that the parent company "possessed some degree of control over, or awareness about, the fraud." *Valentini*, 837 F. Supp. 2d at 317; *see also Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 708 (7th Cir. 2008) ("the doctrines of respondeat superior and apparent authority remain applicable to suits for securities fraud" (citing *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1429–33 (3d Cir. 1994))). Plaintiffs have now done just that at the pleading stage. The SAC alleges that Arconic maintained a level of control over the alleged fraud by essentially appointing Mr. Wehrle and Mr. Schmidt to manage the safety certifications and sales of Reynobond PE. According to Plaintiffs, Mr. Wehrle, as

manager of the Technology Department, was designated as the person responsible for the certification of Reynobond PE products and was designated as the Arconic representative involved in corresponding with the CSTB and the BBA. (SAC ¶¶ 133–34, 155.) And Mr. Schmidt, as General Manager of the facility, was tapped with tracking the sales reports of Reynobond PE for Arconic. (*Id.* ¶¶ 159–63.)

The SAC alleges that Mr. Wehrle and Mr. Schmidt knew about the downgraded safety tests and that they supplied that information to Arconic and recklessly disregarded or tolerated Arconic's false representations about its products. (*Id.* ¶¶ 139, 167.) Despite Defendants' assertions otherwise, Plaintiffs' allegations on these points are not too conclusory because the SAC as a whole pleads with particularity the designated roles and responsibilities of Mr. Wehrle and Mr. Schmidt with regards to the safety and sales of the Reynobond PE product. This case appears different than cases cited by Defendants, where nothing seems to have suggested that the parent company had control over subsidiary managers in the manner that occurred here, and where the subsidiary managers had no connection to the asserted conduct beyond their status as managers within the subsidiary. *See Christian v. BT Grp. PLC*, No. 17-497, 2018 WL 3647213, at *1–4, 8 (D.N.J. Aug. 1, 2018); *Pathfinder Mgmt., Inc. v. Mayne Pharma, Inc.*, No. 06-2204, 2009 WL 4250061, at *9 (D.N.J. Nov. 25, 2009).

Defendants are nonetheless adamant that Mr. Wehrle and Mr. Schmidt are insufficiently senior for their scienter to be imputed to Arconic. Defendants rely in particular on *Thomas v. Shiloh Industries, Inc.*, 2018 WL 4500867 (S.D.N.Y. Sept. 19, 2018). In that case, the court determined that a "low- to mid-level manager responsible for just a slice of the Company's accounting" was not sufficiently senior to impute his scienter to the corporation, even when the individual had allegedly furnished false information to corporate officials. 2018 WL 4500867, at *5. The court

noted that "the fact that an employee is not part of senior management weighs strongly against imputation," but such is not always determinative. *Id.* at *4. The court proceeded to reject an agency theory of liability that would attribute scienter to the corporation based on any low-level employee's intentional misbehavior. *Id.* at *4–5.

Though *Thomas* is instructive, it does not compel the conclusion Defendants seek. The SAC does not endeavor to attribute scienter to the corporation based on the misbehavior of "any low-level employee." Such a characterization better describes the allegations in the FAC, which focused on the knowledge of Deborah French, a U.K. sales manager. The SAC now focuses on the knowledge of managers of the French facility where Reynobond PE products were manufactured for use in the U.K. and parts of Europe. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177–78 (2d Cir. 2015) (imputing the scienter of a managing director). And the allegations pertain not just to any managers, but rather the very ones assigned with managing the safety certifications and sales of the Reynobond PE product.

The Court must also consider the allegations about Mr. Wehrle and Mr. Schmidt's knowledge and responsibilities given the new allegations about the allegedly voluminous sales of Reynobond PE. This is no longer a case alleging that "one employee of an Arconic subsidiary made one sale of Reynobond PE for use on one high-rise building." (*See* ECF No. 106, at 62.) The SAC moves far beyond that. Besides allegations about dozens of such sales, the SAC alleges that subsidiary managers were essentially deputized by Arconic to be in charge of the Reynobond PE product. Taken collectively, Mr. Wehrle and Mr. Schmidt are plausibly alleged to have acted as managerial agents of Arconic with respect to this product. Ultimately, the SAC does enough at this stage of litigation to permit the particular scienter of Mr. Wehrle and Mr. Schmidt to be imputed

to Arconic. An inference of corporate scienter here is "cogent and at least as compelling as" an opposing inference that could be drawn from the facts alleged. *Tellabs,* 551 U.S. at 324.

On these alleged facts and given the magnitude of alleged Reynobond PE sales for use in high rises, the Court finds it appropriate to apply the "corporate scienter" doctrine here. The Court concludes that the SAC supports a strong inference of scienter as it relates to Mr. Wehrle and Mr. Schmidt, so this is not a case dealing with unknown individuals who may have possessed scienter.[17] And as Plaintiffs note in their briefing, they plead not just that Mr. Wehrle and Mr. Schmidt had the requisite scienter, but also that those individuals were ones who knowingly supplied or furnished misinformation to Arconic. (ECF No. 115, at 26–27 & n.10 (citing the narrower Fifth Circuit corporate scienter approach).)

\*\*\*

In sum, the Court will dismiss the § 10(b) claims against Mr. Kleinfeld because Plaintiffs failed to allege his requisite scienter to survive a motion to dismiss. As for the § 10(b) claims against Arconic, Plaintiffs plausibly plead facts to support their claims based on the following statements only: parts of SAC ¶¶ 240, 278, 319, and 359 (risk disclosure statements); parts of SAC ¶¶ 231, 232, 245, 246, 247, 287, 288, 312, 313, 333, 336, 339, 340, and 362 (values/safety statements); and SAC ¶¶ 229, 251, 285, and 310 (brochure statements) and parts of SAC ¶¶ 253, 290, 326, and 366 (online statements).[18] To the extent that Plaintiffs' § 10(b) claims rest on other statements alleged in the SAC, they are dismissed with prejudice.

---

[17] Plaintiffs do not appear to proceed on a theory that the facts alleged in the SAC are so "extraordinary" so as to establish a strong inference of corporate scienter, like the alleged wrongdoing in *Bridgestone*, 399 F.3d 651, or the hypothetical set forth in *Makor*, 513 F.3d 702. *See Roseville*, 442 F. App'x at 676.

[18] The specific challenged statements under § 10(b) that survive the motion to dismiss are reproduced in Appendix A to this Opinion.

### B.  <u>Count I: Section 11 of the Securities Act</u>

Section 11 of the Securities Act imposes civil liability on preparers and signers of materially misleading registration statements. 15 U.S.C. § 77k(a). A § 11 claim may be brought against the issuer of securities, its directors or partners, underwriters, and accountants who prepared or signed the registration statement. *Id.* It is limited to registered public offerings and provides for broader liability than the Exchange Act because a plaintiff need only show that she bought the security and then that the registration statement contained a material misrepresentation. Reliance is generally not required. *In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 783 (3d Cir. 2009). Nor does § 11 require scienter. *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 273 nn.5, 7 (3d Cir. 2004). The issuer will be strictly liable once the plaintiff proves that she bought the security and there was a material misstatement in the registration statement. Section 11 thus acts as a "virtually absolute liability provision," even for innocent statements. *Id.* at 274 n.7.

Materially identical safe harbor provisions, however, appear in both the Exchange Act and the Securities Act. *See* 15 U.S.C. §§ 77z-2(c), 78u-5(c). Consequently, for § 11 claims, a safe harbor provision limits liability for forward-looking statements if the statements were accompanied by meaningful cautionary statements or if the plaintiff fails to show the statements were made with actual knowledge of their falsity.

Plaintiffs allege that Arconic's 2013 10-K, incorporated by reference into its Registration Statement for the Preferred Offering, omitted information necessary to make the statements in the 10-K not misleading and omitted information required to be disclosed by SEC rules (Items 303 and 503). For the reasons that follow, the Court agrees that the § 11 claims can proceed to the next litigation steps, but only based on the one non-forward-looking statement that is not protected by

the PSLRA safe harbor.[19] Because the Court concludes that Plaintiffs failed to sufficiently plead the requisite actual knowledge, the forward-looking statements are protected by the PSLRA safe harbor and thus cannot proceed. Likewise, the § 11 claims based on Item 303 and 503 cannot proceed because, as discussed below, both SEC rules also require some requisite level of actual knowledge that Plaintiffs fail to plead. Thus, the only § 11 claim that will proceed to the next steps is the one based on the following non-forward-looking statement: "[Arconic] believes it has adopted appropriate risk management and compliance programs to address and reduce these risks."

### 1. False or Misleading

Under § 11, a plaintiff must allege that a registration statement "(1) contained an untrue statement of material fact, (2) omitted to state a material fact required to be stated therein, or (3) omitted to state a material fact necessary to make the statements therein not misleading." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 269 (3d Cir. 2006) (quoting 15 U.S.C. § 77k(a)) (internal quotation marks omitted). Because Plaintiffs' § 11 claims do not sound in fraud, they are only subject to Federal Rule of Civil Procedure 8's more relaxed pleading requirements, and not the PSLRA's heightened standard. *See id.* at 269.

Plaintiffs allege that the Registration Statement misleadingly failed to disclose that, at the time of the Preferred IPO, Arconic regularly sold and was selling and/or negotiating to sell Reynobond PE for unauthorized and unsafe use on high-rise towers. (ECF No. 115, at 30 (citing SAC ¶ 182); *see also* SAC ¶ 181.) The test for materiality under § 11 and § 10(b) is the same. *In re Constar Int'l*, 585 F.3d at 783; *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 273–74 (3d Cir. 2005); *Rombach v. Chang*, 355 F.3d 164, 172 n.7 (2d Cir. 2004). Given that mirror image

---

[19] The Court's specific conclusions as to the actionable status of the § 11 claims are set forth in Appendix B to this Opinion.

analysis, for the same reasons discussed in the Court's analysis in Section III.A.1.i, *supra*, the risk disclosures have been sufficiently alleged to be materially false or misleading for § 11 purposes.

However, as discussed in Section III.A.1.ii, most of the risk disclosures fall within the protection of the PSLRA safe harbor. With the exception of one statement, the risk disclosures are forward-looking. And because, as described below, the SAC does not raise a strong inference of Arconic's actual knowledge that the statements were false or misleading, they are protected by the PSLRA safe harbor. Notwithstanding that, the one non-forward-looking statement within SAC ¶ 182 is actionable under § 11. That sole statement is: "[Arconic] believes it has adopted appropriate risk management and compliance programs to address and reduce these risks."

## 2.  **Item 303**

As stated, Section 11 liability attaches if a registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Because registration statements must comply with Regulation S-K, Item 303 information is "required to be stated therein" and therefore must be disclosed. Item 303 requires a public company to affirmatively disclose trends or uncertainties that are: (1) presently known to management, and (2) reasonably likely to have material effects on the registrant's financial condition or results of operation. 17 C.F.R. § 229.303.

The SAC alleges that at the time of the Preferred Offering, there was an undisclosed trend of knowing and unapproved sales of Reynobond PE for use on high-rise buildings in a manner that Arconic knew was unsafe and which conflicted with safety and risk management safeguards. (SAC ¶¶ 187–88.) Plaintiffs contend that these sales needed to be disclosed in the Registration Statement because they were reasonably likely to have a material impact on Arconic's profitability under

Item 303. (SAC ¶¶ 189.) Defendants argue that the sale of Reynobond PE for allegedly unsafe use does not constitute a "'trend or uncertainty' that could have materially affected Arconic's revenues or income," and even if it did, it was not known to management at the time of the Preferred Opening.

By pleading that Arconic was persistently churning out Reynobond PE sales for unsafe use in high-rises, Plaintiffs sufficiently plead a "trend" reasonably likely to have material effects on the registrant's financial condition. Even though Reynobond PE makes up a fraction of Arconic's overall sales, the considerable extent of the alleged improper sales of Reynobond PE could plausibly be found to drive uncertainties and create substantial risk to Arconic. After all, each sale allegedly increased the likelihood that an impending disaster would come to pass, and that if any such risk converted to reality, the loss resulting would be catastrophic, even if the events were of a limited frequency.

Thus, the alleged undisclosed trend would trigger Item 303's disclosure requirements, so long as it was "known to management." Plaintiffs' argument on this point is based on new allegations about the knowledge of employees at the French facility, broad and general allegations about Arconic's knowledge, and an allegation previously pled in the FAC about a statement in a news article.

These allegations are insufficient. Plaintiffs have failed to raise a plausible inference of the requisite knowledge by Arconic's management. First, the allegations about the French managers do not establish liability under Item 303, which requires a showing that "management" had the requisite actual knowledge of the alleged undisclosed trend when the Registration Statement was

issued.[20] *See Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95 (2d Cir. 2016); *In re Hertz Global Holdings, Inc. Sec. Litig.*, No. 13-7050, 2017 WL 1536223, at *19 n.7 (D.N.J. Apr. 17, 2017).

Second, without citing any specific allegation, Plaintiffs declare that the SAC "alleges that Arconic's management was aware of these sales practices." (ECF No. 115, at 35.) Surely, the SAC alleges that Arconic methodically tracked the specifications for each construction project to which it was supplying PE panels. (SAC ¶ 48.) But it would be too big a leap for the Court to, as Plaintiffs suggest, infer from this that Arconic's management had the requisite actual knowledge of the alleged sales practice. (*Id.*) The SAC cites a 2007 article that reported Arconic implemented an upgraded global database system that allowed "[Arconic's] executives . . . to access, manage, and integrate global data." (*Id. ¶* 140.) The SAC does not allege that this system is the same as the CRM software system described by CW4 nor does it allege that Arconic's executives actually accessed or managed the data relevant here. (*See id. ¶* 162.) This allegation thus does not raise the plausible inference that management had the required actual knowledge. To adequately plead an Item 303 violation, it is not enough to allege that Arconic's management could have known, or even should have known, about the existing trend, event, or uncertainty. *See Indiana Pub. Ret. Sys.*, 818 F.3d at 95. Hypothetical knowledge does not cut it, even in the third iteration of the Complaint and at the pleading stage. *See Blackmoss Invs. Inc. v. ACA Cap. Holdings, Inc.*, No. 07-10528, 2010 WL 148617, at *9 (S.D.N.Y. Jan. 14, 2010) ("While it is true that Section 11 claims generally do not require pleading scienter, Item 303's requirement of knowledge requires that a

---

[20] The scienter standard is distinguishable from the required mental state for Item 303, which requires management's actual knowledge. Scienter, on the other hand, "is a mental state embracing intent to deceive, manipulate, or defraud, and requires a knowing or reckless state of mind." *Avaya*, 564 F.3d at 252 (citations and quotations omitted).

plaintiff plead, with some specificity, facts establishing that the defendant had actual knowledge of the purported trend."); *id.* (citing cases).

Next, the SAC further pleads that "Arconic's top management" knew about the fire test results of Reynobond PE (*see, e.g.*, SAC ¶ 154) and that "Arconic's management" knew that Arconic had a practice of systematically selling Reynobond PE for application on high-rises (*see, e.g.*, *id.* ¶ 158). But such bare, conclusory allegations with a generic reference to "management" are not enough. "Item 303 simply requires more to demonstrate a plausible inference of knowledge by management." *In re Coty Inc. Sec. Litig.*, No. 14-919, 2016 WL 1271065, at *7 (S.D.N.Y. Mar. 29, 2016) (rejecting vague allegations about actions by "management").

Finally, Plaintiffs' last attempt to establish management's actual knowledge lies with a news article that the Court already rejected as not meeting the mark. Like the FAC, the SAC cites a *Reuters* article that reported that "Arconic said in a statement [to Reuters] that it had known the panels would be used at the Grenfell Tower but that it was not its role to decide what was or was not compliant with local building regulations." (SAC ¶ 105.) Plaintiffs ask the Court again to put weight on this statement, which Plaintiffs submit is sufficient on its own to establish that management knew of the sales. (ECF No. 115, at 35 n.25 ("[E]ven if the employee who gave the statement did not have the authority to make it, it would have been approved by someone who had the authority, *i.e.*, it was not a rogue, low-level employee making unauthorized statements on behalf of Arconic.").) The Court's prior conclusion on this point still holds up: "Arconic's after-the-fact statement to a news outlet, seeking to emphasize that it did not know that the Grenfell Tower use of Reynobond PE was non-compliant with local regulations . . . [does] not suffice to allege that *management* knew of any sales for improper uses." (*See* ECF No. 106, at 71.) Plaintiffs do not point to any other allegations in the SAC that could raise a plausible inference that

management knew of the undisclosed trend. Nor do they cite any cases to support their argument that what is alleged is enough.

Though the SAC now sufficiently alleges an undisclosed trend or uncertainty that could require disclosure under Item 303, there are insufficient alleged facts in the SAC to support an inference that Arconic's management had actual knowledge of the alleged trend or certainty. As a result, the SAC does not plausibly allege a violation of Item 303.

### 3. Item 503(c) (now Item 105)[21]

Item 503 of Regulation S-K addresses risk factors associated with the issuer's business or the securities being distributed. Item 503 requires issuers to disclose the most significant factors that make an investment speculative or risky. "[T]hose factors should be (a) concise and organized; (b) specific, not generic; and (c) include an explanation connecting the risks to the offer." *Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701, 711 (3d Cir. 2020) (citing 17 C.F.R. § 229.105). In other words, while "Item [503] seeks a 'concise' discussion, free of generic and generally applicable risks, it requires more than a short and cursory overview and instead asks for a full discussion of the relevant factors." *Id.* at 712.

Plaintiffs argue that Defendants violated their affirmative disclosure duties under Item 503 by failing to disclose that Arconic was selling its product for unauthorized use and that the danger created by these sales practices could expose Arconic to significant criminal and/or civil liabilities, thereby making an investment in Arconic risky or speculative. (ECF No. 115, at 33 (citing SAC ¶ 192).) Defendants contend that the SAC fails to plead an actionable omission under Item 503 because the risk of sales related to Reynobond PE could not have been one of Arconic's "most

---

[21] On April 2, 2019, the SEC relocated Item 503(c) to Item 105 of Regulation S-K to streamline disclosure requirements. *See* FAST Act Modernization and Simplification of Regulation S-K, 84 Fed Reg. 12674, 12688-89 (Apr. 2, 2019); 17 C.F.R. § 229.105. For ease of reference, and because all briefing in this case refers to these requirements as Item 503(c), the Court will also continue to refer to these requirements as Item 503(c).

significant" factors, and, in any event, Arconic appropriately disclosed the risks that materialized. (ECF No. 112, at 30–36.) Defendants further assert that the Item 503 claim must be dismissed because Plaintiffs fail to adequately allege that anyone responsible for the issuance of the Registration Statement knew of the alleged risk to investors.

Relevant to this issue is *Jaroslawicz v. M&T Bank Corporation*, which the Third Circuit decided after the SAC was filed and about which the parties filed supplemental briefing. *See* 962 F.3d 701. In *Jaroslawicz*, the Third Circuit explained the basic "parameters" of Item 503(c): first, "a cause of action for failing to disclose a material risk naturally requires an allegation that a known risk factor existed at the time of the offering," and second, "registrants need not list speculative facts or unproven allegations, even if they fit within one of the identified factors." *Id.* at 713. Applying these parameters to the facts of the case before it, the Third Circuit held that the plaintiffs plausibly alleged that the defendants' disclosures did not meet the requirements of Item 503. The risk disclosures had identified that a merger "hinged on obtaining regulatory approval," but failed to discuss how "treacherous" jumping through the regulatory hoops would be. *Id.* at 714–15. Even though the defendants allegedly knew that failure to obtain regulatory approval would be "significant" and "possibly fatal" to the merger, the defendants offered "little more than generic statements about the process of regulatory review." *Id.* at 716. Such disclosures were deficient and did not meet the Item 503(c) bar.

Here, Arconic generally disclosed that it "may be exposed to significant legal proceedings [and] investigations," and that it was "subject to a variety of legal compliance risks," including "potential claims relating to product liability, health and safety." (SAC ¶ 182.) It disclosed that its "results of operations or liquidity . . . could be affected by certain health, safety or environmental

matters." (*Id.*) Finally, it also disclosed that "unexpected events, including fires or explosions . . . may impact [Arconic's] financial performance." (*Id.* ¶ 195.)

Disclosure of these general risks—were more specific risk factors known, as discussed below—would be plausibly insufficient. The disclosures identified risks facing Arconic but failed to discuss how Arconic's own sales practices amplified those risks. Defendants submit that *Jaroslawicz* "underscores how significant a risk factor must be in order to warrant disclosure under Item 503(c)." (*See* ECF No. 126, at 2.) That may be so, but the SAC still meets that mark. Plaintiffs' theory is that it was very dangerous to use Reynobond PE on high-rises, but Arconic was nonetheless selling that exact product for that exact dangerous use—not once, not twice, but allegedly more than 200 times throughout the U.K. (SAC ¶ 170), plus other sales worldwide. Such a sales practice could plausibly expose Arconic to substantial civil and criminal liabilities. As with the Item 303 "trend" analysis, given the pled magnitude of these allegedly dangerous sales, it would not be dispositive that Defendants' profitability did not "entirely depend[] on [the] commercial success" of Reynobond PE. *See Silverstrand Invs. v. Amag Pharm., Inc.*, 707 F.3d 95, 103–04 (1st Cir. 2013).

*Jaroslawicz* is instructive. The defendants in *Jaroslawicz* knew that failure to obtain regulatory approval would harm the company, and they warned investors as much. Defendants here knew that they could face legal compliance issues and health and safety risks, including those stemming from unexpected fires, and they warned investors as much. But, contrary to Item 503's directive that "specificity is key," defendants in both cases allegedly failed to detail the level of risk that existed. *See Jaroslawicz*, 962 F.3d at 706. Plaintiffs here have therefore pleaded enough

to show that there is a substantial likelihood that a reasonable shareholder would have considered the sales practice important.[22]

The sufficiency of Plaintiffs' Item 503 claim therefore turns on whether such a claim requires knowledge of the significant risk factor. The parties here debate what *Jaroslawicz* says about a knowledge requirement under Item 503. On the one hand, Plaintiffs argue that the Third Circuit clarified that "actual knowledge of the alleged wrongdoing 'is of no moment,'" because, in *Jaroslawicz*, it was the "'risk to the merger posed by the regulatory inspection itself' that triggered the duty to disclose." (ECF No. 128, at 2 (quoting *Jaroslawicz*, 962 F.3d at 716).) On the other hand, Defendants contend that *Jaroslawicz* "unequivocally" held that Item 503 requires knowledge of the alleged risk factor for liability to attach. (ECF No. 126, at 2.)

In *Jaroslawicz*, the Third Circuit plainly imposes some level of knowledge requirement, stating that a "known risk factor" must have existed at the time of the offering. *See* 962 F.3d at 713 (citing *Silverstrand*, 707 F.3d at 103). The court further explained that, like the defendants in *Silverstrand*, the defendants in *Jaroslawicz* were plausibly alleged to have known that regulators would be looking into its compliance program and that failure to obtain approval would be significant to the merger. *Id.* at 716. The Court of Appeals appears to have perhaps muddied the waters a bit, however, in also noting that the defendants' actual knowledge of compliance shortcomings was not relevant.[23] *Id.* But the court did not waver in its holding that given the

---

[22] And the stakes here went beyond the impact of a potential corporate restructuring. The core of Plaintiffs' case appears to be that Arconic was globally selling a considerable volume of Reynobond PE for uses that were contrary to its approved uses, and that the risk of any loss being catastrophic was both real and high. Given that, the degree of specificity becomes even more acute, in that it is more than plausible that any loss would by definition be a big one, and, in terms of actual financial liability, would generate a risk of major harm to the reputation of the product and then to Arconic as a seller of the product. Even if the likelihood of a specific risk being converted to an actual loss on any one day at any one building may not be huge, the likelihood that any loss, were it to occur, would be huge is plausibly quite real and quite significant.

[23] The Court also notes there remains some differences among other courts about what satisfies this knowledge requirement. *Compare Rubinstein v. Credit Suisse Grp. AG*, 457 F. Supp. 3d 289, 300 (S.D.N.Y. 2020) ("Plaintiffs must demonstrate *actual* knowledge of an existing trend, event, or risk to allege violations of Section 303 and [503].")

defendants' alleged knowledge of the significance of the merger, the defendants were still required to make more than generic statements about the process of regulatory review.

In this way, *Jaroslawicz* is different than this case. The SAC does not allege a known risk like the one present in *Jaroslawicz*. As discussed above, there is no well-pleaded allegation that anyone responsible for making the statements in the 10-K, or anyone in Arconic's management, was actually aware that Arconic was persistently selling Reynobond PE for allegedly improper use. Without such allegations, the Item 503 claim is insufficient. In short, like with Item 303, the SAC's failure to adequately plead Arconic's actual knowledge is fatal to this claim.

### 4. Timing

Finally, Defendants also argue that the § 11 claims must be dismissed in part because the SAC fails to adequately plead violations after October 2015. "Section 11 plaintiffs generally are presumed to have relied on allegedly false and misleading statements in offering documents." *In re IndyMac Mortg.-Backed Sec. Litig.*, 286 F.R.D. 226, 240 (S.D.N.Y. 2012). Notwithstanding that general rule, a plaintiff bringing a § 11 claim must prove reliance on a misrepresentation in a registration statement if the plaintiff "acquired the security after the issuer has made generally available to its security holders an earning statement covering a period of at least twelve months beginning after the effective date of the registration statement." 15 U.S.C. § 77k(a); *see also In re Petrobras Sec.*, 862 F.3d 250, 259–60 (2d Cir. 2017) (mentioning limitations inherent in Section 11 (citing 15 U.S.C. § 77k(a))).

Defendants argue that the SAC does not allege that any purported class member relied on the Registration Statement (declared effective on July 30, 2014, *see* SAC ¶ 178), and so, any claims

---

with *Panther Partners Inc. v. Jianpu Tech. Inc.*, No. 18-9848, 2020 WL 5757628, at *10 (S.D.N.Y. Sept. 27, 2020) ("Plaintiff need not allege Defendants' knowledge in order to plead an Item 503 violation.").

based on purchases after October 23, 2015, by which date Arconic had issued such earning statements, must be dismissed. (ECF No. 112, at 36 (citing *In re Petrobras Sec. Litig.*, 150 F. Supp. 3d 337, 344 (S.D.N.Y. 2015).)

An "earning statement" must consist of one, or any combination of, the following corporate reports: Forms 10-K, 10-Q, 8-K, 20-F, 40-F, 6-K, or in the annual report pursuant to Rule 14a–3 of the Exchange Act. 17 C.F.R. § 230.158(a)(2)(i)-(ii). Here, a combination of 10-K and 10-Q reports covering a period of at least 12 months beginning after the effective date of the registration statement were made available to security holders. (*See* SAC ¶¶ 276, 293, 297, 302.)

Plaintiffs do not respond to Defendants' argument on this point in their briefing. Nor do they plead that they relied on the original registration statements for purchases made after the issuance of the earning statements. Accordingly, Plaintiffs' § 11 claims based on purchases after October 23, 2015 must be dismissed.

***

In sum, Count I of the SAC survives Defendants' motion to dismiss only to the extent that it is based on the non-forward-looking statement within SAC ¶ 182 and on purchases before October 23, 2015. The other § 11 claims, including those based on Item 303 and Item 503, are dismissed with prejudice.

### C. <u>Count IV: Section 20(a) of the Exchange Act</u>

Plaintiffs also allege claims pursuant to § 20(a) against Mr. Kleinfeld. In Plaintiffs' view, because they have alleged a primary violation under § 10(b), the Court should sustain Plaintiffs' control-person claims under § 20(a). In addition to arguing that the § 20(a) claim should be dismissed because the SAC fails to allege a predicate violation of § 10(b), Defendants argue that

Plaintiffs fail to plead Mr. Kleinfeld's culpable participation in the alleged wrongdoing, and as such, the § 20(a) claims against him must be dismissed.

Section 20(a) of the Exchange Act imposes joint and several liability on any individual who exercises control over a "controlled person" who violates §10(b). 15 U.S.C. § 78t(a); *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 275 (3d Cir. 2005). The elements of a § 20(a) claim, or a "control person" claim, are: (1) the defendant controlled another person or entity; (2) the controlled person or entity committed a primary violation of the securities laws; and (3) the defendant was a culpable participant in the fraud. *In re Suprema*, 438 F.3d at 284 & n.16. "[P]laintiffs must prove not only that one person controlled another person, but also that the 'controlled person' is liable under the [Exchange] Act." *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 484 (3d Cir. 2013) (quoting *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 153 (3d Cir. 2004), *abrogated on other grounds by Tellabs*, 551 U.S. 308). "Culpable participation refers to either knowing and substantial participation in the wrongdoing or inaction with the intent to further the fraud or prevent its discovery." *Carmack v. Amaya Inc.*, 258 F. Supp. 3d 454, 466 (D.N.J. 2017) (citing *Rochez Bros., Inc. v. Rhoades*, 527 F.2d 880, 890 (3d Cir. 1975)).

District courts in this Circuit are divided on whether Plaintiffs must plead culpable participation to establish control person liability at the pleading stage. *See Belmont*, 708 F.3d at 485 n.20 (declining to resolve the "difference of opinion" about the § 20(a) pleading requirements that has emerged among district courts in the Third Circuit). The Court will follow the lead of the recent decisions of other courts in this Circuit that require a plaintiff to plead all elements of a § 20(a) claim, including culpable participation. *See, e.g.*, *In re Advance Auto Parts, Inc.*, No. 18-212, 2020 WL 599543, at *9–10 (D. Del. Feb. 7, 2020); *In re Cognizant Tech. Sols. Corp. Sec.*

*Litig.*, No. 16-06509, 2018 WL 3772675, at *35 (D.N.J. Aug. 8, 2018); *see also In re Suprema*, 438 F.3d at 284 n.16 (suggesting that § 20(a) requires culpable participation to be pled).

The Court explained above, in Section III.A.4, *supra*, that Plaintiffs failed to adequately plead scienter on behalf of Mr. Kleinfeld. For substantially the same reasons, Plaintiffs have not alleged that Mr. Kleinfeld was a "culpable participant" in the fraud. *See In re Henry Schein, Inc. Sec. Litig.*, No. 18-01428, 2019 WL 8638851, at *29 (E.D.N.Y. Sept. 27, 2019) (finding that because plaintiffs failed to allege scienter of certain defendants under § 10(b), the plaintiffs necessarily failed to allege that those defendants were culpable participants under § 20(a)); *see also id.* (citing cases).

The Court will thus dismiss with prejudice the § 20(a) claims against Mr. Kleinfeld.

### D. **Count II: Section 15 of the Securities Act**

Finally, Defendants move to dismiss the § 15 claims against the Individual Defendants and Arconic. Plaintiffs argue that the Court should sustain the § 15 claims on the basis that Plaintiffs have alleged a primary violation under § 11. (ECF No. 115, at 36.) Like with the § 20(a) claims, in addition to arguing that Plaintiffs fail to plead a predicate violation, Defendants also argue that Plaintiffs fail to plead the culpable participation of the Individual Defendants, and as such, the § 15 claims must be dismissed. (ECF No. 112, at 36.)

Section 15 of the Securities Act imposes joint and several liability on any person who controls anyone liable under § 11 of the Securities Act. 15 U.S.C. § 77o(a); *In re Suprema*, 438 F.3d at 285. "[T]he plaintiff must prove that one person controlled another person or entity and that the controlled person or entity committed a primary violation of the securities laws." *In re Suprema*, 438 F.3d at 284. The Third Circuit has not clarified whether culpable participation is also required for a § 15 violation. Some district courts in our Circuit have required culpable

participation as an element of a § 15 claim, and others have not. *See SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 911 n.189 (E.D. Pa. 2018) (noting that it is "not clear whether culpable participation is . . . required for a § 15 violation" and referencing the split on the matter among district courts in the Third Circuit). The Court concludes that such a claim requires culpable participation as an element which needs to be pled and then proven.[24] *See Carmack v. Amaya Inc.*, 258 F. Supp. 3d 454, 466, 469 (D.N.J. 2017); *Yang v. Tibet Pharms., Inc.*, No. 14-3538, 2015 WL 730036, at *5 n.11 (D.N.J. Feb. 20, 2015); *In re Ravisent Techs., Inc.*, No. 00-1014, 2004 WL 1563024, at *15 (E.D. Pa. July 13, 2004); *see also In re Weight Watchers Int'l Inc. Sec. Litig.*, No. 19-2005, 2020 WL 7029134, at *7 (S.D.N.Y. Nov. 30, 2020); *In re Marsh & Mclennan Companies, Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 493–94 (S.D.N.Y. 2006).

Here, the Court has concluded that Plaintiffs adequately alleged a primary violation of § 11. But the SAC fails to allege facts about the culpable participation of any Individual Defendant in the alleged wrongdoing. *See Carmack*, 258 F. Supp. 3d at 469 (finding no particularized allegations of individual defendants' alleged control of, or culpable participation in, any of the alleged false or misleading statements); *see also Belmont*, 708 F.3d at 485 (describing examples of culpable participation in the § 20(a) context). The SAC alleges only that the Individual Defendants signed the Registration Statement (SAC ¶ 24), and then pleads conclusory statements that the Individual Defendants were control persons of Arconic by virtue of their positions, and that they were culpable participants based on having signed the Registration Statement and having

---

[24] The Court recognizes that the split among district courts, in this Circuit and in others, about whether a § 15 claim requires culpable participation is more entrenched than the split about pleading culpable participation for a § 20(a) claim, as some district courts have held that § 20(a) requires culpable participation while § 15 does not. *See, e.g., In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 660 & n.43 (S.D.N.Y. 2007); *In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 187–89 (S.D.N.Y. 2003). The Court notes that the Third Circuit has not spoken on this question, and it was barely briefed by the parties. In fact, Plaintiffs only contended that culpable participation is not required to plead a § 15 claim in their response to the motion to dismiss the FAC, not in any of the SAC briefing. (*See* ECF No. 75, at 51 n.31; ECF No. 115, at 36.)

participated in the process that allowed the Preferred IPO to be completed. (*Id.* ¶¶ 208–09.) That is not enough for culpable participation.

But the SAC alleges § 15 claims against Arconic too. The parties did not directly address these claims in their briefing. The Court bears in mind that the SAC also alleges that Arconic is the controlled entity under the § 11 claims. "A person cannot be both the controller and the controlled." *In re Regal Communications Corp. Sec. Litig.,* No. 94-179, 1996 WL 411654, *4 (E.D. Pa. July 17, 1996); *see also Rochez v. Rhoades,* 527 F.2d 880, 891 (3d Cir. 1975). The Court recognizes that alternative theories of liability are permitted at the pleading stage, including with respect to control-person claims in securities fraud cases such as this one. *See* Fed. R. Civ. P. 8(d)(2) (stating that a party "may set out" alternative statements of a claim alternatively or hypothetically, either in a single count or defense or in separate ones); *In re Harmonic, Inc., Sec. Litig.*, No. 00-2287, 2006 WL 3591148, at *8 (N.D. Cal. Dec. 11, 2006); *see also Universal Am. Corp. v. Partners Healthcare Sols. Holdings, L.P.*, 176 F. Supp. 3d 387, 398 (D. Del. 2016); *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 412–13 (S.D.N.Y. 2005). The alternative pleading requirement under Rule 8(d)(2) "is generally met through 'either-or' propositions' or 'if-then' allegations.'" *See Sun Life Assurance Co. of Canada v. Imperial Premium Fin., LLC*, 904 F.3d 1197, 1213 (11th Cir. 2018). In the § 11 section of the SAC, Plaintiffs here allege that each Defendant "violated and/or controlled a person who violated § 11 of the Securities Act." (SAC ¶ 202.)

Regardless, to survive a motion to dismiss, Plaintiffs must do more than make a single conclusory assertion that Arconic was a controlling person liable for § 15 claims; they must support such claims with requisite factual allegations that would show just that. On this point, Plaintiffs allege only that Arconic "controlled the Individual Defendants and all of Arconic's employees."

(SAC ¶ 208); *see Kovach v. Turner Dairy Farms, Inc.*, 929 F. Supp. 2d 477, 500 (W.D. Pa. 2013) ("While pleading in the alternative is certainly permitted by the Federal Civil Rules, what is pled alternatively must still have a plausible basis grounded in fact.").

The SAC as a whole does not support this alternative theory of liability. Without much more, such a purely conclusory allegation will not carry the day, and the SAC does not reveal any intention on the part of Plaintiffs to plead § 15 claims in the alternative. And neither the SAC nor the briefing submitted by Plaintiffs otherwise explain the facial tension between their allegations that it was the Individual Defendants who were the "controlling persons" and their modest almost boilerplate converse conclusion that it was instead Arconic that was the "controlling person." And these gaps in explanations come after Plaintiffs have now attempted to plead their claims three times. As a result, the Court will dismiss with prejudice the § 15 claims against all parties with prejudice.

## IV. <u>CONCLUSION</u>

In sum, the SAC transforms the plausibility of some, but not all, of Plaintiffs' allegations. As a result, some, but not all, of Plaintiffs' claims can proceed to the next stage of litigation. The actionable statements are reproduced in Appendix A (§ 10(b) claims) and Appendix B (§ 11 claims) to this Opinion.

For the reasons stated, Defendants' Motion to Dismiss at ECF No. 111 is granted as follows:

- Count I of the SAC will be dismissed against all Defendants with the exception of the specific limited claims described below.

- Count III of the SAC will be dismissed against Arconic with the exception of the specific limited claims described below.

- Count III of the SAC will be dismissed in its entirety against Mr. Kleinfeld.

- Count II of the SAC will be dismissed in its entirety against the Individual Defendants and Arconic.

- Count IV of the SAC will be dismissed in its entirety against Mr. Kleinfeld.

All dismissals are with prejudice. Plaintiffs have now twice amended their original Complaint and have had full opportunity to plead whatever could be said in support of their claims. Any further amendment would thus be futile.

For the reasons stated, Defendants' Motion to Dismiss at ECF No. 111 is denied in part as follows:

- Count I of the SAC survives against all Defendants only with regard to claims based on the sole non-forward-looking statement within SAC ¶ 182 and then only as to claims based on purchases before October 23, 2015.

- Count III of the SAC survives but only against Arconic, and only with regard to claims based on the actionable allegations as described in detail above and within SAC ¶¶ 240, 278, 319, and 359 (risk disclosure statements); SAC ¶¶ 231, 232, 245, 246, 247, 287, 288, 312, 313, 333, 336, 339, 340, and 362 (values/safety statements); SAC ¶¶ 229, 251, 285, and 310 (brochure statements), and SAC ¶¶ 253, 290, 326, and 366 (online statements).

An appropriate Order will issue.

s/ Mark R. Hornak
Mark R. Hornak
Chief United States District Judge


Dated:        June 23, 2021